1

<pre>
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
 2
     - - - - - - - - - - - - - X
 3
     UNITED STATES OF AMERICA,    :   21-CR-458(CBA)
 4
               Plaintiff ,        :
 5                                     United States Courthouse
          -against-               :   Brooklyn, New York
 6
     ROBERTO CORTES RIPALDA,      :
 7                                     November 21, 2024
               Defendant.         :   10:00 a.m.
 8
     - - - - - - - - - - - - - X
 9
          TRANSCRIPT OF CRIMINAL CAUSE FOR FATICO HEARING
10          BEFORE THE HONORABLE CAROL B. AMON
               UNITED STATES DISTRICT JUDGE
11
     APPEARANCES:
12
     For the Government: BREON PEACE
13                       United States Attorney
                         BY:  BENJAMIN WEINTRAUB
14                           Assistant United States Attorney
                             271 Cadman Plaza East
15                           Brooklyn, New York 11201

16                       UNITED STATES DEPARTMENT OF JUSTICE - CRM
                             1400 New York Ave, NW
17                           Washington, D.C.
                         BY:  RANDALL WARDEN, ESQ.
18

19   For the Defendant:  MYERS & GALIARDO LLP
                             52 Duane Street
20                           New York, New York
                         BY:  MATTHEW D. MYERS, ESQ.
21

22   Court Reporter:     Michele Lucchese, RPR, CRR
                         225 Cadman Plaza East
23                       Brooklyn, New York
                         (718) 613-2273
24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer-aided transcription.
</pre>

Proceedings                                      2

1          (In open court.)

2          THE COURTROOM DEPUTY:  Good morning.

3          This is criminal cause for a Fatico hearing in

4   21-cr-458, USA versus Roberto Cortes Ripalda.

5          Would the parties please state your name for the

6   record, starting with the Government.

7          MR. WEINTRAUB:  Good morning, Your Honor.  Benjamin

8   Weintraub and Randall Warden for the United States.  We are

9   joined at counsel's table by Special Agent Joseph Weber and

10  paralegal specialist from our office Asher Martin-Rosenthal.

11         THE COURT:  Good morning.

12         MR. MYERS:  Matthew Myers for Mr. Roberto Cortes.

13  Good morning, Judge.

14         THE COURT:  Good morning.  Everyone can be seated.

15         This matter is on for a hearing, a Fatico hearing on

16  the amount of loss.

17         I understand the Government has witnesses available

18  to testify and we will hear from them momentarily, but there

19  are a number of questions that I have before we begin, number

20  one is that this from presentence report was filed in, I

21  think, February of 2024.  Obviously, questions of loss are

22  intertwined with restitution.  And the PSR says something to

23  the effect of we don't have enough information about

24  restitution.

25         Is the Government going to be seeking restitution to

Proceedings                                                           3

1    victims in this case?

2         MR. WEINTRAUB:  Certainly with respect to some

3    victims, yes.  The Government is, and has been for some time,

4    endeavoring to contact as many victims as the Government can

5    identified.  So to the extent the Government is able to

6    identify victims, we have been notifying them of all court

7    proceedings and I have been in touch with a number of victims

8    with respect to potential restitution.

9         Loss amount, in the Government's view, is not always

10   coextensive with restitution.

11        THE COURT:  Well, I understand that, but the issues

12   are intertwined and I don't want to have another proceeding

13   like this one as to individual victims.

14        Can you put the information on today as to the

15   losses of the individuals that you understand that you have

16   talked to and losses?

17        MR. WEINTRAUB:  We're not prepared to go into each

18   or any specific victim today.

19        THE COURT:  Well, when are we going to do that?  I

20   mean, all good things have to come to an end.  The PSR has

21   been filed in 2024.

22        One of the things the Court has to determine at

23   sentencing is restitution and I'm not going to do one of these

24   we will put it off 90 days.  That issue needs to be resolved

25   before sentencing.

Proceedings                                    4

1          MR. WEINTRAUB:  We will endeavor to obtain from any

2   victim who wants to seek restitution their affidavit of loss

3   in advance of sentencing, and certainly key that issue up for

4   the Court in advance of sentencing.

5          THE COURT:  How are you going to connect it to the

6   information that you are putting forth today?  In other words,

7   this is highly contested information.  How are you going to

8   link it to whatever it is that the Court is able to determine

9   today?

10         MR. WEINTRAUB:  It's the Government's position that

11  individuals who invested in the Proprietary Products that were

12  issued by Biscayne Capital, all of which are, for lack of a

13  better phrase, went bust with the liquidation of Biscayne.

14  Those investors who have outstanding amounts owed to them are

15  the victims.  And to the extent that they have been paid back

16  either over the course of the Ponzi scheme, some individuals

17  are paid back or there is a liquidation in progress.  As the

18  Court may be aware, a judgment against Deutsche Bank, for

19  example, that was originally $95 million and then post-trial

20  settlement negotiations had roughly --

21         THE COURT:  What was the basis?  You mentioned it,

22  but I don't know what Deutsche Bank has to do with anything.

23  No one has really explained that.

24         MR. WEINTRAUB:  Deutsche Bank was one of the banks

25  in which -- where various client bank accounts, client of

Proceedings                                                    5

1   Biscayne Capital bank account were custody.  So when,

2   primarily, in connection with the overdraft scheme, which is

3   the scheme we have talked about and we will discuss a little

4   bit more through testimony today, clients' accounts that were

5   custodied at Deutsche Bank through the conduct of the

6   defendant and his co-conspirators were overdrafted.  And thus,

7   when -- and thus, as a result of that, Deutsche Bank

8   essentially advanced money to the defendant and his

9   co-conspirators, which they then used freely.

10          So what happened was then, I believe it was some of

11  those individuals then sued Deutsche Bank, essentially, for

12  negligence, for not catching the criminal fraudulent -- excuse

13  me.  It was the liquidator of the Biscayne estate standing in

14  the shoes of the creditors of Biscayne who sued Deutsche Bank.

15  I think I understand it to be essentially a negligence theory,

16  saying that Deutsche Bank should have caught the criminal

17  fraudulent conduct by the defendant and his co-conspirator, so

18  that judgment will redound to the estate of Biscayne and

19  ultimately to the creditors of Biscayne, who are in large part

20  the victims, the investors.

21          So that's just another factor that complicates

22  calculating restitution in this matter.  But the Government

23  has been in detailed communications with the liquidators

24  trying to get a sense from them who the victims are, what the

25  actual amounts are.  They're doing their own work to assess

Proceedings                                    6

1    claims.  And the Government again has been trying to identify

2    victims, many of whom are abroad, some of whom maybe don't

3    want to be identified and don't want to put forth a

4    restitution claim.

5           But the Government hears the Court loud and clear.

6    We will endeavor to have any restitution claims put forth at

7    sentencing.  It's the Government's position that once -- if

8    the Court were to agree with the Government's view that

9    essentially an investor in these Proprietary Products who has

10   not yet been paid back, at the very least their principal, is

11   a victim, then those individuals would only need to establish

12   that they are, in fact, investors in the Proprietary Products

13   who have not been paid back.  And that's what the Government

14   will intend to put forth.

15          THE COURT:  I don't know whether this simplifies the

16   issues at all.  It may well not.  But the Government is

17   seeking to establish a loss of 155 million; correct?

18          MR. WEINTRAUB:  I think that the tranche in the

19   guidelines is 150 million.  That takes you up to right where

20   the enhancement is that the Government believes is

21   appropriate.

22          There are a number of different figures were the

23   Court or anyone could conclude the loss amount is.  We believe

24   on the most conservative estimate, it's 155 million.

25          THE COURT:  Apart from the restitution issue, which

Proceedings                                                    7

1    obviously complicates this, any loss that exceed $25 million,

2    it would bring you to a guideline range that would exceed the

3    statutory maximum.

4          Would that shorten the proceedings at all to

5    establish a loss of 25 million as opposed to a loss of 155

6    million or not?

7          MR. WEINTRAUB:  Well, simply with respect to loss

8    amount, I'm not really sure it would, because -- if I can just

9    preview the testimony we intend to elicit here today.  We will

10   go through sort of a couple of specific victims and means and

11   mechanisms through which the fraud was perpetrated.  And if we

12   were to take those and add the numbers associated with those

13   specific victims and those specific methodologies, you might

14   get a number that is over 25 million.  But the bulk of the

15   loss amount is driven by the theory, the Government's theory

16   that the investments in the Proprietary Products were procured

17   at least in part and then intermingled by fraudulent means.

18         So I'm not sure it would shorten the proceedings

19   today.  But that's sort of a preview of what the Government

20   intends to put forth today.

21         THE COURT:  The Government intends, I take it, to

22   establish that this is what you have referred to as a Ponzi

23   scheme, that investments were subsequently created to pay back

24   people who had previously --

25         MR. WEINTRAUB:  Yes, Your Honor.  In part, we intend

Proceedings                                          8

1    to establish that.

2          We also intend to establish that there were

3    misrepresentations made in the procurement of investments as

4    early as -- we believe it's as early in 2019, but in the

5    indictment we start at 2013.  So we will, at the very least,

6    go back that far,, you know, with the defendant's knowledge,

7    participation and that -- so that's one thing we will intend

8    to establish.  Another is that he remained involved really

9    throughout until the liquidation in 2018.  He never withdrew

10   from the conspiracy, that he was aware of the conduct of his

11   -- certain of his co-conspirators, which the Government makes

12   no bones about, that certain conduct, the overdraft scheme,

13   was driven and largely orchestrated by Fernando Haberer.

14         THE COURT:  The overdraft scheme was different from

15   the Ponzi scheme?

16         MR. WEINTRAUB:  Well, in a Ponzi scheme the

17   fundamental issue facing the perpetrators of the scheme is

18   case, how do they get cash.  So one way to get cash was to

19   obtain new investments from new clients.

20         THE COURT:  To payback and keep older clients on the

21   hook by paying them back?

22         MR. WEINTRAUB:  Correct.

23         But another way that the defendant and his

24   co-conspirators obtained cash was throughthis the overdraft

25   scheme and they used that money to pay older investors who

Proceedings                                    9

1   wanted to redeem and --

2          THE COURT:  So you intend to offer testimony about

3   that scheme as well?

4          MR. WEINTRAUB:  Yes, Your Honor.

5          THE COURT:  And is there a separate amount for the

6   overdraft scheme versus the --

7          MR. WEINTRAUB:  So we haven't done that calculation.

8   But, yes, I think it could be possible to ascertain a distinct

9   amount that was obtained through the overdraft scheme and

10  never paid back to the banks because part of the overdraft

11  scheme was also paying back the banks.

12         THE COURT:  So who is the victim, the banks?

13         MR. WEINTRAUB:  Well, it's actually not just the

14  banks, but it's also the clients of Biscayne Capital whose

15  accounts were overdrafted at the banks.

16         THE COURT:  But are you going to indicate client by

17  client who that was?

18         MR. WEINTRAUB:  We will at least indicate -- today

19  we're not going to go into any specific clients.

20         THE COURT:  Well, how are you going to establish the

21  Ponzi nature?  Are you going to establish that the money was

22  taken from one person to pay another person?

23         MR. WEINTRAUB:  There's at least one victim we will

24  walk you through.

25         THE COURT:   Is that client number one you referred

Proceedings                                        10

1   to?

2           MR. WEINTRAUB: Yes.

3           THE COURT:  Who is that?

4           MR. WEINTRAUB:  Ferran Mirapeix.

5           THE COURT:  And I take it you knew that beforehand?

6           MR. MYERS:  Yes.

7           MR. WEINTRAUB:  That's with respect to the pure

8   Ponzi. But  with respect to the overdraft, we will have two

9   witnesses who will testify about the existence of the

10  overdraft scheme, what its purpose was, documents reflecting

11  the income of cash through the overdraft scheme, the use of

12  that cash to repay other investors.  So, that's what we intend

13  to establish via the overdraft scheme

14          THE COURT:  Let me just  -- Mr. Myers, I must say I

15  was somewhat surprised by your response to the loss

16  presentation made by the Government because it seems to

17  completely contradict Mr. Cortes's plea allocution, which is a

18  bit troubling.  And I don't see any motion to withdraw his

19  plea.

20          And you're not making that motion, right?

21          MR. MYERS:  I am not.

22          Part of the -- I have approached the Government to

23  try to resolve this in a much more minimalistic way.  Part of

24  the intellectual disagreement is that between -- I mean, this

25  was started in -- I'll use a ballpark figure -- 2000, all the

Proceedings                                                          11

1    way up to 2016.  They had a lot of money under management,
2    $1.5 billion.  It was earning a lot of fees, generating a lot
3    of fees for these advisors.  So what happened was there was a
4    lot of disagreement amongst the partners, the two witnesses
5    who are going to testify today, along with a fellow who's
6    being extradited, Haberer.  Those three split up into a
7    different organizations completely, which my client doesn't
8    want to take any responsibility for.
9               THE COURT:  What is your client willing to take
10   responsibility for?  That wasn't clear to me.
11              MR. MYERS:  So there are a number of transactions
12   with  his father, that he  got -- father-in-law, which he got
13   involved in, that he had knowledge of what the other three
14   people were doing at some point.  And there was a series or
15   three or four things which there's too much detail behind it.
16   But there are three or four transactions that I think he was
17   very aware of, that he's willing to admit to.  I would put him
18   on the witness stand and have him tell you about the knowledge
19   behind those, we will call them scams.  But we are never going
20   to play into the prosecutor's theory that this is a pyramid
21   scam.
22              THE COURT:  You mean a Ponzi scheme?
23              MR. MYERS:  A Ponzi scheme.
24              THE COURT:  Well, that's what he allocuted to,
25   though.

```
                          Proceedings                    12
```

1          MR. MYERS:  Yeah,  but what he was speaking of was a

2    period where he knew what these guys were doing.  He agreed

3    with it.  It may have been foreseeable.  He didn't stop it.

4    He didn't withdraw himself.  But there is an assumption on the

5    Government's part that from 2000 to 2016 they were taking in

6    money and earning $20 million in fees and it was a Ponzi

7    scheme.  It wasn't.  No Ponzi scheme could even financially

8    operate that way.

9          THE COURT:  He admitted that he used investor funds

10   to cover the debt owed to other investors between the dates of

11   2013 and 2018.  He's not seeking to back away from that

12   admission, or is he?

13         MR. MYERS:  He is not.

14         And here's the rub, which is a nuance, when the

15   prosecutors didn't nail him down to what transactions between

16   2013 and 2018 are you talking about, he wasn't admitting to

17   from the first day of January 1st, 2013 up to 2018 I was

18   scamming people.  That's not what he was allocuting to.  It

19   could have been ironed out.  Maybe it is my fault, too.  He

20   should have been more transparent.

21         THE COURT:  He stands by the statement that between

22   2013 and 2018 he engaged in a scheme to use investor funds to

23   cover the debts owed to other investors within Biscayne

24   Capital.  I take it he stands by that statement; is that

25   correct?

Proceedings                                13

1            MR. MYERS:  Yes, Judge.

2            THE COURT:  Okay.

3            MR. MYERS:  There were certain transactions in that

4    period that he would stand by having knowledge of.

5            THE COURT:  Okay.  Are you ready?

6            MR. WEINTRAUB:  Yes, Your Honor.

7            THE COURT:  Hold on.  Let me see if there is --

8            MR. MYERS:  Judge, can I just add one thing?

9            THE COURT:  Sure.

10           MR. MYERS:  Five seconds. That is, I know it's a

11   little bit -- we don't like -- criminal lawyers don't like to

12   talk about civil suits, but I just want to correct something,

13   that Deutsche Bank civil lawsuit with overdrafts, that was

14   Madison.  The liquidators saw that Haberer, Trujillo, and

15   Weisson were sued, and it was the Madison Corporation, not

16   Biscayne, which Mr. Cortes set up.

17           THE COURT:  But I think the Government's theory is

18   that the funds went into Madison.

19           MR. MYERS:  Okay.

20           THE COURT:  I think their theory is the defendant

21   was involved in that.

22           MR. MYERS:  You may be right.  Maybe my cross will

23   bear out something different.

24           THE COURT:  There is a Google Drive cash flow

25   spreadsheet.  And does that spreadsheet show the loss to all

Proceedings                                                          14

1    of the potential victims here?

2            MR. WEINTRAUB:  Your Honor, there are two

3    spreadsheets that are really important here, one is Exhibit D,

4    which I think we have called the Proprietary Products

5    spreadsheet.  That is the one we would argue actually will

6    show the loss to all of the victims because it goes

7    Proprietary Product by Proprietary Product.  Okay.

8            The cash flow spreadsheet will show how incoming

9    cash -- from where it was received and then how it was used.

10           So by going through at least one example that I know

11   I will go through regarding Ferran Mirapeix, the Court will

12   see his investment money coming in and how it is -- it flows

13   out within a week to other people and not for the purpose that

14   was stated in the offering memorandum for his investment and

15   not for the purpose that he was told his money would be used

16   by the defendant.

17           THE COURT:  Do you have the offering memorandum for

18   each of the Proprietary Products?

19           MR. WEINTRAUB:  We do have at least -- we do.

20           THE COURT:  Are they in the exhibit?

21           MR. WEINTRAUB:  Yes.

22           THE COURT:  I know you presented some.

23           MR. WEINTRAUB:  They are in the supplemental

24   exhibits after the Court's order regarding the Government's

25   latest submission a week ago.  So they're in the new binder

Proceedings                                                    15

1    the Court has.  And yes, the Government does have those

2    offering memorandum.

3              THE COURT:  And it's your position that all of those

4    offering memoranda show that they were told that the

5    investment was for the product --

6              MR. WEINTRAUB:  Some are more specific than others,

7    but in particular, the ORC Senior Secured Limited offering

8    memorandum for 2013 says that.  The offering memorandum for

9    the Select Industries PLLC, which is the sort of bespoke

10   product that was created just for Ferran Mirapeix says that.

11             There were, however -- it's the Government's

12   position that there was -- investors were told that their

13   money would be used to develop real estate.  Even if it's not

14   specifically said in an offering memorandum, there could be

15   misrepresentations outside of the offering memorandum.

16             And there are also material omissions in the

17   offering memorandum.  They do not sort of disclose the

18   financial impairment of South Bay.  They certainly do not

19   disclose that the money would be used to repay other investors

20   in other Proprietary Products.

21             THE COURT:  So the phrase working capital, in your

22   view, referred to the actual Proprietary Product that was  --

23             MR. WEINTRAUB:  Working capital, in our view, and it

24   will be the testimony of our first witness, as it is used in

25   the ORC Senior Secured Limited offering memorandum refers to

Proceedings                                                16

1    the working capital of South Bay, which is the working capital

2    for South Bay's projects, which is building and constructing

3    and selling real estate.

4          And to the extent it is any repayment of debt, it's

5    the repayment of bank mortgages.

6          So South Bay, as a real estate development company,

7    buys property and it either tears down the house there and

8    rebuilds or in the event that the lot is vacant, it buys

9    vacant lots in bits.  That's its business model.

10         At times, in order to buy the property, South Bay

11   had to obtain a mortgage, just like a classic loan from a bank

12   to buy property.  The first witness will testify that working

13   capital needs could go to pay back that, but that is a

14   separate concept than paying back an investor in a different

15   Proprietary Product.  That's money being used to payback a

16   bank loan for the very real estate that South Bay is intending

17   to develop.

18         THE COURT:  And you will offer testimony as to

19   client one's what Proprietary Product he invested in because

20   that seems to be the subject of dispute?

21         MR. WEINTRAUB:  Yes, Your Honor.  It's called Select

22   Industries PLLC.  Again, this client in particular wanted his

23   own vehicle and he got that.  So there is an offering

24   memorandum specific to Select Industries PLLC.  There is also

25   a term sheet, a one-page term sheet, that he was given that is

Proceedings                                             17

1    specific to his investment.  There are misrepresentations in

2    both of those documents.  In addition to the

3    misrepresentations in those documents, there were oral

4    misrepresentations made by the defendant and his

5    co-conspirator, who will testify today, to Mr. Mirapeix in

6    person while they were touring the Ocean Reef Club in Key

7    Largo.

8             THE COURT:  All right.  Do you want to call your

9    first witness then?

10            MR. WEINTRAUB:  Yes, just for technical purposes,

11   we're going to have exhibits that we would like to show.  I

12   have my computer plugged in.

13            THE COURT:  Are they in the --

14            MR. WEINTRAUB:  Everything is in the binder and on

15   the flash drive that has been provided to the Court, with the

16   exception of the spreadsheets are not in the binder because

17   they cannot printed in a way that would fit in the binder, but

18   they are on the flash drive.

19            THE COURT:  Just one other thing to clarify.  As

20   part of the plea agreement, there would be a four-point

21   enhancement, I believe, for leader.  You're not questioning

22   that?  That was agreed to in the plea agreement; correct, Mr.

23   Myers?

24            MR. MYERS:  Upon further review, I may contest that.

25            THE COURT:  Do you want to withdraw from the plea

Proceedings                                                    18

1   agreement?  How do you contest that?

2          MR. MYERS:  Well, I think it might be hair

3   splitting, but it goes back to the old argument that I just

4   mentioned, that when they split up from him, I don't think the

5   loss amounts attributed to new group at Madison should be

6   attributed to my client.

7          He may have been a leader in 2016, but after 2016 he

8   wasn't doing anything with that group.  And that's a massive

9   tranche of lose.  So he shouldn't be attributed  to being the

10  leader of that group.  I know it's a nuance.  But if that's

11  $80 million of the 155, he is not the leader of that group,

12  and I just want to point that out.

13         THE COURT:  Although his plea allocution did say

14  2013 to 2018; correct?

15         MR. MYERS:  Yes.

16         THE COURT:  Do you want to --

17         MR. WEINTRAUB:  Tiffany, it will be a little bit of

18  time before I need my first exhibit.

19         The Government calls Ernesto Heraclito Weisson

20  Pazmino.

21         THE COURT:  Who goes by what?

22         MR. WEINTRAUB:  Ernesto Weisson, W-E-I-S-S-O-N.

23         THE COURTROOM DEPUTY:  Good morning.  Step up by the

24  chair there.

25         Remain standing and raise your right hand.

1            THE WITNESS:  I swear.

2            (Witness sworn.)

3            THE COURTROOM DEPUTY:  Can you please state and

4    spell your name for the record.

5            THE WITNESS:  Ernesto Weisson, E-R-N-E-S-T-O, W E I

6    S S O N.

7            THE COURTROOM DEPUTY:  Thank you.  You may be

8    seated.

9    **ERNESTO HERACLITO WEISSON PAZMINO**,

10        called as a witness, having been first duly

11        sworn/affirmed, was examined and testified as follows:

12   DIRECT EXAMINATION

13   BY MR. WEINTRAUB:

14   Q    Good morning, Mr. Weisson.

15   A    Good morning.

16   Q    Can you just tell the Court a little bit about your

17   personal background, where you were born, where you grew up,

18   what you studied, things of that nature?

19   A    Yes.  I was born in Washington, D.C., and then when I was

20   two years old, I went to live in Ecuador in Guayaquil with my

21   family.  I studied there and I lived there until I was 30

22   years old, until 1998, in which I came back to the United

23   States to study a master's degree, to get a master's degree.

24            And then, in 2000, when I graduated, I decided with

25   my wife and my kids to stay in the U.S. living in Miami.

1   Q     What did you study?  What did you obtain your master's

2   degree in?

3   A     In architecture.

4   Q     Okay.  Now, you grew up, for the most part, though, in

5   Ecuador, in Guayaquil?

6   A     Yes.

7   Q     Did you know the defendant Roberto Cortes growing up?

8   A     Yes.

9   Q     How did you know him?

10  A     From high school.

11  Q     After high school, did you stay in touch with him?

12  A     No.

13  Q     Did there come a time around 2000 or 2001 when you

14  reconnected with Roberto Cortes?

15  A     Yes.

16  Q     Can you describe that reconnecting?

17  A     Yes.  I had my kids studying at the public school in

18  Biscayne and he had his kids there as well.  I think there was

19  a parents' meeting where I saw him and, you know, we say hi to

20  each other and we started chatting.

21  Q     What did you talk about at that parents' meeting?

22  A     Well, what he was doing, what he had been doing through

23  time and the same for me.

24  Q     What did he say that he had been doing professionally?

25  A     He said that he was working in a private banking firm and

1    that he was also doing some development in Key Biscayne with

2    his brother-in-law.

3    Q    Did he say anything more about the development in Key

4    Biscayne with his brother-in-law?

5    A    No.  At that moment it was a very, I would say, a

6    superficial conversation, but  what we ended up doing was

7    setting up a meeting to discuss a little bit more about the

8    things we wanted to do.

9    Q    So let's talk about that next meeting.

10         Can you tell us what happened at the next meeting

11   with Roberto Cortes?

12   A    Yeah.  There was first a meeting and then we had several

13   meetings in which I presented in more detail what it is that I

14   wanted to do, meaning Key Biscayne, which was to purchase a

15   couple of lots with old houses, you know, to tear them down

16   and build new houses, and he told me he was already doing

17   that.  He had know-how in certain things regarding that, like,

18   you know, obtaining financing from banks, managing the legal

19   part of it.

20         And I told him that I had more of the architecture

21   and construction experience.  So we -- I'm sorry -- decided to

22   do something together, which was to finish a couple of the

23   homes he had started already and that he wasn't finishing with

24   his brother-in-law, and then to purchase the two lots that I

25   was -- that I wanted -- in which I wanted to develop

Weisson - direct - Weintraub                    22

1   something.

2          MR. WEINTRAUB:  Your Honor, may I just provide the

3   defendant with a bottle of water?

4          THE COURT:  Yes.

5          THE WITNESS:  Thank you.

6   Q    Just to be clear, the business that you wanted to get

7   into was the business of buying old houses, tearing them down,

8   and then building new houses on those lots; is that right?

9   A    Yes.

10  Q    And that's the business that Roberto Cortes told you that

11  he was already involved in; is that right?

12  A    Yes.

13  Q    And essentially, you and he, at that meeting and the

14  subsequent meetings, discussed the concept of going into

15  business together; is that right?

16  A    Yes.

17  Q    And did you ultimately go into business with Roberto

18  Cortes?

19  A    Yes.

20  Q    And did you call that business, sort of as a trade name,

21  South Bay?

22  A    Yes.

23  Q    So South Bay is the business of you and Roberto Cortes

24  with the business model is find properties, tear them down,

25  build new ones, sell them; correct?

1    A    Yes.

2    Q    Okay.  Let's just talk about in the early days.  What was

3    the source of -- sources of funding for South Bay?

4            How did it obtain money to buy properties, tear them

5    down, build new properties?

6    A    It would be through different sources:  One would be a

7    bank financing, and the other would be private investors,

8    which would be family and friends lending us money to, you

9    know, to put the equity required for the projects and for the

10   banks to give us lines of credit.

11   Q    Okay.  And what was the business model or the plan to

12   repay either the bank loans or the friends and family

13   investors?

14   A    To build the homes, finish them, sell them.  And with

15   that, repay any loans outstanding and get a profit.

16   Q    Okay.  So, South Bay has to build homes, sell those homes

17   and profit, and then use those profits to repay its investors;

18   correct?

19   A    Yes.

20   Q    Okay.  Now, did there come a point -- well, before I get

21   there.

22            You mentioned friends and family.  So is it the case

23   that for each time South Bay wanted to buy a property or do a

24   teardown, it had to sort of take out the road show again and

25   find new investors and it was a very iterative process, so to

1  say?

2  A    Yes.

3  Q    Did there come a time when you and Roberto Cortes and

4  South Bay decided or contemplated an alternative source of

5  funding South Bay's operations?

6  A    Yes.

7  Q    Okay.  Can you describe the genesis of that idea and what

8  that idea was?

9  A    Yes.  Roberto and his brother told me that there was a

10  way in which this raising of funds for the purpose of

11  developing could be done in a more institutionalized way and

12  that it could be through a fund.  So instead of us having to

13  be meeting with investors and, you know, meeting with them

14  afterwards, because they wanted to follow up on how things

15  were doing, et cetera, et cetera,, you know, this could be

16  simply a way through which investors could purchase a note or

17  a document from a fund.  And then, on the other hand, the fund

18  would invest into South Bay for development of the properties.

19  Q    Okay.  Just to unpack that, you mentioned Roberto Cortes

20  brother.  What is his name?

21  A    Juan Carlos Cortes.

22  Q    Okay.  Now, just to make sure I understand the idea as it

23  was pitched to you, it was to create a fund, an investment

24  fund through which investors or customers or clients would

25  invest and that money would then be used by South Bay to fund

1    South Bay's real estate development business; correct?

2    A    Yes.

3    Q    Did you and Roberto Cortes and Juan Carlos Cortes

4    ultimately go forward with this plan to set up a fund?

5    A    Yes.

6    Q    Do you remember approximately what year this was?

7    A    Between 2005 and 2006, I believe.

8    Q    Okay.  What was the name of that fund?

9    A    Sentinel Investment Fund.

10            THE COURT:  Did you say Sentinel?

11            THE WITNESS:  Yes, Sentinel.

12   Q    What was the Biscayne Capital Casa de Valores?

13   A    When we were discussing about the idea of this fund,

14   there was also the idea of having -- in order to sell the fund

15   or the notes of the fund to clients, to do it through a

16   broker-dealer or Casa de Valores, as its called in Ecuador,

17   and, so, the idea, again, on that side was to create a Casa de

18   Valores, which basically was done through purchasing an

19   existing one, changing the name, and then getting financial

20   advisors with portfolios and clients to sell this Sentinel

21   Investment Fund.

22   Q    Okay. So I just want to -- since it's a little bit

23   tricky -- make sure we are clear on sort of the relationship

24   between these entities.

25            So you have Sentinel Investment Fund, which is

1    created by you and Roberto and Juan Carlos, and then there is

2    Biscayne Capital, Casa de Valores down in Ecuador, which is a

3    broker-dealer that you and Roberto and Juan Carlos bought and

4    ran, and then there are financial advisors that are hired by

5    you and Roberto and Juan Carlos, and their job is to find

6    clients to buy or invest in Sentinel Investment Fund; is that

7    correct?

8    A    Yes.

9    Q    Okay.  And, again, the policy --

10                THE COURT:  I'm not sure he has indicated clearly

11   what Biscayne -- you identified Biscayne Capital as something

12   separate.  Maybe you want to --

13                MR. WEINTRAUB:  Sure.

14   Q    So the first Biscayne Capital entity was called Biscayne

15   Capital Casa de Valores; correct?

16   A    Yes.

17   Q    And that was a broker-dealer that you and Roberto

18   initially purchased in Ecuador; correct?

19   A    Yes.

20   Q    What was the name of that broker-dealer when you

21   purchased it?

22   A    If I am not mistaken, it was it Westwood Capital.

23   Q    And then did you and Roberto rename it to Biscayne

24   Capital Casa de Valores?

25   A    Yes.

Weisson - direct - Weintraub                    27

1   Q     And is that the first sort of Biscayne Capital entity?

2   A     Yes.

3   Q     Now, in the years between 2005 and 2006 and 2018, were

4   there  a number of other entities that were created by you and

5   Roberto and others that were titled in some way Biscayne

6   Capital XYZ?

7   A     Yes.

8   Q     So the initial entity is a broker-dealer that was

9   purchased to execute the trades or the investments into

10  Sentinel Investment Fund; is that correct?

11  A     Yes.

12  Q     And then subsequently, there were a number of other

13  financial companies and institutions that you and Roberto and

14  others started that were called Biscayne Capital Uruguay, for

15  example; correct?

16  A     Yes.

17  Q     Okay.  So if I refer, though, to the phrase Biscayne

18  Capital, at a certain point do you understand that to mean the

19  business that you and Roberto and others are running, that is

20  the sort of financial advisory business that's one part of

21  your larger business?

22  A     Correct.

23              THE COURT:  Does it remain a broker-dealer?

24              THE WITNESS:  I don't know what the status of that

25  business is right now, Your Honor.

1          THE COURT:  No.  I meant when you change it and

2    start these -- counsel has pointed out that it changed names

3    and became, I guess, at one point Biscayne Capital Euro.  Was

4    it still functioning as a broker-dealer?

5          THE WITNESS:  Yes, in -- it was a broker-dealer in

6    Ecuador, then a broker-dealer in Uruguay, and then the one in

7    Ecuador was closed, but many other projects were opened.

8          THE COURT:  But it is always a broker-dealer but

9    branches are opened in other places?

10          THE WITNESS:  Depending on the jurisdiction, it is a

11    broker-dealer or it's a different type of entity.

12          THE COURT:  For what purpose was it used in the

13    business?  How did you use it in the business?

14          THE WITNESS:  The main purpose was to -- on the one

15    hand to bring clients and portfolio and with that to generate

16    profits as a broker-dealer.  But also, it was a platform to be

17    able to sell the multiple products that, or issuance of -- the

18    multiple issuance that basically the group was doing in order

19    to get funds to continue with growing the projects and the

20    business.

21          THE COURT:  So it was selling these proprietary

22    products?  Is that what it was doing?

23          THE WITNESS:  Well, in part, yes.  On other hand, it

24    was a business -- a -- basically making fees by clients, you

25    know.

1              THE COURT:  Who were purchasing these?

2              THE WITNESS:  Purchasing that or securities.

3              THE COURT:  So it was broader than just the South

4    Bay business?

5              THE WITNESS:  Yes.

6              THE COURT:  Okay.

7    Q    Right.  So to be clear, there were -- a client could --

8    Biscayne would sell the Proprietary Products, that was one

9    part, but also there were clients who  just -- that Biscayne

10   Capital managed their money not within a Proprietary Product,

11   they might invest it in Microsoft, for example?

12   A    Yes.

13   Q    Or hold it as cash, for example?

14   A    Yes.

15   Q    In sometimes accounts in the United States; right?

16   A    Yes.

17   Q    Now, the client that you and Roberto were targeting

18   initially, where were they from, more or less?

19   A    Initially from Ecuador.

20   Q    Okay.  So when I mentioned there were sort of two parts

21   of your and Roberto's business, there is the Biscayne Capital

22   financial advisory on the one hand and then there's the South

23   Bay development on the other?

24             THE COURT:  I'm sorry.  I hit the microphone.

25             MR. WEINTRAUB:  I will repeat the question.

1  Q    So, on the one hand there was the Biscayne Capital

2  financial advisory and broker-dealer; correct?

3  A    Yes.

4  Q    And on the other hand there was the South Bay real estate

5  development; correct?

6  A    Yes.

7  Q    And they were entwined, at least to a certain extent,

8  because many of the Proprietary Products, if not all of them,

9  that were sold by Biscayne Capital financial advisors, the

10  investments in those Proprietary Products or the purchases of

11  those Proprietary Products, that money was then used by South

12  Bay to fund its real estate development; correct?

13  A    Yes.

14  Q    That was the intended purpose of this relationship ?

15  A    Yes.

16  Q    Okay.   Now, I just want to quickly touch on the Sentinel

17  Investment Fund.  This is the first one.  So investors, were

18  they going to get paid a fixed interest rate on their

19  investment?

20  A    Yes.

21  Q    Okay.  And then they could redeem their principal;

22  correct?

23  A    On maturity of the investment, yes.

24  Q    And, so, the fixed interest rate, that's sort of how they

25  were going to profit on their investment; correct?

1    A    Yes.

2    Q    Okay.  And when Sentinel Investment Fund gets money, it

3    loans that money over to South Bay; correct?

4    A    Yes.

5    Q    So that South Bay can use it for its operations; right?

6    A    Yes.

7    Q    And that's what investors in Sentinel were told that this

8    money would be used by South Bay to develop real estate?

9    A    Yes.

10   Q    And then the plan to pay the Sentinel investors their

11   interest or to redeem their investment, again, would that come

12   from South Bay building and selling houses, generating

13   profits, and then using those profits to repay investors?

14   A    Yes.

15   Q    Okay.  I want to turn to the Ocean Reef Club.  What is

16   the Ocean Reef Club?

17   A    It is a private club, which is a private community with

18   residences all over the club.

19   Q    And is it located in Key Largo, Florida?

20   A    Yes.

21   Q    Okay.  Now, did there come a time after the creation of

22   Sentinel Investment Fund where South Bay purchased a number of

23   lots in the Ocean Reef Club?

24   A    Yes.

25   Q    Okay.  How many lots?

1  A     29.

2  Q     And approximately how much did South Bay pay for those

3  lots in total?

4  A     Around 15 million, plus the memberships they also had to

5  purchase related to those lots.

6  Q     The membership was approximately 200,000?

7  A     Yes.

8  Q     Okay.  Now, is it fair to say that a 15-million-dollar

9  purchase of 29 lots represented a large purchase for South

10 Bay?

11 A     Yes.

12 Q     Okay.  What was South Bay's business plan for building,

13 initially for building on the Ocean Reef Club lots?

14 A     We were aware that basically what we could do in terms of

15 the zoning of the lots was to build single-family homes.  So

16 we thought of doing that.  But, initially, we thought that it

17 would be maybe more profitable to be able to sell those homes

18 instead of simply a single-family home, through a structure,

19 which is called fractional ownership, which is similar to

20 timeshare.

21 Q     Approximately when did South Bay purchase the Ocean Reef

22 Club lots?

23 A     In 2006.

24 Q     So around the same time but after Sentinel Investment

25 Fund is formed?

1  A    Yes.

2  Q    Okay.  So did that business plan, to build single-family

3  homes with fractional ownership on the Ocean Reef Club lots,

4  did that plan succeed?

5  A    No.

6  Q    Why not?

7  A    Because after I would say a year or so, you know, of

8  working on -- on presenting the plan by hiring, you know,

9  attorneys that were specialized in this type of structure, we

10  -- once we have -- had the presentation to be done to the

11  board of directors at Ocean Reef Club, we did it, and they

12  rejected the plan.

13  Q    Okay.  So from the time of the commencement of the plan

14  to its rejection, approximately how much time was that?

15  A    Over a year.

16  Q    So that's over a year of no building on the Ocean Reef

17  Club lots; correct?

18  A    Yes.

19  Q    No selling any of those; correct?

20  A    Yes.

21  Q    No generation of profits; is that correct?

22  A    Yes.

23  Q    What was the next plan?

24        After that initial plan of fractional ownership was

25  rejected, what was South Bay's next plan for how to build on

1  the Ocean Reef Club lots?

2  A    We were about to -- we started with plans for the homes

3  one by one and -- but we were approached by a group of members

4  of the club, and they said that they were interested in doing

5  a community for the elderly in a portion of the lots that we

6  had.

7           THE COURT:  Doing what?  I couldn't understand.

8           THE WITNESS:  A community for the elderly.

9  Q    So they came to you with an idea of creating within the

10 Ocean Reef Club like sort of a community within a community

11 that would be essentially geared or targeted toward elderly;

12 correct?

13 A    Yes.

14 Q    So tell us, did that plan succeed?

15 A    No.

16 Q    Why not?

17 A    Because in order for us to achieve the plan, we needed to

18 change the zoning of 17 lots to build 34 duplexes, which is

19 what they wanted, and they said if we would be able to do it,

20 they would purchase it.  So we would sell the whole thing, at

21 least on the particular street.

22           And we went through the process that also take --

23 took like another year and we were, I would say, at the final

24 stages.  There was a hearing and -- there was going to be a

25 hearing or there was a hearing, and one of the neighbors found

1    out that there was this hearing and that we were working on

2    this changeing of zoning, and she complained about this.  She

3    complained and told other neighbors if they were in agreement

4    with this, they were not.  And then there was a group of

5    neighbors that complained and said they didn't want this to

6    happen.  And, finally, the Ocean Reef Club, the board decided

7    that it was going to be rejected as well.

8    Q    Okay.  And you said this entire process from commencement

9    of second idea to rejection was over a year or approximately a

10   year?

11   A    Approximately.

12   Q    So that's again a year of no building?

13   A    Yes.

14   Q    No sales at Ocean Reef?

15   A    No.

16   Q    No generation of profits?

17   A    No.

18   Q    So now we are over two-plus years after the purchase of

19   the lots in 2006  with nothing having been done there;

20   correct?

21   A    Yes.

22   Q    Okay.  And how did these failed attempts to build at the

23   Ocean Reef Club, how did that affect South Bay's financial

24   state?

25   A    Well, South Bay was in a very difficult situation at the

1    moment.

2    Q    Can you elaborate?

3    A    Yes.  I mean, we were -- we had a lot of expenses we had

4    to pay to honor the debts,, you know, pay a lot of interest,

5    and we were not generating any profits or any sales, at least

6    in this portion of the assets from South Bay.

7    Q    During this time, let's call it from the 2006 period to

8    the 2009 period, was South Bay building elsewhere outside of

9    Ocean Reef Club?

10   A    Yes.  We were building a few homes in Key Biscayne.

11   Q    And you were successfully building and selling those

12   homes; right?

13   A    Yes.

14   Q    Were you profiting on the homes?

15   A    No.

16   Q    Okay.  So you weren't profiting on the homes.  And you

17   certainly weren't profiting enough to repay the investors;

18   correct?

19   A    Yes.

20   Q    Now, in 2008, 2009, there was a substantial financial

21   crisis as well; correct?

22   A    Yes.

23   Q    And it primarily affected the real estate industry;

24   correct?

25   A    Yes.

1  Q    Can you tell us how the financial crisis of 2008 affected

2  South Bay's financial state?

3  A    I recall two things maybe that were a problem for South

4  Bay:  Number one, that the houses that -- the few houses that

5  we had for sale in Key Biscayne sold at a very low price, way

6  below our cost, generating losses; and on the other hand,

7  banks who had given us loans didn't want to lend anymore, in

8  general, not only South Bay but, you know, in general, it was

9  a problem worldwide, I would say.  But in our case, you know,

10  banks didn't want to renew loans.  They wanted to be repaid or

11  they will go -- you know, they will take any legal actions and

12  we started to pay banks and we didn't have that source of

13  financing anymore.

14  Q    Now, at this time, let's just call it 2009, when you have

15  this sort of the double -- the two different things that are

16  really affecting South Bay's financials, the inability to

17  build at the Ocean Reef Club, which was South Bay's biggest

18  investment, and the financial crisis, did you and Roberto

19  Cortes have any discussions regarding South Bay's financial

20  state at this time?

21  A    Yes.  I recall, you know, us talking about, you know,

22  what to do related to the problems we were facing, and that we

23  could either sell everything for whatever amount of money we

24  could get and pay that to all, you know, investors and

25  institutions or we could hold the assets, raise more money and

1  continue hoping that the market would turn and then we would

2  recuperate, you know, all the money would have spent trying to

3  keep these assets.

4  Q    And, so, that first option, you said we could sell

5  everything and pay everybody back whatever we could.  That

6  sounds like declaring bankruptcy?

7  A    Kind of.

8  Q    South Bay was essentially at the point where that was one

9  option on the table; correct?

10  A    Yes.

11  Q    Do you feel like you had the ability to repay everything

12  all that they were owed?

13  A    Not in totality, no.

14  Q    Now, the other option that was discussed with Roberto was

15  hold on the assets and raise more money; correct?

16  A    Yes.

17  Q    Which of those two options did you and Roberto pursue:

18  Pay everyone back, liquidate everything and declare bankruptcy

19  or continue to raise more money?

20  A    The second one:  Continue to raise more money.

21  Q    And what was the plan to do?  What was your plan about

22  what to do with the new money that was raised?

23  A    Well, at that time there was a new portion of the

24  Biscayne Capital business, the financial business that

25  started, which was the -- the opening of the Biscayne Capital

1   Uruguay, so that on the one hand while the real estate was not

2   doing well that we were working on starting that additional

3   side of the financial business.

4          THE COURT:  Is that creating another broker-dealer,

5   you mean?

6          THE WITNESS:  Yes.

7          THE COURT:  In Uruguay?

8          THE WITNESS:  Yes.

9   Q    Maybe to jump ahead and anticipate something the Court

10  might be thinking about, where were all of the places that

11  Biscayne Capital ultimately had offices or businesses or

12  broker-dealers, if you recall?

13  A    I don't recall all of them, but I would say there were

14  offices in Europe, there was offices in Latin America, South

15  America, and there was an office here in the United States.

16  Q    In Miami?

17  A    Yes.

18  Q    What there also one in the Bahamas at one point?

19  A    Yes.

20  Q    Any other Caribbean islands?

21  A    Not that I recall right now, but we had many offices.

22  Q    Okay.  Was part of the plan when generating this new

23  money to pay older investors with that money?

24  A    Can you repeat that?  I'm sorry.

25  Q    Was part of your and Roberto's plan, when you decided to

1  continue to raise more money, to use some of that money to pay

2  older investors?

3  A    Yes.

4  Q    And the method for raising this money, was that going to

5  be additional Proprietary Products like Sentinel Investment

6  Fund but new ones as well?

7  A    Yes.

8  Q    Was SG Strategic Income Limited one of those Proprietary

9  Products?

10  A    Yes.

11  Q    What about Preferred Income Collateralized International

12  Limited, was that another Proprietary Product?

13  A    Yes.

14  Q    And GMS Global Step Up Note Limited another propriety

15  product?

16  A    Yes.

17  Q    ORC Senior Secured Limited, was that another Proprietary

18  Products?

19  A    Yes.

20  Q    What about the liquidity fund, was that another

21  Proprietary Products?

22  A    Yes.

23  Q    Okay.  Now, I want to show you --

24        MR. WEINTRAUB:  I'm now going to pull up, Ms.

25  Campbell, a document.  And this is Exhibit V.  I'm going to go

1   to the first page.

2           THE COURT:  What is the exhibit number?

3           MR. WEINTRAUB:  They are lettered, unfortunately,

4   but it is V, like Victor.

5           THE COURT:  All right.  Is this for the Court?

6           MR. WEINTRAUB:  Yes, Your Honor.

7           THE COURT:  Okay.

8           MR. WEINTRAUB:  So Exhibit V is what I am going to

9   direct the witness to.

10          THE COURTROOM DEPUTY:  It's on the screen for the

11  witness.  If you want it published just ask the Court.

12          MR. WEINTRAUB:  Can we presumptively publish

13  everything?

14          MR. MYERS:  It's on my screen already.

15          MR. WEINTRAUB:  I don't know if the Court wants to

16  publish it.  THE COURT:  I have it.

17          MR. WEINTRAUB:  Everybody has it?  Okay.  No

18  problem.

19  Q    Mr. Weisson, what is this document?

20  A    This is an offering memorandum for one of the notes.

21  Q    And is it for the ORC Senior Secured Limited note series

22  one?

23  A    Yes.

24  Q    And this is -- was it issued in May 2013; correct?

25  A    Yes.

1    Q    Okay.  I'm going to turn to page 9 of this document, the

2    section called investment objective and use of proceeds.

3         So I'm going to read from the second paragraph.  It

4    says, "The issuer will primarily invest in South Bay in

5    exchange for interest this South Bay."

6         Now, is the issuer here the fund, ORC Senior Secured

7    Limited?

8    A    I understand it is, yes.

9    Q    Okay.  And then skipping to the next highlighted

10   sentence, it says, "It is understood that South Bay will in

11   turn use the proceeds of such investment for its working

12   capital needs and to construct, market, and sell the South Bay

13   properties"; correct?

14   A    Yes, sir.

15   Q    Okay.  So staying on that page.  What was the purpose or

16   what was the money that was going -- that was invested by

17   individuals who purchased notes issued by ORC Senior Secured

18   Limited going to be used for?

19   A    It was going to be used in developing, in this case, the

20   homes at Ocean Reef.

21   Q    And it says that it is going to be used to construct

22   market and sell the South Bay properties, that's what you were

23   just referring to, the real estate development.

24        What is your understanding of what was meant by

25   working capital needs?

Weisson - direct - Weintraub                    43

1   A    Working capital would be everything related, every

2   expense related to, in this case not the construction or the

3   marketing or selling of the property, but the operation

4   required to construct, market and sell the property.

5   Q    So maybe South Bay's salaries for its employees?

6   A    Yes.

7   Q    Or its office space; correct?

8   A    Yes.

9   Q    Or if South Bay had taken out a mortgage on one of its

10  properties and it needed to repay a bank, that would fall into

11  working capital needs?

12  A    In my understanding, yes.

13  Q    Was it your understanding that working capital needs

14  would encompass paying investors in other Proprietary Products

15  interest on their investments or capital redemptions?

16  A    No.

17  Q    Now, was some of the money at least, some of the money,

18  if not all of the money, that was invested in ORC Senior

19  Secured Limited used to repay investors in other notes?

20  A    Yes.

21  Q    And were you aware that that was happening at the time?

22  A    Yes.

23  Q    And was that in violation of the offering memorandum?

24  A    I would say yes.

25  Q    And do you believe that Roberto Cortes was aware of this

Weisson - direct - Weintraub                    44

1    at the time?

2    A    Yes.

3    Q    What's your basis for believing that Roberto Cortes was

4    aware of this?

5    A    Because we would be discussing periodically the use of

6    funds that were received through a general cash flow and he

7    was -- you know, that was something that I would check with

8    him and others periodically.

9            THE COURT:  What were you checking with him?

10           THE WITNESS:  The cash flow chart in which the

11   monies coming, for example, for this note would be reflected,

12   as well as other notes, and then we would determine what to do

13   with those funds, and then in the cash flow we would

14   memorialize what is it that was going to be done with this

15   money.

16           THE COURT:  So this cash flow note that you created

17   and made a chart of, was it clear from the cash flow note in

18   your discussions that the money was used in violation of the

19   objective here, it was paying back someone else unrelated?

20           THE WITNESS:  Yes.  It clearly showed that

21   situation.

22   Q    And just take one level of generality, aside from

23   discussions keyed to the cash flow spreadsheet, were there

24   discussions that you and Roberto had regarding the need to use

25   new money that was being generated to repay old -- or

Weisson - direct - Weintraub                          45

1    investors?

2    A    Yes.

3    Q    Did you have any of those discussions with any financial

4    advisors?

5    A    Yes.

6    Q    Can you describe, in general, those discussions with

7    Roberto and/or those discussions with financial advisors?

8    A    Yes, in general.

9          THE COURT:  Why don't you take them one at a time.

10   Q    Can you describe some of the discussions or the nature of

11   some of the discussions that you and Roberto would have with

12   financial advisors regarding either paying back their

13   investors and using new money to do that?

14   A    Yes.

15   Q    Can you tell us about some of those discussions?

16   A    Yes.

17         It would be, I would say, common to have financial

18   advisors complaining about the fact --

19         MR. MYERS:  I'm going to object.  I'm going to

20   object, Judge, unless he can specifically talk about an

21   advisor on a particular date dealing with a particular client.

22   He's just talking about wild generalities.  I don't even know

23   what year he is talking about it.

24         THE COURT:  I think we to need to pinpoint it.

25   Q    Well, during this time period from 2009 through 2018 were

1    there times when financial advisors had asked you and Roberto

2    for money to repay some of their clients?

3    A    Yes.

4    Q    Okay.  And in general, what was the message that was told

5    to those financial advisors?

6    A    In general, that if they wanted, you know, redemptions or

7    money to go to their clients, they would have to bring more

8    money to cover for those financial advisors.

9    Q    We will get to an example of that in a bit, but I just

10   want to keep on going down and focusing on this offering

11   memorandum.

12            Still on page 9, there is a selection titled

13   "Collateral."  Do you see that?

14   A    Yes.

15   Q    It says, "The issuer" -- and again, that's ORC Senior

16   Secured Limited -- "will be granted a charge over one sum or

17   all of the properties listed below."

18            Now, these properties listed below, they're all

19   properties at the Ocean Reef Club; correct?

20   A    Yes.

21   Q    And if you go to the next section, it says, "The issuer,

22   ORC Senior Secured Limited, will appoint Florida Law Titled

23   and Trust LLC to hold the first mortgage lien titles on behalf

24   of the issuer."

25            Do you see that?

1    A    Yes.

2    Q    So is it fair to say that investors in ORC Senior Secured

3    Limited were told that they would have a first mortgage or

4    that -- excuse me -- that ORC Senior Secured would have a

5    first mortgage on one or all of these properties?

6    A    Yes.

7    Q    Okay.  Now, at the time of this offering memorandum, May

8    2013, was it already the case that there were other entities

9    that already had first mortgages on these properties?

10   A    Yes.

11   Q    Okay.  I am going to show you Exhibit AO?

12            And I will just note that the addresses here in this

13   offering memorandum are 36 Cinnamon Bark Lane, 37, 38, 45, 48

14   and 50 Cinnamon Bark Lane; correct?

15   A    Yes.

16   Q    I'm going to show you Exhibit AO, and I will zoom in a

17   bit.  Can you see it clearly?

18   A    Yes, sir.

19   Q    What is this document?

20   A    That is a chart that we asked the people working in

21   accounting to be prepared for us to be able to clearly see how

22   many mortgages or what mortgages were on each property.

23   Q    So if you go to 36 -- sorry.  Reading it from left to

24   right there are a series of columns, but after the property

25   address column, there's a series of columns that aren't

1    titled.  But if you read it from left to right, what does that

2    signify?

3    A    That means the order in which those mortgages are being

4    recorded in the title of the property.

5    Q    Okay.  Now, if you look at 36 Cinnamon, here it says

6    Cinnamon Bar Lane, but is that Cinnamon Bark Lane?

7    A    Yes.

8    Q    Just a typo.  Okay.

9          And if you look at Cinnamon Bark Lane, it says that

10    there's this entity London Financial; correct?

11    A    Yes.

12    Q    And then it says ORC SS.  Does that stand for ORC Senior

13    Secured?

14    A    Yes.

15    Q    Okay.

16          So here, what does it mean that there is London

17    Financial to the left and then ORC to the right?

18    A    That London Financial has a first mortgage on that

19    property and then the other one, the ORC SS series two has a

20    second mortgage.

21    Q    But the offering memorandum that we were just talking

22    about, it said that ORC would have a first mortgage; correct?

23    A    Yes.

24          THE COURT:  I'm sorry.  Does this chart mean they

25    had a second mortgage, not a first mortgage?

Weisson - direct - Weintraub                              49

1          THE WITNESS:  Yes, yes, Your Honor.

2    Q    And that's important, right, the difference between a

3    first mortgage and a second mortgage; right?

4    A    Yes, sir.

5    Q    Do you understand why?

6    A    Yes.  Because whoever is in the first mortgage has first

7    priority over that mortgage.

8    Q    They get paid out first from any money or any profits on

9    a sale?  They are satisfied first?

10   A    Or if there is litigation or foreclosure, they would be

11   the one with the priority.

12   Q    Okay.

13          THE COURT:  Do they have a first mortgage on 43

14   Cinnamon Bark Lane?

15          THE WITNESS:  Yes.

16          THE COURT:  So ORC had a first mortgage on that

17   property?

18          THE WITNESS:  Yes, according to the chart, yes.

19   Q    Yes, but is that one of the properties listed here?

20   A    No.

21   Q    So these specific properties that the offering memorandum

22   says --

23          THE COURT:  Just for the record, you're referring to

24   Exhibit V?

25          MR. WEINTRAUB:  Yes, Your Honor.

1    Q    These specific properties that the offering memorandum

2    says ORC will have a first mortgage over some or all of these,

3    43 isn't one of those properties, right?

4    A    Yes.

5    Q    It is not; correct?

6            It is not one of those properties?

7    A    It is not one of those properties.

8    Q    But the properties was 36 and here you see 36 London

9    Financial, first mortgage; correct?

10   A    Correct.

11   Q    37, first mortgage London Financial?

12   A    Yes.

13   Q    38, first mortgage London Financial?

14   A    Yes.

15   Q    45 Cinnamon Bark Lane, first mortgage London Financial?

16   A    Yes.

17   Q    48 Cinnamon Bark Lane, first mortgage London Financial?

18   A    Yes.

19   Q    50 Cinnamon Bark Lane, first mortgage London Financial?

20   A    Yes.

21   Q    Okay.

22           MR. MYERS:  Judge, I need a clarification, I'm

23   seeing this mortgage chart that the document that Mr.

24   Weintraub is referring to for, say, 43 is ORC Select One, so

25   the prospectus -- if we are dealing with was, or I guess ORC

1   S2, which is a totally different document, which has maybe

2   totally different promises on it.  I just want to clarify.

3            THE COURT:  Is there a one and two?

4            MR. WEINTRAUB:  If you can give me a moment, Your

5   Honor, I would like to pull this up without showing the Court.

6   Just a moment.

7            I'm going to pull up now Exhibit W.

8            THE COURT:  Let's just clarify, Exhibit V was ORC

9   Senior Secured Limited.  Was it one or two?

10           MR. WEINTRAUB:  One, Your Honor.  I think he

11  testified to that.

12           THE COURT:  Okay.

13  Q    Now, I am going to show you --

14           THE COURT:  But your chart referred to two.

15           MR. WEINTRAUB:  I'm going to clarify that in a

16  moment.

17  Q    Mr. Weisson, showing you Exhibit W, what is this?

18  A    I'm sorry, I don't see it.

19           THE COURT:  Do you see it now?

20           THE WITNESS:  Yes.

21  Q    What is this?

22  A    This is a -- the offering memorandum for another series

23  of the same note.

24  Q    Okay.  So this is series two; correct?

25  A    Yes.

Weisson - direct - Weintraub                    52

1    Q    Okay.  Now, if you go to page 9, you're going to see

2    again the language of the issuer will be granted a charge over

3    one, some or all of the properties listed below; correct?

4    A    Yes.

5    Q    And here you have many more properties than were in

6    series one; correct?

7    A    Yes.

8    Q    But one of them., for example, is 36 Cinnamon Bark Lane.

9    Do you see that?

10   A    Yes.

11   Q    And that was also one of the ones in Exhibit V series

12   one; correct?

13   A    Yes.

14   Q    Okay.  So the same property that is -- that in series one

15   says ORC Senior Select Limited series one is going to have a

16   mortgage over is the same property as ORC series two is going

17   to have a mortgage over; correct?

18             THE COURT:  Do you want to go down to the paragraph

19   that says it's going to have a mortgage over it?  I don't see

20   that.

21             Where is that paragraph?

22             MR. WEINTRAUB:  So this is in ORC series two.  It

23   granted a charge over one, some or all of the properties

24   listed below.  Here it says, again, the issuer will appoint

25   Florida Law Title and Trust to hold the mortgage titles.

1          THE COURT:  Does it say first mortgage?

2          MR. WEINTRAUB:  I will be very clear about this.

3     Q    This is series two; correct?

4     A    I think so, yes.

5     Q    Does say first mortgage?

6     A    I don't see the word first.

7     Q    Okay.  But it is the case that both series one and series

8     two say mortgages over 36 Cinnamon Bark Lane; correct?

9     A    Yes.

10    Q    So when this chart says series two for 36 Cinnamon Bark

11    Lane, when Exhibit AO says series two -- Do you see that?

12    A    Yes.

13    Q    -- that's because series two also had a mortgage on -- on

14    36 Cinnamon Bark Lane; correct?

15    A    Yes.

16    Q    So the chart, is it possible the reason it only says

17    series two and not series one is because both series one and

18    series two had mortgages?

19    A    Yes.  I see in the chart that one and two are marked

20    there.

21         THE COURT:  They're what?

22         THE WITNESS:  Series one, I see it marked in a

23    purple color and series two in an orange color.  So I see

24    both, if that is the question.

25    Q    But the point is is that we just went through how series

1    one does have a mortgage over 36 Cinnamon Bark Lane according

2    to the offering memorandum; right?

3    A    Yes.

4    Q    That's Exhibit V?

5    A    Correct.

6    Q    And then series two also has a mortgage over that same

7    property; correct?

8    A    Yes.

9    Q    So even though this chart reflect only series two when it

10   comes to 36 Cinnamon Bark Lane, that 36 Cinnamon Bark Lane has

11   a mortgage for series one and series two; correct?

12   A    Yes.

13   Q    And if you ... I think that clarifies that.

14        Now, I want to move on to Exhibit AD.

15        Now, this is an e-mail chain from approximately

16   July.  It starts July 2012, but really the substantive

17   communications are on August 7, 2012; is that right?

18   A    Yes.

19   Q    Now, who is Frank Chatburn?

20   A    He is -- he was at the moment a financial advisor.

21   Q    He sends this e-mail to Roberto Cortes and to you;

22   correct?

23   A    Yes.

24   Q    I'm going to read this.  It says, "Tito and E.W."

25        Does Tito refer to Roberto?

1   A    Yes.

2   Q    And E.W. refers to you?

3   A    Yes.

4   Q    It says, "Please give Miguel."  Who is Miguel?

5   A    Miguel Sanchez.

6   Q    Who is that?

7   A    He was, I would say, the equivalent if not the CFO for

8   the notes.

9   Q    Okay.  "Please give Miguel authorization to cover this

10  maturity (30k plus interest) when we have funds.  I'm working

11  on something in the vicinity of 3 million and everything's

12  collapsing due to the nervousness of this man.

13          I'm in your hands.

14          Can you explain to the Court what is going on in

15  this e-mail?

16  A    Yes.

17          Frank Chatburn is indicating that there was a

18  maturity on that amount or so and that he needed to pay his

19  client, otherwise his client was going to be very upset and

20  could be a problem is.  But -- but, on the other hand, he was

21  working on raising 3 million, you know, new money, which was,

22  you know, important for him to mention in here.

23  Q    What does Frank Chatburn raising $3 million of new money

24  have anything to do with paying back another investor, an

25  older investor his $30,000 maturity?

Weisson - direct - Weintraub                              56

A      Well, because this was an example of what we were
speaking before, a financial advisor being told to bring new
money, more money in order to pay any redemptions they may
have.

Q      Now, let's go to the next e-mail up, the response from
Roberto Cortes.  It reads, "I'm concerned that we're only
focusing on the 3 million.  It will be amazing if this comes
in, but we need an urgent trade this week.  You need to remove
your 80, the 30 for right now, and we have several other
things pending.  Check and see if you can do an urgent trade
today for 350 to 500.  When the three come in, we will replace
what you put in today."

       Can you explain what Roberto is saying in this
e-mail?

A      What I understand from the e-mail is that Roberto is
saying that, you know, he is concerned about why we are
talking about something that hasn't come yet, which is the 3
million.  He says once it comes, it will be great, but in the
meantime, we have urgencies to take care of.  And so he says
forget about the 80.  We can deal with the 30 as long as you
bring 350 to 500,000 now.

       When the 3 million came, we will repay the 350 or to
500 that you are going to put now if you are able to put it.
That's what I understand.

Q      Sorry.  Just to be clear, what did you understand when he

Weisson - direct - Weintraub                    57

1    said see if you could do an urgent trade today for 350 to 500?

2            First of all, is that $350,000 in your

3    understanding?

4    A    Yes.

5    Q    What does it mean do an urgent trade for 350 to 500,000?

6    A    To find clients who have cash positions so that -- with

7    those clients with cash positions he can purchase one of the

8    notes of the Proprietary Products and with that basically the

9    money will come in.

10   Q    As you understood this e-mail, Roberto is saying find

11   somebody, a client who has cash that's being managed, trade

12   between 350,000 to $500,000 of that cash for an investment in

13   a Proprietary Product, and once that money has been converted

14   to a Proprietary Product Biscayne can use it to pay back this

15   other investor that Chatburn is asking about?

16   A    Yes.

17   Q    And then Frank Chatburn responds, "Agreed Tito, I'll

18   place a number of trades tomorrow."

19           I want to show you another exchange and this is

20   Exhibit AW, actually Exhibit AW-1.

21           Now, this is another e-mail from December 10, 2013,

22   again from Frank Chatburn to you, Roberto Cortes, and Nicolás

23   Barcia.

24           Who is Nicolás Barcia?

25   A    He is the person managing at the moment the trading desk

1    in Uruguay.

2    Q    He says, "Nico, buy 250,000 in account number 29026212."

3    Sorry.  Let's go to the subject of the e-mail.

4            MR. MYERS:  Sorry to interrupt.  This an exhibit?

5            MR. WEINTRAUB:  Yes, it's AW1.

6            MR. MYERS:  How about the last one?

7            MR. WEINTRAUB:  That was AD.

8            MR. MYERS:  AD.  Thank you.  Sorry.

9    Q    The subject of this e-mail is Commerz liquidity note.

10   What does that mean?

11   A    That is the liquidity product, if you will.

12   Q    That was one of the Proprietary Products that Biscayne

13   created?

14   A    Yes.

15   Q    Now, what did you understand Frank to be saying when he

16   instructs Nico to buy 250,000 in this account?

17   A    That means that that account had cash in X amount of

18   dollars, you know, 250 or more, 250,000 or more, and that he

19   was giving an instruction to Nicolás Barcia to purchase

20   $250,000 of the liquidity note into that account.

21           THE COURT:  So it was to purchase a liquidity note

22   for that account?

23           THE WITNESS:  I'm sorry?

24           THE COURT:  It's to purchase a liquidity note for

25   that account?

Weisson - direct - Weintraub                    59

1          THE WITNESS:  Yes.

2          THE COURT:  What were the liquidity notes?  What

3     kind of investment vehicle were they?

4          THE WITNESS:  I don't know the exact details of the

5     note, but in general terms it was for clients who had cash to

6     -- instead of having simply cash to put in a type of money

7     market account and generate some interest while instead of

8     being cash.

9          THE COURT:  So it was supposed to be like a money

10    market?

11         THE WITNESS:  Yes.

12         THE COURT:  Which means it's entirely safe, nobody

13    is doing anything with it?

14         THE WITNESS:  Yes.

15         THE COURT:  It's just earning interest, correct?

16         THE WITNESS:  Yes.

17    Q    Were investments or purchases of the liquidity note, once

18    those purchases were made, was that money used by Biscayne for

19    other purposes?

20    A    Yes.

21    Q    Including to repay other investors?

22    A    Yes.

23    Q    Now, I want to go to the next e-mail up.  I think it is

24    the same day.  This is from Roberto to again Frank, you, and

25    Nicolás, and he says, "Put 2.5 million and stop F dot, dot,

1  dot around.  Let's go Chatburn.  It's Christmas and we need to

2  close the year properly."

3      MR. WEINTRAUB:  Does the Court need clarification on

4  what stop dot, dot, dot around means?

5      All right.

6  Q    Ernesto, what did you understand this e-mail to be

7  meaning?

8  A    Basically Roberto was asking Chatburn instead of simply

9  putting $250,000 to put 2 million 500 so that basically the

10  group would have more cash available for things.  And since

11  he's referring to Christmas, it would be a good way to close

12  the year and Christmas will be okay with cash.

13      THE COURT:  Is Commerz liquidity note a specific

14  account or is that just the name of the liquidity?

15      THE WITNESS:  No, the name of the note was

16  liquidity, but it was issued by Commerzbank.

17  Q    Commerzbank is just I believe maybe a German bank that

18  was the entity that issued the note; correct?

19  A    Yes, I believe so.

20  Q    Again, it is for a Biscayne Capital Proprietary Product;

21  correct?

22  A    Yes.

23  Q    Okay.  So as you understand this e-mail, this is Roberto

24  Cortes saying don't just take $250,000 from this client's

25  account and move it from cash into the liquidity note, take

1  two and a half million from this account, it's the end of the

2  year, we need to close the year properly, which you understand

3  to mean we need to either pay things off and close people out

4  or just be in a better cash position?

5  A    Well, not necessarily he's talking about taking it from

6  that particular account.  It could be other accounts, not

7  necessarily that one.

8  Q    But as you understand it, he is saying raise more money

9  or convert more money into a Biscayne Proprietary Product so

10  that you can use it?

11  A    Yes.

12  Q    Okay.  Now, I want to turn to Ferran Mirapeix.  Do you

13  know who that is?

14  A    Yes.

15  Q    Have you met him?

16  A    Yes.

17  Q    Who is Ferran Mirapeix?

18  A    Someone who has a portfolio of clients in something I

19  believe to be a private banking firm.

20  Q    Is he essentially a financial advisor himself?

21  A    Yes.

22  Q    He has a roster of clients; right?

23  A    Yes.

24  Q    Is he based in Europe?

25  A    Yes.

Weisson - direct - Weintraub                    62

1   Q    Okay.  Did there come a time that you and Roberto Cortes

2   and Ferran started discussing the possibility of some

3   investment by Ferran related to the Ocean Reef Club

4   properties?

5   A    Yes.

6   Q    Okay.  Did you meet with Ferran in person at the Ocean

7   Reef Club?

8   A    Yes.

9   Q    Was Roberto Cortes there?

10  A    Yes.

11  Q    Can you describe that meeting, please?

12  A    Yes.   Roberto told me in advance that he had started this

13  new relationship with this banker, if you will, and that he

14  wanted to, you know, to propose a deal with him particularly

15  in Ocean Reef Club, and that he was going to come to Miami and

16  that it would be ideal, you know, if I prepared a

17  presentation, a tour, and we both meet with him in Ocean Reef

18  and show him everything.

19  Q    Okay.  So what happened at the meeting at Ocean Reef

20  Club?

21  A    Well, he came.  We met there.  You know, we had -- with a

22  golf cart we went around the club showing him everything and

23  talking, I would say, in general terms about what would be

24  that basically we would be proposing him if he was interested.

25  Q    Was this approximately 2015, 2016?

1  A    Could be, yes.

2  Q    And what was the proposal that you were making to him?

3  A    That we would develop a few specific homes and that he

4  could bring the money for, you know, the construction of those

5  specific homes with collateral.

6  Q    So the pitch was that he would invest or bring money over

7  for the specific purpose of building on specific lots at Ocean

8  Reef Club; is that right?

9  A    Yes.

10 Q    And you went around with him and looked at different

11 lots; correct?

12 A    Yes.

13 Q    Picked out different lots?

14 A    Yes.

15 Q    The idea was these are going to be where your money is

16 going to go towards, building on these lots; correct?

17 A    Yes.

18 Q    You mentioned that during that pitch you told him that

19 there would be security or collateral on the investment; is

20 that right?

21 A    Yes.

22 Q    What was told to him?

23 A    It was told that he was going -- going to have a mortgage

24 on the properties.

25 Q    First mortgage?

Weisson - direct - Weintraub                          64

1    A    I think it was first mortgage.

2    Q    Was that you who told him that, Roberto who told him that

3    or did you both tell him together?

4    A    I would say both.

5    Q    You both were part of the whole meeting where this pitch

6    was made?

7    A    Yes.

8    Q    Actually, who introduced Ferran into the South Bay world?

9    Was that somebody that you knew or somebody that Roberto knew?

10   A    I don't know.  Roberto knew him because of the Biscayne

11   Capital side of the business.

12   Q    So Roberto sort of brought him in?

13   A    Yes.

14   Q    Now, did Ferran ultimately invest?

15   A    Yes.

16   Q    Now, did he do it through one of those Proprietary

17   Products that I had mentioned before, either Sentinel or SG or

18   Preferred Income or GMS or ORC, or the liquidity fund?

19   A    No.

20   Q    Did he do it through a different structure?

21   A    Yes.

22   Q    Okay.  Was he the only investor in that structure?

23   A    I believe so.

24   Q    Okay.

25             MR. WEINTRAUB:  I am going to show Exhibit AB.

Weisson - direct - Weintraub                65

1   Q    Okay.  Do you know what this document is?

2   A    Yes.  It's the offering memorandum for a specific

3   product.

4   Q    Is that product called Select Industries PLLC?

5   A    Yes.

6   Q    Is that the product that was set up for Ferran's

7   investment?

8   A    Yes.

9   Q    Okay.  I'm going to go to page 12, to the use of proceeds

10  section.

11        Now, this is a bit complicated, but we are going to

12  walk through it sort of methodically.  Okay?

13  A    Okay.

14  Q    The first sentence here says that the issuer -- and in

15  this case, is the issuer, to your understanding, Select

16  Industries PLLC?

17            THE COURT:  I'm sorry, are you on page 12, you said?

18            MR. WEINTRAUB:  It's actually page 8 of the

19  enumerated pages.  It's page 12 of the PDF.

20  Q    There is a section titled "Use of Proceeds."  Do you see

21  that, Mr. Weisson?

22  A    Yes, sir.

23  Q    The first section is called secured loan to Select

24  Industries LLC, correct?

25  A    Yes.

1    Q    And it says, "That the issuer."  Now, was the issuer

2    Select Industries PLLC?

3    A    I think so, yes.

4    Q    All right.  So it says, "That the issuer," and that's

5    Select PLLC, "will enter into a Florida law governed-loan

6    facility agreement with Select Industries LLC."

7            Do you see that?

8    A    Yes.

9    Q    "Pursuant to which it will lend all subscription proceeds

10   it receives from the issue to the borrower, to Select

11   Industries LLC.

12           Do you see that?

13   A    Yes.

14   Q    Okay.  And then if you go down to the next section titled

15   "Investment in Ocean Reef Club Real Estate By Select

16   Industries LLC," it says, "the borrower," which was defined

17   above as Select Industries LLC; correct?

18   A    Yes.

19   Q    "Will in turn enter into a loan facility with each of

20   Ocean Reef Group LLC and Ocean Reef Group 3 LLC, which are

21   then defined as together the Ocean Reef Group LLCs.

22           Do you see that?

23   A    Yes.

24   Q    Okay.  Then it says, "Pursuant to which the borrower" --

25   again, that's Select Industries LLC -- "will lend all of the

Weisson - direct - Weintraub                   67

1   proceeds to the Ocean Reef Group LLCs.

2           Do you see that?

3   A    Yes.

4   Q    Just to be clear, Ferran's investment is going to first

5   go into Select Industries PLLC; correct?

6   A    Yes.

7   Q    Then Select Industries PLLC will loan all of that money

8   to Select Industries LLC; right?

9   A    Yes.

10  Q    Then Select Industries LLC will loan all of that money to

11  the Ocean Reef Group LLCs; correct?

12  A    Yes.

13  Q    So we are still just talking about Ferran's money.

14          It says the Ocean Reef Group LLCs were established

15  for the purpose of purchasing and developing real estate in

16  the Ocean Reef Club in Key Largo, Florida.

17          Do you see that?

18  A    Yes.

19  Q    Did I read that correctly?

20  A    Yes.

21  Q    Then it says, "And the funds received by the Ocean Reef

22  Group LLCs under the Ocean Reef loan facilities will be

23  utilized to develop, with a view to eventually selling those

24  properties."

25          Do you see that?

Weisson - direct - Weintraub                           68

1   A    Yes.

2   Q    Does this say that the money can be used for working

3   capital expenses?

4   A    No.

5   Q    Working capital needs?

6   A    No.

7   Q    Does say that it can be used for any purpose other than

8   to develop with a view towards eventually selling the Ocean

9   Reef Club properties?

10  A    No.

11  Q    Sitting here today, do you know whether the money that

12  was invested by Ferran was used solely for the purpose of

13  developing the Ocean Reef Club properties?

14  A    It was not.

15  Q    Did you know at the time that you pitched Ferran and told

16  him that his money would be used to develop the lots and at

17  the time that he received this offering memorandum that you

18  were not going to use that money?

19  A    Maybe a portion of it.

20  Q    But not all of it?

21        MR. MYERS:  Judge, I want a clarification on what

22  money Ferran submitted to this entity right here.  We're

23  talking about money.

24        THE COURT:  How much?

25        MR. WEINTRAUB:  We will get there in a minute.

Weisson - direct - Weintraub                    69

1   Q    But did you know, when you pitched the investment to

2   Ferran, the concept, that you would not use all of the money

3   to develop the real estate?

4   A    Yes.

5   Q    Okay.  Now let's go to this Exhibit AC?

6        Do you recognize this document?

7   A    Yes.

8   Q    It's a two-page document; correct?

9   A    Yes.

10  Q    What is this document generally?

11  A    It's typically a term sheet document.

12  Q    Did this term sheet refer to or pertain to Ferran's

13  investment?

14  A    Yes.

15  Q    Okay.  Now, I want to go to the investment highlights.

16       Do you see that there is a sentence there that says,

17  "Through the structure investors will be secured by the

18  following guaranties:  First mortgages -- first mortgage on

19  the houses, club memberships and project reserves in escrow."

20       Do you see that?

21  A    Yes.

22  Q    So is this saying -- or is this a memorialization of the

23  promise that you and Roberto had made during the pitch to

24  Ferran at the Ocean Reef Club?

25  A    Yes.

1  Q    That there be would a mortgage on the houses that his

2  money was going to be used to develop?

3  A    Yes.

4  Q    First mortgages; correct?

5  A    Yes.

6  Q    Do you know if Ferran ever received mortgages on the

7  properties?

8  A    I know that we, in our office, prepared the first

9  mortgage documents, but those were never recorded.

10 Q    Do you know if they were first mortgages or was there

11 another entity that already had the mortgage over them?

12 A    There were entities already had first mortgages and other

13 mortgages.

14 Q    So Ferran did receive mortgages, correct, on his

15 properties?

16 A    Yes.

17 Q    But they weren't first mortgages?

18 A    They were unrecorded mortgages, so whatever was recorded

19 was before that.

20 Q    And there were mortgages recorded before that?

21 A    Yes.

22        THE COURT:  Did you know that at the time that you

23 gave him this sheet and discussed the deal?

24        THE WITNESS:  Yes, Your Honor.

25        THE COURT:  Was Mr. Cortes part of giving him this

Weisson - direct - Weintraub                              71

1    sheet?  Were you doing this together?

2                THE WITNESS:  Yes.

3                THE COURT:  Did he know -- according to your

4    knowledge, did he also know there were other mortgages on

5    these properties?

6                THE WITNESS:  Yes, Your Honor.

7    Q    In fact, wasn't one of the Ocean Reef Club lots that was

8    specified tied to Ferran's investment later sold?

9    A    Yes.

10   Q    Was there a different entity that stood in first position

11   there?

12   A    Yes.

13   Q    And got paid out; correct?

14   A    Yes.

15   Q    Are you aware if any of those Ocean Reef Club properties

16   that pertained to Ferran's property were foreclosed on?

17   A    Yes.

18   Q    Do you know who foreclosed on them?

19   A    I think the majority by London Financial.

20   Q    That was the entity that we saw had all of those

21   mortgages in Government Exhibit AO?

22   A    Yes.

23   Q    Did Ferran foreclose on any of the properties?

24   A    Not that I know of.

25                MR. WEINTRAUB:  Your Honor, I'm going to go now into

1  the cash flow spreadsheets, but it is going to be a little bit

2  tedious.

3              THE COURT:  Let me ask you:  Do you know, the money

4  that you got from Mr. Ferran, do you know what you did with

5  that money?

6              THE WITNESS:  Yes.  By means of the cash flow

7  document in which we would see what to do with the money,

8  being this part of that money, some of it, I think, went to

9  construction.

10             THE COURT:  Construction of what?

11             THE WITNESS:  Of houses.

12             THE COURT:  On this property.

13             THE WITNESS:  Maybe those or some others, I don't

14  recall, and the rest to pay other debts.

15             THE COURT:  Other debts unrelated to this property?

16             THE WITNESS:  Yes.

17             THE COURT:  All right.  I'm sorry.

18             MR. WEINTRAUB:  I'm just saying that I am

19  highlighting that I'm about to go into the cash flow

20  spreadsheet.  It's going to be a little tedious.

21             THE COURT:  All right.  We can take a recess for ten

22  minutes.

23             MR. WEINTRAUB:  Thank you, Your Honor.

24             (Recess taken.)

25             THE COURT:  Are we ready to continue?

1           MR. WEINTRAUB:  Yes, Your Honor.

2           THE COURT:  Okay.

3    BY MR. WEINTRAUB:

4    Q    Now, Mr. Weisson, I'm going to show you Exhibit I-1.

5    Hang on one second.

6           So I am going to show you Exhibit I-1.  And this is

7    an Excel spreadsheet; correct?

8    A    Yes.

9    Q    At the bottom, you see there are many tabs; correct?

10   A    Yes.

11   Q    Now, I'm going to just work off of the tab that is titled

12   8-14-15?

13          Do you see that?

14   A    Yes.

15   Q    Have you ever heard or referred to a document called the

16   cash flow spreadsheet?

17   A    Yes.

18   Q    Is this that document?

19   A    Yes.

20   Q    Okay.  So at a high level, can you just tell us what this

21   spreadsheet was?

22   A    Yes.  In order to be able to visualize all the inflows

23   from the different sources and the outflows of money, this

24   document was created for, you know, for Roberto and I and

25   Carlos and other people to be able to manage the cash in that

1   way.

2   Q    Okay.  Now, I'm going to --

3           THE COURT:  When was it created?

4           THE WITNESS:  I don't recall the creation date, Your

5   Honor.

6           THE COURT:  Do you recall a general timeframe?

7           THE WITNESS:  I would say that we were maybe having

8   different versions of it probably since 2010.

9           THE COURT:  Was this a document that was continually

10  generated over the course of your time at the entity we have

11  been talking about?

12          THE WITNESS:  Yes.  Yes, Your Honor.

13          THE COURT:  So these were something you used

14  periodically or you had drawn up periodically and looked at in

15  connection with the business?

16          THE WITNESS:  Yes.  As a matter of fact, I would say

17  that we typically would check it weekly.

18          THE COURT:  Every week?

19          THE WITNESS:  Yes.

20          THE COURT:  And who ordered that this document be

21  created?

22          THE WITNESS:  I think it was Mr. Cortes.

23          THE COURT:  Who?

24          THE WITNESS:  Mr. Cortes.

25          THE COURT:  All right.  So this was a document that

1  to your understanding was created at Mr. Cortes's direction?

2          THE WITNESS:  Yes.  Yes, Your Honor.

3  Q    Okay.  So what we're going to do is just first walk

4  through some of the rows by focusing on column D and then we

5  will turn to a specific example in columns AK and AL.

6          But just to understand, Mr. Weisson, I would like

7  you to walk us through sort of how we read this document.

8  Okay?

9  A    Yes.

10 Q    If you look at row three, column D, it says 8/14/2105.

11 First of all, that a typo?

12 A    It seems to be a typo, yes.

13 Q    What did you understand 8/14/2105 to mean?

14 A    To be 2015.

15 Q    August 4th, 2015?

16 A    Yes.

17 Q    If you look at column E in row three, it says 8/21/2015;

18 is that right?

19 A    Yes.

20 Q    And then the next column, column F, row three says

21 8/28/2015?

22 A    Yes.

23 Q    So is it fair to say that this goes week by week?

24 A    Yes, sir.

25 Q    Now, we're just again focusing on column D.  Row four

1    reads:  Opening balance.

2            Do you see that?

3    A    Yes.

4    Q    And then there is a number there, $1,524,043.  Do you see

5    that?

6    A    Yes.

7    Q    What does opening balance refer to?

8    A    That would be cash available at the moment of starting

9    this particular week.

10   Q    So starting the week of August 14th that's how much cash

11   is available; correct?

12   A    Yes.

13           THE COURT:  Cash is available to whom, to what

14   entity?

15           THE WITNESS:  Basically to all of them because we

16   have all the cash into one -- into one control, which was this

17   particular cash flow.

18   Q    This reflects cash that might have been available -- that

19   was available to you and Roberto and other people running

20   Biscayne that might have been held in different places but it

21   all was under your control; correct?

22   A    It was, I would say, to be clear, a consolidated cash

23   flow.  So it's showing all the entities in the inflow and all

24   of the different outflows for the different entities as well.

25           THE COURT:  All the entities that were involved with

1   Biscayne?

2          THE WITNESS:  Biscayne and South Bay, yes.

3          THE COURT:  And South Bay?

4          THE WITNESS:  Yes.

5   Q    Okay.  Now, I want to just quickly ask, row five in

6   column A, it says, floating available Mariano and Leo.

7          Do you know what that referred to?

8   A    Yes.

9   Q    What?

10  A    That is -- Mariano is a friend of Fernando Haberer and

11  Leo, I'm not sure which Leo.

12         Mariano, I recognize.

13  Q    What is this money?

14         There is a figure of $700,000 in column D.  What

15  does that refer to?

16  A    I believe it refers to Fernando Haberer having money that

17  belonged to Mariano that he basically had for a short period

18  of time and that basically could be used if it would be

19  brought back to Ferran to be given to Mariano.

20  Q    So just to be clear, when it says floating available

21  Mariano and Leo, is it your understanding that this was money

22  provided by Mariano and Leo and that was it was within

23  Biscayne Capital's control and this spreadsheet denotes that

24  you could use it at your disposal?

25  A    Yes.

Weisson - direct - Weintraub                    78

1    Q    Okay.  Then it says, row 7 says, "Net balance."

2         Do you see that?

3    A    Yes.

4    Q    And is that just a sum of opening balance and then the

5    floating available Mariano and Leo?

6    A    Yes.

7    Q    The next line floating due Mariano and Leo?

8    A    Yes.

9    Q    Okay.  If you see, there is a formula here, right?

10        It says this net balance is just the sum of opening

11   balance and then rows five and six floating available Mariano

12   and Leo and floating due Mariano and Leo; correct?

13   A    Yes.

14   Q    Then row nine reads:  Income.

15        Do you see that?

16   A    Yes.

17   Q    And then there's a figure here, 1,737,000.

18        Do you see that?

19   A    Yes.

20   Q    What does income refer to here?

21   A    Inflows.

22   Q    Inflows of new money coming in that week?

23   A    Yes.

24   Q    Okay.  Then there are a series of rows from row 10 all

25   the way through row 33.

Weisson - direct - Weintraub                    79

1              Do you see that?

2    A    Yes.

3    Q    And just taking, for example, column D, there's an input

4    of $300,000 in row 10 and then there's an input of 1,437,000

5    in row one; correct?

6    A    Yes.

7    Q    And if you add those two figures up, 1,437,000 plus

8    300,000, you get 1,737,000; correct?

9    A    Yes.

10   Q    So is it fair to say that rows 10 through 33 show various

11   sources of income money?

12   A    Yes.

13   Q    And just focusing on this one week, we see that there was

14   an incoming of 1.737 million that's comprised of 300,000

15   reflected in row 10, And 1.437 million reflected in row 31;

16   correct?

17   A    Yes.

18   Q    And then you see another row, 34, that says available?

19   A    Yes.

20   Q    And that's 3.9 million; correct?

21   A    Yes.

22   Q    And is that essentially the sum of the net balance in row

23   7 and the new incoming inflows in row 9?

24   A    Yes.

25   Q    Approximately 2.2 million in row 7, that was net, and

Weisson - direct - Weintraub                    80

1   then an inflow of 1.7 in row 10 -- in row nine, excuse me, and

2   that creates approximately 3.9; correct?

3   A    Yes.

4   Q    And that's what you see here, 3.9 million and change;

5   correct?

6   A    Yes.

7            THE COURT:  What comprised the opening balance?

8            THE WITNESS:  It's simply the cash left from the

9   previous week.

10           THE COURT:  So it's cash?

11           THE WITNESS:  Yes.

12  Q    Then there is another row that's called net available.

13  And it says that 3.046 million figure.  Do you know what net

14  available -- how you got to that number?

15  A    I believe it's by adding rows 36 to 44 plus 33.

16  Q    But it could also be subtracting some of the figures

17  there?

18  A    In that case, there's a negative number there, which is

19  by formula is subtracted.

20  Q    Okay.  Now, moving on to expenses, row 47.  Do you see

21  that?

22  A    Yes.

23  Q    And then there's a bunch of rows from 48 all the way down

24  to 211.

25           Do you see that?

1    A    Yes.

2    Q    And then at row 212, it says total expenses.

3         Do you see that?

4    A    Yes.

5    Q    Now, what is reflected in rows 30 -- excuse me, 40, you

6    know, under expenses from row 48, really starting in row 51,

7    all the way down through row 211?

8    A    It reflects the outflows that are required.

9    Q    Okay.  So then you get in row 212 total expenses.  And

10   then in row 214 you get closing balance.

11        Do you see that?

12   A    Yes.

13   Q    And so is closing balance simply the difference between

14   net available?

15   A    Yes.

16   Q    And then all of the expenses that had to be or were paid

17   out that week.

18   A    That is correct.

19   Q    Now, here in row 214, column D, you see that the closing

20   balance for the week of August 14, 2015 was $1,666,252.

21        Do you see that?

22   A    Yes.

23   Q    Now, I want to take you up then to the top in column E,

24   which is the next week; correct?

25   A    Yes.

Weisson - direct - Weintraub                82

1   Q    And the opening balance is the same number, $1,666,252;
2   correct?
3   A    Yes.
4   Q    Just so I understand how this spreadsheet works, you
5   start off with an opening balance in row 4, you add in all of
6   the new inflows of money, then you take out all of the things
7   that you spent money on that week, and you get to a net for
8   that week, how much is left after the week; is that right?
9   A    Yes.
10  Q    And whatever is left at the end of the first week, that
11  becomes the new opening balance the next week; correct?
12  A    Yes.
13  Q    Okay.  So, now, I want to move over to column AK.
14         Now, I want to start -- let's just cut to the chase
15  and say -- well, let's just being yeah, net balance in row
16  seven of column AK.
17         By the way, what's the date on column AK?
18  A    It's April 1, 2016.
19  Q    Okay.  And in Row 7, what is the net balance available?
20  A    404,000.
21  Q    $404,511.87?
22  A    Yes.
23  Q    And then it says in the income row 500,000; right?
24  A    Yes.
25  Q    Does that mean you had a starting balance of 404,000 and

Weisson - direct - Weintraub                83

1    in this column get another $500,000 into the pot; correct?

2    A    Yes.

3    Q    If you look at where this $500,000 comes from, it comes

4    from one place, correct?

5           There is only one entry in this section for this

6    period; correct?

7    A    Yes.

8    Q    And you see it says 500,000 right there in row 28.  And

9    what does it say in column A of row 28?

10   A    It says Ferran confirmed.

11   Q    And I think you testified earlier that approximately

12   Ferran invested approximately $5 million in total?

13   A    Yes.

14   Q    So here you see 500,000 from Ferran and that's the only

15   knew money coming in that week; correct?

16   A    Yes.

17   Q    So, then, it says that the total available is 904,000

18   that week; right?

19   A    Yes.

20   Q    And then if you go down, you see some expenses:  179,000

21   to SBH 2020, 483,000 to SBH 2018.  Do you know what those

22   were, what they refer to?

23   A    Yes, those are payments to notes.

24   Q    Payments to Proprietary Product notes?

25   A    Yes.

Weisson - direct - Weintraub                    84

1    Q    Not construction costs?

2    A    No.

3    Q    Another 75,000 for buyback EA shopping centers.  Do you

4    know what that is?

5    A    I believe it's something that Edith Hinojosa requested.

6    Q    EH refers to Edith Hinojosa; correct?

7    A    Yes.

8    Q    She is a financial advisor for Biscayne?

9    A    Yes.

10           THE COURT:  What are you referring to on the chart?

11           MR. WEINTRAUB:  Row 99 reads buyback EH shopping

12   centers, 75,000.

13   Q    And tell us again what you recall that was for.

14   A    To pay -- to give back something that Edith Hinojosa had

15   requested.

16   Q    Just going back up, when you said that SBH in row and SBH

17   in row 28, that these were payments to Proprietary Products,

18   does that mean payments to repay investors in those products?

19   A    Yes.

20           THE COURT:  The cash inflows on this chart, are they

21   from funds raised from the sale of Proprietary Products or

22   some other source?

23           THE WITNESS:  Various sources.

24           In this case in particular, this 500,000, which is

25   the only entry that I see, comes from Ferran.

Weisson - direct - Weintraub                85

1  Q    And Ferran, we have gone through what he was investing

2  in, right, Select Industries PLLC for the purpose of

3  developing the real estate at Ocean Reef Club; correct?

4  A    Yes.

5  Q    At the beginning of this week there was 904,000

6  available; correct?

7         I can bring you back up to --

8  A    Yes, please.

9  Q    -- row 45 in column AK, which says net available.

10 A    Yes.

11 Q    904,000; correct?

12 A    Yes.

13 Q    500,000 of which was from Ferran; correct?

14 A    Yes.

15 Q    If you go to row 212 for this week, the total expenses

16 are $884,000; correct?

17 A    Yes.

18 Q    Leaving a closing balance of 19,000; correct?

19 A    Yes.

20 Q    So even assuming that that 19,000 is still Ferran's

21 money, that means that 480,000 of his 500,000 was spent that

22 week; correct?

23 A    Yes.

24 Q    And we have just gone through a couple of examples where

25 it wasn't spent on construction costs or developing real

1    estate; correct?

2    A     Yes.

3    Q     Now, I want to go up to column AL now.  Now, it skips

4    some time, but in row three it says 4/29/2016.  So it's a

5    couple of weeks later; correct?

6    A     It seems to be.

7    Q     And here again the opening balance is 19,000?

8            THE COURT:  I'm sorry, but to the extent that it

9    skips a couple of weeks, does that mean that these reports

10   weren't done for the intervening weeks or do you know?

11           THE WITNESS:  Well, in this case, since I see there

12   is a date above, I can -- I think that basically for some

13   reason some weeks were not included and then we were looking

14   at that moment in time.

15           THE COURT:  So you're looking for the week 4/8

16   through 4/29, is that what you think?

17           THE WITNESS:  That's what it seems to be in my view.

18           THE COURT:  Okay.  So it wasn't done every week like

19   it had been done before?

20           THE WITNESS:  Yeah.  Maybe in this particular case,

21   no.

22           THE COURT:  Let me just ask you one other question.

23   Is this the format in which you saw these documents?  Did it

24   look like what's on the screen when you saw them?

25           THE WITNESS:  Yes.

1          THE COURT:  Okay.

2     Q    Now, the opening balance in column AL is $19,918.42;

3     right?

4     A    Yes.

5     Q    As you recall, that was the exact same figure as the

6     closing balance in the previous column, column AK; correct?

7     A    Yes.

8     Q    Okay.  So it looks like it is picking up right after that

9     period of time; correct?

10    A    Yes.

11    Q    Now, here, there are -- there's a lot of inflows,

12    $19,247,000 come in between the period of April 8 and April

13    29, 2016; correct?

14    A    Yes.

15         THE COURT:  How much comes in?

16         MR. WEINTRAUB:  19,247,000.

17         THE COURT:  I see.

18    Q    It comes in from a number of sources; correct?

19         Do you see here?

20    A    Yes.

21    Q    I want to focus on row 28, which says Ferran confirmed

22    $4,445,000.  Do you see that?

23    A    Yes.

24    Q    Again, that's the money that Ferran invested for the

25    purpose of developing real estate?

Weisson - direct - Weintraub                88

1    A    Yes.

2    Q    And after all of the inflows, there's $19 million

3    available that week; correct?

4    A    Yes.

5    Q    I want to focus here on some of the expenses now.

6         Row 55, GMS 2, do you know what that is?

7    A    It is one of the Proprietary Products.

8         THE COURT:  One of what?

9         THE WITNESS:  The Proprietary Products.

10   Q    Proprietary Products?

11        THE COURT:  So what would that mean to you?

12        THE WITNESS:  That we are paying that note that

13   amount of money.

14        THE COURT:  Paying back the note?

15        THE WITNESS:  Yes.

16   Q    And by paying back the note, that means paying the note

17   so that it can pay its investors or the people who bought the

18   note their interest or redemptions; correct?

19   A    Yes.

20   Q    So 375 to GMS 2.  We talked earlier, GMS is one of the

21   Proprietary Products.

22        Next row, row 56, is 711,000 to GMS 3.  Is that

23   another one of the notes?

24   A    Yes.

25        THE COURT:  Was that one of the Proprietary

Weisson - direct - Weintraub                    89

1    Products?

2            THE WITNESS:  Yes, Your Honor.

3    Q    Sorry.  When I use the phrase note, I'm using it to mean

4    the same thing as Proprietary Product.

5            Do you understand that, Mr. Weisson?

6    A    Yes, sir.

7    Q    Okay.  PICI 2.  I referred earlier to Preferred Income

8    Collateralized International Limited, PICI, in this case 2.

9            Is that another one of the Proprietary Products?

10   A    Yes.

11   Q    504,000 to that?

12   A    Yes.

13   Q    Do you know what SP2 is here?

14   A    I believe it is one of the portfolios of Sentinel

15   Investment Fund.

16   Q    So Sentinel Investment Fund is another one of the

17   Proprietary Products; correct?

18   A    Yes.

19   Q    And 190,000 goes there?

20   A    Yes.

21   Q    And I want to focus on row 87.  Here it reads:  Buybacks

22   ORC 1, 5,695,000.

23           And then the next row, row 88, it says buybacks PC

24   ORC 1, another $5,182,000.

25           And the next row, 89, says buybacks PC PICI 100,000.

Weisson - direct - Weintraub                    90

1      And the next row says, PC GMS 2 $140,700.

2      Do you know what PC means?

3  A    I think it means Pablo Costavilla (phonetic).

4      THE COURT:  What?

5      THE WITNESS:  The name of an FA, financial advisor.

6  Q    Pablo -- say it again.

7  A    Pablo Costavilla.

8  Q    Costavilla?

9  A    Yes.

10 Q    Now, ORC 1, does that refer to ORC Senior Secured Limited
11 Series 1?

12 A    Yes.

13 Q    And PICI refers to Preferred Income Collateralized
14 International; correct?

15 A    Yes.

16 Q    And GMS 2 refers to GMS Global Step Up Note Limited;
17 correct?

18 A    Yes.

19 Q    These are all Proprietary Products?

20 A    Yes.

21 Q    And it keeps saying buybacks.

22     What did you understand these four figures to be?

23 A    Basically the FAs would, from time to time, you know,
24 purchase products as requested basically to be able to cover
25 their own redemptions.  And if they, for instance, raised it

Weisson - direct - Weintraub                91

by purchasing, on behalf of a client, let's say ORC, then they
would say okay when are you giving me back this because I'm
going do it but basically you have to purchase it back at a
certain point because I'm not going to wait for maturity, and
that mechanics was called a buyback.

Q    So to make it a little simpler, is this again money being
paid to cover an investment made by another client in ORC 1 or
PICI or GMS 2?

A    Yes.

Q    I'm not going to go through all of these, but at the end
of that period of time, that three-week period, row 212 shows
that the total expenses were $19,078,947; correct?

A    Yes.

Q    So just to be clear, at the beginning of that period, the
available amount was $19,266,918; correct?

A    Yes.

Q    And at the end, the expenses were $19,078,947; correct?

A    Yes.

Q    Leaving a closing balance of $187,970?

A    Yes.

Q    And during this period, Ferran invested $4.9 million;
correct?

A    Yes.

Q    And there's only $187,000 left out of all of the money
that came in; correct?

Weisson - direct - Weintraub                    92

1   A    Yes.

2   Q    Okay.  I'm going to take this exhibit down now and ask

3   about -- switch topics and ask about the SEC, Securities and

4   Exchange Commission.

5           Did there come a time when the SEC investigated

6   Biscayne?

7   A    Yes.

8   Q    And what happened at the end of that investigation?

9   A    There was a settlement between Biscayne Capital and the

10  SEC.

11  Q    And after that settlement, was there any change in any of

12  the -- officially of the ownership or the management or

13  anything like that of Biscayne?

14  A    Yes.  I would say that, if my memory is not wrong, the

15  settlement between Biscayne and the SEC occurred around May of

16  2016, but we had, during the same year, the beginning of the

17  year, created a new structure which was a series of trusts in

18  which South Bay would settle all the assets and liabilities.

19          When I say that, I mean South Bay and Biscayne.  At

20  a certain point there was a change in, I would say, governance

21  because Roberto Cortes stepped down as CEO of Biscayne

22  Capital.

23  Q    Were there trusts involved in the ownership structure?

24  A    Yes.

25  Q    Can you explain that?

Weisson - direct - Weintraub                    93

1  A    Yes.  Basically the trusts became the owners of all the

2  assets and liabilities of South Bay.

3          THE COURT:  What are you saying?

4          THE WITNESS:  South Bay developers.

5          THE COURT:  South Bay?

6          THE WITNESS:  Yes.

7  Q    Even though the trust became the owners, did you and

8  Roberto have any relationship to those trusts?

9  A    Yes.

10  Q    What was your relationship to those trusts?

11  A    We were consultants to the trust.

12  Q    As consultants to the trust, did you exercise any

13  decisionmaking authority?

14  A    Yes.

15  Q    Substantial decisionmaking authority?

16  A    Yes.

17  Q    Is it fair to say that you both were still very involved

18  in the running of South Bay and Biscayne even after the

19  establishment of the trust?

20  A    Yes.

21          THE COURT:  Let me ask a question, who made the

22  decision to establish a trust?  Was that as a result of the

23  SEC investigation?

24          Were you ordered to do that?

25          How did that come about, that you created these

1  trusts?

2         THE WITNESS:  No, it was to, in my point of view, to

3  protect the assets, because we didn't know what the outcome

4  was going to be related to the SEC, and we wanted to protect

5  the assets for the investors because it would be a problem for

6  the investors if the assets would have been liquidated or

7  taken or --

8         THE COURT:  So were these trusts created before the

9  end of the SEC investigation or after the settlement?

10        At what point in time were the trusts created?

11        THE WITNESS:  It was created before, and the date

12  was January of 2016.  And, you know, for the settlement, for

13  the actual finalizing of the structure of the trusts, there

14  was that was the settlement date, if you will.  I believe it

15  was two dates, January and February.  There were two events.

16        And then the actual settlement of the SEC was May

17  2016.

18        THE COURT:  But the idea to create the trust, that

19  was not something you were directed that you had to do by the

20  SEC?

21        THE WITNESS:  No.  In fact, it was something, if I

22  recall correctly, we communicated to the SEC that we were

23  doing and they -- I think they were okay with that.

24        THE COURT:  What was the purpose of the trust?  Did

25  they hold all of the remaining money or what?

1          THE WITNESS:  Yes, because -- well, in principle, it

2    was the fact that since the trust or the trusts were

3    irrevocable trusts, basically we would not have any decision

4    or any -- or we will get any money from it except -- I believe

5    there is an exception that was in the documents, if, after

6    liquidating everything, there would be a remaining balance,

7    then it could be ours.

8          But the idea was that the trusts were entities, you

9    know, in this case, offshore entities, would own the assets,

10   not us.  And then also in another trust, there would be the

11   liabilities.  And the benefit of this trust, all of the assets

12   would be for the benefit of the trust holding the liabilities.

13         THE COURT:  What was actually in the trust?

14         THE WITNESS:  It was anything -- any asset that was

15   still, I would say, active or existing in South Bay,

16   including, for example, not only real estate, but, for

17   example, the shares of Biscayne Capital as a company, any

18   asset in the U.S. or offshore would be -- well, in one trust

19   would be only U.S. assets of U.S. company.

20         In the other trust would be any offshore assets,

21   plus all the liabilities that were issued through offshore

22   companies.

23         THE COURT:  All right.

24   Q    Now, even with the creation of the trusts, you again had

25   this consultancy arrangement where you were consultants to the

Weisson - direct - Weintraub                              96

1   trusts?

2   A    Yes.

3   Q    Through those consultancies exercised control over the

4   trusts?

5   A    Yes.

6   Q    Now, switching topic.

7        Who is Fernando Haberer?

8   A    Fernando Haberer is an FA that was, if I recall correctly

9   the first FA hired in the Uruguay, Argentina.  So, yes, it is

10  an FA.

11       THE COURT:  I'm sorry, I couldn't understand what

12  you said.

13       THE WITNESS:  Okay.

14       THE COURT:  Fernando Haberer is who?

15       THE WITNESS:  In my recall, recollection, the first

16  FA, financial advisor.

17       THE COURT:  All right.  Okay, first financial

18  advisor.

19       THE WITNESS:  Yes, I'm sorry.

20       THE COURT:  When did he begin to work with the

21  company?

22       THE WITNESS:  I believe it was 2009.

23       THE COURT:  So he would have been one of the

24  individuals selling the Proprietary Products?

25       THE WITNESS:  Yes.

Weisson - direct - Weintraub                              97

1    Q    Now, overtime, did his role change?

2    A    Yes.

3    Q    Did he become at some point a partial owner of Biscayne?

4    A    Yes.

5    Q    And at some point in time did he assume a role of more

6    control over decisionmaking?

7    A    Yes.

8    Q    Tell us about that process.

9    A    Well, I recall that there were many different events

10   through time, there were problems, you know, for Biscayne

11   Capital, one of them that I remember very clearly because we

12   were in a retreat in 2013, if I am not mistaken.

13              MR. MYERS:  Judge, I'm so sorry to interrupt.  I

14   need a time period here because this is going to be crucial.

15              MR. WEINTRAUB:  He just said 2013.

16              THE COURT:  Did you say this was 2013?

17              THE WITNESS:  My recollection, yes.

18              MR. MYERS:  I'm sorry.  I didn't hear that.

19   A    And while we were at the retreat, we got a notice that

20   Pershing Bank of New York decided not to continue to be one of

21   the banks of Biscayne Capital.

22              That was a huge problem in my understanding because

23   a lot of majority or a great portion of the clients, you know,

24   liked -- were using that bank, you know, for their portfolios.

25              So through time, I think 2014, a new structure was

Weisson - direct - Weintraub                98

1    created in order to be able to have that bank as a custodian

2    even though they do you want to work with Biscayne Capital.

3    And that's something that Fernando Haberer, I believe,

4    structured and therefore he became more in control and managed

5    that company, which I believe was called Total Advisors or

6    something like that.

7    Q    Okay.  Now --

8             THE COURT:  I'm sorry.  He created a new structure

9    for the purposes of trying to keep Pershing Capital as the

10   bank?

11            THE WITNESS:  Yes.  Pershing Bank of New York was a

12   bank, was one of the custodian banks for Biscayne Capital.

13            THE COURT:  And then he became not simply a

14   financial advisor, but something -- took another role on in

15   Biscayne Capital?

16            THE WITNESS:  Yes, he took more -- in my

17   recollection, a more managerial role, but continuing to be a

18   financial advisor, of course.

19   Q    Now, at some point the people running Biscayne, the major

20   decisionmakers at some point were you, Roberto, Juan Carlos

21   Cortes, and Fernando Haberer; is that right?

22   A    Yes.

23            MR. MYERS:  Judge, again, at what time?

24            MR. WEINTRAUB:  I'm going to ask.

25   Q    What time period would you say that you and Roberto and

1  Fernando and Juan Carlos Cortes were sort of running the

2  company?

3  A    I would say since 2009, and I would say through the time

4  that evolution consulting partners, which was a company even

5  consulting to the trust, existed.

6  Q    When was Biscayne liquidated?

7  A    I believe in 2018.

8  Q    And up until that time, did you and Roberto continue to

9  be involved in the decisionmaking of Biscayne?

10  A    Yes.  Not at the same level, I would say, because Roberto

11  was the CEO, I believe, until 2016, so he had full control.

12  But less control, but involvement, yes.

13  Q    Okay.  We will come back to that in a bit.

14        Was Fernando Haberer aware of the cash and liquidity

15  crunch problems that faced South Bay and Biscayne?

16  A    Yes.

17  Q    Was he aware that there was a constant need for cash?

18  A    Yes.

19  Q    And did he try to solve that or try to help solve that?

20  A    I believe so.

21  Q    Now, did you become aware at a certain point in time of a

22  way that Fernando Haberer had come up to generate some cash

23  for Biscayne?

24  A    Like what?

25  Q    Were you familiar -- have you ever heard of the idea of

Weisson - direct - Weintraub                    100

1    -- the phrase of an overdraft or an overdraft scheme?

2    A    Yes.

3    Q    Okay.  What did you understand that to be?

4    A    I understand that to be some type of a loop I believe

5    that Fernando Haberer found in which when there was a trade of

6    a Proprietary Product, once he would place the trade the bank

7    would disburse the funds before the actual settlement of the

8    trading of these -- of this product, and that -- in that time

9    period, which I believe was days, you know, there was cash

10   that became available.  But of course the purpose of that was

11   to simply finalize the settlement.  But at a certain point he

12   found that this was there and that it could be used, you know,

13   in the cash flow, for our cash flow needs.

14        THE COURT:  Was there anything that you understood

15   that was wrong about engaging in that kind of transaction?

16        THE WITNESS:  Yes.

17        THE COURT:  What was bad about that?

18        THE WITNESS:  It was bad because the purpose of that

19   money was to be available for when the settlement was going to

20   happen.  And if it was not available, then it had been used

21   inappropriately.

22        THE COURT:  So did the settlements not go forward?

23        THE WITNESS:  I think, from what I remember of him

24   complaining that basically he had to generate other trades in

25   other trades in order to be able to --

Weisson - direct - Weintraub                    101

1          THE COURT:  Cover that money?

2          THE WITNESS:  Exactly.

3   Q    Were the sales that were being input, the trades that

4   were being input that the bank advances the money at the trade

5   date, were those legit sales?

6          Were those real transactions?

7   A    I don't know.

8   Q    Okay.  Now, were you contemporaneously aware of this

9   overdraft idea and mechanism?

10  A    Yes.

11  Q    Okay.  Now, I want to go back to the cash flow

12  spreadsheet, which is Exhibit I-1.

13         Now, generally speaking, I want to ask, did you have

14  phone calls where this document or documents like this was

15  discussed?

16  A    Yes, periodically.

17  Q    And were those conference calls?

18  A    Sometimes they were conference calls.  Typically, if

19  Roberto and I were in Miami, our offices were next to each

20  other, so I would go to his office and we would both

21  personally review it while being in a conference call with

22  other people.

23  Q    Who else would be on the calls?

24  A    Typically Fernando Haberer and Juan Carlos Cortes and

25  Gustavo Trujillo.

1    Q    So there were times that there was going to be this

2    conference call and Gustavo and Fernando and Juan Carlos

3    Cortes, were they based in the U.S.?

4    A    No.

5    Q    Okay.  But you and Roberto were in the same office in

6    Miami; correct?

7    A    Yes.

8         Juan Carlos Cortes was based at the time, I believe,

9    in Miami, just to clarify.

10   Q    Okay.  But there were times when you were having this

11   call and some of the people were in South America, but you and

12   Roberto were together in the same office building right next

13   to each other?

14   A    Sometimes.  I mean, other times traveling or I was

15   traveling.

16   Q    Right.  But are there at least sometimes you remember

17   taking the phone call physically in the presence of Roberto

18   Cortes and discussing this spreadsheet?

19   A    Yes.

20   Q    Okay.  Now I want to go down to the bottom of the

21   spreadsheet.  There is a section in rows 216 and down where it

22   says -- row 216, column A reads DB NY overdraft?

23        Do you see that?

24   A    Yes.

25   Q    Does DB NY stand for Deutsche Bank New York?

1    A    Yes.

2    Q    Does this refer to the overdraft scheme that was

3    concocted by Fernando Haberer through Deutsche Bank?

4    A    Yes.

5    Q    Were there phone calls in which you discussed the cash

6    flow spreadsheet or otherwise where you had conversations

7    about overdrafts?

8    A    Yes.

9              MR. MYERS:  Judge, again, when were the calls made?

10   What year is he talking about?

11             THE COURT:  Please try and pinpoint it.

12   Q    Well, let's see, this column F is August 28, 2015.  Let

13   me sort of back up.

14             Did there come a point in time when the overdraft

15   scheme blew up?

16   A    I believe so.

17   Q    Do you remember when that was approximately?

18   A    No, I don't remember the date.

19   Q    No, but approximately what year?

20   A    No, I don't recall the exact year.

21             THE COURT:  Can you pinpoint it from when the SEC

22   investigation was?  Does that help you?

23             THE WITNESS:  I -- I -- you know, I may be wrong,

24   but it could have been, you know.

25             THE COURT:  It could have what?

1          THE WITNESS:  2017.  It could have gone all the way

2    to 2017.

3          THE COURT:  Could it have began before 2017?

4          THE WITNESS:  Yes.  2015.

5    Q    Column E, row 3 is 8/21/2015; correct?

6    A    Yes.

7    Q    And all the way down at the bottom -- sorry.  Sorry.

8          Column F, which would be August 28, 2015, there is a

9    reference to a million dollars of Deutsche Bank overdraft.

10         Do you see that?

11   A    Yes.

12   Q    So is it fair to say that the overdraft scheme existed at

13   least as early as August 2015?

14   A    Yes.

15   Q    And maybe went as far as into 2017?

16   A    Yes.

17         THE COURT:  Who was aware of this overdraft scheme?

18         THE WITNESS:  At least all reviewing the cash flow

19   for sure.

20         THE COURT:  So that would have included Mr. Cortes?

21         THE WITNESS:  I mean, myself, Mr. Roberto Cortes,

22   Mr. Juan Carlos Cortes, Fernando Haberer and Gustavo Trujillo.

23   Q    Were there times between August 2015 and 2017 where you

24   had calls and Fernando Haberer was saying we need money to

25   cover these overdrafts?

1    A    Yes.

2    Q    Can you describe what you recall about those calls?

3    A    Yes, I remember some of them very clearly because he was

4    very upset because he felt like this -- the covering of these

5    overdrafts were not -- was not being a priority, while in his

6    view it was something that affected him directly because he

7    was the one executing this scheme, if you will.

8    Q    Okay.

9            MR. WEINTRAUB:  That's all I need on this exhibit.

10           THE COURT:  All right.  I think at this point we

11   will take a luncheon recess, then.

12           MR. WEINTRAUB:  Your Honor, I have only three more

13   minutes with him, so if you want me to finish my direct, I'm

14   happy to.  But I'm happy to wait as well.

15           THE COURT:  That's all right.  If you can finish in

16   three minutes.

17           MR. WEINTRAUB:  I will.

18   Q    You said Biscayne liquidated in 2018, right?

19   A    Yes.

20   Q    Prior to the liquidation, did Roberto Cortes ever say we

21   should liquidate our assets and come clean to all of the

22   investors about what we have been doing for all these years?

23   A    No.

24   Q    Did he ever say we should go to the authorities?

25   A    No.

1   Q    Now, you mentioned that at some point you and he stepped

2   back from being as involved as you were; correct?

3   A    Yes.

4   Q    But you remained involved; correct?

5   A    Yes.

6   Q    You remained aware of what Haberer was doing to raise

7   money to keep Biscayne afloat; correct?

8   A    Yes.

9            THE COURT:  When you say "you," are you including

10  Roberto Cortes?

11  Q    Were you and Roberto Cortes both continually involved in

12  the decisionmaking?

13  A    Yes.

14  Q    Were you both aware of what Fernando was doing?

15  A    Yes.

16  Q    And that's up to the point of the liquidation in 2018?

17  A    Yes.

18           MR. WEINTRAUB:  I have no further questions.

19           THE COURT:  All right.  Then we will resume promptly

20  at 2:00.

21           (Lunch recess.)

22

23

24

25

Proceedings                                                      107

1              AFTERNOON SESSION:

2          (In open court.)

3          (Judge CAROL B. AMON enters the courtroom.)

4          THE COURTROOM DEPUTY:  All rise.

5          THE COURT:  Are we ready?

6          MR. WEINTRAUB:  Yes, Your Honor.

7          MR. MYERS:  Yes, Your Honor.

8          THE COURT:  Are we going to be able to finish the

9    witnesses today?

10         MR. WEINTRAUB:  So Your Honor, we were just talking

11   about that  .

12         We have been informed that Mr. Myers believes he has

13   maybe 30 minutes with Mr. Weisson and then our next and only

14   other witness we can do in two to two-and-a-half hours.

15         And if cross is tops an hour on that, we think that

16   we could be done by 6:00, if the Court's willing to stay.

17         THE COURT:  I have a 10:00 o'clock matter on

18   tomorrow, but I have the rest of the day open.

19         MR. WEINTRAUB:  What time does your 10:00 a.m.

20   conclude?

21         THE COURT:  Probably no later than 11:00.

22         MR. WEINTRAUB:  Well, we could certainly come back,

23   yeah, absolutely.  I mean, we can make whatever time tomorrow

24   needs to be made work.

25         THE COURT:  All right.  Well, let's try and get

1    through it if possible.

2            MR. WEINTRAUB:  Yes, Your Honor.

3    CROSS EXAMINATION

4    BY MR. MYERS:

5    Q    Good afternoon.

6    A    Good afternoon, sir.

7    Q    I represent Mr. Cortes, you understand that, right?

8    A    Yes, sir.

9    Q    Okay.

10            And let's just go back over the structure.

11            South Bay was a holding company, agreed?

12   A    Yes, sir.

13   Q    And Biscayne was set up to be like an international

14   wealth business, right?

15   A    Yes.

16   Q    And it was to be owned eventually by South Bay?

17   A    Yes.

18   Q    Okay.

19            South Bay wasn't just for real estate, was it?

20   A    No, in the sense that it had, for example, the shares of

21   Biscayne Capital.

22   Q    Okay.

23            And when you say they have the shares of

24   Biscayne Capital, the idea was to keep increasing the value of

25   those shares over time, right?

1    A    Yes.

2    Q    Okay.

3         And at some point, did you have discussions with

4    Mr. Cortes that you wanted to diversify South Bay out of just

5    Proprietary Products but into other vehicles?

6    A    Can you be more specific?

7    Q    Well, you wanted to make sure South Bay was income

8    producing, correct?

9    A    Yes.

10   Q    And explain that to the Judge, how would South Bay

11   produce income?

12   A    By developing and selling real estate.

13   Q    Okay.

14        And how about other fees based on trades, on stock

15   or any other portfolios?  Would they be able to do that or

16   not?

17   A    I don't think so.

18   Q    So it was just a hundred percent Propriety Products?  You

19   never involved yourself -- they never involved themselves?

20   A    I'm sorry.  When you say "they," what do you mean?

21   Q    South Bay.

22   A    Not -- not that I think of right now.

23   Q    Okay.

24        So your indication to the Court is that South Bay

25   dealt with just Propriety Products?

1  A    Well, I think it's more Biscayne than South Bay in

2  reality.

3  Q    Okay.

4        So how would you describe South Bay?

5  A    South Bay was a -- a real estate company, a real estate

6  development company, which will receive loans from these

7  Propriety Products.

8        THE COURT:  I am sorry, would receive what?

9        THE WITNESS:  Loans.

10 Q    And at some point --

11       THE COURT:  Loans from -- I did not hear you say

12 from whom.

13       THE WITNESS:  From the Propriety Products.

14 Q    And at some point did you have a discussion with

15 Mr. Cortes about expanding that business away from that?

16 A    Which business, I'm sorry?

17 Q    Expanding away from just Propriety Products?

18 A    No, that's not a business in the way I see it.

19 Q    Okay.

20       Was your goal to create like, subsidiaries of

21 Biscayne around the world?

22 A    When you say "you," you mean Mr. Cortes and I?

23 Q    Yes.

24 A    Yes.

25 Q    Okay.

1          And you listed some of those before, right?

2    A    Yes.

3    Q    Okay.

4          And can you explain to the Judge the structure of

5    class A shares held by South Bay; how would that work?

6    A    In my general understanding, there would be a class that

7    is -- was preferential to South Bay and then there would be, I

8    believe, two other classes, B and C.

9    Q    Okay.

10         And the B shares would be held by financial

11   advisors, right?

12   A    I think so.

13   Q    Okay.

14         So that was expanding the business of South Bay,

15   right, when you started to get into A shares and B shares.

16   A    Yes.

17   Q    Okay.

18         And from 2009 to 2016, Biscayne was growing, right?

19   A    Yes.

20   Q    You had roughly 1.5 billion under management?

21   A    Yes.

22   Q    And you would agree with me that it was a successful

23   company, correct?

24   A    I think so.

25   Q    Okay.

1           I want to talk to you now about this ORC Senior

2    Secured note which the Government asked you about.

3           So an investor buys ORC Secured Limited note,

4    correct?

5    A    Okay, yes.

6    Q    And ORC sends the money to whom, South Bay?

7    A    Yes.

8    Q    Okay.

9           And South Bay sends a promissory note to ORC,

10   correct?

11   A    Yes.

12   Q    Okay.

13          You were shown in Exhibit V, a section in -- you had

14   a -- you were asked by the Government about working capital.

15   Do you remember that on direct examination from the prosecutor

16   here?

17   A    Yes, sir.

18   Q    Okay.

19          And what is your understanding of working capital?

20   A    My understanding is that working capital is the capital

21   or money necessary for the operation of -- of a business,

22   to...

23   Q    Okay.

24   A    -- happen.

25   Q    And you said that -- I believe you said on direct

1   examination that paying a bank is acceptable, right?

2   A    In my opinion, it is, yes.

3   Q    Okay.

4        And how about paying another South Bay liability?

5   A    I think if there's a -- in this case, if we are talking

6   about ORC as a note --

7   Q    Yes.

8   A    -- or as Proprietary Product --

9   Q    Yes.

10  A    -- and it has certain conditions, the conditions are, you

11  know -- that would -- that would directly go to, in my view,

12  the project related to the issuing of that particular note.

13  Q    Okay.

14       And when you say "generally," where are you getting

15  your understanding from?

16  A    In this case, from the -- from the text of the document.

17  Q    Okay.

18       MR. MYERS:  So Your Honor, if I could just use the

19  ELMO here.  I'm not so sure if that's going to come up

20  automatically.

21       THE COURT:  Can you tell me what document this is

22  you are showing?

23       MR. MYERS:  This is the same thing we were talking

24  about before, the ORC.

25       THE COURT:  What exhibit number is it?

1    MR. MYERS:  That was V, as in victory.

2    THE COURT:  Okay.

3    (Exhibit published.)

4  Q   So you see that, Mr. Weisson, it's part of that ORC

5  Senior Secured Limited note.  It says there:  The issuer will

6  primarily invest in South Bay.

7    THE COURT:  These are your markings on the document?

8    MR. MYERS:  Yes, I just highlighted that.

9  A   I see it, sir.

10  Q   Okay.

11    Let me go back.

12    Did you ever read any of these documents?

13  A   At a certain point, yes.  Maybe not initially when they

14  were issued.

15  Q   So when you say at some point, was that with meeting with

16  the prosecutor?

17  A   No.  Way before, when dealing with the SEC.

18  Q   Okay.

19    So before that, you -- you start off as an

20  architect, right?

21  A   Yes, sir.

22  Q   I'm not being mean or anything, but you don't have any

23  legal training, do you?

24  A   No, sir.

25  Q   Okay.

Weisson - cross - Myers                    115

1          So did you ever sit down when the client was there

2     and read this to them and explain these documents?

3     A    No.

4     Q    Okay.

5          Were some of these documents -- were they ever --

6     had multiple additions of the same editions of the same

7     document?

8     A    I believe it did -- they did have, multiple versions.

9     Q    And here, the word that I've highlighted is "primarily."

10         The issuer will primarily invest in South Bay

11    Holdings.

12         Do you take that to mean that there are other

13    options that the issuer will -- could invest in South Bay in

14    other manners, like expenses, liabilities?

15    A    I think that would be an interpretation.  I don't want to

16    go into interpretations.

17    Q    Okay.

18         Well, didn't you have to sit down with clients and

19    explain what that word potentially meant?

20    A    No, I wasn't a financial advisor.

21    Q    Okay.

22         And down below that it says:  It's understood that

23    South Bay will in turn use proceeds of such investment for its

24    working capital needs.

25         You see that, right?  And we went over those terms,

1    right?

2    A    Yes, sir.

3    Q    And since you're not an advisor, you wouldn't go over

4    these terms with them, right?

5    A    No.

6    Q    Okay.

7         Some of the money, Mr. Weisson, in this particular

8    note, like ORC Senior Secured, did it go from South Bay and

9    eventually end up at Biscayne?

10    A    I think so.

11    Q    So when you say you think so, that means it didn't stay

12    with South Bay and wasn't pegged toward specifically something

13    that South Bay was doing, correct?  It could have been moved

14    to Biscayne.

15    A    That is correct.

16         THE COURT:  I am sorry, Counsel.  I am not clear on

17    your question.

18         Is it did that happen that it didn't stay with

19    South Bay?  Is that -- are you asking what factually happened?

20         MR. MYERS:  Yes.

21         THE COURT:  So there were instances where the money

22    didn't stay with South Bay but went somewhere else?

23         THE WITNESS:  Yes.  In this case, I think in -- in,

24    in -- in the example was it would go to Biscayne Capital.

25    Q    Correct.

1   A    And I said yes.

2   Q    And you didn't see anything illegal about that, did you?

3   A    No.

4   Q    Let's just talk about --

5          THE COURT:  What would have been -- excuse me.

6          What would have been the purpose of the money going

7   to Biscayne Capital?

8          THE WITNESS:  If the money is going to South Bay

9   Holdings --

10          THE COURT:  Yes.

11          THE WITNESS:  -- South Bay Holdings was the owner of

12   Biscayne Capital.  So in a way South Bay Holdings had two

13   businesses; the real estate development on the one hand and

14   then the financial business on the other hand, which the

15   financial business needed, of course, also capital to be

16   injected from time to time.

17   Q    So there it is, the financial side of it needed money

18   from time to time, right?

19   A    Yes.

20   Q    And that wasn't illegal?

21   A    I don't know if it's illegal or not.  I don't think so,

22   I'm not a lawyer.

23   Q    Okay.

24   A    But I don't think so.

25          THE COURT:  What did it need money for?

1           THE WITNESS:  The business model of

2    Biscayne Capital, in my general recollection, was to bring

3    financial advisors from other broker-dealers, or platforms,

4    and to grow the assets under management of that business, in

5    this case, Biscayne Capital, and typically, the way I saw,

6    that financial advisors were brought, were attracted to this

7    new business, if you will, within the market, was by giving

8    them incentive bonuses at -- when they were coming in to the

9    business.  And that is an example of something that would need

10   capital in order to bring these financial advisors.

11          MR. MYERS:  Is that it, Judge?

12          THE COURT:  Yes.

13   Q    So the prosecutor was asking you -- let's move on to the

14   Chatburn email, which I have up on the screen now.

15          (Exhibit published.)

16   Q    You see on the underline there:  Today for 350 to 500.

17          MR. MYERS:  That's Exhibit, Your Honor, AD, Chatburn

18   email.

19   Q    So an advisor sells a note to a client, and the client

20   may not want to hold some of those notes to maturity.

21          Is that a true statement?  Sometimes a client will

22   not hold the note to say, a five-year note, they want to cash

23   out after four years?

24   A    Could be the case.

25   Q    So when we refer to liquidity, that could mean that,

1  potentially, you might need to have cash on hand in case

2  somebody wants to cash out.  They don't want to wait five

3  years, they want to cash out after four.

4  A    I mean, I don't know the mechanics or the mechanics of

5  the note itself, but in my understanding a money market, as an

6  instrument, should have -- should always have liquid

7  investments.

8  Q    Okay.

9         And I'm not going to go over that cash flow sheet

10 that you showed us, that was the Government showed you.

11        Is it a true statement that the group of you who

12 were the controlling group, were trying to not just pay out on

13 notes that were being matured, but rather satisfy some

14 investors who needed liquidity?

15 A    Can you repeat the question?

16 Q    Sure.

17        If somebody after -- has a five-year note, they call

18 up and they say after four years, say an advisor may call you

19 and say, hey, my client needs money, and the note's not due

20 for another year, you guys owe him the principal and the

21 interest, but he's calling up to get his money, where do you

22 get the money from?

23 A    I would say from -- from what is in the inflows, if that

24 is the case because, you know, when selling different notes,

25 there would be, you know, money coming in to the company and

1    then that would be the money we would use.

2    Q    Okay.

3         You wouldn't consider that to be wrong, would you?

4         THE COURT:  What to be wrong?

5    Q    The paying off of that investor by using new money that's

6    coming in, would you?

7    A    Yes, I would consider it wrong.

8    Q    You would consider it to be wrong.

9         So you would tell the investor then, we can't give

10   you any -- offer you any liquidity, you have to wait for the

11   fifth year for your mature note.

12   A    If, in the example you are representing, if I understand

13   correctly, I would say that if an investor purchase a certain

14   product, you know, at FAs, and basically waits, and in that

15   case, the maturities are a certain time, there shouldn't be a

16   reason why that investor is requesting money before the

17   maturity.

18        So I would say, no, if that is the case

19   specifically.

20   Q    Okay.

21        So in, say, 2005 up to 2016, did you ever have the

22   experience of an investor calling, or an advisor calling and

23   saying, hey, one of my clients needs cash, liquidity?

24   A    Yes.

25   Q    His note is not due for two years.

1          Would you just tell him tough luck?

2    A    Okay.

3          THE COURT:  Well, the question I think, first of

4    all, is whether that ever happened.

5          Do you remember a financial advisor calling you and

6    saying I have a client, the note is not due, but he wants to

7    be paid now.

8          Do you ever remember that happening?

9          THE WITNESS:  I don't recall that happening as

10   someone who had a maturity that wanted to, for some reason,

11   you know, make liquid the investment before maturity.

12         THE COURT:  But you had the advisors call you up and

13   say, look, this guy's note is due and he wants the money.

14         You had that happen.  Or not?

15         THE WITNESS:  I could -- I could point out to a

16   different type of situation, if -- if that is the case.

17         THE COURT:  But were there occasions when that

18   happened?

19         In other words, the note was due and the guy wants

20   his money.

21         Do you recall being called and asked about that?

22         THE WITNESS:  Yes, there were -- there were times

23   with the notes had maturities, in which case not only -- in

24   that case, I would say yes.  If there was a maturity, and --

25   and clients, you know, were expecting their money at that

Weisson - cross - Myers                    122

1    particular time, an advisor would say, hey, the note is

2    maturing and my client is not going to renew and everything,

3    therefore, he's going to need the money.

4    Q    Okay.

5         So it is your, I'll say understanding, not right,

6    wrong, or illegal, but it's your understanding that you were

7    not permitted to pay people's maturing notes with money that

8    was coming in.  The money's coming in, you have a note that's

9    matured, I have to have new money, I'm going to use the new

10   money to pay off the old debt.

11        Your understanding is you're not permitted to do

12   that in business.

13   A    In this -- in our business, I think we were not.

14   Q    Okay.

15        How many advisors were there, roughly, in 2016?

16   A    I think around 30.

17   Q    And roughly, how many clients?

18   A    More than hundred, probably.

19   Q    More than --

20   A    100, probably.  I don't have a -- an exact number, but...

21   Q    Okay.

22        And you agreed with me that there was about

23   1.6 billion under management?

24   A    Yes.

25   Q    Okay.

Weisson - cross - Myers                    123

1          And do you agree with me that about 90 percent of

2    that 1.6 billion had nothing to do with Propriety Products?

3    A    More or less.

4    Q    So those shares in Biscayne were extremely valuable in

5    2016, correct?

6    A    I don't -- I don't -- I don't know about what the value

7    of the shares were.

8    Q    Well, I'm not asking you whether the exact value, but you

9    agree with me that they were very valuable.

10   A    I don't -- I don't know if they were very valuable.

11   Q    Okay.

12         At some point, did you or the group make an attempt

13   to purchase Raymond James?

14         THE COURT:  I could not hear you.

15         What was your --

16   Q    In 2015, did you try to purchase Raymond James in

17   Uruguay?

18   A    Yes, sir.

19   Q    Okay.

20         And do you remember that that was -- you would had

21   to pay about 9 million for that?

22   A    No.

23   Q    No, it wasn't 9 million or no --

24   A    No.  I'm sorry.

25         No, I don't remember the details of the transaction.

1    Q    Okay.  Okay.

2         You agree with me that Raymond James in Uruguay had

3    a massive book of clients, right?

4    A    That's what I understood at that time.

5    Q    Did you -- did you have some communication with

6    Mr. Cortes here that you could afford that Biscayne was doing

7    well enough to afford to buy out the book of Raymond James?

8    A    Yes.

9    Q    Do you recall having a conversation with Mr. Cortes that

10   you could not only buy out that book, but you could cover the

11   liabilities of South Bay?

12   A    With the same transaction, you mean?

13   Q    Well, that you had enough assets, that the company was

14   worth enough to not only make that purchase, whether it was 9

15   million or not, you can't recall, but also cover your

16   liabilities at the same time.

17        The 9 million or whatever to buy it out was not

18   going to bankrupt you, was it?

19   A    Well, it was going to simply increase our debt, our

20   general debt.

21   Q    Okay.

22        And in running a business, many businesses like this

23   have debt, right?

24   A    Some, yeah.

25   Q    Do you know, in what I put up on the screen there where

1    it's underlined --

2             (Exhibit published.)

3    Q    Today, check and see if you can do an urgent trade today

4    for 350 to 500.

5             Do you have any idea what Mr. Cortes was referring

6    to?

7    A    Yes.

8    Q    Tell us.

9    A    Mr. Chatburn needed the 30,000 that he -- in the initial

10   part of the email was requesting, and Mr. Cortes was saying --

11   was asking for -- for Mr. Chatburn to at least bring that

12   amount of money that is highlighted there in order for Frank

13   to be able to receive that money and give it to his client.

14   Q    Okay.

15            And so back to my earlier question, isn't this

16   Chatburn asked for a client to cash out or that he needed cash

17   immediately?

18   A    Yes.

19   Q    And the only way to generate that is to do trades where

20   everybody makes a commission and you can pay Chatburn his

21   $30,000, right?

22   A    Not necessarily.

23            (Pause in the proceedings.)

24   Q    You're familiar with the -- that commerce liquidity note

25   that we spoke about earlier, right?

1   A     Yeah.  Yes.

2   Q     Now, who's Nicholás Barcia?

3   A     He was the -- the person at the trading desk doing the

4   trades for the financial advisors.

5   Q     Now, earlier, I think on direct, you said that the money

6   market liquidity was used only to buy Propriety Products; is

7   that your statement?

8   A     I don't think I -- I said that with those words.

9   Q     Okay.  But let me just rephrase.

10          Is that your position that the money market

11  liquidity would only be used to buy Proprietary Products?

12  A     You mean the money market that -- that was issued by us.

13  Q     Yes.

14  A     Yes.  It was -- no, it was used as part of the whole cash

15  flow, I would say.

16          THE COURT:  As part of what?

17          THE WITNESS:  Part of the whole cash flow.

18          THE COURT:  I am sorry, I could not --

19          MR. MYERS:  The whole cash flow.

20          THE COURT:  Oh.

21          THE WITNESS:  The whole cash flow.

22  Q     Okay.

23          MR. MYERS:  Let me just show you this email.

24          (Exhibit published.)

25          MR. WEINTRAUB:  Is it an exhibit?

1          MR. MYERS:  No, I'm just seeing if he's familiar

2     with this email here.  I didn't mark it.

3     Q    If you could just read that, Mr. Weisson?

4          You speak Spanish, right?

5     A    Yes, sir.

6     Q    If you could just read that email, there.

7     A    Okay.

8     Q    Now, were you -- are you familiar with this email?

9     A    I'm -- I don't recall having seen it.  Maybe it was sent

10    to me, but I don't recall.

11    Q    Are you -- are you familiar with the fact that Nicholás

12    Barcia and Mr. Cortes, they were in communication a lot,

13    right?

14    A    Yes.

15    Q    And Mr. Cortes was adamant that Barcia should be

16    investing in high -- high-grade corporate securities all the

17    time, correct?

18    A    No, I didn't know of the mechanics of that.

19    Q    You didn't know the mechanics of that.

20         Okay.

21         Is it -- is it true that Mr. Cortes instructed

22    Barcia to buy things that were nonpropriety products, such as,

23    let me show you this.

24         (Exhibit published.)

25    Q    Those, what I would consider to be -- or Cortes says

1  high-grade corporate securities, such as those company;

2  caterpillar, General Electric.

3          That would be high-grade securities, right?

4  A    I'm not familiarize with the companies, but, so I cannot

5  tell you if --

6  Q    Okay.

7          Are you familiar with the fact that Cortes was

8  always talking to Barcia about high-grade securities?  That he

9  didn't want to invest in low-grade products?

10 A    No, I never knew they were investing in that.

11 Q    Okay.

12         Were you -- are you at all familiar with their

13 communication and what they were talking about or not?

14 A    I mean, not in this sense.

15 Q    Okay.

16         In what other sense?

17 A    In the sense that if someone needed a trade, like the

18 example we saw with Chatburn, but never -- I didn't know that

19 the company was purchasing shares or -- or securities in

20 the -- of any type.

21 Q    Okay.

22         Are you at all familiar -- are you at all familiar

23 with the fact that Barcia would invest in securities,

24 nonproprietary, that were just stocks; like cash, Caterpillar,

25 GE, things like that?

1   A    I wasn't aware, but I mean it wouldn't -- I mean, it

2   wouldn't surprise me.

3   Q    Okay.

4         Is it true that you -- the timeframe that you were

5   working with Mr. Cortes, was roughly 2003 to 2015?

6   A    No.

7   Q    Okay.

8         Well, you cut off your relationship with Mr. Cortes

9   when you started running Madison, right?

10  A    No, I wasn't running Madison.

11  Q    Okay.

12        Well, you patented in Madison, right?

13  A    No.  Madison was a company owned by Gustavo Trujillo and

14  he was the one managing it.

15  Q    Okay.

16        Did you -- the separate question.  Did you

17  participate with Trujillo in Madison in any day-to-day

18  operations of Madison?  Did you ever do anything with them

19  concerning Madison?

20  A    No, I did -- I would say businesses with Madison, but

21  not -- I wasn't managing Madison at all.

22  Q    Okay.

23        I didn't use the word "managing."

24        Did you do business with them?

25  A    I did businesses, yeah, with Madison, yes.

1   Q    Okay.

2        Now, when you left Biscayne, what country were you

3   in at that time?

4        When Biscayne was closing up and you were where, in

5   Uruguay or Buenos Aires?

6   A    I don't recall where I was at the time.

7        You mean at the time of the settlement?

8   Q    Yes.

9   A    I think I was in Miami, but I may be wrong.

10  Q    Okay.  Okay.

11       You have a lot of connections to Ecuador, right?

12  A    Yes.

13  Q    Okay.

14       Who's Alex Bravo?

15  A    He's a person that I -- I seen -- I've seen in the news.

16  That's what I can, you know, his name is -- is...

17  Q    Okay.

18       So he's the general manager of Petroecuador, right?

19  A    I don't know exactly what position he had.

20  Q    Okay.

21       Did you cash checks for Alex Bravo?

22  A    No, not that I recall.

23  Q    Okay.

24       Who's Ivan Rueda?

25  A    Who, I'm sorry?

1    Q    Ivan Rueda, R-U-E-D-A.  Who is that?

2    A    I don't know.

3    Q    Okay.

4         Did you ever tell Mr. Trujillo to open accounts at

5    Amcorp using Cortes's father's name?

6    A    No.

7    Q    You never did that?

8    A    No, sir.

9    Q    Did you ever hear of anyone doing that at the company?

10   A    No, sir.

11   Q    The day-to-day booking at South Bay, that was done by

12   your brother Javier and you, right?

13   A    No, sir.

14   Q    Who did the bookkeeping?

15   A    Different accountants that we had through time for

16   South Bay.

17        My brother had a role of simply closing the books

18   when -- when we would have a -- a -- an audit.  And for a

19   certain period of time, when he graduated from the university,

20   he worked there for a year, I believe.

21   Q    All right.

22        Did you have anything to do with the books at

23   South Bay?

24   A    Yes.  Roberto and I were involved --

25   Q    I didn't ask about Roberto.  You.

1  A    Yes.

2  Q    You did.

3        THE COURT:  What did you have to do with the books?

4        THE WITNESS:  You know, checking the information and

5  making sure, you know, everything makes sense, that, you know,

6  sometimes when you see something, that could be something that

7  is off balance or something.  I mean, things like that.

8  Q    Okay.

9        Describe for the Judge what Villa Hermosa is.

10 A    Okay.

11       Villa Hermosa is a low-income housing project in

12 Ecuador.

13 Q    Okay.

14       And you went -- and that was your investment,

15 correct?

16 A    Yes, sir.

17 Q    Okay.

18       And at the start of that -- when did you start that

19 up?

20 A    I would say when I purchased the land.

21 Q    Okay.

22 A    Which was about, I don't know, October 2012.

23 Q    Okay.

24       So in 2012, you never told Mr. Cortes about that,

25 right?

1    A    I told him, yes.

2    Q    No, you didn't tell him in 2012 that you owned Villa

3    Hermosa, did you?

4    A    I don't recall the exact date, but it could have been

5    months after, probably.

6    Q    Okay.

7          Isn't it true that Mr. Cortes confronted you in

8    Miami because he found out that you were doing a project

9    behind his back?

10   A    No.

11   Q    Isn't that true?

12   A    No, not the way you are presenting it.

13   Q    Oh.

14         So in -- with your recollection, when do you recall

15   Mr. Cortes confronting you about an investment called Villa

16   Hermosa in Ecuador?

17   A    I told him about that before confront -- you know, having

18   a confrontation, if that's what you mean.  And afterwards, he

19   was desperate to have that project in the books of the

20   company.  And I said no.  And that's what -- when he started

21   confronting me regarding that particular project.

22   Q    Well, you used the -- those SPVs, special project

23   vehicle, to fund Villa Hermosa, right?

24   A    Yes.

25   Q    And that was through Madison, not Biscayne, right?

1  A    Yes.

2  Q    Okay.

3        So you had a direct connection to this company

4  Madison, right?  It wasn't just some superficial relationship.

5  You used SPVs through Madison to fund your project in Ecuador.

6  A    Yes.

7  Q    And you told Mr. Cortes that you were doing this funding

8  through Madison?

9  A    No.

10 Q    Villa Hermosa, that's actually owned by a company called

11 Centra Dagasa, right?

12 A    Yes, something like that.

13 Q    And your brother Javier and Ernesto Senior owned that?

14 A    No, sir.

15 Q    You eventually approached Mr. Cortes to try to give you

16 more money for Villa Hermosa, right?

17 A    Yes.

18 Q    Did you use -- did you utilize a promissory note from

19 South Bay to pay off a loan by your father-in-law?

20 A    Can you make the question more clear?

21 Q    You managed South Bay accounting, right?

22 A    I'm sorry?

23 Q    You were managing South Bay's accounting.

24 A    Yes.

25 Q    Okay.

1           And at some point, did you direct someone, like an

2   auditor, to utilize a promissory note from South Bay to pay

3   off a loan that your father-in-law had?

4   A    You will have to give me a specifics, because I'm not

5   understanding exactly.

6   Q    Did your father-in-law have a loan that needed to be paid

7   off, ever in your life?

8   A    You mean that he gave a loan to South Bay?

9   Q    Yes.

10  A    Okay.

11          Yes, he gave loans to South Bay at times.

12  Q    Did you -- did you -- did you have that loan paid off

13  through the company?

14  A    Yes.

15  Q    Okay.

16          And how did you go about that?

17  A    I would speak with Robert, I say, hey, my father-in-law,

18  you know, he's -- is -- is requesting to be paid the loan

19  that, you know, we offered to pay long time ago and we have to

20  pay him.

21  Q    Okay.

22          And did you take funds from another investor and

23  give it to your father-in-law to pay off the loan?

24  A    We would take money from South Bay --

25  Q    I didn't say -- I'm sorry.  I don't mean to be rude, but

1  you keep saying "we."

2          I'm asking if you did it.

3  A    Yes, sir.

4  Q    All right.

5          What does the term "free delivery" mean?

6          If you have securities that are available for free

7  delivery, what does that mean?

8  A    I'm not a -- again, an expert in the -- in the financial

9  part of the business, but it is my understanding that is

10  sending a -- a -- a position or a note directly to an account.

11  Q    Okay.

12          At some point in time, did you receive cash from

13  clients in Ecuador or Argentina that were paid with these free

14  delivery -- in this free delivery situation; paid with those

15  notes?

16  A    I don't recall.  You would have to offer me specifics to

17  see, you know.  I'm not -- in the way you're presenting it, I

18  don't think so.

19  Q    Did you ever receive cash?  Somebody would just come and

20  give you, personally, cash from Ecuador?

21          THE COURT:  I think you have got to be more

22  specific.

23          What type of person coming in?

24  Q    Any of your friends, any -- anybody in your family; would

25  they give you cash?

1           THE COURT:  To do what?

2   Q    To just give it to you because they knew you were an

3   investor.

4           Did your family or friends just come and give you

5   cash?

6   A    Yes.

7   Q    Not an investor, now.  Family or friends give you cash.

8   A    Yes.

9   Q    Okay.

10          And who would that be?

11  A    For example, it could be my father-in-law or my father or

12  somebody else.

13  Q    Okay.

14          And did you receive any cash from somebody in

15  Ecuador that you knew?

16  A    Yes.

17  Q    And what did you do with the cash?

18  A    Invested it sometimes in South Bay.  I, you know, I

19  sometimes gave loans to South Bay myself.

20  Q    Okay.

21          And were the clients supposed to receive notes in

22  return for the cash?

23  A    Yes.

24  Q    Okay.

25          Would you keep the cash yourself?  Did you ever have

1  occasion to keep the cash?

2  A    If I receive the cash because I requested it, this was

3  invested somewhere.

4  Q    Okay.

5        So you never kept any cash.  For yourself, I mean.

6  A    No.  No.  No, sir.

7  Q    Okay.

8        Did you -- when you were operating Madison and you

9  were part of Madison, did you ever specifically tell Trujillo,

10 don't tell Cortes that we're operating Madison behind his

11 back?

12 A    The first part of your question is, I don't agree.

13 Q    The first part of "they're operating"?  You had --

14 A    Can you repeat the question?

15 Q    You had deals with Madison, right?

16 A    Can you repeat the question, please?

17 Q    I'm breaking it down for you.

18        You have deals with Madison.

19 A    Business deals, yes.

20 Q    Business deals with Madison.

21        And you specifically told Trujillo that you didn't

22 want Cortes to know about Madison, correct?

23 A    When you say "Madison," all of my dealings?  My business

24 dealings --

25 Q    Yes.

1    A    Yes.

2    Q    I just want to move very quickly to Mr. Ferran.

3         Are you familiar with the Ferran and Cinnamon Bark

4    deal?

5    A    Yes, sir.

6    Q    Okay.

7         And how are you familiar with that deal?  Why are

8    you familiar with it?

9    A    Because I participated with Roberto in -- in -- in

10   presenting the deal to Ferran.

11   Q    Okay.

12        And did Mr. Ferran fulfill 100 percent his

13   obligations, his promises to you financially about Cinnamon

14   Bark?

15   A    I think partially.

16   Q    Partially.

17        So when an investor comes and partially invests, do

18   you take that partial payment you were talking of earlier

19   about mortgages, would you use his partial payment, in this

20   example Ferran, to pay off mortgages on properties that

21   existed; yes or no?

22   A    Could be.

23   Q    Okay.

24        And if an investor like Ferran wanted to he,

25   himself, have the first mortgage, could you use his money to

Weisson - cross - Myers                    140

1   go pay off an existing mortgage first, and then he would have

2   a first mortgage?

3   A    If that's something that was disclosed to him and he was

4   clear about that, yes.

5            THE COURT:  Did that happen?

6            THE WITNESS:  I don't -- I don't think it happened

7   that way.

8   Q    You don't think.

9            Do you have a vivid memory of the conversations?

10  A    Yes.

11  Q    What year was that?

12  A    It was 2000 -- 2015.

13  Q    Okay.

14           And where were you when you were having these

15  conversations?

16  A    In -- in -- when we were at the office, or we were at

17  Ocean Reef, or there were conversations even at the

18  Intercontinental Hotel.

19  Q    Okay.

20           So you were walking around with him having these

21  conversations.

22  A    We would sit down and have a conversation.

23  Q    Okay.

24           Did you say earlier that Ferran -- a Select fund was

25  created specifically for him, right?

1   A    Yes.

2   Q    Well, actually, isn't it true that the IACAP, I-A-C-A-P,

3   IACAP Series 62 was really what he invested in?

4   A    I don't know what that -- you are talking about terms

5   that I -- I'm not familiarized, I mean, with the details, so.

6   Q    Okay.

7        So you're familiar with Select but you're not

8   familiar with IACAP?

9   A    You're -- you said a number.  I don't know what the

10  number refers to.

11  Q    Forget the 62.

12       Are you familiar with IACAP?

13  A    Yes.

14  Q    Tell the Judge what IACAP is.

15  A    I believe it's the company is that owns or that

16  structures the issuance of these other companies like Select.

17  Q    So you can't just -- Ferran can't walk up to you and

18  Cortes and say, I'm just going to have my own fund and it's

19  going to be called Select and we're just going to make that up

20  tomorrow morning, right?  It has to go through IACAP.

21  A    Yes.

22  Q    And do you know -- did you ever read over the IACAP

23  prospectus?

24  A    No.

25  Q    The money that was supposed to go into, quote, escrow,

1    the escrow account for Cinnamon Bark, for those properties,

2    those -- that escrow could only be set up at the building

3    phase, correct?

4    A    I think so.

5    Q    You never reached a building phase for Cinnamon Bark,

6    right?  For Ferran?

7    A    Oh, with Ferran?  No.

8    Q    Ferran.

9              Did eventually that property come into a

10   controversial lawsuit between the trust and the liquidators?

11   A    At which property?  I'm sorry.

12   Q    The Cinnamon Cay.

13   A    The which one?

14   Q    The entire lot of properties.  Did it come into the

15   subject of a lawsuit between the trust and liquidators?

16   A    I don't know.  Once the liquidators came in, I -- I -- I

17   don't know what exactly happened or what, what they did with

18   the properties or what...

19   Q    Okay.

20              Were you involved in a lawsuit where the trust where

21   the liquidators brought a lawsuit against you, Haberer and

22   Trujillo?

23   A    There is a lawsuit from the liquidators in which -- which

24   I believe is the <u>Michael Pearson versus Ernesto Weisson, et</u>

25   <u>al.</u>, if that is the one you are referring to, yes.

Weisson - cross - Myers                    143

Q    The liquidity product that you spoke about, was that
the -- when we referred to Nicholás Barcia, that senior VP
head of trading, he and Cortes were working together on
certain things, correct?

A    I believe so.

Q    And just describe in ten seconds or less, what is the
liquidity product?

A    It's a -- a -- it's a product that was issued to -- for
clients to instead of having cash, put it in a -- in a product
that is liquid, meaning it could be -- they can get their
money almost immediately, I believe in three days, but they
could make a small interest on that money.

Q    Okay.

        At some point, was a liquidity money market fund
created?

A    Can you repeat the question?

Q    At some point, was a liquidity money market fund created?

A    A liquidity fund was created.  I don't know if it was a
money market itself.

Q    Okay.

        In this time period, about 2010 to 2015, you had any
dealings with Commerz Bank, it's C-O-M-M-E-R-Z, it's a German
bank?

A    When you say "you," who are you referring to?

Q    You, Trujillo, Haberer, Cortes.  The four of you.

1  A    I wasn't involved in the -- in the technicalities of

2  this, although, of course, I was aware.

3  Q    Okay.

4         So you're familiar with Commerz Bank Germany?

5  A    Yes, I mean it sounds familiar.

6  Q    Okay.

7         At the time of this -- the -- what we were referring

8  to as this liquidity money market fund, is this about the same

9  time that Haberer and you broke off and were dealing with

10 Madison?

11 A    You would have to guide me a little bit --

12 Q    Well, what time did you break off?

13         THE COURT:  Break off from --

14 Q    -- did you break off--

15 A    Time.

16 Q    -- from Biscayne?

17 A    I think it was in 2018.

18 Q    2018.

19         At some point, did you sell the securities that were

20 in the -- that Commerz Bank liquidity fund?  Did you -- did

21 you sell that off?

22 A    When you say "you," whom are you referring to, please?

23 Q    You.  Weisson.

24 A    No.

25 Q    Mr. Weisson.

1  A    No.

2  Q    Okay.

3        Did you have any dealings in moving money, in

4  dealing with Madison, now, transferring cash from Biscayne,

5  out of Biscayne, into Madison, into a new IACAP product?

6        Did you ever do that?

7  A    Not that I recall.

8  Q    So in 2016 you did not move all the cash that was on the

9  books into a Madison account from this IACAP product?

10 A    I couldn't because I didn't have access to it to do it

11 myself, so I don't --

12 Q    Did you tell anybody at Madison to do it?  Trujillo?

13 A    No.

14 Q    Okay.

15        Who would be responsible at Madison, if you know,

16 for say, funneling the money to this new IACAP?  Would that be

17 Haberer and Trujillo?

18 A    I would say that Trujillo is -- was the -- the only

19 person with authority because he was the owner of that

20 company.

21 Q    Just describe to us what self-clearing is.

22 A    I'm -- I don't know, I don't know the exact, you know,

23 technical -- technical parts of it, so it would be difficult

24 for me to describe, although I'm, you know, I'm familiarized

25 with the term.

1  Q    Okay.

2         Would you agree with me that it makes business --

3  you control, to a certain amount, you would control trades and

4  you wouldn't have to rely on a third-party?

5  A    Again, when you say "you," you are talking about me

6  or...?

7  Q    I'm talking about you as a business person.  I'm trying

8  to understand self-clearing.

9  A    I -- no, I don't have the knowledge.  I mean, I'm an

10  architect, so there are things that I'm not exactly sure how

11  they work.

12  Q    Okay.

13        So you don't, -- you don't have -- you wouldn't have

14  any knowledge about how to do self-clearing yourself?

15  A    No, sir.

16  Q    And in 2016, you didn't do any kind of self-clearing with

17  Trujillo or Haberer?

18  A    Not that I recall.

19  Q    All right.

20        At some point, when you were dealing with Madison,

21  how many -- what kind of assets would you say were the total

22  amount of assets at Madison?

23  A    Assets, you mean assets under management or?

24  Q    Yes, assets under management.

25  A    I don't know.  I -- I know in Biscayne, but not in -- not

1    in Madison.

2    Q     Yeah.

3          So were you privy to the books at Madison?

4    A     I'm sorry?

5    Q     Were you privy to, were you knowledgeable about the books

6    at Madison?

7    A     No.

8    Q     Okay.

9          Do you know why Madison was set up?

10   A     I understand that that's -- there was a company created

11   by Roberto's father, so, and then was sold to Trujillo.

12   That's my knowledge of Madison.

13   Q     I'm sorry.  The last part?

14   A     That I -- my understanding is that company was created by

15   the father of Roberto, Roberto Cortes Rueda and then sold to

16   Trujillo.

17   Q     Okay.

18         And then is it not true that Mr. Cortes's father is

19   a lawyer, right?

20   A     Yes.

21   Q     So when you say he set it up, he did the legal paperwork

22   behind it, right?

23   A     I imagine.

24   Q     Okay.

25         And then Trujillo was the one operating it?

1   A    He -- from what Trujillo told me, he purchased it.

2   Q    Okay.

3   A    He paid for it to -- to -- to Roberto's father.

4   Q    Wait.

5        He paid -- he paid -- you're saying he paid

6   Mr. Cortes's father for the -- for Madison?

7   A    It's something that he told me in Uruguay, yes.

8   Q    Okay.

9        And at what point did you and Trujillo start working

10  together?  What year in Madison?

11  A    What do you mean by working together in Madison?

12  Q    Did you do anything with Madison or you just live in

13  Miami, Florida?

14       Did you do anything with Madison businesswise or

15  not?

16  A    What is the question, then?  I'm sorry.

17  Q    Did you do business with Madison?

18  A    Yes, I got a loan from Madison.

19  Q    You got a loan.

20  A    Yes.

21  Q    Is that it?

22  A    And besides that, I was, along with other people, like

23  Trujillo, Haberer, Roberto and Juan Carlos, managing the cash

24  flows.  So that we were doing together.

25       That doesn't mean that I was part of Madison.

1    Q    So you were managing cash flows, but you weren't part of

2    the company?

3    A    We were managing the cash flows for South Bay and

4    Biscayne.  Because Madison, in my understanding, was the -- I

5    would say, the bank account to move the money.

6    Q    So you were instrumental in moving the money?

7    A    I wasn't instrumental.  I'm saying that I was

8    knowledgeable.

9    Q    How would you become knowledgeable?

10   A    Because whenever we were checking the cash flow --

11   Q    Who's "we"?

12   A    Again, Roberto, Juan Carlos, Haberer and Trujillo.

13            THE COURT:  When you say Roberto, are you referring

14   to the defendant?

15            THE WITNESS:  Yes, Mr. Cortes.

16   Q    Okay.

17            So before you got around a table and you're looking

18   at the cash flows, right?

19   A    The five of us, yes.

20   Q    Okay.

21            And what year is this?

22   A    I would say up to 2000 -- the cash flow itself, probably

23   up to 2017.

24   Q    Okay.

25            And so in 2017, you're looking over the cash flows,

1   and is Madison set up that same year?  You said --

2   A    Oh, no.  I don't -- I don't know when it was set up.  I

3   didn't say it was set up that year.

4   Q    Okay.

5        Were you taking money from Biscayne, you, Trujillo,

6   or Haberer, and moving it from Biscayne accounts over to the

7   Madison accounts with these cash flows that you were talking

8   about?

9   A    No.

10  Q    No.

11       What cash flows were you talking about?

12  A    Whenever there were notes being sold or purchase by

13  clients of FAs, the monies would go to Madison and then we

14  would be discussing, as a group, how to disburse that money

15  through, for instance, a cash flow chart.

16           THE COURT:  Now who would be discussing this?

17           THE WITNESS:  That would be the five of us that I

18  just mentioned, which are Fernando Haberer, Gustavo Trujillo,

19  Roberto Cortes, Juan Carlos Cortes and I.

20           THE COURT:  So money from the sale of instruments

21  was going into Madison.

22           THE WITNESS:  At a certain point, yes.

23           THE COURT:  And among other people who were involved

24  in that are -- was the defendant?  Mr. Cortes?

25           THE WITNESS:  In the decision-making, yes.

Weisson - cross - Myers                    151

1          THE COURT:  In the decision-making about the money

2    going to Madison?

3          THE WITNESS:  No, going from Madison.

4          THE COURT:  To?

5          THE WITNESS:  To somewhere else.

6          THE COURT:  And where else was it going?

7          THE WITNESS:  To South Bay or to pay other -- other

8    notes.

9          But the thing, the typical things that basically we

10   would -- we will see in the cash flow.

11         Or construction, if that is the case.

12   Q    Were you ever approached by a fellow named San Andres?

13   A    No, I know him, Roberto introduce him to me, but not

14   approached.

15   Q    Okay.

16         Did you -- were you familiar with the fact that he

17   wanted to invest in some or he had in his possession, I'm

18   sorry, Government -- Ecuadorian Government bonds?

19   A    No.

20   Q    Okay.

21         What is your understanding of Hector San Andres, as

22   far as what he wanted to do financially, beside being a friend

23   of Mr. Cortes?

24   A    I knew that he had some -- that he had some type of

25   investment and that he was Haberer who was a -- managing that

Weisson - cross - Myers                                152

1   relationship, if you will.

2   Q    Okay.

3        And did he have a communication with Mr. Cortes that

4   Cortes said I don't want any involvement with Ecuadorian

5   Government investments?

6        Did he ever communicate that to you?

7   A    I don't recall.

8   Q    Okay.

9        Did you ever approach Mr. Cortes to solve a problem

10  with San Andres?

11  A    I don't recall that.

12  Q    Okay.

13       The trust was set up in 2016?

14  A    It was settled in 2016, yes.

15  Q    Okay.

16       And would you say that your interest in Madison were

17  different than the trust?

18  A    Yes.

19  Q    Do you ever recall that San Andres's bonds from Ecuador

20  vanished from the Madison accounts?

21  A    At a certain point, yes.

22  Q    Okay.

23       And Andres was asking for his money back, of course,

24  right?

25  A    Yes.

1   Q    And that was a big problem for Madison, right?

2   A    Well, I think it was a big problem for Haberer, I recall

3   the problem itself from Haberer.

4           THE COURT:  From who?

5           THE WITNESS:  From Fernando Haberer.

6   Q    And did you approach Mr. Cortes to try to solve that

7   problem?

8   A    I don't recall, of that event.

9   Q    Let's be clear.

10          Mr. Cortes never profited one penny from the Madison

11  company, correct?

12  A    I don't know about that.

13  Q    Well, when you saw the cash flows going in and out, you

14  didn't see payment, salary or otherwise, going to Mr. Cortes,

15  did you?

16  A    No.

17          Salary, yes, I'm sorry.

18          What is the question again?

19  Q    The -- Mr. Cortes made no money off of Madison; yes or

20  no?

21  A    I don't know.

22  Q    Okay.  You don't know.

23          Now, in 2016, that same year you left Ecuador,

24  right?

25  A    What -- what do you mean by I left Ecuador?

1   Q    You left on an airplane, you left the country.

2         You left the country and left Ecuador; went

3   somewhere else.

4   A    Oh, yes.  I flew, I traveled a lot to Ecuador, so.

5   Q    No, I'm not talking about going in.  I'm talking about

6   leaving.

7   A    Well, I came back, so, that's why I'm a little confused

8   with your question.

9   Q    In 2016 you left.

10  A    The last time I left Ecuador was in December.

11  Q    December.

12        And you certainly never went back to Ecuador, right?

13  A    Yes, I went.

14  Q    You did?

15        Do you have any bribery case pending there?

16  A    No, sir.

17  Q    You don't have any bribery charges pending in-- with the

18  Government?

19  A    No, sir.

20  Q    Okay.

21        Did you deal with some Government officials that

22  took some bribes and you invested their money at Madison?

23  A    No.

24  Q    No.

25        Do you have any charges pending there?

1    A    No, sir.

2    Q    And you went back after December 16th.

3         You went back in?

4    A    Yes, sir.  A couple of times.

5    Q    Okay.

6         THE COURT:  December 16th of when?  I am sorry.

7         THE WITNESS:  I'm sorry.

8    Q    December 2016?

9         THE COURT:  2016.

10        You were not living in Ecuador then, were you?

11        THE WITNESS:  No, I was living here.  And I came

12   from Ecuador, but I went back again a couple of times.

13        THE COURT:  You went back and forth to Ecuador, you

14   mean.

15        THE WITNESS:  Well, yes.  Two times after that

16   particular date.

17   Q    Did Mr. Cortes ever, in 2016, '17 or '18, ever set foot

18   in any Madison office in Buenos Aires?

19   A    I don't know.  I don't recall that.

20   Q    How about in Uruguay?

21   A    I -- I don't know.

22   Q    And how many times would you go to the Madison offices?

23   A    I would say a few times a year.

24        THE COURT:  Where were -- just establish for the

25   record, where were these offices of Madison?  Was it in one

1    country they were in or?

2            THE WITNESS:  They -- the specific offices for

3    Madison were in Buenos Aires.

4            THE COURT:  Okay.

5            MR. MYERS:  If I could just have a minute, Judge.

6            (Pause in the proceedings.)

7            MR. MYERS:  Nothing further, Judge.

8            MR. WEINTRAUB:  Very briefly, Your Honor.

9            THE COURT:  Just hold off a second.

10           (Pause in the proceedings.)

11           MR. WEINTRAUB:  May I proceed?

12           THE COURT:  Yes.

13   REDIRECT EXAMINATION

14   BY MR. WEINTRAUB:

15   Q    The email that we went over with Frank Chatburn

16   requesting money to pay a client of his, that loan had

17   matured, correct?

18   A    The -- yes, the initial $30,000, yes.

19   Q    All right.

20           So it had matured.

21           And it was due?

22   A    Yes, sir.

23   Q    And your testimony on direct about what that email was,

24   was that Roberto was saying make some other trades to cover

25   that maturity, correct?

1    A     Yes, sir.

2    Q     Okay.

3          This cash flow spreadsheet that we looked at, we

4    went through example of Ferran's investment.  There were $5

5    million, nearly $5 million invested.

6          We went through all of the ways in which it was

7    spent, correct?

8    A     Yes.

9    Q     We went through a number of examples in which it was

10   spent to pay off other investors in other notes from other

11   periods of time, right?

12   A     Yes.

13   Q     And the houses -- well.

14         That money didn't go towards the building of houses,

15   right?

16   A     I think a portion of that week went to South Bay.

17   Q     Okay.

18         But the -- at least the majority of the 5 million

19   didn't, right?

20   A     Oh, yeah.

21   Q     Yeah.

22         And you were asked about the mortgages.

23         You testified on direct that London Financial, who

24   had the first position, was able to foreclose on some of the

25   properties, right?

1  A    Yes.

2  Q    That would suggest that those mortgages were not paid off

3  by Ferran's money, correct?

4  A    Yes.

5  Q    And when one of those houses that was the subject of

6  Ferran's investment actually was built and sold, who was paid

7  off on the mortgage, London Financial or Ferran?

8  A    I don't know.

9  Q    Okay.

10       Do you know if Ferran was ever paid back any portion

11 of his investment?

12 A    I don't know.

13 Q    Okay.

14       You were asked about managing South Bay's books

15 correct?

16 A    Yes.

17 Q    Did you have a role in managing South Bay's financials?

18 A    Yes.

19 Q    Did Roberto Cortes have a role in that as well?

20 A    Yes.

21 Q    Was there a point in time when you believed that

22 South Bay was -- even if it had built and successfully sold

23 houses on all of the properties it owned, would not be able to

24 repay its debts?

25 A    Yes.

Weisson - redirect - Weintraub                159

1   Q    Approximately when do you think you came to that view?

2   A    When the SEC problems started and we were -- or I was

3   starting to be more involved in -- in details.  I was very

4   concerned about the numbers, from thereon, I would say.

5   Q    Okay.

6          But prior to that even when you were building houses

7   in South Bay, you testified that they weren't turning profits,

8   right?

9   A    Yes.

10  Q    And you all continued to raise money?

11  A    Yes.

12  Q    On the idea that the money would be invested towards

13  South Bay?

14  A    Yes.

15          MR. WEINTRAUB:  Thank you, no further questions.

16          THE COURT:  What did you do wrong?  What was your

17  crime?

18          THE WITNESS:  Well, I -- I knew about this --

19  these -- I would say these mechanics of receiving money and

20  not using it, necessarily, for -- for -- for developing the

21  projects, but mainly for covering other debt.

22          THE COURT:  And you knew that that was wrong,

23  correct?

24          THE WITNESS:  Yes, Your Honor.

25          THE COURT:  And you knew that the people you raised

Weisson - recross - Myers                    160

1    the money from did not understand that, correct?

2              THE WITNESS:  Yes, Your Honor.

3              THE COURT:  And did you do -- did Mr. Cortes also

4    know that?

5              THE WITNESS:  Yes, Your Honor.

6              THE COURT:  Were these things you discussed?

7              THE WITNESS:  Yes.

8              (Pause in the proceedings.)

9              THE COURT:  And were those Proprietary Products that

10   we talked about, was that a way in which money was raised that

11   was -- where the investors were not told the truth about where

12   their money was going to be used?

13             Did that happen with those Proprietary Products that

14   we talked about?

15             THE WITNESS:  Yes, Your Honor.

16             THE COURT:  Do you have anything further?

17             MR. MYERS:  Just one or two questions, Judge.

18   RECROSS EXAMINATION

19   BY MR. MYERS:

20   Q    Did you discuss with Mr. Trujillo the fact that you took

21   $1 million cash out of the Madison account?

22   A    I don't know how I would take $1 million cash.

23   Q    I just ask if you discussed it.

24             THE COURT:  Well, no, the question is, I think, it

25   is assuming a fact not in evidence.

1          So maybe you want to ask him the first question

2     which is:  Did you take a million dollars out of the Madison

3     account.

4     Q    Okay.

5               MR. MYERS:  Okay.

6               Whether he did or didn't, Judge, that's not the

7     issue I'm driving at.

8     Q    Did you have a discussion with Trujillo about taking out

9     a million dollars?

10              THE COURT:  About his taking out a million dollars?

11              MR. MYERS:  Yes.

12              THE WITNESS:  I was -- I got a loan from Madison,

13    therefore, I -- I -- I -- I received the money from Madison.

14              THE COURT:  Was it a million dollars?

15              THE WITNESS:  No, it was more around $15 million.

16              THE COURT:  15 million?

17              THE WITNESS:  Yes.

18              THE COURT:  Did you discuss that with Trujillo?

19              THE WITNESS:  Yes.

20              THE COURT:  Okay.

21    Q    Okay.

22              And did you pay the loan back?

23    A    No, sir.

24    Q    And you testified actually earlier, I don't know if you

25    want to correct your testimony, that the problems that you

1    were having with the SEC coming out, you had a lot of

2    problems, we'll call them politically, about your business in

3    2013.

4              It really wasn't until 2016 after the SEC ruling

5    that you started to have problems, right?

6    A    No.

7    Q    It was in 2013 that you had problems?

8    A    Well, it was starting in 2012, really.

9    Q    Okay.

10             So in 2012, you had problems.

11             Was that a result of an SEC determination?

12   A    No.

13   Q    Because the determination at the SEC that said that you

14   weren't -- the determination, it was your prospectuses weren't

15   clear enough, weren't forthcoming enough, right?

16   A    In part, yes.

17   Q    And that was in 2016.

18   A    Yes, sir.

19   Q    And when that happened, brokers and other people did not

20   want to invest in the company, right?  Because that's a public

21   certification by the SEC, right?

22   A    In my recollection, the -- some -- some FAs left, in

23   fact, and some stayed.

24   Q    Okay.

25             But it was causing problems in generating fees and

1  having people invest when you had a negative determination by

2  the SEC, right?

3          Can you agree with that?

4  A    Could be, yes.

5  Q    Well, I don't want to deal with possibility.  I mean, you

6  were there.  You experienced it.

7          Did -- did brokers and advisors drop their accounts

8  with you?

9  A    If they did that, I think it was related to the

10  nonpayment of -- of notes.

11  Q    Okay.

12  A    And then the SEC aggravated the situation.

13  Q    Okay.

14          But the SEC's determination, that wasn't -- that

15  was, what, you got a $50,000 fine?

16  A    I believe, I believe that was the amount that I

17  personally got.

18  Q    Okay.

19          It wasn't a criminal determination, right?

20  A    I'm -- I'm not a lawyer, but in my understanding, it was

21  a settlement.

22  Q    Okay.

23          Did Mr. Trujillo ever accuse you of using Madison as

24  your personal piggy-bank?

25  A    Not that I know of.

Proceedings                                      164

1    Q      Okay.

2                MR. MYERS:  Nothing further, Judge.

3                THE COURT:  Do you have anything further?

4                MR. WEINTRAUB:  No, Your Honor.

5                THE COURT:  All right.

6                You want to call your next witness?

7                MR. WEINTRAUB:  Yes, the Government calls Gustavo

8    Trujillo.

9                THE WITNESS:  May I leave, Your Honor?

10               THE COURT:  Yes.

11               THE WITNESS:  Thank you.

12               (Witness excused.)

13               MR. WARDEN:  Your Honor, may we take a brief break

14   before we start the next witness for the restroom?

15               THE COURT:  I will wait.

16               MR. WARDEN:  Okay.

17               (Witness enters and takes stand.)

18               THE COURTROOM DEPUTY:  You can just step up and

19   remain standing, please.

20               Please, raise your right hand.

21   **GUSTAVO TRUJILLO**,

22               called as a witness having been

23               first duly sworn, was examined and testified

24               as follows:

25               THE WITNESS:  Yes.

1           THE COURTROOM DEPUTY:  Can you please state and

2     spell your name for the record.

3           THE WITNESS:  Gustavo Trujillo -- G-U-S-T-A-V-O,

4     T-R-U-J-I double L-okay.

5           THE COURTROOM DEPUTY:  Thank you.  You may be

6     seated.

7           MR. WARDEN:  May I proceed, Your Honor?

8           THE COURT:  Yes.

9     DIRECT EXAMINATION

10    BY MR. WARDEN:

11    Q    Mr. Trujillo, good afternoon.

12         Can you tell the Court a little bit about your

13    background, where you're from and where you grew up?

14    A    Sure.

15         Good afternoon.  I'm from Guayaquil, Ecuador.  I was

16    born and raised there.  I have a bachelor's degree in business

17    administration.

18    Q    And did there come a time when you started working at

19    Biscayne Capital?

20    A    Yes.

21    Q    Can you describe when that was?

22    A    Around 2006.

23    Q    And could you explain how you came to work at

24    Biscayne Capital?

25    A    Previous to 2006, I used to work for an insurance broker,

Trujillo - direct - Warden                    166

1   which was owned, in part, by one of the -- by Roberto Cortes

2   Senior, in part.

3   Q     Excuse me.  That's the defendant's father?

4   A     Yes.

5               And through that relationship I got to know

6   Juan Carlos Cortes, and he brought me over to Biscayne Capital

7   later in time, in -- now in 2006.

8   Q     Okay.

9               When you joined Biscayne, what was your highest

10  educational level?

11  A     High school diploma.

12  Q     Okay.

13              And when you joined, what were your initial

14  responsibilities at Biscayne?

15  A     I was brought in to become a financial advisor, to bring

16  clients for the entity.

17  Q     Did that change over time, your responsibilities?

18  A     Yes.

19  Q     Can you describe how that changed?

20  A     I became an operations manager for the group, for

21  Biscayne entities.

22  Q     And can you explain a little bit more about what an

23  operations manager does?

24  A     I was in charge of opening bank accounts, documents,

25  relationship with the bank, and between the banks and the

1    financial advisors of Biscayne.

2    Q    And who -- who were the bosses at Biscayne Capital that

3    you dealt with?

4    A    At the beginning, it was with Juan Carlos Cortes.  And

5    then, from him, Roberto Cortes and Ernesto Weisson, and

6    Fernando Haberer.

7    Q    And as part of your operational responsibilities at

8    Biscayne, did you help manage incoming funds relating to the

9    Biscayne Proprietary Product notes?

10   A    Yes.

11   Q    Okay.

12             Can you explain very briefly what those Proprietary

13   Products were?

14   A    Were notes issued -- issued by certain entities that were

15   used to raise capital for real estate investments.

16   Q    And did Mr. Cortes have a role in the proprietary notes?

17   A    Yes.

18             THE COURT:  Which Cortes?

19             MR. WARDEN:  Mr. Roberto Cortes.

20             THE WITNESS:  Roberto Cortes.

21   Q    And what kind of real estate did you understand those

22   notes were investing in?

23   A    Real estate developments in south Florida.

24   Q    Whose real estate developments?

25   A    For South Bay Group.

1    Q    And who -- do you know who owns South Bay Group?

2    A    Roberto Cortes and Ernesto Weisson.

3    Q    Okay.

4         Could you identify for the Court some of the names

5    of some of the Proprietary Products?

6    A    SG Strategic Income, Preferred Income Collateralized

7    Interest, GMS Global Markets Stepup Note, ORC Ocean Reef

8    Notes.

9    Q    Okay.

10        Did Roberto Cortes, was he involved in the

11   decision-making about how to use investor funds in the

12   proprietary notes?

13   A    Yes.

14   Q    How do you know that?

15   A    There was a weekly meeting to discuss weekly cash flows

16   of incomings and outgoings for the week.

17   Q    Who participated in these meetings?

18   A    Ernesto Weisson, Roberto Cortes, Fernando Haberer,

19   Juan Carlos Cortes, from time to time myself.

20   Q    And approximately when did you start participating in

21   these kinds of meetings?

22   A    Late 2014, 2015.

23   Q    And were there other -- other than the weekly meetings,

24   were there other ways that the group that you just described

25   discussed cash flow decisions?

1   A    Yes.   Through a WhatsApp chat.

2   Q    And were they also tracked in any way, in any documents?

3   A    Well, those related to a cash flow sheet that was shared

4   amongst the participants.

5   Q    Okay.

6   A    Spreadsheet.  Spreadsheet.

7   Q    Can you tell the Court, what was the time period, at

8   least based on your experience, that Roberto Cortes was

9   involved in cash flow decisions regarding the proprietary

10  notes?

11  A    So, before my time, I would -- when I started with this

12  operational side, up until late 2017.

13  Q    And what happened in late 2017?

14  A    That's where pretty much everything collapsed and our

15  request for outflows were not being met.

16  Q    Mr. Trujillo, are you familiar with the concept of a

17  Ponzi scheme?

18  A    Yes.

19  Q    What is it?

20  A    Take from Peter to pay Paul.  That's an example.  Take

21  money from one client to pay another.

22  Q    And were the Proprietary Products of Biscayne used to

23  facilitate a Ponzi scheme?

24  A    Yes.

25  Q    And did you participate in that scheme?

1   A    Yes.

2   Q    And help it continue for years?

3   A    Yes.  Yes.

4   Q    Who did you do that with?

5   A    Fernando Haberer, Roberto Cortes, Ernesto Weisson, Juan

6   Carlos Cortes.

7   Q    And these are the Proprietary Products that were -- you

8   described as being marketed as real estate investments?

9   A    Yes.

10  Q    And in reality, what was happening with the money once

11  you started getting involved in helping manage cash flow?

12  A    It was used to pay previous investors, to pay interest --

13  distribute interest of these notes, to pay operational

14  expenses and pay salaries.

15  Q    And was this true for all of the Biscayne Proprietary

16  Product notes?

17  A    Yes.

18  Q    In general terms, when a note was reaching its maturity

19  date, what was done to address the maturities?

20  A    There were a couple of ways to address the maturity as

21  they were requested an extension of maturity for the clients

22  or bringing more -- other clients to pay previous clients that

23  wanted to be -- to cash out.

24  Q    And were there times where new notes were created or

25  different notes were created?

1  A    Yes.

2  Q    And how did that play into the maturity of an existing

3  note?

4  A    Just extended it.  It just kept rolling it further in

5  time.

6  Q    In other words, it's one way to -- that -- that the group

7  addressed the maturity of a note was to -- to roll over the

8  investment into a new or different note?

9  A    Yes.

10  Q    That had a later maturity?

11  A    Correct.

12  Q    And why was that necessary?

13  A    There was no enough funds to cover the outstanding of the

14  issue at maturity.

15  Q    And did Roberto Cortes know this?

16  A    Yes.

17  Q    And did he have a role in the decision-making about these

18  strategies you've discussed; how do deal with note maturities?

19  A    Yes.

20        THE COURT:  Was the investor told the note was being

21  rolled over?

22        THE WITNESS:  The final investor should have been

23  notified by the financial advisor, but this was pretty much

24  controlled by the -- by the entity, by the Biscayne Capital's

25  financial advisors, at that level.  So I cannot speak if the

Trujillo - direct - Warden                    172

1    financial advisor specifically asks the client.  But because

2    this was done through a system, the financial advisor was able

3    to respond to these requests of extension by themselves.

4             THE COURT:  You mean the financial advisor himself

5    could do the rollover, the extension, without contacting the

6    investor?

7             THE WITNESS:  So, the financial advisor wouldn't do

8    itself the extension, but it would approve.  And the issuance

9    would need like, over 50 percent of approval for this

10   extension.  And this approval was accepted by financial

11   advisors from Biscayne.

12            THE COURT:  Okay.

13   Q    Now, at maturity, if investors were pushing for their

14   cash payments, nonetheless, were there ways to address that

15   problem?

16   A    By replacing the investor with a new one.  And that was

17   done through the financial investors.

18   Q    Was Mr. Cortes aware of that practice?

19   A    Yes.

20   Q    Did Mr. Cortes have a role in that practice?

21   A    He would contact financial investors in order to find a

22   replacement of a previous investor.

23   Q    Now, did Mr. Cortes monitor the amount of cash available

24   in client accounts?

25   A    Yes.

1    Q    How do you know this?

2    A    He would request from me a report of cash available in

3    clients's accounts through the -- throughout the custodians

4    that Biscayne Capital had a relationship with.

5    Q    Did you have an understanding of why Mr. Cortes was

6    requesting this from you?

7    A    To see cash availability and to increase investments from

8    clients into the Proprietary Products.

9    Q    And did you ever, on occasion, discuss Mr. Cortes's

10   monitoring of client cash with a particular financial advisor?

11   A    Yes.

12   Q    Who was that?

13   A    Frank Chatburn.

14   Q    Can you describe that conversation?

15   A    Frank Chatburn was a -- upset at me because I was

16   providing this information to Mr. Cortes.  And that Mr. Cortes

17   came to him requesting more investments into Proprietary

18   Products.

19             And he was -- and Frank Chatburn was upset that I

20   was providing him this type of report.

21   Q    You testified a few minutes ago that you -- that one of

22   the ways that cash flow decisions were tracked was through a

23   spreadsheet; is that correct?

24   A    Yes, that is correct.

25   Q    And did you have a role in this spreadsheet?

Trujillo - direct - Warden                    174

1   A    I would keep the spreadsheet updated with inflows and

2   requested outflows for the week that was being discussed.

3            MR. WARDEN:  I'm going to show the witness

4   Exhibit I.

5            (Exhibit published.)

6            MR. WARDEN:  Excuse me, Exhibit I-1.

7            (Exhibit published.)

8   Q    Mr. Trujillo, do you recognize this document?

9   A    Yes.

10  Q    What is it?

11  A    It's the spreadsheet that we are referring to.

12  Q    And for this particular version of this spreadsheet, does

13  it cover the time period from August 2015 through July 2016?

14  A    Yes.

15  Q    And who maintained this document?

16  A    The updating of these numbers and lines was by done by

17  myself.

18  Q    Okay.

19            And where was this document kept?

20  A    Cloud-base system, Google Drive, from Gmail.

21  Q    And who had access to it?

22  A    Roberto Cortes, Juan Carlos Cortes, Ernesto Weisson,

23  Fernando Haberer and myself.

24  Q    And how was it accessed?

25  A    Through a Gmail account.

```
1    Q    Were these Gmail -- and did each -- each of the people

2    you just listed have a separate Gmail account to access it?

3    A    Yes.

4    Q    And did those accounts use your real names?

5    A    No.

6    Q    What did they use?

7    A    Those were fake names related to each of the individuals.

8              THE COURT:  Related to?

9              THE WITNESS:  To each of the individuals.  So each

10   email was for each of the individuals, with a fake name for

11   each one.

12   Q    And who created these fake name log-ins?

13   A    Fernando Haberer.

14             THE COURT:  I can't -- who?

15             THE WITNESS:  Fernando Haberer.

16   Q    And do you know why he did that?

17   A    He didn't want to use real names to conceal the

18   identities of the people involved.

19   Q    (Not Alvarez -- Haberer?

20             THE COURT:  I did not get the last part of what you

21   said.  He did not want to conceal the --

22             THE WITNESS:  The identities.

23             THE COURT:  From?

24             THE WITNESS:  From?

25             THE COURT:  What was the last part of what you said?
```

He wanted to conceal the identities.

THE WITNESS:  Of the people that had access to this -- to this spreadsheet.

THE COURT:  Okay.

Q    Did Mr. Roberto Cortes review this spreadsheet?

A    Yes.

Q    And did he access the spreadsheet at times?

A    Yes.

Q    Through his log-in?

A    Yes.

Q    How do you know that?

A    This spreadsheet kept track of people who would access it and if they make changes.  And I, at least saw his log -- his credentials, that the credentials he was using, making changes there.

Q    So this is a spreadsheet that all of the group could access and edit?

A    Yes.

Q    In real-time?

A    Yes.

Q    And you, at one point, saw that Mr. Cortes had done that?

A    Yes.

Q    Or to be fair, someone using Mr. Cortes's log-in.

A    Correct.

Q    Now, did you discuss this spreadsheet with Mr. Cortes?

1    A    In the meetings that we held, yes.

2    Q    And -- and where were you in relation to Mr. Cortes for

3    most of the these meetings?

4    A    Physically?

5    Q    Yes.

6    A    Sometimes in Argentina, and I believe at one time it was

7    done in Miami.

8    Q    So sometimes you were on the phone and Mr. Cortes was in

9    Miami?

10   A    Yes.

11   Q    And you -- you had at least one time where you were in

12   person in Miami with him?

13   A    Yes.

14   Q    Among other things, does this spreadsheet reflect the use

15   of incoming client's funds to purchase Biscayne proprietary

16   notes?

17   A    Yes.

18   Q    And does it also reflect that client funds were used to,

19   among other things, pay back other investors's principle and

20   maturities?

21   A    Yes.

22        MR. WARDEN:  Okay.

23        I'm going to take that off the screen for the

24   moment.

25   Q    Mr. Trujillo, what is Madison Asset?

Trujillo - direct - Warden                    178

1   A    It was an entity created in the Cayman Islands,

2   registered with the Cayman Islands, the monetary authority,

3   that was used to establish a relationship with Deutsche Bank

4   New York in order to provide services to the Proprietary

5   Products.

6   Q    And did Madison Asset have a role in the handling of the

7   Biscayne Proprietary Products?

8   A    Madison Assets created subaccounts for each of the

9   Proprietary Products in order to handle the settlements and

10  cash of each of the Proprietary Products.

11              THE COURT:  It created what?

12              THE WITNESS:  Subaccounts.

13              THE COURT:  What were the names of the subaccounts?

14              THE WITNESS:  Each subaccount would have the name of

15  the Proprietary Product.

16              THE COURT:  And what was the purpose of doing this?

17              THE WITNESS:  This relationship allowed settlement

18  of securities in that account, and the cash proceeds to be

19  distributed.

20  Q    And who -- who owned Madison Asset?

21  A    When it was established, Roberto Cortes Rueda was the

22  owner.  So, Senior.

23  Q    That's Mr. Cortes's -- the defendant's father?

24  A    Correct.

25  Q    And how did you -- did you come at some point to own it?

VB        OCR        CRR

Trujillo - direct - Warden                179

1   A    At some point, yes.

2   Q    And how did that happen?

3   A    At -- during, a couple of years after the creation of

4   Madison, Mr. Cortes Rueda was removed, and I was placed

5   instead of him.

6   Q    And did you pay his debt, Mr. Cortes's dad some money

7   to --

8   A    No.

9   Q    No.

10   A    It was just paperwork.

11   Q    Now, roughly, what time period is -- do you take over

12   Madison for the purpose of creating subaccounts for the

13   proprietary notes?

14   A    So before I took it as an owner, that, I started the

15   operations with Madison around 2013 and '14.

16   Q    Okay.

17   A    The '13, '14.

18        THE COURT:  I am not sure.

19        In 2013, what did you do with respect to Madison?

20        THE WITNESS:  It's when -- it's when the -- there

21   was a transition in time in which I was working firstly

22   directly with Biscayne, and then I changed my role to Madison.

23        THE COURT:  That was when?

24        THE WITNESS:  Late 2013.

25        THE COURT:  Okay.

Trujillo - direct - Warden                    180

1           THE WITNESS:  Early 2014.

2           THE COURT:  And then your role changed at Madison?

3           THE WITNESS:  Yes, because I started handling the

4    operational side of the Proprietary Products.

5           THE COURT:  And what did your position become,

6    ultimately?

7           THE WITNESS:  I became, ultimately, an owner of the

8    entity.

9           THE COURT:  Who else was owners?  Anyone else other

10   than you?

11          THE WITNESS:  No.  At the end it was just me.

12          THE COURT:  So it was first Roberto Cortes Senior,

13   who's the owner.  And then you became the owner.

14          THE WITNESS:  Correct.

15          THE COURT:  Okay.

16   Q    Now, you were the owner of this entity.

17          What was the function of this entity with respect to

18   the Biscayne proprietary notes that you've testified about?

19   A    To held subaccounts for each of the Proprietary Products

20   and these accounts will allow cash and securities settlements

21   in -- for the Proprietary Products.

22   Q    And why was that necessary in 20 -- starting in 2014 or

23   2013, whenever that started?

24   A    This was a -- all this process was done from the

25   United States, south Florida, and in this period of time there

1   was a -- an investigation from the SEC to these notes and the

2   relationship of the principals into these notes.

3          And the -- one of the outcomes of this investigation

4   was that they needed -- the principals needed to relinquish

5   any control of these entities, of these Proprietary Products,

6   and that became the need of creating a new entity that would

7   handle these proceeds of investments.

8   Q    And when you say the principals needed to relinquish

9   control, who are you referring to?

10  A    Roberto Cortes and Ernesto Weisson.

11  Q    And were they actually through this mechanism

12  relinquishing this control of decision-making around the

13  proprietary notes?

14  A    No.

15  Q    So was this just a change in paper at the top?

16  A    I'm sorry?

17  Q    A change in the name on the paper at the top?

18  A    Correct.

19  Q    Did Mr. Roberto Cortes know that you were taking this

20  role on through the nominal use of the name Madison?

21  A    Yes.

22  Q    How do you know that?

23  A    He is the one who handle, with Fernando Haberer, the

24  removal of his father and replacing his father with me.

25          MR. WARDEN:  I'm going to put up on the screen

Trujillo - direct - Warden                    182

1    Exhibit AR-1.

2              (Exhibit published.)

3    Q    Do you see, Mr. Trujillo, that this is an email chain

4    from February 27, 2014?

5    A    Yes.

6    Q    And the email at the top is from Roberto Cortes, to is it

7    Simon Bergson is it?

8    A    It should be Simon Bergson, yes.

9    Q    And who is Simon Bergson?

10   A    It's Fernando Haberer's second name and second last name.

11   So this would refer to Fernando Haberer.

12   Q    Okay.

13             So the email Simon Bergson or Bergson Simon, as it

14   reads here, is really Fernando Haberer?

15   A    Correct.

16   Q    And in the CC line is -- is that Juan Cortes, Nicholás

17   Barcia and you?

18   A    Correct.

19   Q    And then looking down, starting with the words:  On

20   February 27, 2014.

21             Is that an email initially sent by Fernando Haberer?

22   A    Correct.

23   Q    And he writes:  Hello, everyone.  Today we had an

24   excellent meeting with Flores from DBNY where they give us

25   settlement service?

1    A    Correct.

2    Q    Who is Flores?

3    A    He is a representative of Deutsche Bank New York and he's

4    the person who established that relationship between Deutsche

5    Bank New York and the Biscayne entities.

6    Q    One of those essentially being Madison Asset; is that

7    correct?

8    A    Yes.

9         This one's referring to Madison Assets.

10   Q    Okay.

11        Reading on with Mr. Haberer's email:  The important

12   points are Madison Asset LLC.  It is okay to open an account

13   and the idea is to open a subaccount for each issuing entity.

14   These accounts can also make direct payments without

15   necessarily going through DMS.

16        What does that mean?

17   A    That, just to explain, DMS is a previous bank used to

18   provide banking services to the notes.  And it was being

19   replaced with Deutsche Bank New York to make payments.  That's

20   what that sentence is referring to.

21   Q    But instead of opening a Biscayne Capital-named account

22   at Deutsche Bank, you guys were going to open it using the

23   name Madison Asset?

24   A    Yes.

25   Q    But it was going to do the same thing with respect to the

1   notes, is that correct?

2   A    So, I'm not sure what the name was in DMS.

3   Q    Fair enough.

4   A    I think that's a different bank.  The idea was to replace

5   that relationship of the notes, which I think they did have an

6   account there, to move it from DMS to Deutsche Bank, and

7   keep -- continue with the services that needed to the -- for

8   the notes.

9   Q    Okay.

10          And the last sentence of that first paragraph:  All

11   settlements and free delivery from Proprietarios property

12   owners would go through here?

13   A    Yes.

14   Q    And what does is that referring to?

15   A    To the proprietary notes and the settlement of the

16   securities and the cash for the proprietary notes.

17   Q    And then he continues:  Biscayne Capital of Bahamas, I

18   could open the account and that's everything that is done by

19   BVI in the Biscayne SA account to this account.

20          What is that referring to?

21   A    That's -- that's referring to a relationship between

22   Biscayne Capital Domicilio in Bahamas, a relationship with

23   Deutsche Bank New York.

24   Q    Okay.

25          In other words, there was a company Biscayne Capital

Trujillo - direct - Warden                    185

1   Bahamas, and it was going to open an account at Deutsche Bank

2   in New York?

3   A    Yes.

4   Q    And Mr. Cortes was aware of this?

5   A    Yes.

6            MR. WARDEN:   And number 3:   Through Madison we can

7   structure the custody, trading and payment business for other

8   institutions.

9   Q    What does that refer to?

10  A    Those are services that Madison would be able to provide

11  to other entities.  Like, not limited to Biscayne.

12  Q    Okay.

13           Is it fair to say that Mr. Cortes had involvement in

14  the decision to open the subaccounts form in the name of

15  Madison Asset at Deutsche Bank in New York?

16  A    Yes, he was the one receiving this email.

17  Q    And --

18  A    And confirming on top.

19  Q    And separate and apart from this email, do you know that

20  from your personal experience working with him?

21  A    Yes.

22  Q    And that, in fact, Mr. Cortes replies to Mr. Haberer's

23  email:  We should have Flores confirm in writing.

24  A    Yes.

25  Q    No question in your mind that Mr. Roberto Cortes

1  understood that part of the purpose of opening accounts in the

2  name of Madison Asset was to open subaccounts to handle the

3  proprietary notes?

4  A    No question in my mind.

5  Q    Okay.

6         So did these subaccounts, through Madison as

7  Deutsche Bank New York, were they used as part of the Ponzi

8  scheme you described earlier?

9  A    Yes.

10 Q    And how was that done?

11 A    Once the proceeds of the investments of new clients was

12 set up in this Madison accounts, subaccounts, payments went

13 out to pay previous investors.

14 Q    And was Roberto Cortes involved in the decision-making

15 around how to handle payments from cash coming in from

16 investors and going out to investors while the -- while it was

17 done through the use of the Madison Asset accounts?

18 A    Yes, and it was reflected in the spreadsheet that we saw

19 before.

20 Q    And was it also reflected in WhatsApp chats?

21 A    Yes, yes.

22 Q    And for what time period was that true?

23 A    Since like I took over, for all I know, until the end;

24 end of 2017.  Late 2017.

25 Q    Okay.

1        MR. WARDEN:  Mr. Trujillo, I'm putting up now on the

2   screen Exhibit H-1.

3        (Exhibit published.)

4   Q    Do you recognize this document?

5   A    Right now, it went black, but -- yeah, it's back.

6        Yes, that's a -- I do recognize it.

7   Q    What is it?

8   A    It's a WhatsApp chat.  A group chat from WhatsApp.

9   Q    And what is the name of this chat?

10  A    Flux.

11  Q    And what was the purpose of this chat?

12  A    Discussions of inflows and outflows of cash.

13  Q    And did that include discussions about what to do with

14  investor cash and how to -- how to use it?

15  A    Yes.

16  Q    And did that include discussions to -- to use investor

17  money to pay other investors?

18  A    Yes.

19       MR. WARDEN:  Looking at the top line here, dated

20  April 5th, 2016.

21  Q    Do you see that?

22  A    Yes.

23  Q    The first line says:  RC created Flux Group.

24  A    Yes.

25  Q    Who is RC in this chat?

1    A    Roberto Cortes.

2    Q    Who else was on this chat message, the whole -- the whole

3    message trail?

4    A    Participants in the group were Fernando Haberer, Roberto

5    Cortes, Juan Carlos Cortes, Ernesto Weisson, and myself.

6    Q    And Mr. Cortes, in the second line of page 1 of

7    Exhibit H-1, RC added you.  That is Mr. Cortes inviting you to

8    this chat?

9    A    Yes.

10   Q    And just scrolling down.  This chat starts in April of

11   2016.

12        And scrolling down towards the last page, does it

13   substantively end, effectively, in November of 2017?

14   A    Yes.

15   Q    And during this time period, are you having regular

16   discussions amongst the group that included Mr. Cortes?

17   A    Yes.

18   Q    And included him in decision-making roles about what to

19   do with investor money?

20   A    Yes.

21   Q    Okay.

22        Mr. Trujillo, when did the Ponzi scheme begin to

23   collapse, as far as you could see?

24   A    I would place it around 2016.

25   Q    And -- and why do you -- why do you say that?

1  A    2016 is when the SEC went public, and that started a

2  nervous -- nervous -- people getting nervous about everything

3  related to the notes that were mentioned there.  And financial

4  investors started to request their clients's funds to be -- to

5  be returned out of the Proprietary Products.  And the cash

6  constraints started to be obvious.

7  Q    And when did it finally collapse, in full?

8  A    I'd say by end of 2017, early 2018.

9  Q    So the time period of this --

10  A    Chat.

11  Q    -- years-long chat that --

12  A    Chat, yes.

13  Q    -- that we just looked at --

14  A    Yes.

15  Q    -- in which Mr. Cortes was a regular participant?

16  A    Yes.

17  Q    And did the collapse impact all of the Biscayne

18  Proprietary Product notes?

19  A    Yes.

20  Q    As you sit here today, do you have a -- an understanding

21  of how much investor money in the Biscayne Proprietary

22  Products was outstanding at the time of collapse?

23  A    Close to 300 million.

24  Q    And roughly how many investors do you think were

25  impacted?

1    A    More than 200, probably.

2            MR. WARDEN:  I'm going to put up on the screen now

3    Exhibit D.

4            (Exhibit published.)

5    Q    Mr. Trujillo, do you recognize this document?

6    A    Yes.

7    Q    What is it?

8    A    It's a report showing the total outstanding of each of

9    the proprietary notes by financial advisor, the amount that

10   each financial advisor's clients were holding of the notes.

11   Q    So if we look at row 3, across this row, what are

12   these -- each of these?

13   A    Those are abbreviations of the names of the Proprietary

14   Products.

15   Q    And these first three that -- in columns C, D and E that

16   are under a heading SIF, what are those?

17   A    Those represent Sentinel Investment Fund series.

18   Q    So those are the very first notes?

19   A    Yes.

20   Q    And then -- then onward from there, including some of the

21   other ones that you've mentioned by name; is that correct?

22   A    Yes.

23            THE COURT:  What is the first column, the names in

24   the first column are what?

25            MR. WARDEN:  In column B?

1          THE COURT:  Yes.

2    Q    Mr. Trujillo?

3    A    Those are financial advisors of Biscayne Capital.

4          THE COURT:  Did the financial advisors know this was

5    a scam, too?  A scam to the extent that they were selling or

6    getting investments to the -- for the effect of paying other

7    people back?

8          THE WITNESS:  Not at the beginning.  It became

9    obvious at the end, but not at the beginning.

10         THE COURT:  So each of these financial advisors has

11   a series of clients, if you will, that comprise the amount of

12   money --

13         THE WITNESS:  In each of the notes.

14         THE COURT:  -- in each of those products.

15         THE WITNESS:  Yes.

16         THE COURT:  So it is more than one client

17   invested -- investing in these, in each of these --

18         THE WITNESS:  Yes, correct.

19         THE COURT:  -- products?

20         THE WITNESS:  Yes.

21   Q    Mr. Trujillo, to help with the Court's question.  Do you

22   have an understanding of how this particular spreadsheet was

23   compiled?

24   A    This -- this report was created from reports received

25   from the banks, their security identificator that gave a

1   detailed report per client of the holdings.  And it was

2   summarized into this report.

3            THE COURT:  Do you want to go over the numbers?

4            MR. WARDEN:  Yes, Your Honor.

5   Q    So, Mr. Trujillo, I am directing you now down to row 86,

6   total investors?

7   A    Yes.

8   Q    What does that row represent?

9   A    It's a summary of other rows above it, Proprietary

10  Product.

11  Q    And so if we go over to column M of row 86, that column

12  is titled subtotal?

13           What is that?

14  A    That shows the total amount outstanding per Proprietary

15  Product.

16  Q    And what is that number in this particular document?

17  A    217.2 million.

18  Q    Okay.

19           And I should have asked earlier --

20           THE COURT:  Which line -- you are calling that M?

21           THE WITNESS:  Column M, line 86.  The cursor is on

22  top of it.

23           THE COURT:  Oh, okay.  I see.

24  Q    And Mr. Trujillo, do you have an understanding of what

25  time period this particular summary document is from?

1    A    End of 2017.

2    Q    Now --

3         THE COURT:  But it covers investments over what

4    period of time?

5         THE WITNESS:  Since inception.

6         THE COURT:  Since its inceptions to 2017.

7         THE WITNESS:  2017, yes.

8         THE COURT:  So that is all the money that is

9    invested.  And then, the money that is lost.

10        THE WITNESS:  That remain outstanding up until this

11   point in time as a debt.

12        MR. WARDEN:  Your Honor, may I clarify.

13        THE COURT:  Okay.

14        Go ahead.

15        MR. WARDEN:  I apologize, Your Honor.

16   Q    Mr. Trujillo, this spreadsheet, this is -- this is a

17   snapshot in time of the amount of note outstanding at a

18   particular time; is that right?

19   A    Yes.

20   Q    In other words, it would not cover money that had been

21   paid back to clients and their investments were done?

22   A    Correct.

23   Q    This is, at this period of time, which -- can you tell us

24   when this is from?

25   A    It is a picture of 2017, and I think it's November.

1   Q    And you can see at the top, towards the top left, there's

2   a date that says March 31, 2016?

3   A    Yes.

4   Q    Do you understand that that is accurate or not?

5   A    It's not accurate.  It's a -- just that a particular date

6   was never updated.

7   Q    Okay.

8   A    But if you see the records of this report, that

9   particular date never changed, but it was kept updated on

10  time.

11  Q    And was there a file name attached that included the

12  date?

13  A    That's -- that's where the date of the report really

14  shows.  The name of the file.

15  Q    And have you reviewed this document previously and

16  identified the file name associated with it?

17  A    Yes.

18  Q    And was that from November of 2017?

19  A    Yes.

20  Q    Now, to the Court's question about what time period this

21  represents in terms of funds.

22          You testified that this is outstanding note at this

23  particular time, based on the pull of -- the summary reports

24  from the banks; is that correct?

25  A    Yes.

1          THE COURT:  But it is possible that included within

2    this could be a very early investment that was never paid

3    back, right?

4          THE WITNESS:  Yes.

5    Q    So, for instance, if I can point you, Mr. Trujillo, to

6    column D, under Sentinel Investment Fund?

7    A    Sentinel Investment Fund was the first Proprietary

8    Product that was issued before.

9    Q    Do you know what time period the Sentinel Investment firm

10   products were issued?

11   A    At least 2006, which is where -- when I started with

12   Biscayne.  So.

13   Q    And does -- does row 86 at column D indicate how much is

14   outstanding in that particular Sentinel note?

15   A    29 million.

16         THE COURT:  But if someone had previously invested

17   and had all of their investment returned, that would not be in

18   that --

19         THE WITNESS:  No, that would be --

20         THE COURT:  -- right?

21         THE WITNESS:  No, that would not be --

22         Yes.  No.

23         THE COURT:  Okay.

24   Q    Now, continuing through.  If you look under row 86 total

25   investors, there are two rows 87 and 88.

Trujillo - direct - Warden                              196

1    A    Yes.

2    Q    And then a row 89, net investors.

3         Do you see that?

4    A    Yes.

5    Q    Does that net investors row subtract those two

6    categories?

7    A    Yes.

8    Q    To come out with a calculation of potential net

9    outstanding?

10   A    Correct.

11   Q    And what -- if you look at row 89, column M, what is

12   that?

13   A    155 million -- 155 million .19, almost .2.

14   Q    Okay.

15        MR. WARDEN:  We'll get back, Your Honor, I think a

16   little bit later in the testimony as to what those two rows

17   are subtracting out.  Well, maybe we'll take one of them right

18   now.

19   Q    Mr. Trujillo, what is B-to-B in row 88?

20   A    Those are back-to-back loans.  Investors would be able to

21   purchase and invest in one of these Proprietary Products and

22   receive -- receive a loan back to themselves from the

23   investment they -- they purchased.

24   Q    Okay.

25        So, the reason for subtracting out money that had

1    been paid back to the investor as a loan, a back-to-back loan,

2    would be trying to represent that they got their money even

3    though the note is still outstanding?  Or they got a portion

4    of their money, should I say?

5    A    Yes.

6    Q    So, going back to that subtotal in row 89 for net

7    investors.

8            Is that a -- you testified earlier that you believe

9    the loss is around 300 million; is that correct?

10   A    Yes.

11   Q    Fair to say that the $155 million net investor

12   calculation is a conservative estimate of loss?

13   A    Too conservative.

14   Q    Too conservative, in your view.

15   A    Yeah.

16   Q    Okay.

17           Now, rows 91 through 93.

18           Do you see those?

19   A    Yeah.

20   Q    They -- and then below, row 95 reaches what's called a

21   total outstanding.

22           Is that after adding rows 91 to 93?

23   A    Yes.

24   Q    From the net investor?

25   A    Yes.

Trujillo - direct - Warden                    198

1          MR. WARDEN:  And let's take a look just at row 93.

2    Liquidity participation in products.

3    Q    Are you familiar with the liquidity note?

4    A    Yes.

5    Q    And what was that note marketed as?

6    A    As a money market product.

7    Q    Was it a money market in practice?

8    A    No.

9    Q    By this time in 2017, what had happened to the money

10   invested in the liquidity note?

11   A    100 percent was invested into Proprietary Products.

12   Q    And is that what liquidity participation in products

13   means?

14   A    Correct.

15   Q    Okay.

16         That you moved the money from the liquidity

17   investments, people who thought they were putting their money

18   in a money market, and moved it into these other Biscayne

19   proprietary notes related to real estate?

20   A    Yes.

21   Q    Who did that?

22   A    It was discussed in the chat and the weekly meetings with

23   Roberto Cortes, Ernesto Weisson and Fernando Haberer.

24   Q    And were you the one who actually would make the

25   transactions happen?

1  A    When the decision was made, I -- I executed the

2  transaction in the custodians.

3  Q    Was Mr. Roberto Cortes aware that money that came in for

4  the liquidity products was moved into these other Biscayne

5  proprietary notes?

6  A    Yes.

7        THE COURT:  Then what happened to the money that

8  went into the Biscayne proprietary notes?

9        THE WITNESS:  It just was washed out in the Ponzi.

10  It went back to pay back investors to pay back interest.  It

11  is reflected in the cash flow sheet.  You will see the income

12  and the outflow.

13  Q    Well, and, in fact, Mr. Trujillo, at the -- at the end

14  of -- at the collapse of the Ponzi scheme, was there still

15  money that was supposed to be in liquidity that had been moved

16  in to the Proprietary Products?

17  A    Yes.

18  Q    And if you look at row 93, column M, how much was -- of

19  the liquidity investment had been moved into other Proprietary

20  Products?

21  A    About 29 million.

22  Q    29.6 million approximately?

23  A    Yes.

24  Q    Okay.

25  A    Almost 30.

1        THE COURT:  Which figure are you looking at?

2        THE WITNESS:  Column M, row 93.

3        THE COURT:  Oh, okay.

4   Q    And if you look below that, row 95 which is that total,

5   total outstanding and go to the subtotal, column M.

6        What is the total outstanding as calculated once you

7   subtract and add back those rows?

8   A    276.9 million.

9   Q    Okay.

10       MR. WARDEN:  Now, I'm going to pull up Exhibit AV.

11       (Exhibit published.)

12  Q    Do you see this document?

13  A    Yes.

14  Q    Do you recognize what this document is?

15  A    This is the report that I was referring before in

16  which -- well, you change, sorry.

17  Q    I'm sorry.

18       THE COURT:  What number is this?

19       MR. WARDEN:  A-V, alpha, Victor.

20       Okay, Your Honor?

21       THE COURT:  Yes.

22  Q    Mr. Trujillo, is this a report that you were referring to

23  that was used to build the summary spreadsheet that we looked

24  at in Exhibit I?

25  A    Yes.

Trujillo - direct - Warden                    201

1   Q    And is this an example of one of those reports from 2016?

2   A    Yes.

3   Q    Now, I'm going to go first to the -- the first tab that

4   says resumen, R-E-S-U-M-E-N, resumen?

5        Do you see that?

6   A    Yes.  That's in Spanish, so summary in English.

7   Q    And in column A, here, there's a column called ISIN.

8        What is ISIN?

9   A    International securities identification number.  That's

10  the ID for each of the Proprietary Products.

11  Q    So these numbers, these ISIN numbers correspond to the

12  Biscayne proprietary notes?

13  A    Yes.

14  Q    Okay.

15       And so, this -- this spreadsheet, if we go to one of

16  those tabs for -- we will look at tab for ISIN XX0364515331?

17       Do you see that?

18  A    Yes.  Yes.

19  Q    And what is that a summary of?

20  A    Of the note as G Strategic income with maturity in 2016.

21  With that ISIN number ending in 331.

22

23           (Continued on following page.)

24

25

1    DIRECT EXAMINATION

2    BY MR. WARDEN:  (Continuing)

3    Q    Okay.  So this -- and going from left to right, column A

4    here, custody, what is that?

5    A    That's the bank that holds the client's account.

6    Q    And, so, we see Pershing, Pictet, Raymond James, Syz.

7    Pictet and Syz, where are those banks located?

8    A    Switzerland.

9    Q    So those were various banks where these particular

10   clients had their investment assets custodied?

11   A    Yes.

12            THE COURT:  Do these represent individual clients?

13            THE WITNESS:  Yes, you see the names there.

14   Q    So then column B is account number?

15   A    Column B, yes.

16   Q    Column C, short name, what is that?

17   A    That's an abbreviation of the client's name.

18   Q    Okay.  And then column D is an amount outstanding?

19   A    Is the nominal volume of the note held in this particular

20   client's account.

21   Q    And then there is the -- column F has the financial

22   advisor?

23   A    Correct.

24   Q    And so who's preparing these reports?

25   A    These are being prepared in Argentina, in the backoffice

1   personnel that works there, that worked there.

2   Q    And did those personnel work with you?

3   A    Yes.

4   Q    And you are familiar with these documents?

5   A    Yes.

6   Q    And this details then what is taken to prepare that

7   summary spreadsheet in Exhibit I?

8   A    Yes.

9   Q    At any given particular period of time?

10  A    Correct.

11  Q    As it's updated?

12  A    Correct.

13  Q    Now, I am going to show you next Exhibit AM.

14       Do you see that document?

15  A    Yes.

16  Q    Did you occasionally get reports directly from Deutsche

17  Bank of the amount of note outstanding?

18  A    Yes.

19  Q    When you say note --

20  A    Notes.

21  Q    -- do you understand me to mean the Proprietary Products

22  of Biscayne?

23  A    Yes.

24  Q    Is this e-mail chain an example of that?

25  A    Yes.

1  Q    If I -- if we look the second e-mail from the top of page

2  1, do you see the "from" line?

3  A    Yes.

4  Q    Who is the "from" line?

5  A    Carmen.depository@DeutscheBank.  That's the department

6  inside Deutsche Bank that controlled the outstanding of the

7  notes.  And this is Deutsche Bank London.

8  Q    And who are they sending this e-mail to?  Sophia Milan,

9  who is that?

10  A    Sophia is a backoffice personnel from Buenos Aires in

11  Argentina.

12        THE COURT:  Who does she work for?

13        THE WITNESS:  Under me.

14  Q    The day of the e-mail that she received from Deutsche

15  Bank is November 22, 2017; is that right?

16  A    Yes.

17  Q    And the Deutsche Bank employee writes:  "Hello.  Please

18  refer to the attached spreadsheet for the positions as on

19  31/10/2017."

20        What do you understand that to mean?

21  A    That's the outstanding snapshot as of the end of October

22  2017.

23  Q    And then eventually in February of 2018 -- on February

24  20, 2018, do you receive this document from Melissa Brandt?

25  A    Yes.

1   Q    It gets forwarded to you?

2   A    Yes.

3   Q    What's her job?

4   A    She was part of the back-office personnel.

5   Q    Another staff member in Argentina that worked with you?

6   A    Yes.

7            THE COURT:  What date did you say that was?

8            MR. WARDEN:  It was forwarded to Mr. Trujillo on

9   February 20, 2018.

10           THE COURT:  I see.

11           MR. WARDEN:  But the e-mail from Deutsche Bank is

12  originally November 2, 2017.

13           THE COURT:  Who forwarded it to you?

14           THE WITNESS:  Sophia and Melissa were both staff in

15  Argentina working under me.

16  Q    And the attachment from Deutsche Bank, does the Deutsche

17  Bank e-mail -- that that is the outstanding notes as of

18  October 31, 2017?

19  A    Yes.

20           THE COURT:  Is the attachment with this?

21           MR. WARDEN:  We are going to look at it just next

22  yes, Your Honor, Exhibit AN.

23  Q    Do you see this, Mr. Trujillo?

24  A    Yes.

25  Q    What is this?

A    It's the report the outstanding per IC, per security

certification of the proprietary notes split between the two

of the global depositories known as Clear Stream and

Euroclear.

Q    But the summary of this is these are the -- this is the

outstanding of the Biscayne proprietary note held at Deutsche

Bank as of October 31, 2017?

A    It's not held at Deutsche Bank.  It's held through the

different banks, the different custodians that hold an account

at Euroclear and Clear Stream.

Q    Thank you.

        What does the total amount -- it relates to the

Biscayne proprietary notes; correct?

A    Yes.

Q    What is the total amount of the Biscayne proprietary

notes?

A    $251.3.

Q    By the way, is this all of the Biscayne proprietary

notes?

A    No.

Q    Why not?

A    This does not show Sentinel Investment Fund outstanding

at the end of November -- of October.

Q    So looking at the summary spreadsheet, again, Exhibit D,

the C column, CD and the E, those are the Sentinel Investment

1   Fund?

2   A    Correct.

3   Q    Those are not captured by that Deutsche Bank report?

4   A    No, because these are not held in bank accounts through

5   Euroclear or Clear Stream.

6   Q    Okay.  Is there anything else that wasn't included on

7   that 251 million outstanding at Deutsche Bank?

8   A    There were other issuance that were created at flex

9   funds, a different entity that created more notes.

10  Q    Okay.  Let's discuss a few specific examples, Mr.

11  Trujillo.

12          You testified a little earlier ago about the

13  liquidity note?

14  A    Yes.

15  Q    And remind us, what was the liquidity note supposed to

16  be?

17  A    It was created as, or distributed as a money market

18  product.

19  Q    Was Roberto Cortes involved in the creation of the

20  liquidity note?

21  A    Yes.

22  Q    Can you describe his involvement and how you know that?

23  A    He -- with Nicolás Barcia, Fernando Haberer, and Roberto

24  Cortes, the three of them, they signed this product to

25  distribute among financial advisors, and there were e-mails

1    from him requesting the marketing of this product.

2           THE COURT:  What was the purpose?  Did you discuss

3    with Mr. Cortes what the purpose of creating this liquidity

4    note was?

5           THE WITNESS:  I didn't discuss with him, but the

6    purpose was to invest client's cash in the accounts and that's

7    reflected in the e-mails.

8    Q    All right.  Mr. Trujillo, I have put on the screen

9    Exhibit AF.

10   A    I see it, yes.

11   Q    Do you recognize this e-mail?

12   A    Yes.

13   Q    It's an e-mail chain from October 23, 2013; is that

14   right?

15   A    Yes.

16   Q    And the subject line is, although there is a typo, is it

17   commerce liquidity index?

18   A    Yes.

19   Q    Is that the liquidity note?

20   A    Yes.

21   Q    And is this around the time the liquidity note is first

22   announced?

23   A    Yes.

24   Q    And if you look down to the middle of the page starting

25   at Nico, is that an e-mail sent by Roberto Cortes?

1  A    Yes.

2  Q    And he writes:  "Nico" -- is that referring to Nicolás

3  Barcia?

4  A    Yes.  Nicolás Barcia, head trader of Biscayne Capital in

5  Uruguay.

6  Q    -- I'm copying FCH, FM and Edith?  Who are they?

7  A    Frank Chatburn, Fernando Martinez, and Edith Hinojosa.

8  Those are financial advisors of Biscayne.

9  Q    "I want them to buy the index."

10        Does that refer to the liquidity index note?

11  A    Yes, they want the reference.

12  Q    "We are ready now.  It has daily liquidity and pays .25

13  percent gross and .25 to the client."

14        What does that mean?

15  A    That it's ready to be distributed, that he has daily

16  liquidity that can be converted into cash for the client on a

17  daily basis, pays .25 commission gross to Biscayne Capital and

18  0.25 interest to the client.

19  Q    This was a money market product that Biscayne Capital was

20  going to make as much as money on as their client?

21  A    Yes.

22  Q    Mr. Cortes continues in this e-mail:  "This is a money

23  market product for parking cash.  I want you to do some trades

24  to start it up now and begin watching the operation."

25  A    Yes.

Trujillo - direct - Warden                   210

1   Q     "There's an account at Julius Baer belonging to Juan
2   Carlos Calero that I manage.  Gus, do a trade to start it up."
3           Can you summarize the last half of that e-mail?
4   A     So he wanted to make the first purchase of this new note,
5   and he was using Juan Carlos Calero account at Julius Baer to
6   place this first trade.
7           THE COURT:  What trade was being placed here?
8           THE WITNESS:  In this new note called Liquidity
9   Fund.
10          THE COURT:  But when you say trade, what about it?
11  What was supposed to happen?  Just tell me practically.
12          THE WITNESS:  Practically, the client would purchase
13  this note from the client's account.
14          THE COURT:  And it was a liquidity note, so it was
15  like a money market-type thing?
16          THE WITNESS:  That was how it was supposedly
17  designed, to be a money market, but it required a trade to be
18  placed.
19          THE COURT:  So the first note was this -- this first
20  transaction was supposed to be in this Juan Carlos Calero
21  account?
22          THE WITNESS:  Yes.
23          THE COURT:  And that was managed by financial
24  advisor, someone named Baer; is that right?
25          THE WITNESS:  No.  The financial advisor for this

Trujillo - direct - Warden                    211

1   client was Roberto Cortes.  This client held his account at

2   Julius Baer.

3   Q    Is Julius Baer a bank in Switzerland?

4   A    It's a bank in Switzerland, correct.

5   Q    Who is Juan Carlos Calero?

6   A    Mr. Cortes's brother-in-law.

7   Q    And you respond to Mr. Cortes:  "Roberto, these 383k in

8   Calero's account 6390233, how much shall we buy"?

9   A    Yes.

10  Q    He responds:  "350,000"; is that correct?

11  A    That is correct.

12       THE COURT:  Do you know what happened to that money?

13       THE WITNESS:  It was, afterwards, invested in the

14  Proprietary Products.

15       THE COURT:  And then --

16       THE WITNESS:  It went away in the Ponzi scheme.

17  Q    So Mr. Trujillo, the statement in Mr. Cortes's e-mail,

18  this is a money market product for parking cash, was that

19  true?

20  A    No.

21  Q    What actually happened to money invested into liquidity

22  note?

23  A    At the beginning, there was a portfolio underlying with

24  this -- with the cash that was received and part of it was in

25  Proprietary Products, through time it became 100 percent in

1  Proprietary Products.

2  Q    So fair to say that at the beginning of the liquidity

3  index note there were some investments in other kinds of

4  products?

5  A    In other securities, yes.

6  Q    In other securities?

7  A    Yes.

8  Q    But then by the end, what was the result of money put in

9  the liquidity note?

10  A    100 percent went to Proprietary Products.

11  Q    And if you recall from the summary Proprietary Products

12  summary spreadsheet, the line for liquidity participation and

13  product, approximately how much money are we talking about

14  here?

15  A    Almost 30 million.

16  Q    Was Mr. Roberto Cortes aware of that use of the money in

17  liquidity?

18  A    Yes.

19          THE COURT:  That is $30 million right there;

20  correct?

21          THE WITNESS:  Yes.

22  Q    And do you have an understanding of why money that was

23  put into the liquidity note was moved to purchase other

24  Proprietary Products?

25  A    Sorry.  Can you repeat the question?

1  Q    Do you know why money that was put in the liquidity note

2  was later used to purchase other Proprietary Products?

3  A    To provide cash to cover the cash needs of the group.

4  Q    Okay.  Let's look at Exhibit I, the cash flow proceeds,

5  Exhibit I-1.

6          Was the use of incoming money from the liquidity

7  investment reflected on this cash list spreadsheet?

8  A    Yes.

9  Q    If we look at rows 18, 19, for example, 23?

10 A    Yes.

11         Everything that says liquidity was coming in from

12 purchases of this liquidity note.

13 Q    And was it used at this period of time to purchase

14 treasuries or other money market-related products?

15 A    No.

16 Q    Mr. Trujillo, are you familiar with something called

17 self-clearing?

18 A    Yes.

19 Q    What is that?

20 A    Through the registration office Biscayne Capital Bahamas,

21 in the Bahamas, the intention was to become a self-custodian

22 bank, in other words, Biscayne Capital would be able to hold

23 third-party assets into their accounts and provide statements

24 like a bank.

25 Q    And was there an account created at Deutsche Bank New

1    York do this?

2    A    Yes.

3    Q    And what was the entity for which -- that created this

4    account?

5    A    Biscayne Bahamas.

6    Q    Was Mr. Roberto Cortes involved in the self-clearing

7    program?

8    A    Yes.

9    Q    Do you recall when and where self-clearing was announced?

10   A    There was a financial advisors retreat in Playa del

11   Carmen where it was part of the schedule of events the

12   announcement of self-clearing.

13   Q    Was Roberto Cortes there?

14   A    Yes.

15          MR. MYERS:  Judge, if I could have a date again,

16   about what time is this?

17          THE COURT:  When approximately was this?

18          THE WITNESS:  I'm not particularly sure about the

19   dates, but probably 2015.

20   Q    Now, were Biscayne client funds that were put in the

21   self-clearing account used as part of the Ponzi scheme?

22   A    Yes.

23   Q    How was that done?

24   A    It started with the cash available being purchased into

25   liquidity.

1  Q    So Biscayne clients were moved -- had their cash put into

2  an omnibus account under Biscayne's control in Deutsche Bank;

3  correct?

4  A    Cash and securities.

5  Q    Cash and securities?

6  A    Yes.

7  Q    And the cash in that account, which is all Biscayne

8  clients  who had their cash put in the self-clearing account;

9  is that right?

10  A    Yes.

11  Q    That was used, you testified, to purchase liquidity note?

12  A    Yes.

13  Q    And then what was the liquidity note funds used to

14  purchase?

15  A    Proprietary Products.

16  Q    Was Roberto Cortes aware of cash put in the self-clearing

17  account being used to purchase liquidity?

18  A    Yes.

19  Q    How do you know that?

20  A    E-mail exchanges and meetings that I was a participant.

21  Q    Do you recall a meeting where the decision about how to

22  use this cash in self-clearing was discussed?

23  A    Yes.  There was a particular meeting that took place in

24  Miami at Four Seasons Hotel.

25  Q    Who was at that meeting?

1   A    Roberto Cortes, Fernando Haberer, Juan Carlos Cortes, Mr.

2   Weisson and myself.

3   Q    And what was discussed at this meeting at the Four

4   Seasons?

5   A    The use of the cash available in self-clearing to

6   purchase liquidity note.

7            THE COURT:  I'm sorry.

8   Q    I'm sorry, Your Honor.

9            THE COURT:  Where was the meeting, I thought you

10  said Caesar's Hotel.

11           THE WITNESS:  Four Seasons Hotel in Miami.

12           THE COURT:  I'm sorry.  I interrupted you.

13           MR. WARDEN:  I'm sorry, Your Honor.

14  Q    The Four Seasons Hotel in Miami, do you remember where in

15  the hotel?

16  A    The restaurant.  In one of the restaurants.

17           THE COURT:  When approximately was that?

18           THE WITNESS:  Approximately 2015, that I don't

19  recollect exactly the date.

20           THE COURT:  Okay.  I'm sorry.  Maybe you want to

21  start over as to what happened.

22  Q    So what was the discussion with respect to the use of

23  self-clearing funds to purchase the liquidity note?

24           What do you remember about that?

25  A    The ability of cash in that omnibus account at Biscayne

1  Capital Bahamas from self-clearing clients and to purchase the

2  so-called money market with the cash, the Liquidity Fund.

3  Q    Were clients going to be told that their funds were going

4  to be taken from this cash position and put into a liquidity

5  note created by Biscayne?

6  A    I think that was the intention to tell them, but I'm not

7  sure that ever happened.  Actually, that didn't happen.

8  Q    Is how do you know that?

9  A    Because this program at some point was transferred to the

10  back office in Argentina and when we received the software

11  that handled this, this self-clearing, there was the only

12  representation was cash, there was not representation of

13  liquidity into the clients' accounts.

14  Q    And when you refer to software, what was the purpose of

15  the software?

16  A    To provide individualized statements to the clients of

17  Biscayne Capital Bahamas from the omnibus account.

18  Q    How would the client be able to see a statement from

19  their self-clearing omnibus account?

20  A    From their financial advisor, the financial advisor will

21  provide them the statements.

22  Q    They would access that through this software program?

23  A    The financial advisor would request to the back office

24  the statement.

25  Q    And once you got responsibility for managing the

1  software, what did you see about what was represented in the

2  software designed to generate statements for clients about

3  their cash?

4  A    That their cash was missing, that there was the

5  representation in the statement was not accurate because there

6  was no cash available.

7  Q    In other words, the representation on the software of

8  what would be in the statement was that there was cash; is

9  that correct?

10  A    That is correct.

11  Q    And what was the reality of what had happened?

12  A    There was no cash and there was no liquidity note.

13         THE COURT:  Who was responsible for generating the

14  false report?

15         THE WITNESS:  So it was a software that kept track

16  of the accounts and that software was administered -- it was

17  in Biscayne Bahamas, they had the access to manage that

18  software.  At some point in time this software was transferred

19  to my back office in Argentina.

20         THE COURT:  Who made the decision to change the

21  software so it would present a false picture of what happened?

22         THE WITNESS:  So there was not a decision of making.

23  It was just a decision of not reflecting what happened.

24         THE COURT:  Well, who decided to not reflect what

25  happened?

1    THE WITNESS:  I'm not sure if there was a decision

2  or it just didn't ever happened.

3    If we can see maybe one of the -- so something

4  happened that wasn't never reflected from the statement, the

5  purchase of the liquidity was never reflected in the

6  statements of the accounts and that was decided that -- the

7  purchase of the liquidity was decided in the meeting that

8  we're referring.

9    THE COURT:  But their accounts never showed that?

10    THE WITNESS:  No, never showed that.

11    MR. WARDEN:  May I, Your Honor?

12    THE COURT:  Yes.

13  Q    Did that become a problem in later time?

14  A    Yes.

15  Q    And what was the problem that was created?

16  A    The client were requesting transactions, cash

17  transactions from their accounts and there was no enough cash

18  to cover those transactions.

19  Q    Okay.  I am going to show you on the screen now what has

20  been marked as Exhibit AH.

21    MR. WARDEN:  And I apologize, Your Honor, it's in

22  Spanish and I don't have a translation.

23  Q    But Mr. Trujillo, do you see that there is an e-mail

24  chain from February 16 --

25  A    Yes.

1  Q    -- 2016?

2  A    Yes.

3  Q    And then a response on February 18, 2016?

4  A    Yes.

5  Q    And this is an e-mail from Pablo Perrotta on the bottom

6  e-mail?

7  A    Yes.

8  Q    To Nicolás Barcia?

9  A    Yes.

10 Q    Copying Roberto Cortes?

11 A    Yes.

12 Q    And others?

13 A    Yes.

14 Q    And the subject line is cash 7; is that correct?

15 A    Yes.

16 Q    Can you read the e-mail -- who is Mr. Perrotta?

17 A    Pablo Perrotta it says there, Senior Vice President and

18 Head Global Operations of Biscayne Capital.  He was the

19 manager of Biscayne Capital Bahamas.

20 Q    Can you summarize for the Court what Mr. Perrotta is

21 writing in this e-mail?

22 A    He is expressing to Nicolás Barcia, the head trader, that

23 all the cash available in self-clearing needs to be reflected

24 in liquidity.  He is telling Diego, who is also cc'd, to give

25 Nicolás a report and that Nicolás will book this purchases of

1    liquidity.

2    Q    In other words, to make sure I understand correctly, this

3    is -- is this part of the instruction to purchase liquidity

4    note with cash in self-clearing?

5    A    Yes.

6    Q    And Mr. Cortes is copied on this e-mail?

7    A    Yes.

8    Q    And then Mr. Haberer responds and has an instruction for

9    you.  Can you summarize what that was?

10   A    Mr. Haberer wanted me to coordinate this with Biscayne

11   Bahamas.

12   Q    And Mr. Roberto Cortes is on that response as well; is

13   that correct?

14   A    Yes.

15   Q    Was the issue you testified a moment ago about problems

16   arising from client who's cash had been moved to purchase

17   liquidity, was that discussed in the WhatsApp chat that we

18   looked at at Exhibit H-1?

19   A    Yes.

20   Q    I'm going to direct you to chats on April 5th and 6th of

21   2017.

22            THE COURT:  What exhibit number is this?

23            MR. WARDEN:  This is Exhibit H-1.

24   Q    This is a chat started April 5, 2017, starting with your

25   -- G. Trujillo is you?

1    A    Yes.

2    Q    And you write:  I'm having a lot of problems with self.

3         Can you summarize generally what the problems were?

4    A    I was getting bombarded by e-mails and calls of financial

5    advisors requesting their clients's funds held at

6    self-clearing being sent to other institutions of the clients.

7    Q    So these are clients who are finally finding out that

8    they don't have cash when they thought they had cash?

9    A    No.  They're not finding out.  They're just requesting

10   cash --

11   Q    They are requesting cash?

12   A    They are requesting cash out of it.

13   Q    They haven't been told there's no cash yet?

14   A    No.

15   Q    But in reality, was there cash?

16   A    No.

17   Q    And you write at 11:42 and 56 seconds:  "I'm just about

18   to send a communique because they didn't do a transfer of

19   money, just positions."

20        And there on down, there is a response from Mr.

21   Cortes saying he's calling to talk.  Is that correct?

22   A    Correct.

23   Q    And then you sent, at 6:42, a document; is that correct?

24   A    Yes.

25   Q    And wrote:  "Please review it and let me know so I can

1  circulate it to the FAs who are involved"?

2  A    Yes.

3  Q    Can you summarize for the Court what was the document

4  that you were proposing to send to the financial advisors?

5  A    It was what I said earlier at 11:42.  It is a letter out

6  to the financial advisors stating that I cannot do the

7  transfers because I didn't receive the cash, just securities

8  from self-clearing.

9  Q    And when you say you didn't receive the cash, what do you

10  mean by that?

11  A    When the account of self-clearing, the omnibus account

12  assets were moved from Biscayne Bahamas to Madison

13  sub-accounts, the only assets that were moved were securities,

14  not the cash.

15  Q    Was there any cash?

16  A    Very little, if any.

17  Q    Okay.

18  A    Not enough to cover the requests.

19  Q    And Mr. Cortes responds to you -- this is, by the way, in

20  April 2017.

21          Was Mr. Cortes generally involved in discussions

22  about these kinds of issues?

23  A    Yes.

24  Q    Throughout 2017?

25  A    Yes.

Trujillo - direct - Warden                    224

1  Q    Is this chat and part of this chat one reflection of

2  that?

3  A    Yes.

4  Q    And your response to let me know and they've got things

5  very clear about confirmation of transfers to Madison.

6         So he knows about Madison, not a secret, correct?

7  A    Correct.

8  Q    And then turning to the next page, looking at April 6,

9  2017 message from you.  You resend a document and say to the

10 group:  "I'm sending it again since you all read it but no one

11 responded.  If I don't get confirmation of some sort of

12 change, it will circulate like this today.

13        What was going on there?

14 A    Following up on the request of answers that I asked on

15 the previous day, nobody answered me, and once again,

16 resending the document that I was going -- that I was planning

17 to send out to financial advisors.

18 Q    Telling them, among other things, that you don't have any

19 meaningful amount of self-clearing-related cash?

20 A    To cover their clients's requests.

21 Q    Clients who thought they had cash?

22 A    Yes.

23 Q    And is your understanding that these client did not know

24 the cash had been used to purchase liquidity?

25 A    They did not know.

1       THE COURT:  They thought they were just investing in

2   a regular money market, you mean?

3       THE WITNESS:  No, they didn't even know about that

4   either.  It was never reflected in their statements.

5       THE COURT:  How was cash in their accounts then?

6       THE WITNESS:  Initially, they moved their accounts

7   into the omnibus self-clearing account.  When they initially

8   moved it there, there was cash.

9       Once it got to the Biscayne Bahamas omnibus account,

10  that cash was used to purchase liquidity without being --

11      THE COURT:  Without their knowing?

12      THE WITNESS:  Without their knowing.

13      THE COURT:  So they just thought they had cash in a

14  brokerage account, in effect?

15      THE WITNESS:  Correct.

16      THE COURT:  Okay.

17  Q    And if we turn to Exhibit I-1, the cash flow spreadsheet.

18       Do you see that?

19  A    Yes.

20  Q    Was the use of clients' funds in self-clearing discussed

21  on the cash flow spreadsheet in the calls you had with Mr.

22  Roberto Cortes?

23  A    Yes.

24  Q    Among other things, in row 18, does the cash flow

25  spreadsheet reflect the use of self-clearing funds to purchase

1   liquidity in the line that says liquidity self?

2   A    Yes the.

3   Q    What does that mean?

4   A    That liquidity was purchased from the cash available in

5   self-clearing account.

6   Q    Okay.  If I can show you Exhibit AU.  This is a

7   spreadsheet.

8        Do you recognize this document?

9   A    Yes.

10  Q    What is it?

11  A    It's a report of assets from the software of

12  self-clearing showing assets into individual clients'

13  accounts.

14  Q    So if a financial advisor requested from operations to

15  pull a client's self-clearing account and give the client a

16  statement -- this is -- to be clear, is this a summary of all

17  clients?

18  A    It's a summary of all clients, what financial advisor

19  would get would be individualized by client in a different

20  format.

21  Q    And these top rows here are assets, equities and other

22  assets held in clients' accounts; is that correct?

23  A    Yes.

24  Q    If we scroll down starting at row 304 and below, what are

25  these rows?

1    A    Those show cash in the clients' accounts.

2    Q    Is it actually there?

3    A    No.

4    Q    If we get to the bottom.

5            THE COURT:  I'm sorry.  Who created this document?

6            THE WITNESS:  This was a report pulled from the

7    software that individualized the clients' assets.

8            THE COURT:  So this is what they had put in, but it

9    was no longer there?

10           THE WITNESS:  Correct.

11           THE COURT:  So this wasn't a document where people

12   just made up numbers?

13           THE WITNESS:  No.

14           THE COURT:  It had been the money they put in.  What

15   they didn't know was the money wasn't there anymore?

16           THE WITNESS:  Correct.

17           THE COURT:  Okay.

18   Q    Mr. Trujillo, if you look to row 612, how much total cash

19   had put into self according to this document?

20   A    5.4 million.

21   Q    Mr. Trujillo, I'm going to direct you back to Exhibit D

22   and switch topics briefly.

23           Exhibit D is the Proprietary Products summary sheet

24   again.  Do you see that?

25   A    Yes.

Trujillo - direct - Warden                    228

1    Q    And do you recall we looked at a line called line 87

2    recover SBH.  That was a line that subtracted out amount

3    outstanding?

4    A    Yes.

5    Q    Before we totaled to net investors?

6    A    Yes.

7    Q    What is recovery?

8    A    It was a program designed to help financial advisors that

9    had clients invested into high-risk products, securities, that

10   had lost significant value and help these financial advisors

11   recover the initial amount invested by the client.

12   Q    And how did that work?

13        First of all, you mentioned high-risk investments.

14   Are these unrelated to the Biscayne Proprietary Products?

15   A    Yes.  The initial investment was unrelated to the

16   Proprietary Products and it was a high risk product.

17        THE COURT:  What exhibit number is this?  I'm sorry.

18        MR. WARDEN:  This is Exhibit D.

19   Q    Can you give -- explain how the program worked, perhaps

20   with an example?

21   A    The client would have 100,000 in an investment that has

22   lost 80 percent in value.  So the remaining balance would be

23   20,000.  The client would then sell the remaining value of

24   that investment of 20,000 and purchase a Proprietary Product

25   for 20,000, and the initial amount of 100,000 would be

1  completed by sending free deliver 80,000, so the client's

2  account would reflect back 100,000.

3  Q    So what was the overall goal of this program?

4  A    Get ahold of the remaining 20,000 and have the client

5  think they still have 100,000 in the account.

6  Q    And they did that by a free delivery of, in your example,

7  $80,000 of a Biscayne Proprietary Products?

8  A    Yes.

9  Q    Why would they give someone $80,000 investment for free?

10 A    To be able to get the remaining 20,000.

11       THE COURT:  But were they really getting the 80,000

12 back?

13       THE WITNESS:  No, they got 80,000 in Proprietary

14 Products, which was part of the Ponzi.  So they actually,

15 instead of losing 80 of --

16       THE COURT:  Losing --

17       THE WITNESS:  They lost 100 percent.

18       THE COURT:  Right.

19 Q    Mr. Trujillo, to be clear, in the example of the -- the

20 100,000 example that you gave, the $20,000, at times were

21 those -- that part of the recovery funds used for the Ponzi

22 scheme?

23 A    Yes.

24 Q    Was Roberto Cortes aware of the use of recovery?

25 A    Yes.

1    Q    And the use of it to fuel the Ponzi scheme?

2    A    Yes.

3    Q    Is recovery reflected on the cash flow spreadsheet,

4    Exhibit I-1?

5    A    Yes.

6    Q    For instance, rows 14 and 15?

7    A    Yes.

8    Q    And this is the spreadsheet that you would review with

9    Mr. Cortes and the others?

10   A    Yes.

11   Q    And the recovery here are income to the group?

12   A    Yes.

13   Q    So when, in your example, the 20,000 comes in, that's

14   cash available?

15   A    Yes.

16   Q    To do what?

17   A    Cover whatever cash flow -- outflow would be needed in

18   the week that it was received.

19   Q    Switching topics now, Mr. Trujillo, are you familiar with

20   overdrafts?

21   A    Yes.

22   Q    And in the context of your work at Biscayne Capital, did

23   you create overdrafts at banks to access cash flow?

24   A    Yes.

25   Q    And not to get into the technical details, but did you do

1  that fundamentally by lying to the banks to get their credit?

2  A    Yes.

3  Q    What would you do with the funds obtained through this?

4  A    It would be made available in this spreadsheet to cover

5  cash flow needs.

6  Q    Is it fair to say that Roberto Cortes probably didn't

7  know the specifics of how this was done?

8  A    The mechanics, no.

9  Q    Who was responsible for the mechanics of the overdraft

10  scheme?

11  A    Fernando Haberer and myself.

12  Q    Okay.  Did Mr. Roberto Cortes know about the practice of

13  causing overdrafts to access cash?

14  A    Yes.

15  Q    Still looking here at the cash flow spreadsheet, Exhibit

16  I-1, are overdrafts reflected in the cash flow spreadsheet?

17  A    Yes.  Right here.

18  Q    Looking at rows 37 through 43, for example?

19  A    Yes.

20  Q    And in this accounting here of overdrafts, are they

21  increasing the net available amount of funds to the group?

22  A    Yes.

23  Q    For a week?

24  A    Yes.

25  Q    So, for instance, if we look at row F, there's an amount

1  available after taking in cash and having whatever was

2  available of 2.06 million?

3  A    Yes.

4  Q    And then there is an overdraft line 37 of $1 million?

5  A    Yes.

6  Q    And then a net available that adds that 1 million to the

7  pot; is that correct?

8  A    That is correct.

9  Q    Were the overdraft funds used as part of the Ponzi

10 scheme?

11 A    Yes.

12 Q    And how was that done?

13 A    Throughout the meetings and discussions of cash flow

14 needs.

15         If you go below, you will see the outflows

16 reflecting what was done with those funds.

17 Q    Did you at times use overdrafts caused at banks to pay

18 other investors in the notes?

19 A    Yes.

20 Q    Did you at times use investor money coming into the notes

21 to pay down overdrafts at banks?

22 A    Yes.

23 Q    If we could go down to rows 216 and 217 of the

24 spreadsheet of Exhibit I-1.

25         Do you see lines for DB NY overdraft and RJ

1    overdraft?

2    A    Yes.

3    Q    What are these?

4    A    Those are amounts of overdrafts outstanding in that

5    particular week.

6    Q    And are these running totals week by week of amounts

7    overdrafted at a particular bank?

8    A    Yes.

9    Q    Row 216 is Deutsche Bank New York?

10   A    Yes.

11   Q    And row 217 is Raymond James?

12   A    Yes.

13   Q    So we are talking about amounts in the millions here; is

14   that correct?

15   A    That is correct.

16             THE COURT:  And that's listed as positive cash flow?

17             THE WITNESS:  Yes.

18   Q    And did you also, with Mr. Roberto Cortes and others,

19   discuss overdrafts in the WhatsApp Flux chat?

20   A    Yes.

21   Q    I'm going to take you to Exhibit H-1.  And looking first

22   at chats from May 3, 2017.

23   A    Yes.

24   Q    And the highlighted portions here, do you see Mr. Haberer

25   writes:  "You should see there is an overdraft of 1 million in

Trujillo - direct - Warden                              234

1  Pershing"; is that correct?

2  A    That is correct.

3  Q    He writes:  "We're juggling things around, we have to

4  pay."

5           And who are the people he lists here?

6  A    Alejandro Metheou, financial advisor.

7           He's not referring about paying directly to

8  Alejandro Metheou but to Alejandro Mateo's clients.  Bedias

9  clients, 100k and self-clearing clients.

10 Q    So to be clear, Matheo and Bedias are Biscayne financial

11 advisors?

12 A    Yes.

13 Q    When it says, We have to pay them 400,000 and 600,000, is

14 it your understanding that's referring to their clients?

15 A    Yes.

16 Q    "Self, you already know the story."  What does that refer

17 to?

18 A    Cash being requested out of self-clearing clients's

19 account.

20 Q    And this is in May 2017, shortly after the April chats

21 that we just looked at for self-clearing?

22 A    Yes.

23 Q    Looking ahead a little bit to May 19, 2017, do you see

24 that?

25 A    Yes.

Trujillo - direct - Warden                    235

1   Q    Mr. Haberer writes:  "So they will know the state of the

2   situation.  We're overdrawn today by 4 million.

3            Do you see that?

4   A    Yes.

5   Q    And Mr. Cortes responds:  "Basically, I understand that

6   no dividends have been paid for months and nothing has been

7   invested in stocks."

8            Is that --

9   A    That's not an accurate translation.

10  Q    Okay.

11  A    If you want to see the --

12  Q    Would it be helpful for you to review the original

13  Spanish version?

14  A    Yes.

15  Q    Do you see that?

16  A    Yes.

17  Q    Okay.  Can you summarize what your understanding of the

18  statement from Mr. Cortes is?

19  A    He's stating that there's not -- there hasn't been

20  payments of dividends in months.  There hasn't been

21  investments in new assets and the operation and expense of

22  Biscayne are low, so, basically, stating that the 4 million in

23  overdraft wouldn't add to debt because nothing has been paid

24  from those items.

25  Q    Okay.  In plain English, do you have an understanding of

1   what he meant?

2   A    That he was asking what have been used, this 4 million

3   overdraft if nothing has been done that I know of, and then

4   Mr. Haberer states what was the use of those 4 million.

5   Q    And he says self and then Messi Ale M and then it goes

6   on.  Who is he referring to here?

7   A    Those are all self-clearing clients, that the main issue

8   to cover with those funds were self-clearing.

9   Q    In other words, one of the things that was done with

10  funds overdrafted was to try and pay back clients whose money

11  had been taken already from the self-clearing?

12  A    Yes.

13  Q    Without their knowledge?

14  A    Yes.

15  Q    Mr. Trujillo, I'm going to switch topics now away from

16  overdrafts.

17          Did you at times create fake statements for clients?

18  A    Yes.

19  Q    Was Roberto Cortes aware of any of these statements?

20  A    Yes.

21  Q    To be clear, were there some that he was not aware of?

22  A    I'm not sure.  Probably not.

23  Q    Okay.

24          THE COURT:  What were your discussions with him, if

25  any, about making up fake statements?

1      THE WITNESS:  I was always requested that I need to

2   produce those to cover his needs, to provide the end client a

3   response.

4      THE COURT:  Did Mr. Cortes request you to prepare

5   the false statements?

6      THE WITNESS:  Not in -- not a specific.  He didn't

7   state it like provide statement, but he knew that the assets

8   were not there to provide a real statement.

9      THE COURT:  And did he know you were providing a

10  false statement?

11     THE WITNESS:  Yes.

12  Q    Is one of the clients that you did that involve Westwood?

13  A    Yes.

14  Q    Generally, who was Westwood or what was Westwood?

15  A    Westwood was a client that Mr. Cortes introduced to

16  Madison in 2015 and there was an account opened in Madison for

17  this client.  This account received incoming wire to fund the

18  account.

19  Q    And approximately how much money did the Madison

20  subsidiary account for Westwood receive?

21  A    Close to 7 million in different installments in wires.

22  Q    What was supposed to be done with this money?

23  A    It was supposed to be used for purchasing an Ecuadorian

24  bond.

25  Q    How do you know that that's what the intended purpose

1   was?

2   A    The communications and requests at that time of the

3   incoming funds were all related to this purchase, the request

4   of the purchase of this bond.

5   Q    Turning to the Exhibit I-1, the cash flow spreadsheet,

6   are incoming funds from Westwood reflected on this

7   spreadsheet?

8   A    Yes.

9   Q    In row 30?

10   A    Yes.

11   Q    And if we scroll over, do you see under column U,

12   December 18, 2015, a reflection of incoming of approximately

13   $4.9 million?

14   A    Yes.

15   Q    And at the time that 4.9 million came in what was the

16   amount available?

17   A    The initial amount was 2.7 million.

18   Q    And then $4.9 million came in?

19   A    Yes.

20   Q    To make an amount available in row 34 of 7.6 million; is

21   that correct?

22   A    Almost 7.7.

23   Q    And then looking down under the outflows starting in row

24   47, do you see that?

25   A    Yes.

1   Q    Here are some of the things -- do these reflect what some

2   of this money was spent on for that time period?

3   A    Yes.

4   Q    And rows 52 through 57, what are those?

5   A    Those are interest payments of the proprietary notes.

6   Q    So that's money going where?

7   A    Going to clients accounts in the form of interest

8   payment.

9   Q    Investors in those various notes?

10  A    Yes.

11  Q    And then scrolling down to some of the other outflows, do

12  you see rows 189 and 190?

13  A    Yes.

14  Q    DB NY overdraft and Biscayne overdraft?

15  A    Yes.

16  Q    What are those?

17  A    Those are overdrafts that were covered in that -- with

18  those funds available.

19  Q    In other words, the 2 point I think 7 million, plus the

20  Westwood $4.9 million in part was used to cover overdrafts at

21  Deutsche Bank New York?

22  A    Yes.

23  Q    Okay.  And then scrolling forward in time, columns AD and

24  AE for the dates February 12, 2016 and February 19, 2016, Mr.

25  Trujillo, do those reflect additional incoming funds a little

1    below $2 million?

2    A    Yes.

3          THE COURT:  From Westwood?

4          THE WITNESS:  Yes, same client.

5    Q    Do some of those funds actually get used to purchase

6    Ecuadorian bond?

7    A    At some point some of these funds -- some funds were used

8    to purchase.

9    Q    Fair enough.

10          How much -- do you recall roughly how much

11   Ecuadorian bonds was purchased?

12   A    Nominal value of 2 million, cash was 1.2.

13   Q    So the Westwood client put in about $7 million; is that

14   right?

15   A    Yes.

16   Q    And about 1.3 million of that cash was used to purchase

17   Ecuadorian bonds?

18   A    Yes.

19   Q    Did you send a fake statement to Westwood reflecting that

20   in fact all of their 7 million had been used to purchase

21   Ecuadorian bonds?

22   A    Yes.

23   Q    Why is that?

24   A    They were requesting this statement insistently.

25   Q    Insistently?

1    A    Insistently.

2    Q    I'm showing you an e-mail that's marked Exhibit AL.

3         Mr. Trujillo, do you see this October 4, 2016 e-mail

4    chain?

5    A    Yes.

6    Q    And looking in the middle of the first page of Exhibit

7    AL, do you see an e-mail from Carlos Ortega?

8    A    Yes.

9    Q    And is that to you and Roberto Cortes and Juan Carlos

10   Cortes and copying Hector San Andres?

11   A    Yes.

12   Q    What is Mr. Cortes requesting?

13   A    Bank statement.

14   Q    From where?

15   A    From Deutsche Bank's account of Westwood.

16   Q    And then you reply a couple of days later?

17   A    Yes.

18   Q    And what do you say?

19   A    That the statements are generated under a special request

20   because when there's no activity, they take time.

21   Q    Was that true?

22   A    No.

23   Q    Why did you tell him that then?

24   A    Because there were no real statements.

25   Q    And then there are attachments to this e-mail.  Do you

1    see here?

2    A    Yes.

3    Q    And I am going to show you Exhibit AI to start.  Do you

4    see that document?

5    A    Yes.

6    Q    What is this?

7    A    That's a fake statement, one of the attachments in the

8    e-mail.

9    Q    Who created this?

10   A    I did.

11   Q    And looking down at portfolio positions, can you explain

12   to us why this is a fake statement?

13   A    Because it shows the holdings of two Ecuadorian bonds,

14   nominal value of 8 million, market value of 7.2, which were

15   not in the account.

16   Q    And as the cash flow spreadsheet had reflected, much of

17   Westwood's money had gone to other purposes; is that correct?

18   A    That is correct.

19   Q    There were two other attachments to that e-mail; is that

20   correct?

21   A    Yes.

22   Q    Exhibit AJ.  Do you see that here?

23   A    Yes.

24   Q    And Exhibit AK?

25   A    Yes.

Trujillo - direct - Warden                243

1   Q    And what are these?

2   A    Different periods of time of fake statements.

3   Q    So these are just reflecting different months in the

4   account?

5   A    Correct.

6   Q    Were different -- was it a truthful reflection of what

7   was in the account?

8   A    No.

9   Q    It was sent to the clients to reflect different time

10  periods?

11  A    Yes.

12  Q    And was Mr. Cortes aware that the money from Westwood had

13  not been used in full to purchase Ecuadorian bonds?

14  A    Yes.

15  Q    And was he copied on this e-mail?

16  A    Yes.

17  Q    Did you send others later in time?

18  A    I believe so, yes.

19  Q    And was Mr. Cortes involved and copied on those?

20  A    Yes.

21  Q    At some point in time did Westwood request their assets?

22  A    Yes.

23  Q    What happened?

24  A    There were no assets, so we couldn't process their

25  request.

Trujillo - direct - Warden                    244

1    Q    And were there discussions in the chat about this?

2    A    Yes.

3    Q    Directing you back to Exhibit H-1, and these are chats

4    from -- this is a chat from June 5th, 2017?

5    A    Yes.

6    Q    Again, was Mr. Cortes regularly involved in discussions

7    about how to deal with clients and their cash well into 2017?

8    A    Yes.

9    Q    And starting with the note from Juan Carlos Cortes -- by

10   the way, is he a relation to Mr. Cortes?

11   A    He's half brother.

12   Q    He says, "Ortega is anxious because GT hasn't been in

13   touch with him."

14        Can you explain that?

15   A    I stopped replying to Mr. Ortega and that made him

16   anxious.

17        Ortega is a representative of Westwood and Juan

18   Carlos is stating that Ortega has contacted him regarding my

19   no -- regarding me not responding to him, to Ortega.

20   Q    Why had you not responded to him?

21   A    I had nothing to respond to.  His request was cash and/or

22   statements and I had neither.

23   Q    And you responded:  "What do they want me to answer?  His

24   anxiety is over the transfer more than my responding to him."

25   A    In this case he was requesting a wire out and I couldn't

1  answer him because I did not have the cash to cover his

2  request.

3  Q    And there's some more discussion about how to deal with

4  this, is that fair to say?

5         And then at the bottom highlighted note, does Mr.

6  Cortes indicate he will participate in a discussion?

7  A    Yes.

8  Q    Moving ahead to June 26, 2017, does Mr. Cortes write:

9  "Ortega and San Andres called me.  They're very concerned

10  about payment and he told me that" -- is that Mr. Haberer?

11  A    Yes, Fernando Haberer.

12  Q    -- "informed them that the account was opened and to

13  please send the payment of the interest.  The client is very

14  upset about this and they don't have answers.  I will send

15  them the information, I told him not to worry, this week."

16         Can you summarize what you understand Mr. Cortes to

17  be saying?

18  A    Can we check the Spanish version, please.

19  Q    Sure.  This is Exhibit H.

20  A    Mr. Cortes is stating that both Ortega and San Andres,

21  who are representatives of Westwood, had called him very

22  concerned about the payment that they haven't received, that

23  there's an account open to receive interest, and that they are

24  requesting the wire to be sent to them, that they are very

25  anxious and they don't have any answers.  I'm just informing

1    you, Ortega and San Andres, and told him that this week you

2    should be receiving the payment.

3    Q    How does Mr. Haberer respond?

4    A    That it's being process, but these guys are calling

5    Fernando 500 times a day and he has responded to them, and

6    Roberto is saying he is confirming that they are driving him

7    crazy as well.

8    Q    Was there generally, Mr. Trujillo, an effort to stall a

9    client like this that was asking for money that wasn't there?

10   A    Yes.

11   Q    And was Mr. Cortes part of an effort to help stall

12   clients?

13   A    Yes.

14   Q    Was this chat a reflection of that?

15   A    Yes.

16   Q    Did Westwood end up getting all of their money back?

17   A    No.

18   Q    Do you know how much they lost?

19   A    About -- it could be almost all of it.  I think at some

20   point they received something back, but not much.

21   Q    Okay.

22   A    And the interest were paid out to them.

23          THE COURT:  And what?

24          THE WITNESS:  Some interest funds were wired out,

25   but not the complete amount.

1    Q    Just to be clear, this was a client that wanted to invest

2    in Ecuadorian bonds and then the money was taken in part for

3    the Ponzi scheme into the proprietary notes?

4    A    Yes.

5    Q    Did Mr. Cortes have knowledge of that?

6    A    Yes.

7            MR. WARDEN:  All right.  One more example of that,

8    Your Honor.

9

10            (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   (Continuing)

2   Q    Are you familiar with an entity called Ulticorp?

3   A    Yes.

4   Q    What is that?

5   A    That's an entity that opened an account in Madison, a

6   subaccount in Madison, that was owned by Carlos Calero.

7   Q    Who is that?

8   A    Mr. Cortes's father-in-law.

9   Q    Okay.

10         We saw emails earlier involving Juan Carlos Calero.

11         Are they related?

12   A    Carlos Calero is his father.

13   Q    Okay.

14         So Ulticorp now is Mr. Cortes's -- involves

15   Mr. Cortes's father-in-law?

16   A    Yes.

17   Q    Did you prepare and send fake statements to Mr. Cortes's

18   father-in-law?

19   A    Yes.

20   Q    Was Mr. Cortes aware of that?

21   A    Yes.

22         MR. WARDEN:  I'm showing you what is marked as

23   Exhibit AS.

24         (Exhibit published.)

25   Q    And do you see this is an email chain from January 6th,

Trujillo - direct - Warden                          249

1   2016?

2   A      Yes.

3   Q      And is the bottom email from you?

4   A      Yes.

5   Q      Is that -- is it to Roberto Cortes?

6   A      Yes.

7   Q      And can you summarize what you said to Mr. Cortes here?

8   A      I'm sending him an attachment that it's a statement of

9   movements of Ulticorp account.  Mr. Calero's account.

10  Q      And are you asking Mr. Cortes to review it?

11  A      Yes.

12  Q      Why would he need to review a bank statement?

13  A      To agree with the movements that were reflected in that

14  statement.

15  Q      Before they were given to the client?

16  A      Yes.

17  Q      And did he review it?

18  A      Yes.

19  Q      Did he respond to you?

20  A      He confirmed and asked me to send him -- to send the

21  client.

22          THE COURT:  Was this a false statement?

23          THE WITNESS:  Yes.

24  Q      Now, Exhibit AS that we just looked at was January 6th,

25  2016.  And then I'm looking at Exhibit AT --

Trujillo - direct - Warden                    250

1          (Exhibit published.)

2   Q   -- on that same day.

3          Do you see this email?

4   A   Yes.

5   Q   And what is this?

6   A   It's me sending Mr. Calero the statement that he

7   requested with Ulticorp's movements in the account.

8   Q   And did you do this after Mr. Cortes had reviewed the

9   draft that you prepared?

10  A   Yes.

11  Q   And said it was okay to send?

12  A   Yes.

13          MR. WARDEN:  Showing you Exhibit AT-1.

14          (Exhibit published.)

15  A   Yes.

16  Q   What is this?

17  A   The attachment on that email, on the previous email that

18  we saw.

19  Q   And what is it?

20  A   It's a statement of movements of Ulticorp account.

21  Q   And is it a true statement?

22  A   No.

23  Q   What -- what is false about it?

24  A   It's showing that it's all in cash, when there was almost

25  a hundred thousand invested in liquidity.

1  Q     In the liquidity note.

2  A     Yes.

3  Q     And did Mr. Cortes know that?

4  A     Yes.

5  Q     And if you can remind us, what happened to money that was

6  invested in the liquidity note?

7  A     It went to the Ponzi scheme and the proprietary products.

8  Q     Mr. Trujillo, in your role as the owner of Madison

9  Assets, did you have decision-making authority over what was

10  done with investor money that was coming into the subaccounts

11  held under the name Madison at Deutsche Bank New York.

12  A     No.

13  Q     Did you have some -- some ability to make funds move in

14  and out?

15  A     Yes.

16  Q     And did you follow others's directions about what to do

17  with that money and with those securities?

18  A     Yes.

19  Q     Whose directions did you follow?

20  A     Fernando, Ernesto and Roberto Cortes.

21  Q     Now at times did those gentlemen disagree about how to

22  handle funds?

23  A     Yes.

24  Q     Did they talk about those disagreements?

25  A     In the chat.

1   Q    That chat that that is Exhibit H-1?

2   A    Yes.

3   Q    That lasted through the end of -- through November of

4   2017?

5   A    Yes.

6   Q    And was Mr. Cortes a part of those discussions?

7   A    Yes.

8   Q    Is it fair to say that sometimes his view did not win

9   out?

10  A    Correct.

11  Q    Is it fair to say that he was a participant in those

12  discussions?

13  A    Yes.

14  Q    And he understands how Madison Asset was used to hold the

15  subaccounts for proprietary notes?

16  A    Yes.

17  Q    And that was true for the entire time that you were

18  involved through the end of 2017?

19  A    Yes.

20  Q    Okay.

21            MR. WARDEN:  No more questions, Your Honor.

22            THE COURT:  How long do you think you are going to

23  be?

24            MR. MYERS:  At least an hour.  I'm going to ask to

25  come back tomorrow, Judge.

Trujillo - direct - Warden                    253

1          THE COURT:  Okay.

2          Is there some particular issue with timing tomorrow?

3          MR. WEINTRAUB:  Well, to be candid, I do have a

4   prescheduled meeting that's at 10:00 until the latest 1:00.  I

5   anticipate it will not go maybe until 1:00.

6          THE COURT:  Well, but you -- if it is a meeting --

7   in connection with the U.S. Attorney's Office, you mean?

8          MR. WEINTRAUB:  It's -- it's not just an internal

9   meeting.  It's something that I can get coverage for.

10          THE COURT:  Okay.

11          MR. WEINTRAUB:  If the Court's willing to start at

12   noon or 1:00, that would be wonderful.  But if not, we can

13   start whenever the Court wants and I'll be here.

14          THE COURT:  Do you think if we start at...

15          (Pause in the proceedings.)

16          THE COURT:  Would it be helpful if we started at

17   11:00?  Because I --

18          MR. WEINTRAUB:  For the Government, we'll make

19   whatever works.

20          THE COURT:  Okay.

21          MR. WEINTRAUB:  I understand Mr. Myers may have an

22   issue.

23          MR. MYERS:  First thing is I have to discuss with my

24   client whether he would testify.  So that would open up a much

25   larger timeframe.

Trujillo - direct - Warden                    254

1          The other thing, I would have to cancel a proffer

2    tomorrow in Delaware with about seven different agents that

3    are supposed to be there from out of town.  I had it X'd off.

4    I thought we'd finish this today.

5          THE COURT:  Well, I think we have got to finish

6    this.

7          So, I would -- I think if we start at 11:00, which

8    is actually as soon as I can start because I have a

9    10:00 o'clock issue.

10         So we should be able to finish it if we start at

11   11:00, even if your client testifies, right?

12         MR. MYERS:  Hopefully.

13         THE COURT:  Well, that is what we will do.

14         MR. WEINTRAUB:  Okay.

15         THE COURT:  We will start at 11:00 tomorrow.

16         You understand you have to be back here in court

17   tomorrow?

18         MR. MYERS:  My client wants to speak to me.

19         (Pause in the proceedings.)

20         MR. MYERS:  All right.

21         We definitely can be here tomorrow to finish up with

22   this witness.  My client is asking for an adjournment for his

23   testimony.

24         THE COURT:  No.

25         I mean, think you can just discuss -- I am not going

Proceedings                                              255

1   to adjourn the case for him to have some, you know, we need to

2   get this done.  I have set aside this time.  I have got trial

3   starting.  I cannot adjourn the case for a day or so or some

4   period of time to do that.

5          I think -- you have heard the bulk of the testimony.

6   I think you have time to discuss with your client what he

7   wishes to do.  All of the Government's case is essentially

8   out.

9          We cannot do that.  I am sorry.

10         Okay.  So I will see everyone at 11:00.

11         MR. WEINTRAUB:  We will be here at 11:00.

12

13         (Matter concluded.)

14

15                        ooo0ooo

16

17

18

19

20

21

22

23

24

25

256

**I N D E X**

**WITNESS**                                                          **PAGE**

**ERNESTO HERACLITO WEISSON PAZMINO**

    DIRECT  EXAMINATION BY MR. WEINTRAUB          19

    CROSS EXAMINATION BY MR. MYERS               108

    REDIRECT EXAMINATION BY MR. WEINTRAUB        156

    RECROSS EXAMINATION BY MR. MYERS             160

**GUSTAVO TRUJILLO**

    DIRECT EXAMINATION BY MR. WARDEN             165