257

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
 2
      - - - - - - - - - - - - - - X
 3
      UNITED STATES OF AMERICA,    :   21-CR-458(CBA)
 4
                Plaintiff ,        :
 5
                                       United States Courthouse
          -against-               :   Brooklyn, New York
 6
      ROBERTO CORTES RIPALDA,      :
 7
                                       November 22, 2024
                Defendant.         :   11:00 a.m.
 8
      - - - - - - - - - - - - - - X
 9
            TRANSCRIPT OF CRIMINAL CAUSE FOR FATICO HEARING
10            BEFORE THE HONORABLE CAROL B. AMON
                  UNITED STATES DISTRICT JUDGE
11
      APPEARANCES:
12
      For the Government: BREON PEACE
13                        United States Attorney
                          BY:  BENJAMIN WEINTRAUB
14                             Assistant United States Attorney
                               271 Cadman Plaza East
15                             Brooklyn, New York 11201

16                        UNITED STATES DEPARTMENT OF JUSTICE - CRM
                               1400 New York Ave, NW
17                             Washington, D.C.
                          BY:  RANDALL WARDEN, ESQ.
18

19    For the Defendant:  MYERS & GALIARDO LLP
                               52 Duane Street
20                             New York, New York
                          BY:  MATTHEW D. MYERS, ESQ.
21

22    Court Reporter:     Michele Lucchese, RPR, CRR
                          225 Cadman Plaza East
23                        Brooklyn, New York
                          (718) 613-2273
24
      Proceedings recorded by mechanical stenography, transcript
25    produced by computer-aided transcription.
```

258

1              (In open court.)

2              THE COURTROOM DEPUTY:  Good morning.

3              This is criminal cause for a Fatico hearing,

4     21-cr-458, USA versus Roberto Cortes.

5              Will the parties please state your name for the

6     record, starting with the Government.

7              MR. WEINTRAUB:  Good morning, Your Honor.  Benjamin

8     Weintraub and Randall Warden for the United States, joined at

9     counsel's table by Special Agent Joseph  Weber.

10             THE COURT:  Good morning.

11             MR. MYERS:  Matthew Myers for Mr. Cortes.  Good

12    morning, Judge.

13             THE COURT:  Good morning.  Everyone can be seated.

14             Are you ready to go, Mr. Myers?

15             MR. MYERS:  Yes.

16             THE COURT:  Okay.  Remember that you are under oath

17    from yesterday.

18             THE WITNESS:  Yes.

19             MR. MYERS:  I'm just testing to see if the exhibit

20    is showing up on your guys's screens.

21             THE COURTROOM DEPUTY:  One second.

22             MR. MYERS:  Good.

23             THE COURT:  Yes.

24    **GUSTAVO TRUJILLO**,

25         called as a witness, having been previously duly

1   sworn/affirmed, was examined and testified as follows:

2   CROSS-EXAMINATION

3   BY MR. MYERS:

4   Q    Mr. Trujillo, were you aware at some point that Biscayne

5   had $1.6 billion under management?

6   A    Yes.

7   Q    The company was generating money from fees.  How did that

8   occur?

9   A    Commissions and fees generated by financial advisors

10  transactions with their clients' portfolios.

11  Q    Okay.  And then eventually it would trickle down into an

12  account at Biscayne and you would take salaries and things

13  like that?

14  A    That was handled by Biscayne.

15  Q    Okay.  How would you get compensated?

16  A    From my time at Biscayne, I had a salary in Biscayne.

17  Q    Where did that salary come from?  How did that -- how was

18  that generated?

19  A    From the commissions and the course of business of

20  Biscayne.

21  Q    And is it fair to say that there were millions of dollars

22  worth of fees being generated by all of these advisors and

23  brokers?

24  A    Yes.

25  Q    How does an investor extend the maturity date of a note?

Trujillo - cross - Myers                    260

1    A    It wouldn't be done by the investor.  It would be done by

2    the issuer.  The issuer is the one extending the maturity.

3    Q    Okay.  So the investor would call up the issuer and say I

4    want to extend the date, I don't need my money out at a

5    certain time?

6    A    No.  As I'm saying that, the issuer of the note --

7    Q    Yes.

8    A    -- would ask the investor for permission to extend the

9    maturity.

10   Q    Okay.  And there were a significant number of investors

11   that would take advantage of that extension; right?

12   A    In order to confirm that extension more than half of the

13   investor would have to approve the extension.

14   Q    Okay.  I'm asking you if that occurred historically

15   within Biscayne, somebody would contact the issuer and say I

16   don't need my money out after five years?

17   A    It's the other way around.  The issuer would contact the

18   client asking about the extension and through the system, they

19   would get their response, and the issuer would need more than

20   half of the investors to agree to the extension.

21   Q    Did that occur?

22   A    That occurred, yes.

23   Q    Changing subjects, Mr. Cortes's father, you said -- he

24   was a lawyer; right?

25   A    Yes.

Trujillo - cross - Myers                    261

1   Q    And he did the legal work behind Madison, correct, to set

2   up the structure?

3   A    Not that I am aware that he was involved in that.  There

4   was a lawyer in Cayman Islands who --

5   Q    Well, Mr. Cortes Senior, he wasn't a managing partner of

6   Madison, right, he didn't involve himself in the day-to-day

7   operations of Madison, did he?

8   A    No.

9   Q    Okay.  Switching topics now.  The 2016 SEC order that you

10  spoke of, you were part of that; correct?

11  A    Part of what?

12  Q    You were part of the order?  You, Trujillo; Haberer,

13  Weisson, you were part of the SEC?

14  A    No, I was not involved in that.

15  Q    No?

16  A    No.

17  Q    Did you understand what the mandate was coming out of the

18  SEC in 2016 concerning Biscayne?

19  A    I had the general idea that Ernesto Weisson and Roberto

20  Cortes had to relinquish their participation.

21  Q    Okay.  So you're saying your general understanding.  That

22  didn't prohibit Mr. Cortes from managing Proprietary Products,

23  did it?

24  A    I don't remember the specifics on the mandate, so I'm not

25  a lawyer, and I wasn't part the settlement, so.

Trujillo - cross - Myers                           262

1   Q     Okay.

2   A     I wouldn't know -- I understood that they needed to be

3   removed from all the Proprietary Products, that's what I

4   understood.

5   Q     Okay.  So well, the main reason why the Proprietary

6   Products were moved offshore was to -- well, where were they

7   moved, the Proprietary Products, to what country?

8   A     So the administration of the Proprietary Products was

9   moved to the back office in Argentina.

10  Q     Okay.

11  A     The --

12  Q     And how about Uruguay?

13  A     I'm.

14  Q     How about Uruguay?  Would they moved there also?

15  A     No, Biscayne Capital was in Uruguay, but Proprietary

16  Products was in Argentina.

17  Q     Okay.  And one of the reasons why it was moved from the

18  United States offshore is because that's where most of the

19  properties were; right?

20  A     Which properties?

21  Q     The Proprietary Products, the notes?

22  A     Okay.  The Proprietary Products were issued in Cayman.

23  Q     Okay.

24  A     So....

25  Q     So there was no reason for Biscayne to have its hub or

Trujillo - cross - Myers                    263

1   central location, say, in Miami, Florida; right?

2   A    The same as in Buenos Aires.

3   Q    Okay.  So, yesterday did you not testify as a result of

4   the SEC mandate that the Proprietary section of the business

5   was moved offshore as if it was a reaction to the SEC's

6   mandate?

7   A    Yes.

8   Q    So your understanding, even though you have a layman's

9   understanding, not a legal understanding, was that's the

10  reason why it was moved offshore, because of the SEC?

11  A    Yes.

12  Q    But you knew that Mr. Cortes, not Cortes Senior, but Mr.

13  Cortes had no prohibition against managing Proprietary

14  Products; right?

15  A    I didn't know that.  I thought he wasn't able to continue

16  any participation in the Proprietary Products.  That's what I

17  understood.

18  Q    Did you read the mandate or not?

19  A    Not that I recall right now.

20  Q    Was this just like talking amongst the partners?

21  A    The partners.

22  Q    So yesterday you said you thought the Ponzi scheme

23  started in 2016, after the SEC order?

24  A    No, I stated that's when it started to collapse.

25  Q    Okay.  Let me show you Exhibit -- I think it was D.

Trujillo - cross - Myers                            264

1          Do you see, Mr. Trujillo -- do you see -- you're

2     familiar with Edith Hinojosa; right?

3     A    Yes.

4          THE COURT:  What exhibit is this?  I'm sorry,

5     Counsel?

6          MR. MYERS:  D, D, as in David.

7     Q    Can you see that, Mr. Trujillo?

8     A    Yes, Edith Hinojosa.

9     Q    Do you see line 48 there, Edith Hinojosa?

10    A    Yes.

11    Q    And below Sentinel, it says 17 million, 17.7?

12    A    Yes.

13    Q    Going over on the same line all the way to J, sorry, I --

14    A    Yes.

15    Q    -- there's another 16 million?

16    A    Yes.

17    Q    Okay.  So there's a date above -- sorry.  There is a date

18    above that.  That's 16 million right there.  I think that says

19    12/20/2014.

20    A    Yes.

21    Q    Okay.  That date is the maturity date; is that correct?

22    A    That is correct.  That's stated as a maturity date.

23    Q    And can you tell the judge when the advisor sold Ms.

24    Hinojosa this product?

25    A    Can you rephrase that question, please.

1    Q    Can you tell when the note under that particular date was

2    sold, that's the maturity date, but when was it -- when did it

3    start?

4    A    So that's -- if that's the maturity date, the issue date

5    would have been prior to that date.

6    Q    Okay.  So what is the date?

7    A    I don't have the offering memorandum right now to

8    remember the issuing date.

9    Q    Okay.  And those dates that you see all across the top

10   there, could be different maturity dates for different

11   products; right?

12   A    Yes.

13   Q    So just because it says a certain date, you can't say to

14   yourself, well, exactly five years ago this must have been

15   issued or anything like that; right?

16   A    No, I can't say.

17   Q    Okay.

18   A    When you say "issue," you say the issuance of the note --

19   Q    Yes.

20   A    -- or a problem?

21   Q    Issuance?

22   A    I can't say when was the issuance.

23   Q    Okay.

24         So when this money was raised by an advisor, can you

25   tell if Ms. Hinojosa's money was raised specifically to fund a

Trujillo - cross - Myers                              266

1   Ponzi scheme?

2   A    When she raised it, the product was sold as an investment

3   in real estate.

4   Q    Okay.  And when it got to you, do you have any way of

5   telling, because these are the maturity dates, when she was

6   originally approached by an advisor broker and she purchased

7   something, can you tell us right now under oath that that was

8   specifically used, that money, to fund the Ponzi scheme?

9   A    Ms. Hinojosa was an advisor that was approached to raise

10  more funds to --

11  Q    Okay.

12  A    --  to be included in more investments in these notes

13  that ultimately were lost in the Ponzi.

14  Q    I didn't ask you that.  I asked you when she was

15  approached, do you know that specific -- Ms. Hinojosa was

16  approached specifically because you knew on a certain date,

17  five years ago, four years ago, ten years ago, before the

18  maturity of those notes, that it was going to be used to fund

19  a Ponzi scheme?

20  A    The literal words were not used, but she was approached

21  to raise funds to pay previous investors.

22          THE COURT:  Ms. Hinojosa, is that an investment

23  advisor or investor?

24          THE WITNESS:  She's a financial advisor.

25          THE COURT:  She's a financial advisor?

Trujillo - cross - Myers                    267

1          THE WITNESS:  Yes.

2    Q    And she had a group of people under her; correct?

3    A    Yes.

4    Q    They were all customers or investors?

5    A    Correct.

6    Q    So before 2016, on this exhibit right here, about how

7    much percentage of the money that you see on that D, Exhibit

8    D, came in as clean money, not going to fund the Ponzi scheme?

9    A    All of this investments were already done prior to this

10   date.  So this grew over time.  This amount is a snapshot in

11   time of a new that grew during time.

12   Q    Yes.  And that growing over time, you have no idea, as

13   you sit here today looking at that chart, whose money came in

14   as clean money and whose was used for a Ponzi scheme; right?

15          You can't tell from this document, can you?

16   A    You see a number here.  The cash flow sheet will show you

17   what the money of this investment was used for.

18   Q    You were aware that Madison gave Weisson 16 million,

19   right, for this Villahermosa?

20   A    Yes.

21   Q    And Mr. Cortes had nothing do with Villahermosa, did he?

22   A    Not that I know of.

23   Q    Okay.  Did you ever have any discussions with Mr. Weisson

24   that he, in fact, wanted to keep that secret from Mr. Cortes?

25          THE COURT:  I'm sorry, who wanted to keep it secret.

1  Q    That Mr. Weisson wanted to keep it secret from Mr.
2  Cortes?
3  A    Specifically to keep it secret, no.  I knew it was a
4  different business that was not related to Mr. Cortes.
5  Q    Mr. Weisson did a lot of things behind Mr. Cortes's back;
6  right?
7  A    I wouldn't know it.  That's a question for him.
8  Q    Well, I'm asking you if you knew that because you dealt
9  with Weisson, right, you spoke to Weisson?
10 A    Yes.
11 Q    You had a relationship with Mr. Weisson?
12 A    Yes.
13 Q    You know Villahermosa was low-income housing that he was
14 doing by himself; right?
15 A    Yes.
16 Q    You didn't make any money off Villahermosa, did you?
17 A    No.
18 Q    Did he ever have any conversations with you that, hey.
19 Don't tell Cortes about the 16 million that I just took out
20 for Villahermosa?
21 A    Not specifically.  It was understood that it was not
22 involving Mr. Cortes.  I don't remember -- this I don't
23 remember in a specific request of Mr. Weisson to keep it a
24 secret.
25 Q    Fair enough.

Trujillo - cross - Myers                         269

```
 1              THE COURT:  Do you know what money funded that
 2   project?
 3              THE WITNESS:  Investments through the Proprietary
 4   Products.
 5              THE COURT:  Through who?
 6              THE WITNESS:  Proprietary Products.
 7              THE COURT:  That funded -- I'm sorry.  That funded
 8   the 16 million for Villahermosa?
 9              THE WITNESS:  Yes.
10   Q    Which of those products right there can you point to that
11   funded Villahermosa?
12   A    So there was investments done through liquidity and
13   through liquidity, whichever one of this was available at the
14   moment.
15   Q    Let's move on to -- Madison provided some capital for
16   this Win Wer, W-I-N, W-E-R; is that true?
17   A    Yeah, all of the funds were coming out of Madison's
18   accounts for the operations of several entities, including
19   Biscayne and Win Wer.
20   Q    Are you familiar with Dario Epstein?
21   A    Yes.
22   Q    Tell the judge who that is.
23   A    This was an individual from Argentina that was brought in
24   to establish the purchase of Biscayne Capital's business.
25   Q    Okay.  Is it fair to say you paid millions of dollars to
```

Trujillo - cross - Myers                                    270

1    Epstein to fund Win Wer?

2    A    The group paid him millions of dollars.

3    Q    I don't mean you personally.  The group --

4    A    Yes.

5    Q    -- agreed to pay him millions of dollars; right?

6    A    Yes.

7    Q    Was he a friend of Haberer?

8    A    Yes.

9    Q    Did Haberer at some point basically order you to give

10   money to Dario Epstein?

11   A    Yes.

12   Q    You understand what the liquidators are, right, just as a

13   general --

14   A    Yes.

15   Q    -- term?

16        Describe what a liquidator would do?

17   A    It's an entity that's in charge of closing down a

18   business.

19   Q    Okay.  Are you familiar with the liquidators in this

20   case, Michael Pearson?

21   A    Yes, I've heard of him.

22   Q    Okay.  And were you aware that he sued Madison assets to

23   recover the Biscayne assets stolen by Epstein?

24   A    I don't know the specifics of what happened after I left

25   Madison.

Trujillo - cross - Myers                              271

1   Q    All right.  Were you aware that the liquidators were

2   going after assets that were taken from Biscayne and moved

3   over to Madison?

4   A    That would be the case of a liquidator, searching for

5   assets to cover.

6   Q    Okay.  Was Mr. Cortes named in that lawsuit?

7   A    I don't -- I have no idea.

8   Q    You do agree with me that Mr. Cortes had nothing to with

9   this Win Wer and Epstein fellow; right?

10  A    Yeah.  He knew him and he was part of the agreement with

11  Fernando Haberer.

12  Q    He was.  And when did that occur?

13  A    Through time -- through my time in Argentina they were

14  always having meetings regarding this, even without me.  I

15  wasn't involved in those meetings.

16  Q    So if you weren't involved in those meetings, you

17  wouldn't be able to testify what happened at them, right?

18  A    No, but they knew each other, Mr. Cortes knew Mr.

19  Epstein.

20  Q    Just because he knows him, doesn't mean he would

21  necessarily be involved in his transactions, right?

22  A    It doesn't necessarily mean that.

23  Q    Okay.  And Haberer, not Cortes, was the one that ordered

24  you to give Epstein some money, right?

25  A    It was Haberer.

Trujillo - cross - Myers                     272

1    Q    And how many millions of dollars was that?

2    A    I don't have a recollection right now of how much money

3    was sent to him, but it was a lot.

4    Q    When you say a lot, we have been dealing with a lot in

5    this courtroom for a couple days.  So is that $5 million or 20

6    million?

7    A    No.  Less than five, I would say.

8            And he was receiving funds in cash in Argentina, on

9    a monthly basis to run the operation.

10   Q    Okay.  You never showed any kind of balance sheets for

11   Madison with Mr. Cortes, did you?

12   A    Cash balance sheet?

13   Q    Yeah.

14   A    It was included in the cash spreadsheet that you see

15   there --

16   Q    Okay.

17   A    -- that we saw.

18   Q    Did you share that with him?  Did you show that to him?

19   A    Yes, it was shared in Google Drive that we were speaking

20   of yesterday.

21   Q    Okay.  How much, do you know -- can you give us a figure?

22   How much did Madison owe, roughly, how much in proprietary

23   notes in 2017?

24   A    I would say by the end there were around probably $50

25   million of Proprietary Products inside Madison accounts.

Trujillo - cross - Myers                    273

1       THE COURT:  How much?

2       THE WITNESS:  50.

3       THE COURT:  50.

4   Q    Who prepared the weekly cash flow sheets?

5   A    I did.

6   Q    Did you have a cash flow sheet that was not shown to Mr.

7   Cortes?

8   A    During that time that he was involved, no.

9   Q    Okay.  And you're insinuating that possibly there was a

10  cash flow sheet when he wasn't involved?

11  A    There were -- like when the Villahermosa project was

12  funded, that cash flow, he wasn't part of this, that cash

13  flow.

14      THE COURT:  Which project?  What was it that he

15  wasn't part of?

16      THE WITNESS:  Villahermosa, the Weisson project.

17      THE COURT:  Okay.

18  Q    Do you recall which -- let's move on to liquidity.

19  Explain that in less than 30 seconds, the liquidity.

20  A    It was marketed as a money market product.

21  Q    Okay.  And do you recall which securities were purchased

22  as the underlying asset for the Commerz liquidity note?

23  A    There were some Brazilian bonds and GMS, one of the

24  Proprietary Products, that's how it started.

25  Q    And are you familiar with the Commerzbank?

Trujillo - cross - Myers                                    274

1          That's a German bank in London, right?

2     A     I'm familiar with Commerz, yes.

3     Q     Okay.  And the principal in dealing with Commerzbank is

4     they don't -- they invest in commercial paper generally;

5     right?

6     A     Yes.

7     Q     They only deal with liquid assets; right?

8     A     I have no idea what their investments that they do are

9     limited to some securities or not.

10    Q     You do agree with me that there were securities in

11    Commerzbank in liquidity that were not Proprietary Products;

12    right?

13    A     At the beginning, yes.

14    Q     In fact, when dealing with Commerzbank, did you ever come

15    across or deal with the bank that you had a rule -- they had a

16    rule that you had to abide by that the underlying asset could

17    not exceed 30 percent of nonliquid instruments in dealing with

18    that bank?

19    A     I have no idea of that rule.

20    Q     Okay.  Were you guessing yesterday when you said

21    100 percent of the Commerzbank liquidity was in Proprietary

22    Products?

23    A     I said by the end.  And by the end, I didn't refer to

24    Commerz bank.

25    Q     Okay.  But we are talking about Commerzbank.  So you are

Trujillo - cross - Myers                    275

1  talking about in the beginning.  That's a true statement,

2  right?  It wasn't Proprietary Products?

3           There were all kind of other things in there, like

4  notes?

5  A    There were other things and Proprietary Products.

6  Q    Other things like CDs and things like that?

7  A    Brazilian bonds is what I remember right now.

8  Q    Bonds, commercial paper?

9  A    Commercial paper.

10 Q    Thus the term Commerzbank; right?

11 A    I have no idea if that's related to that.

12 Q    You and Haberer, you established this IACAP liquidity

13 note.  What is that?

14 A    That's the liquidity that -- notes that replaced Commerz

15 liquidity note.

16 Q    Okay.  And did you place Proprietary Products in IACAP?

17 A    Yes.

18 Q    And that was like 20 million dollars' worth?

19 A    Yes, even more.  The spreadsheet showed over -- around 30

20 million.

21 Q    And you never told Mr. Cortes about that; right?

22 A    He was involved in all of the discussions of the

23 liquidity purchases.

24 Q    So you told him that you set up the liquidity IACAP,

25 moving it from liquidity over to liquidity IACAP that you and

Trujillo - cross - Myers                          276

1   Haberer set up?  You were having discussions with Cortes about

2   that?

3   A    Through the --

4   Q    I don't --

5   A    Yes, through the weekly meetings.  That's -- those funds

6   that were at the IACAP, that were received at the IACAP that

7   then were invested in Proprietary Products, that cash

8   available was reflected in the cash flow sheet that was

9   discussed with Mr. Cortes.

10  Q    Okay.  So you're saying that in the chats or e-mails, did

11  you take like a screenshort of the cash flow and show him?

12           He was in a different country at this time; right?

13  A    Yes.

14  Q    So you went through the cash flow with him in the chats

15  or e-mails?

16  A    Through the shared spreadsheet, the cloud-shared

17  spreadsheet, yes.

18  Q    So you put the spreadsheet up there and had discussions

19  about it?

20  A    Yes.

21  Q    And you discussed this IACAP liquidity that you set up

22  with Haberer?  You discussed that specifically; right?

23  A    The investments done through liquidity are shown there,

24  so, yes, he knew that these funds were coming from investments

25  in liquidity.

Trujillo - cross - Myers                    277

1    Q    Okay.  I don't mean to give you a hard time about that,

2    but you keep pointing to the fact that something was in an

3    e-mail or text or the Google Drive, wherever.  I'm asking a

4    little bit of a different question now.

5              Did you have discussions with Mr. Cortes about the

6    IACAP liquidity that you and Haberer set up directly?

7    A    About that setting up of the product?

8    Q    Yes.

9    A    Or the purchases?

10   Q    Yes.

11   A    I don't think I was even involved in the set up of the

12   liquidity at the beginning.

13   Q    How about moving the whole liquidity over to IACAP?  Did

14   you have a conversation with Mr. Cortes that you were going to

15   do that?

16   A    No, I don't recall having that conversation with Mr.

17   Cortes.

18   Q    And did you purposely do that behind his back so he

19   wouldn't know so that it was in a different product that he

20   wouldn't be able to access?

21   A    No, I....

22   Q    I just want to show you if this statement is true or not.

23             Do you see at the top of this, Mr. Trujillo, it

24   says, "FBI" and you have a date there of July 11, 2018?

25             And you agree with me that you at some point told

1  this agent that approximately one year ago, Trujillo, that's

2  you --

3          MR. WARDEN:  Your Honor, objection.  He is asking

4  him a question reading from these notes.  For what purpose?

5  It's not clear.

6          MR. MYERS:  Okay, I will confront him like we were

7  in front of a jury.

8  Q    Is it a true statement that your indication is that you

9  realized that Madison was being utilized as a structure to

10  facilitate a Ponzi scheme approximately one year ago from the

11  date of July 11, 2018?

12  A    Yes.

13  Q    And you have had numerous conversations with the

14  prosecutors and agents; right?

15  A    Yes.

16  Q    And, so, when you said one year ago -- and you were being

17  interviewed on July 11, 2018, you started to realize that it

18  was a Ponzi scheme one year ago from 7/11/2018 would be

19  7/11/2017.  So sometime in 2017 that's when you started

20  realizing that hey, it was a Ponzi scheme?

21  A    It was before that.

22  Q    So why did you tell them it was about a year ago?

23  A    That was a stressful time.  I wouldn't have my exact

24  dates clear when I stated that, but, yeah.

25  Q    Well, just because you're under stress doesn't mean

Trujillo - cross - Myers                    279

1    you're inaccurate, right?

2          This is an accurate statement, right?

3    A    At least from 2017, yes.

4    Q    Do you remember, Mr. Trujillo, in 2018 Haberer's brother

5    brought a Mexican client into Madison?

6    A    Yes.

7    Q    And do you recall about how much money that was?

8    A    I'm not sure, but it was in the millions.

9    Q    Does $8 million ring a bell?

10   A    Could be.

11   Q    And you were -- you were in Buenos Aires at that time,

12   2018?

13   A    Yes.  Yes.

14   Q    And Mr. Cortes was not made aware of this Mexican client;

15   right?

16   A    No, I don't think so.

17   Q    And that $8 million that was brought in by Haberer's

18   brother, that was going to, quote, fill a whole that you guys

19   had, that you owed people out on; correct?

20   A    Yes.

21   Q    Tell the Judge who the Romay -- the Romay account, the

22   Romay account, what is that?

23          R-O-M-A-Y.

24   A    I'm sorry, what you said the last?

25   Q    Who is Romay?

1    A    Romay is a family in Argentina.  Mr.  Haberer is related

2    to them.  His brother is married to one of the Romay -- or

3    Romay members.

4    Q    Romay.  Sorry.

5              And, so, this money from the Mexican client, this $8

6    million was going to try to fill the hole that the Romay money

7    was missing; correct?

8    A    Yes.

9    Q    And would you agree with me that Haberer basically stole

10   the $8 million?

11   A    Yes.

12   Q    Was this roughly in 2018, if you can recall?

13   A    End of '17 until early '18.

14   Q    Okay.

15   A    I think there was a period of time.  I'm not sure

16   exactly.

17   Q    Okay.  And at that time -- the Romays, they invested like

18   $50 million; correct?

19   A    They had an account worth that.

20   Q    Okay.  And they were -- what were they in, like

21   telecommunications or something?

22   A    Media.  I think the person who inherited these funds to

23   the family was an actor and a media mogul, something like

24   that.

25   Q    Okay.  Did they lose all $50 million?

Trujillo - cross - Myers                    281

1    A    I would say yes.

2    Q    And Mr. Cortes had nothing to do with that; right?

3    A    Well, he was a beneficiary of the investments done in

4    that account, that Proprietary Products were purchased through

5    that account.

6    Q    Okay.  Did Mr. Haberer tell you don't tell Cortes about

7    this Mexican client that I brought in?

8    A    No.

9    Q    Never had a discussion about that?

10   A    Specifically telling him to not tell him, no.

11   Q    Was it understood between you and Haberer that you

12   weren't going to tell him about this 8 million that was used

13   to plug the Romay hole?

14   A    Maybe I understood that there was no ability of these

15   funds for anybody outside of his clients.

16   Q    It's about this time that you were supposed to be

17   cooperating with the trust; right?

18   A    What -- can you elaborate a little bit?

19   Q    Sure.

20        Do you know -- there was a trust involved in this;

21   correct?

22   A    There were two trusts.

23   Q    Okay.  Describe the role of the trust and what role the

24   trust had in relation to Madison.

25   A    The trusts were part of the transition of assets and

1  liabilities of the Biscayne Group.  They were going to be

2  taking over all the administration and continue the operation

3  of the business.

4  Q    So they're supposed to protect the assets; right?

5  A    That's what the trust was supposed to do.

6  Q    Okay.  And in this same time that Haberer took the

7  Mexican guy's money for 8 million and plugged the hole with

8  the Romays, the trust was going on about that time; correct?

9  A    There were transactions -- yes, the trust was already set

10 up.

11            THE COURT:  Just so I'm clarifying, the Mexican

12 client is different from the Romays, right?

13            THE WITNESS:  Yes.

14            THE COURT:  So the Mexican client puts in 8 million

15 and that's covered by an influx of money from the Romays?

16            THE WITNESS:  No, it's the other way around.  The

17 Mexican money came in and was used to plug the Romays.

18            THE COURT:  Okay.

19 Q    So the 8 million from the Mexican was to plug the 50

20 million hole left by Romays?

21 A    Part of it, and the overdrafts.

22 Q    Okay.  Yesterday we had a discussion about ORC and that

23 product.  You're familiar with that product; right?

24 A    ORC, yes.

25 Q    And on these prospectus you see we had a discussion --

1    THE COURT:  Can you just indicate what exhibit you

2  are showing him and what prospectus.

3    MR. MYERS:  I'm not sure which exhibit this was

4  yesterday.

5    MR. WEINTRAUB:  I believe it was V.

6    MR. MYERS:  B, as in boy?

7    MR. WEINTRAUB:  V, as in Victor.

8    THE COURT:  V, as in Victor?

9    MR. WEINTRAUB:  Victor, but I will confirm, but I

10  believe, based on my recollection.

11    THE COURT:  What is Exhibit V?  Just so the witness

12  knows.

13    MR. MYERS:  It's a summary of the offer of ORC note.

14  Q    I just want to ask you, do you see here it says, "The use

15  of proceeds, the issuer will primarily invest in South Bay

16  Holdings LLC"?

17    What did you take that to mean?

18  A    That it was going to be used to develop real estate

19  primarily.

20  Q    Okay.  So when they use the word "primarily" in a

21  prospectus, can the funds be used for administrative costs?

22  A    I'm not a lawyer.  I don't know what this would

23  specifically refer to.

24  Q    Okay.  So I'm just asking for your general understanding

25  of what you think the intent of that document was that you

Trujillo - cross - Myers                                284

1    used.

2    A    That the intent of the word would leave room to use for

3    something else.

4    Q    Okay.  Are you familiar with Hernan Luque?

5    A    Hernan Luque?

6    Q    Yes.  Of Petroecuador?

7    A    Yeah, it rings a bell, yes.

8    Q    Okay.  Do you recall that being a client of Chatburn?

9    A    Mr. Chatburn had several clients involved in

10   Petroecuador.

11   Q    Okay.  Was he one of the individuals that you and Mr.

12   Haberer gave this Luque fellow one of those back-to-back loans

13   that you spoke about?

14   A    I'm confused with the name Hernan Luque.  They were

15   clients it was Romero Luque.

16   Q    Was it one of the Luques --

17   A    Yes.

18   Q    -- that was involved in a back-to-back loan or used this

19   process of a back-to-back?

20   A    Yes.

21   Q    Just give us a less-than-15-second explanation of a

22   back-to-back again.

23   A    When an investor received a loan in back of his own funds

24   from the issuer.

25   Q    So you're kind of using his initial investment as

1  collateral in case something goes wrong?

2  A    Correct.

3  Q    You know Chatburn?

4         Who is Chatburn?

5  A    Mr. Cortes's cousin.

6  Q    Okay.  And what is his job?  What were his duties?  Who

7  is he?

8  A    Financial advisor.

9  Q    Okay.  And Chatburn had a lot of connections to

10 Government officials; right?

11 A    Yes.

12 Q    And you know he went to prison; right?

13 A    Yes.

14 Q    What did he go to prison over?

15 A    Him?

16 Q    Yes.

17 A    Bribery schemes, I think it was.

18 Q    And bribery schemes with Government officials; right?

19 A    Yes.

20 Q    And about what year was that?

21 A    The schemes or him going to jail?

22 Q    No, the schemes.

23 A    They came to light in 2016 --

24 Q    Okay.

25 A    -- that I remember.

Trujillo - cross - Myers                     286

1   Q    And did Mr. Haberer get money from him?

2   A    From Mr. Chatburn?

3   Q    Yes.

4            THE COURT:  From Mr. Chatburn?

5   Q    Did Chatburn give Haberer money?

6   A    Not that I know of.  I don't know.

7   Q    Okay.

8   A    And what Mr. Chatburn was doing with Mr. Luque was before

9   2013, '14, that we took over.

10  Q    Okay.  Do you know what year that was?

11  A    The year we took over?

12  Q    No.

13  A    Or the year --

14  Q    No, the year that this was going on with taking the

15  money.

16  A    I'm not sure right now what time period it started.

17  Q    But your recollection is it was before 2013 that Chatburn

18  was involved with Haberer?

19  A    He was not involved with Haberer in this.

20  Q    Okay.

21  A    This is before back-to-backs were moved to the

22  administration below Haberer.

23  Q    When were the back-to-backs?  What year was that?

24  A    They started before that.

25  Q    I'm asking you to approximate what year was that?

Trujillo - cross - Myers                          287

1   A    I have no idea.  I wasn't involved in that when that

2   start.

3   Q    Did you have any involvement with Chatburn, the broker?

4   A    Yes.

5   Q    Okay.  What involvement did you have with Chatburn?

6   A    I was always doing the operation side of the business, of

7   the accounts, and the openings in the custodian banks,

8   commission reporting, like the same I was doing with all of

9   the other advisors.

10  Q    Was Chatburn one of the advisors giving you money?

11  A    Chatburn didn't give me money.

12            THE COURT:  You mean personally giving him money?

13            MR. MYERS:  No.

14  Q    I mean give you funding.  Did he buy things for his

15  client?

16  A    He bought securities and Proprietary Products.

17  Q    Okay.  And --

18  A    -- from --

19  Q    -- do you know where that money came from?

20  A    I'm sorry?

21  Q    Do you know where the money came from?

22  A    Now we know some of those money came from the bribery

23  schemes.

24  Q    Okay.  And the money from the bribery schemes, did

25  Haberer ever have a conversation with you, any kind of

Trujillo - cross - Myers                     288

1   communication, e-mails, texts, that hey, this money is dirty

2   money from the Government?

3   A    Once it became public, yes, we were discussing that.

4   Q    Okay.  And what did you do about that?

5   A    I had meetings with Mr. Cortes's brother and Mr. Chatburn

6   saying, hey, we need to report this, we have these clients

7   that are all over the news, and it was shut down.

8   Q    You said you had a meeting with Mr. Cortes's brother.

9   Did you have a meeting with Mr. Cortes that this was going on?

10  A    No.

11  Q    How much money was that?

12  A    We are talking about the news of these monies and I don't

13  know about how much it was.  I was referring to the clients

14  that were in the news being -- so it was in the millions as

15  well because I then checked, but....

16  Q    Let's not get all ambiguous about this.

17         But that money that you were alerted to that you

18  just testified to, well, we have to do something about this

19  because it's clearly part of a bribery scam or scheme, you

20  wanted to do something about it.  So did you start looking on

21  your books how much money Chatburn had sent in?

22  A    Yes, we had -- I checked that once the news were public.

23  Q    Okay.  Once the news was public, you get the money and

24  you go we better look at Chatburn's accounts because it's part

25  of a bribery schemes where be everybody is going to jail,

1   including Chatburn.

2           Did you come to a total?

3   A    At the time, yes.  I don't remember the exact total now,

4   but it's in the millions.

5   Q    Again, is it 5 or 6 million or closer to 20 million?

6   A    Yeah, I think it's higher than 5 millions.  I'm not sure

7   how high over that.

8   Q    Would you agree with me that after that SEC investigation

9   that we were speaking about earlier in 2016, would you agree

10  that Weisson and Mr. Cortes had a major falling out?

11  A    They gradually fell out, yes, they gradually fell apart.

12  Q    Gradually?

13  A    Yeah.

14  Q    Just very quickly, you said yesterday that you admitted

15  you created some fake e-mails in the G-mail account to use on

16  the Google Drive?

17  A    No, I didn't say that.  That was defender Haberer that

18  created those.

19  Q    Did you create those?

20  A    No, Fernando Haberer created those e-mails.

21  Q    Were you knowledgeable about that?

22  A    Yes, I knew.

23  Q    And you didn't do anything to stop it; right?

24  A    No.

25  Q    I want to draw your attention to San Andres.  Who is

1  that?

2  A    Representative of Westwood.

3  Q    Okay.  And what is Westwood?

4  A    An entity in Panama that opened an account, a subaccount

5  in Madison Assets.

6  Q    Okay.  And what kind of funds were in the Westwood?

7  A    The account was funded by a wire and the purpose of the

8  funds were supposed to buy an Ecuadorian bond.

9  Q    And at some point was there a problem with that

10  Ecuadorian bond?

11  A    With the bond per se with the issuance or --

12  Q    No, with where the funds were coming from.

13  A    So from where the funds were coming from was questioned.

14  Q    Okay.

15  A    Because the due diligence, or the explanation that was

16  said in the beginning or when the funds were received was not

17  matching what was the actually stated in the incoming funds.

18  Q    Okay.  Did you come to find out at some point that the

19  funds may have been stolen?

20  A    Yes.

21  Q    From where?

22  A    From the police retirement fund from Ecuador.

23  Q    Okay.  And did you rectify that situation?  Did you

24  correct that problem?

25        Did you do anything about it?

Trujillo - cross - Myers                             291

1   A    This came to light after my process began here.

2            THE COURT:  After what?

3            THE WITNESS:  After I came to the States to start my

4   process with all this.

5            THE COURT:  You mean when you became involved in

6   this case?

7            THE WITNESS:  No.

8            THE COURT:  When you say process in this, what do

9   you mean?

10           THE WITNESS:  So the news on what happened with the

11  police funds broke out after I already pled.

12           THE COURT:  After you pled guilty?

13           THE WITNESS:  Yes.

14           THE COURT:  Okay.

15           THE WITNESS:  So this was not a public issue.  So I

16  wasn't part of the -- having a remedy for that.

17  Q    Okay.  Do you recall about when the funds came in?

18  A    End of 2015.

19  Q    Okay.  Were you working for the group then?

20  A    Yes.

21  Q    So you're saying at the time that they came in, you

22  didn't know that they were dirty?

23  A    No.

24  Q    Did Mr. Cortes have anything to do with the Westwood

25  account?

Trujillo - cross - Myers                                292

1  A    He introduced Mr. San Andres to Weisson.

2  Q    And then once the introductions were made, did you have

3  anything to do with the transactions beside making a personal

4  introduction?

5  A    Yes.  He knew the funds arrived and those funds were made

6  available in the spreadsheet that we saw yesterday and the

7  decisions that were made from those funds.

8  Q    So were you in communication by way of text messages,

9  e-mail or any communications about the Westwood fund?

10 A    Yes.  Chats, e-mail, and calls.

11 Q    Okay.  Do you know what Mr. Cortes did in a reaction,

12 should I say, or when he found out about the source of the

13 funds?

14 A    No, I don't know.

15 Q    Do you know roughly how much money that was?

16 A    7 million.

17 Q    You were not aware that he ordered all the monies to be

18 returned?

19 A    No.

20         THE COURT:  That who?  I'm sorry.  What did you say?

21         MR. MYERS:  That he ordered the money be returned.

22         THE COURT:  Who ordered the money?

23         MR. MYERS:  Mr. Cortes.

24         THE COURT:  Is that something that you --

25         THE WITNESS:  No.

1      THE COURT:  -- were aware of?

2      THE WITNESS:  I didn't know that he ordered money to

3  be sent back.

4  Q    Did you realize that his brother, Mr. Cortes's brother

5  filed suspicious activity reports concerning Westwood?

6  A    It wasn't his brother.  I think it was me at the end of

7  2017.

8  Q    Okay.  So you did that?

9  A    Yeah.

10 Q    I just want to draw your attention to some peoples' names

11 here:  Juan B-A-Q-U-E-R-I-Z-O, Baquerizo?

12 A    Baquerizo, yes.

13 Q    Who is that?

14 A    He was a client of Biscayne.

15 Q    Okay.  What is Artdale?

16 A    One of the entities that had an account at one of the

17 Biscayne banks.

18 Q    Okay.  And how about Alex Bravo?

19 A    Another client of Biscayne.

20 Q    Pedro Mericalda?

21 A    Mericalda.

22 Q    Mericalda?

23 A    Yes.  Another client of Biscayne Capital.

24 Q    And Juan Rivas?

25 A    Another client of Biscayne Capital.

Trujillo - cross - Myers                    294

1  Q    Okay.  You were aware that these entities or individuals

2  that I just named, they were involved in illegal activity;

3  correct?

4  A    It became public knowledge at some point, yes.  Not at

5  the beginning.

6  Q    Okay.  And is it fair to say that Madison was laundering

7  some of these criminals' money?

8  A    The funds in the accounts were opened at Biscayne.  Then

9  afterward they were moved to Madison.  Some of those funds

10 were moved to Madison.  Yes, that money was moved.

11           THE COURT:  No.  I think the question was did you

12 know that they were laundering money?

13           THE WITNESS:  At the beginning, I didn't.

14           THE COURT:  When did you --

15           THE WITNESS:  When the names became public.

16           THE COURT:  And when was that?

17           THE WITNESS:  2016 forward.

18           THE COURT:  Were they charged with crimes?

19           THE WITNESS:  Yes, they were charged and convicted.

20           THE COURT:  In 2016?

21           THE WITNESS:  No, afterwards.

22           THE COURT:  After 2016?

23 Q    The fellow that I mentioned his name, Alex Bravo, who is

24 that?

25 A    One of the individuals charged.

Trujillo - cross - Myers                                    295

1    Q    He's like the general manager of Petroecuador?

2    A    Yes, I think he was.

3    Q    Did you happen to cash a check for 1.3 million in mid

4    2016 from this individual?

5    A    I received a check, yes.

6    Q    What did you do with the check?

7    A    Through one of the Fernando Haberer relationships, there

8    were trying to cash that check, deposit it, deposit that

9    check.

10   Q    You wouldn't normally, just as an employee of Madison, be

11   cashing checks; right?

12   A    Not cashing.  Depositing into an account.

13   Q    So you would get checks in the mail for you to deposit?

14   A    At some point in time, yes, into client's accounts.

15   Q    Name one other check that you got.

16   A    We did that on several occasions for Raymond James'

17   clients.  We sent checks to be deposited into accounts.

18   Q    What was special about this 1.3 million check from Bravo?

19   A    It was given to us by Mr. Weisson and he was looking a

20   way to deposit this check and have the cash available.

21   Q    Okay.  And was there something illegal about it?

22   A    At that time that we received it, we didn't know, but,

23   yes, it was part of a closing of an account of Mr. Bravo.

24   Q    Okay.  And did you get on a Skype call at some point

25   about this check?

1    A    I'm sorry?

2    Q    Did you get on a Skype call with somebody discussing

3    this, trying to negotiate it?

4    A    The specifics, I don't remember.  But, yes, I had some

5    communications with individual that could help.

6    Q    Did you have a communication with Mr. Cortes about this?

7    A    Not that I recall.

8    Q    All right.  Did Mr. Cortes tell you to close the

9    accounts -- close that account because you couldn't taking

10   $1.3 million checks in the mail?

11   A    Not that I recall.

12   Q    Do you recall anything about the check in relation to Mr.

13   Cortes?

14   A    Not in relation to Mr. Cortes.

15   Q    So you can't tell us that he even knew about this?

16   A    I can't tell you that.

17   Q    The money from the Ecuadorian government officials that

18   turned out to be, we will call it dirty money, you would have

19   to hide that in the spreadsheet; right?

20        The spreadsheet that we keep talking about, that D?

21   A    The cash flow spreadsheet?

22   Q    Not the cash flow.  This Exhibit D, with the brokers on

23   the side.

24   A    I need to see that.

25   Q    Sorry.  Can you just put that back up.  It's on my

Trujillo - cross - Myers                              297

1   screen.

2           MR. WEINTRAUB:  No, it's blurry.

3           MR. MYERS:  It's the one with Hinojosa on it that I

4   showed you before.

5           You're familiar with that; right?

6   A    Yes.

7   Q    Where would like -- I keep using the word dirty money,

8   but the Ecuadorian bribery money that was coming in that we

9   just talked about with those four or five individuals, how

10  would that be noted on this particular spreadsheet?

11  A    So these accounts were opened in banks, in custodian

12  banks that Biscayne had a relationship.  So those funds were

13  in those banks.  Inside those portfolios some or all of the

14  money was used to purchase these securities.

15  Q    Okay.  So the brokers are on the left side.  So you

16  wouldn't really know, for example, which Government official

17  gave Ms. Hinojosa the dirty money; right?

18  A    Not on this report.

19  Q    How about --

20          THE COURT:  Do you know that somebody gave that

21  person dirty money, Ms. Hinojosa?

22          THE WITNESS:  These were relationships handled

23  directly by the financial advisor with the individual.  They

24  brought in the client.

25          THE COURT:  Yes, but did you know at the time that

Trujillo - cross - Myers                         298

1   you were putting this money, noting this money is coming from

2   her --

3              THE WITNESS:  No, I didn't.

4              THE COURT:  -- did you know that that was bribery

5   money or have any reason to know that one way or the other?

6              THE WITNESS:  I didn't know.

7              I came to know after it became public.

8              THE COURT:  And when was that again?

9              THE WITNESS:  After 2016.

10             THE COURT:  Okay.

11  Q    Okay.  You spoke yesterday about fake names, using fake

12  names.  Do you recall that testimony?

13  A    Yes.

14  Q    What was that in relation to?

15  A    The Gmail accounts that were created to access this

16  spreadsheet.

17  Q    Okay.  Did you ever have to use fake names to -- separate

18  subject.

19             Did you ever have to use fake names to camouflage

20  whose account it was?

21  A    At the client level?

22  Q    Yes.

23  A    I don't recall that.

24  Q    Okay.  Do you recall the Denfield account?

25  A    Yes.

1    Q    What happened with the Denfield account, if you could

2    just tell the judge?

3    A    Well, Denfield, the individual that we spoke about

4    before, so that's the entity that held his investments.

5              THE COURT:  That held whose investments?

6              THE WITNESS:  Mr. Luque, Hernan Luque investments.

7    Q    And how were you moving his money?

8    A    The relationship started with Sentinel Investment Fund

9    prior to my involvement and those were being received and sent

10   out to him back, as back-to-backs.

11   Q    Okay.  And at that period of time -- what year was this?

12   A    Before 2013.

13   Q    Okay.

14   A    I think it started before 2013.

15   Q    Okay.  And did you realize that money was dirty, from

16   Luque?

17   A    At some point, yes.

18   Q    Okay.  And did you stand to make extra money on Luque's

19   account?

20   A    No.

21   Q    Okay.  Did Haberer tell you to move his money at any

22   point in time?

23   A    Yes.

24   Q    Why?

25   A    At some point in time the assets of Luque were in

Trujillo - cross - Myers                    300

1  Omnicorp Bank and they wanted to take that and close that

2  relationship.

3  Q    Who wanted to?

4  A    Fernando Haberer.  He didn't want to -- that much his

5  relationship with Omnicorp with this account.

6  Q    So he wanted to disassociate himself?

7  A    Yes.

8  Q    Preserve the relationship with Omnicorp?

9  A    Yes.

10 Q    About how much money are we talking about?

11 A    I don't recall how much was left there.

12 Q    In 2018, can you recall if Mr. Cortes made any money off

13 of Madison?

14 A    I don't recall.

15 Q    Okay.  Were you aware that Mr. Cortes was meeting with

16 Ecuadorian prosecutors in 2017?

17 A    Ecuadorian prosecutors?

18 Q    Yes.  Yes.

19 A    I was aware that there were investigations in Ecuador.

20 Q    Okay.

21 A    And I'm not sure if he met with them, but I believe there

22 was communications.

23 Q    Okay.  And did that make you and Haberer cease your open

24 relationship with Mr. Cortes?

25 A    No.  The relationship kept until late '17.

1  Q    All right.  Did you have a conversation or communication

2  with Mr. Cortes about this situation in Ecuador that they were

3  -- that there was a lot of investigating going on?

4  A    Yes, he was requesting funds to pay his lawyer.

5  Q    And that was 20,000; right?

6  A    Yes, I think so.

7  Q    Because he didn't want to be part and pulled into the

8  bribery money that you had taken?

9  A    I didn't take that money.

10  Q    Well, not you personally, but the fund.  Madison was

11  taking in dirty money and they were under investigate; right?

12  A    The investigation was with Sentinel Investment Fund that

13  I know of.

14  Q    Okay.  Were you under pressure from authorities that you

15  could potentially get arrested for being associated with that

16  Ecuadorian bribery scheme?

17  A    Not that I know of.

18  Q    How about Haberer?

19  A    Not that I know of.

20  Q    How about Mr. Weisson?

21  A    Mr. Weisson would have been named, yes.

22  Q    Did this come up in your chats, hey, Weisson, Cortes,

23  everybody is under investigation?

24  A    I believe at point it was, yes.

25  Q    And the $20,000 was requested on numerous occasions by

1   Mr. Cortes to pay a lawyer over there; right?

2   A    Yes.

3        I'm sorry.  I'm remembering something, that Madison

4   was named in Ecuador as well, yes.

5        THE COURT:  What did you say?

6        THE WITNESS:  That Madison was named in

7   investigations in Ecuador.

8   Q    Do you recall, Mr. Trujillo, that Denfield that we were

9   speaking about -- who is Denfield?  What is Denfield?

10  A    It was an entity.

11  Q    Okay.  And do you recall that you were asked about a

12  finder's fee at $6,000?

13  A    That I was asked?

14  Q    Yes.

15  A    For what?

16  Q    That you were requesting a finder's fee of $6,000 to

17  manage that account.

18  A    I don't remember.

19  Q    Okay.  Did you ever get like a finder's fee for things?

20  A    Probably yes, at some point.

21  Q    Okay.  And do you recall the date that you were dealing

22  with Denfield, the entity Denfield?

23  A    I don't recall the date.

24

25        (Continued on next page.)

1   (Continuing)

2   Q    After 2016, Mr. Trujillo, did Mr. Cortes ever come to

3   Buenos Aires?  Argentina?

4   A    Not sure if he was -- if he went.

5   Q    Okay.

6   A    Meetings were mostly in Miami with him.

7   Q    Did you have a separate chat, any kind of chat -- email,

8   text -- specifically keeping Mr. Cortes off of that chat?

9   Like between you and Haberer?

10  A    Yes.

11  Q    Okay.

12          THE COURT:  I'm sorry, what was your answer?

13          THE WITNESS:  Yes.

14  Q    And you did that to keep him out of the loop as to what

15  you and Haberer were doing, right?

16  A    That was not the main intention.  I had a personal chat

17  with Fernando Haberer, to talk about everything there.

18  Q    You had a personal chat with him about what you were

19  doing with Madison, right?

20  A    We had a personal chat of everything that was going on.

21  You -- the chat was not specific to a topic.

22  Q    All right.

23          You did -- you -- your -- in trying to recall

24  interviews that you had with the Federal Government, how many

25  times did you meet with them?

Trujillo - cross - Myers                    304

1  A    Numerous times.

2  Q    And do you recall stating that in 2016 Cortes was not as

3  involved with your organization?

4  A    I don't recall.

5       MR. WEINTRAUB:  Your Honor, there is the same issue

6  as before.  Mr. Myers is showing him somebody else's notes.

7       MR. MYERS:  I'll hand it to him and see if it

8  refreshes his recollection if we want to do it that way.

9       THE COURT:  This is an interview --

10       MR. WEINTRAUB:  Yeah.

11       THE COURT:  -- conducted of him?

12       MR. WEINTRAUB:  By.

13       MR. MYERS:  By Jeffrey LaMirand.

14       Just take a look at paragraph 26 read it to yourself

15  and see it that refreshes your memory about the interview.

16       THE WITNESS:  Among other things, yes.

17  Q    Okay.

18       And do you agree with me that there came a point

19  in --

20       MR. MYERS:  I've got to move back.

21       THE COURT:  I'm sorry, you want to go back to the

22  microphone and ask your question.

23  Q    Is it fair to say that at some point, that Mr. Cortes was

24  not nearly involved in the operation of Madison when you guys

25  moved it over to Buenos Aires?

VB      OCR      CRR

1    A    There was a point in which he was not involved.

2    Q    And that was about 2016, right?

3    A    The operations -- he never was involved in the operation.

4    He was involved in the decisions-making.  The operation was a

5    different thing.

6    Q    Is it fair to say that that WhatsApp chat that you opened

7    was opened in May 30th of 20106, which excluded Mr. Cortes?

8    A    The WhatsApp chat that you are referring to, which one?

9    Q    The one that you referred to privately with Haberer?

10   A    No.

11   Q    Okay.

12          When was that?

13   A    The WhatsApp chat could have been opened years before

14   that.

15   Q    Okay.

16          I don't want you to guess.

17          When was the private WhatsApp chat with Haberer

18   which Cortes was excluded on?

19   A    There -- it would be a guess because it probably, when I

20   met him back in Uruguay, I'm not sure when.

21   Q    Do you remember you spoke about a meeting with Weisson.

22   I believe it was in PF Chang's in Miami?

23          Do you recall that?

24   A    With Weisson?

25   Q    Yes.

1   A    No.

2   Q    Okay.

3        Who did you meet with?

4   A    Juan Carlos Cortes and Frank Chatburn.

5   Q    Okay.

6        So, Weisson wasn't part of that meeting?

7   A    No.

8   Q    Okay.

9        And do you remember that -- that day, the meeting?

10  A    That was a meeting in which I was coaching to Juan Carlos

11  as my immediate point of contact for the -- to deal with the

12  news that broke out on these corruption cases.

13  Q    Okay.

14       And fair to say that Mr. Cortes here -- not his

15  brother, but my client -- he lived in Miami at that time,

16  right?

17  A    Yes.

18  Q    You didn't invite him to the meeting, did you?

19  A    No.

20  Q    Who is Andres Suarez?

21  A    He is my cousin.

22  Q    Okay.

23       And what was the issue with Suarez?

24  A    I believe he's the individual that gave Mr. Weisson the

25  information about the check of Alex Bravo.

Trujillo - cross - Myers                           307

1           THE COURT:  That what?  I am having a hard time

2    understanding.

3           THE WITNESS:  The check that we were talking about

4    before, from Mr. Alex Bravo, it was given to Mr. Weisson by

5    Mr. Suarez.

6    Q    Okay.

7           And do you recall how much that check was worth?

8    A    He mentioned it was 1.3 million.

9    Q    All right.

10          You never had any discussions with Cortes about

11   that, did you?

12   A    No.

13   Q    In 2017, Weisson and Haberer approved your salary

14   increases, right?

15   A    I spoke my salaries with Haberer, mainly.

16   Q    Okay.

17          So, Cortes had nothing to do with your salary

18   increases, right?

19   A    At that point in time, I don't think so, no.

20   Q    Did you ever advise Mr. Cortes that you were moving money

21   that Luque account, that you were moving that money around?

22   A    Advising?  No.  It was...

23   Q    I just want to brush on the topic of Mr. Weisson wanted

24   to incorporate similar sounding corporate sounding names to

25   open bank accounts at Amicorp?

Trujillo - cross - Myers                    308

1              Do you recall that?

2    A    I think, yes.  He was trying to do so to be able to move

3    funds.

4    Q    So, explain that to the Court.  They were under a certain

5    name, under Biscayne and you wanted to change the name, but

6    make it sound similar under Madison?

7    A    Correct.

8    Q    Okay.

9              And one of those was Roberto Ivan Cortes Rueda.  Who

10   is that?

11   A    That would be Mr. Cortes's father.

12   Q    Okay.

13   A    One of those -- sorry.

14   Q    And Weisson was actually wanting to use that name for one

15   of the accounts?

16   A    I don't recall that.

17   Q    Okay.

18             Weisson would certainly know that Rueda is his

19   father, right?

20   A    Definitely.

21   Q    That's Cortes's father, right?

22   A    Yes.

23   Q    I just want to jump back for a second.

24             In 2016, September 21st, did you create a false

25   Deutsche Bank statement for Chatburn?

1    A    Yes.

2    Q    Was that with the Luque account?

3    A    Yes.

4    Q    Okay.

5         And Mr. Cortes had nothing to do with that, right?

6    A    No.

7    Q    Who is Fernando Martinez?

8    A    Another financial advisor of Biscayne Capital.

9    Q    Okay.

10        And was there an issue about exchanging currency?

11   Bolivars?

12   A    That came to light at some point, yes.

13   Q    Okay.

14        And what is the, if I mention the hole that you had

15   to fill?

16   A    I don't have that number in my mind.  I don't know.

17   Q    Okay.

18        So you wouldn't know what the hole was that was

19   created by the foreign currency exchange?

20   A    No.

21   Q    Okay.

22        This was Weisson's idea about the exchanging

23   Venezuelan currency, right?

24   A    I don't know whose idea this was.  I know he was involved

25   with Fernando Martinez.  That's what I know from that.

Trujillo - cross - Myers                                310

1   Q    Okay.
2         It's fair to say money was missing from certain
3   accounts as a result of this money exchange idea?
4   A    Yes.
5   Q    Okay.
6         You knew that was illegal, right?
7   A    The money exchange?
8   Q    Yes.
9   A    I came to know to that.  I didn't know that when these
10  accounts were opened.
11  Q    Is it fair to say that was about $8 million?
12  A    Could be, yes.
13  Q    Let's talk about Ulticorp, just so we can review.  I know
14  you go over these things over and over, but just so the Court.
15        What is Ulticorp?
16  A    Mr. Cortes's father-in-law entity.
17  Q    Okay.
18        Carlos Calero?
19  A    Carlos Calero, yes.
20  Q    Okay.
21        And he wanted to open a bank account?
22  A    Yes.
23  Q    And it was $117,000?
24  A    Approximately, yes.
25  Q    Okay.

1          Did they ask you to open an account at Deutsche

2     Bank?

3     A     Yes.

4     Q     Did you do that?

5     A     Yes.

6     Q     Okay.

7     A     Subaccount.  A subaccount in Madison.

8     Q     Okay.

9          So that would be under Madison?

10    A     Yes.  Madison subaccount Ulticorp.

11    Q     And did you create a fake statement concerning that

12    account?

13    A     Yes.

14    Q     Okay.

15         And money was eventually taken out of that account,

16    right?

17    A     It was used to purchase liquidity.

18    Q     Okay.

19         And when that was being done, you didn't tell

20    Mr. Cortes about that?

21    A     He actually knew about that, yes.  And he asked for it.

22    Q     Well, wait.  I'm asking you a little bit of a different

23    question.

24         When you took the money out of the account, did he

25    know that money was being taken out of the account?

Trujillo - cross - Myers                           312

1   A    Yes.

2   Q    He did.

3   A    Yes.

4   Q    And what was his reaction to that?

5   A    He's the one managing the account.  He wanted that

6   purchase done, of liquidity.

7   Q    Okay.

8        Was it understood that the money should not be moved

9   out of the account by his father?  Father-in-law, sorry.

10  A    I didn't handle that relationship with Mr. Calero.  That

11  was directly done by Mr. Cortes.

12  Q    Okay.

13       Did you have anything to do with the account?

14  A    The operation?  Yes.

15  Q    Okay.

16       Well, when you created the false bank statement, did

17  you tell Mr. Cortes -- this Mr. Cortes, Junior -- about that?

18  A    I sent him the bank statement showing just cash when, in

19  reality, there was a position there.  And he knew and review

20  and approved.

21  Q    So, he knew that -- he knew that you were duping his

22  father into saying that the money's there when it really

23  wasn't?

24  A    He knew that the account had not the funds that his

25  father-in-law thought it was.

Trujillo - cross - Myers                                313

1   Q    Okay.
2        Did he -- did he have a -- I'll just say mildly, a
3   bad reaction when he found out that you guys had moved money
4   out of his father-in-law's account?
5   A    No.
6   Q    No.
7        He was happy about that?
8   A    He was normal.  He wasn't, it wasn't a surprise.
9   Q    Okay.
10        Did you come to find out that he immediately called
11   his father-in-law and had to apologize about this?
12   A    No.
13   Q    So, you weren't acting behind Mr. Cortes's back.  You're
14   saying, under oath right now, that he had full knowledge of
15   you moving his father-in-law's money out of the account.
16   A    Yes.
17   Q    What is Madison Assets ORC?
18   A    I am not sure what you, your question is.
19        Is that a subaccount?  Or...
20   Q    I'm asking you, what is that entity, do you know?
21   A    Madison Assets ORC?
22   Q    Yes.
23   A    I have no idea what is that.
24   Q    Okay.
25        Did you have any participation in setting that up?

Trujillo - cross - Myers                          314

1    Madison ORC?

2    A    No.  I don't recall that name.

3    Q    Okay.

4         THE COURT:  How much longer are you going to be,

5    Counsel?

6         MR. MYERS:  Less than three minutes.

7         THE COURT:  Okay.

8         (Pause in the proceedings.)

9    Q    If I showed you the notes from your interview with the

10   agents, would that help you refresh your memory?

11   A    Yes.

12   Q    If you could just briefly read paragraph 23 and when

13   you're done, just look up.

14        Or I could just put it on the overhead for us.

15   A    These are notes taken by an agent.  I don't know what --

16   how he translated what I said to the note, to the paper.

17   Q    Okay.

18        MR. MYERS:  Well, let me go back.

19        THE WITNESS:  Just...

20   Q    All right.

21        So it's fair to say that you don't recall having a

22   discussion with the agent about Madison Assets ORC at that --

23   that that contained stolen funds.

24   A    That specific conversation, like what it's stated there,

25   I don't recall it.

Trujillo - cross - Myers                    315

1   Q     Okay.

2         Are you -- are you --

3   A     I'm referring to the whole Madison entity.

4   Q     Okay.

5         So, let's drop the ORC.  I don't know what that

6   stands for.

7         Madison Assets.

8   A     Yes.

9   Q     Okay.

10        You did have a discussion with that -- with agents?

11  A     Yes.

12  Q     About Madison Assets?

13  A     Yes.

14  Q     Over and over again.

15        You recall that, right?

16  A     Yes, yes, of course.

17  Q     Okay.

18        And did you make -- is it fair to say that you knew

19  it -- that it contained all kind of stolen funds and you were

20  admitting this to agents.

21  A     Yes.

22  Q     Okay.

23        THE COURT:  So the people who stole the funds and

24  put the money in Madison stole the money.

25        THE WITNESS:  Yes, that's the hole that he's

Trujillo - cross - Myers                    316

1    referring to.  The $350 million.  Everything that was put into

2    Madison was lost.

3                THE COURT:  So, karma.

4                THE WITNESS:  Yeah, pretty much.

5                (Pause in the proceedings.)

6    Q    Is it fair to say that of the 300 million that was

7    raised, about 240 to 250 went through Madison?

8    A    No.

9    Q    How much?

10   A    The turnover on Madison was, on that.  But the raise of

11   funds, once Madison was open, was maybe half of that.

12   Q    Okay.

13              Half of 300?

14   A    Half of 300, yes.

15   Q    Being 150?

16   A    Yes.

17   Q    Okay.

18              Just explain, just very briefly again, overdraft.

19   The concept.

20   A    When -- it's the same concept as when you draw a check

21   from your checking account and there's no funds in the account

22   and the bank covers the check.

23   Q    Okay.

24   A    It was done with, in the securities account of Deutsche.

25   Q    Okay.

Trujillo - cross - Myers                    317

1          And when you're talking about investments now, and

2    not just a personal check -- so, when the account would be

3    overdrawn, overdraft -- what would the bank do?

4    A    The bank would settle a trade that would free cash in the

5    account.

6    Q    Okay.

7          Set up a trade to cover the overdraft?

8    A    No.  You're -- we're talking about creating it.  Once

9    you -- for to create that, the overdraft, the -- actually, the

10   bank is releasing funds to be available.

11   Q    Okay.

12          And why would the bank do that?

13   A    This was -- this is a technical procedure that it's

14   common, that happens when settlements are delayed.

15   Q    Okay.

16   A    And so that the -- yes, yes.

17   Q    So, the settlement is delayed, money is owed, but they

18   create cash --

19   A    Yes.

20   Q    -- by creating this trade.

21   A    Yes.

22   Q    And banks do this all the time.

23   A    It happens all the time, yes.

24   Q    There's nothing illegal about an overdraft, correct?

25   A    Not that I know of, no.

Trujillo - cross - Myers                    318

1   Q    Okay.

2        Well, banks are doing it like, every day.  Millions

3   of times.

4   A    They are.

5   Q    Do you recall a person named Escobar?

6        Do you have the full name?

7   A    I don't.

8   Q    Do you remember Mr. Weisson laundering Mr. Escobar's

9   money through the Madison account?

10  A    Oh, I -- he tried to wire funds from Escobar, yes.  I

11  remember.

12  Q    Okay.

13       Can you explain to the Court what Weisson was doing?

14  A    He was facilitating the move of funds from this

15  individual out of wherever he held them.

16  Q    Okay.

17       And was Weisson directing you to keep that money on

18  the side?

19  A    That was money that he raised and he was going to be --

20  it was going to be available for him.

21  Q    Okay.

22       So, is it, is it, is it a fair statement that, at

23  times, Mr. Weisson was using Madison as his own personal

24  piggy-bank?

25  A    It would be -- yeah.

Trujillo - cross - Myers                    319

1          MR. MYERS:  Just if I could have a moment with my

2    client, Judge.

3          (Pause in the proceedings.)

4          MR. MYERS:  Just three or four more questions.

5    Sorry.

6    Q    Just drawing your attention back to that Ulticorp.

7          Would it be a fair statement that you recalled that

8    Haberer used about $300,000 from Ulticorp account for cash

9    flow purposes without Cortes's knowledge?

10   A    No, can you -- I don't understand.  I didn't understand

11   the question.

12         Can you repeat it, please?

13   Q    Sure.

14         Is it a fair statement, is it a true statement, that

15   you recall Haberer using $300,000 from the Ulticorp account

16   for cash flow purposes without Cortes's knowledge?

17   A    I remember there was a time some funds were used by

18   Fernando.  I don't recall if that $300,000 was from

19   Mr. Calero, but it could be, yes.

20   Q    Okay.

21         THE COURT:  Was Mr. Cortes aware of that?

22         THE WITNESS:  He was made aware at some point.

23         THE COURT:  Okay.

24   Q    The -- did you have another cash flow spreadsheet, a

25   second account, when Mr. Cortes was no longer involved with

1    Madison?

2    A    A second account?

3    Q    Second cash flow spreadsheet.

4    A    There were several.

5    Q    You showed us one yesterday, remember?

6    A    Yes, but there were several.

7    Q    There were several?

8    A    Yes.

9    Q    And you never showed those to Cortes, did you?

10   A    There were specific cash flow sheets.

11   Q    So, talking about the specific ones.

12        You never showed those to Cortes?

13   A    No.  The one that he was involved was the one that was

14   showed yesterday.

15   Q    Okay.

16        And the chat that I referred to that was a private

17   chat, I actually forgot to add, did you have a private chat

18   not just with Haberer, but Haberer, you, and Weisson?

19   A    Yes.

20   Q    And when did you create that chat, Mr. Trujillo?

21   A    I'm not sure if I created that chat.

22   Q    Whoever created it, when was it created?

23   A    I, I can't recall when it was created.

24   Q    In that, I won't put it up now, but you can remember the

25   large spreadsheet that we started with, that was Exhibit D

1    with the advisors on the left?

2    A    Yes.

3    Q    From that, can you tell us from that Exhibit, from your

4    memory, how much money any of those advisors sold before 2016?

5    A    I can't.

6    Q    Impossible.  It's impossible to tell, right?

7    A    I, there, there's got to be a report that shows the same

8    amount -- the same report around 2013.

9    Q    2013?

10   A    Yes.

11   Q    Okay.

12              MR. MYERS:  Nothing further, Judge.

13              THE COURT:  Do you have any redirect?

14              MR. WARDEN:  Yes, Your Honor.

15   REDIRECT EXAMINATION

16   BY MR. WARDEN:

17   Q    Mr. Trujillo, you were asked on cross-examination about

18   the IACAP liquidity note?

19   A    Yes.

20   Q    Approximately when did that issue?

21   A    '15.  2015, approximately.

22   Q    Was Mr. Cortes aware of that issuance?

23   A    Yes.

24   Q    And was that also marketed to clients as a money market

25   product for working cash?

1   A    Yes, it's the same concept that was rolled over to a new

2   note.

3   Q    Okay.

4            And Mr. Cortes was aware of that?

5   A    Yes.

6   Q    Was Mr. Cortes aware that funds invested in the second

7   liquidity note were then moved to other Biscayne proprietary

8   products?

9   A    Yes.

10           MR. WARDEN:  Mr. Trujillo, I'm putting on the screen

11  Exhibit AQ.

12           (Exhibit published.)

13  Q    Do you see it?

14  A    Yes.

15           MR. WEINTRAUB:  Your Honor, just, we have some

16  additional exhibits, so I'm going to hand a binder that has

17  any potential new exhibits that will be shown.

18           MR. WARDEN:  This one, to be clear, Your Honor, was

19  in the -- in yesterday's binder.

20           THE COURT:  Okay.

21  Q    So, Mr. Trujillo, do you recall testifying yesterday

22  about the defendant asking you to purchase -- about $350,000

23  of liquidity notes for his -- in his brother-in-law's account

24  at -- at the time of liquidity note was created?

25  A    Yes.

1  Q    I'm sorry, was it his brother-in-law or father-in-law?

2  A    Brother-in-law.

3  Q    Okay.

4        And that was in, in --

5  A    Julius Baer.

6  Q    Julius Baer.

7        And that was in approximately October of 2013?

8  A    Yes.

9  Q    And do you see this Exhibit AQ as an email chain from

10 December 2013?

11 A    Yes.

12 Q    Okay.

13       Going down to the last page, do you see an email

14 from Wendy Ruperty?

15 A    Yes.

16 Q    Do you know who that is?

17 A    That's an assistant for Mr. Juan Carlos Calero.

18 Q    Okay.

19       So an assistant to the defendant's brother-in-law?

20 A    Yes.

21 Q    And she's writing to you and saying:  Can you tell me

22 tomorrow why the cash amount is falling in the Swiss accounts

23 comparing the statements at 10/22 versus 10/30 and then versus

24 11/30?

25 A    Yes.

Trujillo - redirect - Warden                    324

1   Q    There's a difference in the cash of around $350,000.  I

2   don't have any letter ordering the transfer.  This is why I'm

3   asking you.

4            Do you, can you tell us what that means?

5   A    That the balance, the cash balance in the account changed

6   in $350,000 in those dates, between those dates that she was

7   referring to.  So, the cash was reduced in 350,000.

8   Q    And why was the cash balance reduced by 350,000?

9   A    Because of the purchase of the liquidity note.

10  Q    And who ordered you to purchase the liquidity note?

11  A    Mr. Cortes.

12  Q    Okay.

13           And do you know whether he had told his

14  brother-in-law that he was going to do that?

15  A    I don't know if he told him.

16  Q    And then, afterward there's some back-and-forth.

17           And does it appear that they were told, Mr. Calero

18  was told that there was a liquidity note purchased?

19  A    Yes, he's involved in this email chain.

20  Q    So, at this point there's no fake statement being sent to

21  him; is that correct?

22  A    No, this is, this is -- the fake one was for Mr. Carlos

23  Calero, not for Mr. Juan Carlos Calero.

24  Q    Okay.

25           And on page 1 of Exhibit AQ here, the top email from

1  Roberto Cortes to you, he writes:  Tell her it's a Commerz

2  money market, the same thing, that it was something automatic

3  for accounts having cash without generating anything.  Tell

4  her it's something general and automatic that has already been

5  agreed with Julius.  It's like a checking account that pays

6  something.

7          Did you see that?

8  A    Yes.

9  Q    Was that a true statement that Mr. Cortes said?

10  A    No.

11  Q    Why not?

12  A    Because he ordered that purchase.  Mr. Cortes ordered

13  that purchase.  It was not done automatically in the account

14  at the Julius Baer level.

15  Q    It wasn't general and automatic to just take clients'

16  minute and put it in liquidity.

17          It had to be ordered, correct?

18  A    That is correct.

19  Q    But he's telling you to tell his brother-in-law that it

20  was automatic.

21  A    Yes.

22  Q    No big deal.

23  A    That's what it stated there.

24  Q    He was asking you to lie to his brother-in-law.

25  A    Yes.

1    Q    Mr. Trujillo, you were asked some questions about a

2    client of Fernando Haberer, referred to as the Romays?

3    A    Romays, yes.

4    Q    And how much money did they invest through Mr. Haberer?

5    A    I think approximately 50 million.

6    Q    And did Mr. Cortes have any knowledge of this client?

7    A    Yes, he did.

8    Q    And can you describe generally what that was?

9    A    Mr. Haberer make these clients' funds available to the

10   group.

11   Q    And --

12   A    And to "the group," I refer to Mr. Weisson and

13   Mr. Haberer.

14   Q    And so, how did the Romays funds get made available to

15   the group?

16   A    Mr. Haberer placed trades into the proprietary products,

17   into those accounts, and that's how the fund came out of their

18   accounts into the Madison's accounts availability for the

19   group.

20   Q    Did the Romays know that that was happening?

21   A    No.

22   Q    Do you know if Mr. Haberer prepared fake statements to

23   send to the Romays --

24   A    Yes.

25   Q    -- to trick them into not -- not knowing that that was

1    happening?

2    A    Yes.

3    Q    And that money that that was taken was put where?

4    A    Into proprietary products.

5    Q    Into the Biscayne proprietary products.

6    A    Yes.

7    Q    And then, from there, what was done with it?

8    A    It was reflected in the cash flow spreadsheet where the

9    principals, Cortes, Weisson and Haberer, will decide what to

10   do and what payments to do regarding previous investors,

11   interest, expenses.

12   Q    So part of what happened to the Romays money is it gets,

13   essentially, stolen from them, is that fair?

14   A    Fair.  Yes.

15   Q    They had liquid security in other things; is that right?

16   A    Yes.

17   Q    Like, regular stocks and equities and bonds?

18   A    That's what I know, yes.

19   Q    And there was an effort to liquidate those and purchase

20   Biscayne proprietary products; is that right?

21   A    That is right.

22   Q    Now, Mr. Cortes was not involved in the details of that,

23   is that fair?

24   A    He was not involved in that.

25   Q    But that cash stolen from that client was then made

Trujillo - redirect - Warden                    328

1    available to the Biscayne proprietary products that

2    Mr. Cortes, Mr. Weisson and Mr. Haberer managed; is that

3    correct?

4    A    That is correct.

5    Q    And then it was made available to help keep the Ponzi

6    scheme alive; is that right?

7    A    That is right.

8    Q    By paying other clients?

9    A    Correct.

10   Q    And Mr. Haberer was -- Mr. Cortes was not aware of the

11   fake statements sent to the Haberers --

12        MR. WARDEN:  Excuse me, let me try again.

13   Q    Mr. Cortes was not aware of the fake statements that

14   Mr. Haberer prepared and sent to the Romays?

15   A    Not that I know of.

16   Q    But he was aware of other fake statements; is that right?

17   A    That is right.

18   Q    He was aware of the Westwood statement that you prepared.

19   A    That is correct.

20   Q    You copied him on the emails; is that right?

21   A    That is correct.

22   Q    Now, we looked at one yesterday from 2016; is that

23   correct?

24   A    Yes, I think so.

25   Q    Did you also send a fake statement to the Westwood client

1   in 2017?

2   A     Probably did, yes.

3          MR. MYERS:  Judge, I'm going to object to any

4   commentary that includes once somebody is copied on an email,

5   therefore they have knowledge of what was going on.  He was

6   copied on thousands of e-mails.  That's doesn't necessarily

7   mean he has knowledge.

8          THE COURT:  Your argument.

9          MR. WARDEN:  Thank you, Your Honor.

10  Q     Mr. Trujillo, I'm showing you Exhibit AAC.

11         Do you see that?

12  A     Not yet.

13         MR. WARDEN:  Oh, sorry, my fault.

14         THE COURT:  Is this a new Exhibit?

15         MR. WARDEN:  This is a new Exhibit.  It's behind

16  tab 5 of the binder, Your Honor.

17         (Exhibit published.)

18  Q     Do you see this document, Mr. Trujillo?

19  A     Yes.

20  Q     Do you recognize it?

21  A     Yes, it's an email.

22  Q     And what is the email?

23  A     I'm attaching a statement, a fake statement, to

24  Mr. Ortega from Westwood.

25         MR. WARDEN:  And now I'm showing you Exhibit AAC-1,

Trujillo - redirect - Warden                     330

1    which is behind tab 4 of the binder.

2              (Exhibit published.)

3    Q    Do you see that?

4    A    Yes.

5    Q    And what is this?

6    A    The fake statement attached to the email.

7    Q    And that email that Mr. Cortes was copied on?

8    A    Yes.

9    Q    And during this time frame in 2017, was Mr. Cortes in the

10   Flux chat WhatsApp chat discussing with the group discussions

11   that he was personally having with Westwood?

12   A    Yes.

13   Q    And what was the general plan for how to deal with

14   Westwood?

15   A    To stall him.  To just not let him take the funds out.

16   Q    And why did you have to stall the Westwood clients?

17   A    Because it's -- their fund were not there.

18   Q    And who was involved in stalling the client and speaking

19   to them about that?

20   A    Mr. Cortes, Mr. Juan Carlos Cortes, Fernando Haberer and

21   myself.

22   Q    Basically, everyone?

23   A    Yes.

24   Q    So, the defendant here, Mr. Roberto Cortes, was involved

25   in those discussions?

Trujillo - redirect - Warden                    331

1   A    Yes.

2   Q    And there, in Exhibit H-1, the WhatsApp chat, numerous

3   examples of Mr. Cortes talking about Westwood amongst you guys

4   and then reporting back that he was speaking with Westwood to

5   stall them.

6   A    Yes.

7   Q    And by the way, with respect to the Romays, do you know

8   approximately how much money they lost?

9   A    Fifty million.

10  Q    And where did that money get lost to?

11  A    The proprietary products.

12  Q    The Biscayne proprietary products.

13  A    Yes.

14  Q    Now, you were asked some questions about various

15  individuals involved in various bribery schemes; is that

16  correct?

17  A    Yes.

18  Q    And Mr. Trujillo, is one of the things that you pled

19  guilty to helping move some of that money?

20  A    Yes.

21  Q    Using the accounts involving the proprietary notes?

22  A    At Madison, yes.

23  Q    Now, some of that money, are you aware, was set up

24  through the back-to-back loan system?

25  A    Yes.

1   Q    And what is the back-to-back loan system as it relates to

2   the proprietary notes?

3   A    It was a loan backed to the client that invested in a

4   proprietary product.  So, money went back to the client.  As a

5   loan.

6   Q    So, if a client who is involved in a bribery scheme gives

7   the group $5 million, maybe 4 million would get sent back out?

8   A    Correct.

9   Q    And what is the value of that to somebody who's trying to

10  launder their bribery money?

11  A    That the funds were coming from a different issuer

12  instead of the bribing person.  So, it's laundered --

13  laundering money.

14  Q    It helps hide the money.

15  A    Yes.

16  Q    And they could then send it out to third-parties or to

17  themselves.

18  A    They -- yes, correct.

19  Q    Now, did some of that money then get kept by Biscayne?

20  A    A small portion, yes.

21  Q    In the proprietary notes?

22  A    In the proprietary notes, yes.

23  Q    And what happened to that money?

24  A    That was lost in the Ponzi scheme.

25  Q    So, was there value to Biscayne, the entire group, to

Trujillo - redirect - Warden                   333

1   having bribe payers launder their money through Biscayne?

2   A    Yes.

3   Q    Why?

4   A    Because of that money were -- stay in their Biscayne

5   accounts, to -- for use of the principals.

6   Q    It was cash flow?

7   A    Cash flow, yes.

8   Q    And it was used to pay other investors in the proprietary

9   notes?

10  A    Yes.

11  Q    And were, at times, some of the other investors in the

12  proprietary notes used to then help pay back the bribe payers

13  and receivers?

14  A    As well, yes.

15  Q    And you testified about, you were asked specifically

16  about, Mr. Luque and Denfield Investments?

17  A    Yes.

18  Q    Do you know if Mr. Cortes had any involvement in

19  approving transfers out to Denfield?

20  A    I believe so, yes.

21  Q    Was that before you were -- had a hand in handling the

22  funds through Madison?

23  A    Yes, that is correct.

24  Q    You were asked about the use of the fake name Gmail

25  accounts, correct?

1   A    Correct.

2   Q    And you were asked whether you objected to using the

3   email account in that way, correct?

4   A    Yes.

5   Q    And you did not.

6   A    I did not.

7   Q    Did Mr. Cortes?

8   A    No, he didn't.

9   Q    Did he use it to access the, the spreadsheet?

10  A    Yes.

11            (Pause in the proceedings.)

12  Q    From the time that you started handling cash flow in --

13  remind us when that was?

14  A    2014, late 2013.

15  Q    And by that period of time, were you -- did you need to

16  use new investor money to help pay out older investors?

17  A    There was no sense of need, but it was done that way.

18  Q    It's done that way.

19  A    Yes.

20  Q    And as you testified yesterday, the scheme began to

21  collapse, in your view, in 2016?

22  A    Yes.

23  Q    In other words, that's when it -- to, to what you're

24  testified about, there was a sense of desperate need?

25  A    Yes.

Trujillo - redirect - Warden                    335

1    Q    And cash flow urgency was discussed all the time on the

2    spreadsheet?  Or on the chat?

3    A    On the chat, yes.

4    Q    And that's the chat that Mr. Cortes was involved with

5    from 2016 through the end of 2017?

6    A    Yes.

7    Q    In discussing how to handle these cash flow urgencies?

8    A    Yes.

9            (Pause in the proceedings.)

10           MR. WARDEN:  Going back to the cash flow

11   spreadsheet, Exhibit H1.

12           (Exhibit published.)

13   Q    This is -- do you see this, this is page 1 of the

14   Exhibit from April 18th, 2016.

15           Do you see the highlighted portion?

16   A    Yes.

17   Q    Mr. Cortes asks about a certain money and whether it went

18   out; is that right?

19   A    Yes.

20   Q    And Mr. Haberer responds:  There's no money to do

21   transfers today.

22   A    Yes.

23   Q    And what's he referring to?

24   A    Who, Fernando?

25   Q    Yes.

Trujillo - redirect - Warden                    336

1   A    That there was no cash available to pay any transfers as

2   per the request of Mr. Cortes.

3   Q    That wasn't hidden from him, was it?

4   A    No.

5   Q    Now, you were asked about investigations in Ecuador,

6   including one of Madison?

7   A    Yes.

8   Q    Was Mr. Cortes aware of that?

9   A    Yes.

10  Q    And was Mr. Cortes involved in helping the group organize

11  ideas to defeat the investigation of Madison?

12  A    Yes.

13  Q    Because he was involved in the business of Madison, just

14  not on paper; is that right?

15  A    Correct.

16        MR. WARDEN:  So, let's look at page 16 of

17  Exhibit H-1.  March 8th, 2017.

18        (Exhibit published.)

19        THE WITNESS:  Yes.

20  Q    Mr. Cortes's brother, Juan Carlos Cortes, raises several

21  subjects to discuss, including number four, the legal strategy

22  regarding Madison?

23  A    Correct.

24  Q    Mr. Roberto Cortes responds at 8:22:  Also legal strategy

25  for Biscayne.  The Madison matter already has a criminal

Trujillo - redirect - Warden                    337

1    assistance.  If we don't handle things immediately this week,

2    by the end of the month we will be linked to the money

3    laundering trial in Ecuador.  I'm telling you that this is

4    confirmed.

5    A    Yes.

6    Q    And what do you understand he was talking about?

7    A    About Biscayne and Madison's investigations in Ecuador,

8    about money laundering.

9    Q    Okay, but was Mr. Cortes involved in helping the group

10   address the investigation of Madison?

11   A    Yes.

12        MR. WARDEN:  Okay, still on Exhibit H-1, page 41,

13   from May 18th, 2017.

14   Q    Do you see it; Mr. Cortes, saying:  Friends good

15   afternoon, it's the end of the day on Thursday, as we

16   discussed on Monday, I was asked that we do a cash flow and

17   hand it over to Ernesto so that he can review it and speak to

18   Fernando FH.

19        Is that Fernando Haberer?

20   A    Yes.

21        MR. WARDEN:  And then going down the page, further

22   in that message:  There's a very urgent deficiency that we

23   have to cover tomorrow as FH said they have covered millions.

24   Q    What does that mean?

25   A    I'm sorry, can you -- which time stamp?

Trujillo - redirect - Warden                    338

1  Q    16:37, just further down.  The first one.

2  A    But the same paragraph?

3  Q    Yes.

4  A    Okay.

5        Okay.  I'm sorry, what was the question?

6  Q    Mr. Cortes writes:  As FH said, they have covered

7  millions in May of matters that were about to explode.  We

8  have the same urgency here.

9  A    Yes.

10 Q    I am requesting an urgent call this afternoon if anything

11 new has come up or how we are going to handle this.

12 A    Yes.

13 Q    Can you summarize what he is referring to?

14 A    He is referring about to payments to -- I'm not sure if

15 himself or the entity that receive funds in Miami.

16 Q    Okay.

17        And does this reflect that there were urgent cash

18 flow needs?

19 A    Yes.

20 Q    And that the group was unable to meet them?

21 A    Yes.

22 Q    Does it reflect that Mr. Cortes was part of that group

23 was discussing how to meet them?

24 A    Yes.

25        MR. WARDEN:  And then down to 16:42 Mr. Cortes

1   writes:  I explained this very clearly on Monday when we

2   spoke.  There isn't enough to cover the urgent matters that

3   are needed, that's why you asked me what the cash flow was and

4   I sent it.

5   Q    Is that right?

6   A    Yes, that's right.

7   Q    Now, you testified that when you were interviewed at one

8   point by the Government, you said that Mr. Cortes took a

9   smaller role in the business?

10  A    Yes.

11  Q    Starting in 2016?

12  A    Yes.

13  Q    But did he still have a role in the business?

14  A    Yes.

15  Q    And was he still in regular communication with this group

16  about the business?

17  A    Yes.

18  Q    And did that include paying old investors with new

19  investor money?

20  A    Yes.

21  Q    Did that include discussions with you about fake

22  statements to send to certain clients?

23  A    Yes.

24  Q    You were asked about having a separate chat with

25  Mr. Haberer; is that correct?

Trujillo - redirect - Warden                              340

1    A    Yes.

2    Q    Was the purpose of creating a -- having a separate chat

3    WhatsApp group with only Mr. Haberer to explicitly exclude

4    Mr. Cortes?

5    A    No.

6    Q    Did you have separate chat groups with lots of people?

7    A    Correct.

8    Q    Did you have a separate chat group with Mr. Cortes?

9    A    Correct.

10   Q    Or should I say -- not a group.

11        Did you have a separate one-on-one chat with

12   Mr. Cortes?

13   A    I had a one-on-one and a group as well.

14   Q    Did the entire group have group chats and then individual

15   discussions?

16   A    Correct.

17        MR. WARDEN:  In the binder, I'm looking at tab 8,

18   which is Exhibit AWT.

19        (Exhibit published.)

20   Q    Do you see that on the screen there?

21   A    Yes.

22   Q    What is this?

23   A    That's a WhatsApp chat between Mr. Cortes and myself.

24   Q    Is Mr. Haberer on that chat?

25   A    No.

Trujillo - redirect - Warden                341

1   Q    Did you do it to specifically exclude Mr. Haberer?

2   A    No.

3   Q    To specifically exclude Mr. Weisson?

4   A    No.

5   Q    Why did you do this?

6   A    It was normal to have individual chats.

7   Q    And this chat is on -- starts -- goes from July 1, 2015,

8   until September of 2017; is that right?

9   A    Yes.

10  Q    So, again, you were communicating with Mr. Cortes through

11  2017?

12  A    Yes.

13  Q    And this is about the including about the business of

14  Biscayne?

15  A    Yes.

16  Q    And of Madison?

17  A    Yes.

18  Q    Okay.  Turning to page 3 of this Exhibit AWT.

19          Do you see an entry on August 20, 2015?

20  A    Yes.

21  Q    And does that start with a text from Mr. Cortes?

22  A    Yes.

23  Q    Does he write:  Gus, a favor, upload to the G drive file

24  and SP to report.

25  A    Yes.

1    Q    What is -- what does that mean?

2    A    That's a Google Drive that we shared with those fake

3    e-mails.

4    Q    The same Google Drive that the cash flow spreadsheet was

5    on?

6    A    Yes.

7    Q    And Mr. Cortes is asking you to put something on there

8    for him to review?

9    A    Yes.

10   Q    And he is saying:  FH knows what the idea is to propose

11   to the FAs, a swap for a new flex note?

12   A    Correct.

13   Q    Was part of the reason that a swap was done is to avoid

14   having to pay a maturity?

15   A    Correct.

16   Q    And was that because there weren't enough funds to pay

17   maturity?

18   A    Correct.

19            THE COURT:  Let me just ask you for a moment, how

20   much longer do you think you are going to be?

21            MR. WARDEN:  Just a few more minutes, Your Honor.

22            THE COURT:  A new more minutes?

23            MR. WARDEN:  Just a few more minutes.

24            THE COURT:  Okay.

25            All right, go ahead.

Trujillo - redirect - Warden                    343

1          MR. WARDEN:  I'll be quick.

2          Turning to page 11 of this document.

3    Q    You see chats from March 14, 2017?

4    A    Yes.

5    Q    And Mr. Cortes writes:  Gus, sorry to bother you.  Give

6    me a hand with Ulticorp.  I've got my father-in-law here in

7    Miami.

8    A    Yes.

9    Q    And he says:  I don't know how to tell him that I'm not

10   going to be able to give him his statement.

11         Do you see that?

12   A    Yes.

13   Q    And then further on, there's some discussion and he says,

14   at 17:01:  Please, I beg you, let's look at the entry from

15   March 17, 2017, at 1701.

16   A    Yes.

17   Q    He writes:  Gus, it's Friday, I need a bank statement

18   from Ulticorp and my father-in-law asked me to send him 15K

19   because he has to pay some credit cards.  He was here until

20   yesterday to use the credit card for his stay.  Please, I beg

21   you, let's look at this subject and handle it as part of the

22   cash flow for Monday.  Let's remember he has a checking

23   account at Madison.

24   A    Yes.

25         (Continued on following page.)

Trujillo - redirect - Warden                   344

1   REDIRECT EXAMINATION

2   BY MR. WARDEN:   (Continuing)

3   Q    He was aware that you were handling his father-in-law's

4   money through Madison?

5   A    Yes.

6   Q    Sorry.  Back to page 4 from November 9, 2015.  Do you see

7   that?

8   A    Yes.

9   Q    You were asked on cross about whether Mr. Cortes knew

10  about the movement of his brother-in-law's or his

11  father-in-law's money into liquidity; is that right?

12  A    I'm sorry, can you repeat.

13  Q    You were asked about whether Mr. Cortes knew about the

14  movement of his father-in-law's money into liquidity; is that

15  right?

16  A    Yes.

17  Q    And there is from November 9th and then 16, 2015.

18        First, he writes:  "They confirmed the cash incoming

19  into Ulticorp.  Is that the money in from his father-in-law?

20  A    Yes.

21  Q    In cash?

22  A    In cash.

23  Q    And you tell him it was 94,900; is that right?

24  A    That is right.

25  Q    And he says, "Okay.  Send me the statement, please.  Just

1    to me."

2    A    Yes.

3    Q    What did that mean?

4    A    That probably that he wanted to review it by himself.

5    Q    Okay.  And you write:  I wanted to ask you how you want

6    it."  What do you mean by that?

7    A    In what format he wanted it.

8            MR. MYERS:  Judge I'm going to object to this whole

9    line of cross-examination, or redirect, I should say.  It

10   calls for speculation, what was in my client's mind, what was

11   his intent.  We have been over this 100 times anyway.

12           THE COURT:  Overruled.

13   Q    You wrote:  "I wanted to ask how you wanted it.  Remember

14   that initially an SIF operation was opened, then it was turned

15   in liquidity in DB."

16           What did you mean by that?

17   A    By information that was sent to me by Mr. Cortes.  He

18   wanted to open a SIF certificate with those funds.  Then at

19   some point it changed into a liquidity purchase instead of

20   Sentinel Investment Fund.

21   Q    When you say it changed, what do you mean?

22   A    That the investment that was going to be done with those

23   funds changed from being invested in Sentinel Investment Fund

24   to being invested into liquidity.

25   Q    And then Mr. Cortes responds to you:  "No, all I want are

Trujillo - redirect - Warden                          346

1    the cash incomings and cash outgoings just to me.

2              What is he referring to there?

3    A    That I send him a report of cash movements in the

4    account, only showing cash movements.

5    Q    What do you mean by report?  He was asking you for a

6    statement?

7    A    Yes.

8    Q    Okay.

9    A    It says it before:  Send me the statement.

10   Q    And did he that statement to his father-in-law to reflect

11   the purchase of the liquidity note?

12   A    No.

13   Q    He wanted it to just show cash; is that right?

14   A    Yes.

15   Q    That's what you understood?

16   A    That's what I understood.

17   Q    Turning to page 13 of this exhibit, Mr. Cortes writes, on

18   June 29th, "Can you send me an e-mail of global from Madison,

19   that way it's not coming from me, please."

20             And then he provides an e-mail address of Carlos

21   Calero; is that right?

22   A    Yes.

23   Q    He says, "I'm going to tell him that the bank statements

24   are every three months but an exception was made for him,

25   which are March, June, September, December.  You are sending

Trujillo - redirect - Warden                    347

1    May.   Thanks."

2          Can you summarize what's happening there?

3    A    He's asking to contact Mr. Calero sending him a statement

4    and he's directing me on what time period and he's directing

5    me on how to express the banks works regarding the issuing of

6    these statements.

7    Q    Was the statement going to be an accurate statement from

8    the files of Deutsche Bank?

9    A    No.

10   Q    Why not?

11   A    Because it only showed cash up.

12   Q    When Mr. Cortes writes here:  "I'm going to tell him that

13   the banks statements are every three months," was that true?

14   A    That's what it says there, but it wasn't true.

15   Q    That's what Mr. Cortes is writing, but was that through

16   of Deutsche Bank statements?

17   A    No.

18   Q    And he's asking you to send an e-mail from Madison; is

19   that right?

20   A    Yes.

21   Q    He was telling you to use your Madison e-mail account?

22   A    Yes.

23   Q    So you understood that you were going to use Madison

24   Asset to do this and he was asking you and directing you to do

25   that?

Trujillo - redirect - Warden                348

1    A    Yes.

2          MR. WARDEN:  Just one more, Your Honor.

3    Q    Going back to the Flux chat at 22.

4          Do you see towards the top March 13, 2017?

5    A    Yes.

6    Q    At 7:40, Mr. Cortes writes:  "To decide what to pay and

7    what to postpone.  Something we've been doing as a group for

8    over ten years, but the fact that you can't make an allocation

9    for this complicates things for me."

10         Is this regarding one of these payments to the

11   lawyers?

12   A    I'm not sure what is regarding to, but it's requesting a

13   payment, requesting cash.

14   Q    And Mr. Cortes is saying that you guys as a group have

15   been agreeing what to pay and to postpone?

16   A    Correct.

17   Q    Why did you need to decide what to postpone?

18   A    Depending on the cash flow available.

19   Q    And that was something that the group had been reaching

20   agreements about over ten years?

21   A    Yes.

22         MR. WARDEN:  Nothing further, Your Honor.

23         THE COURT:  Do you have anything further?

24         MR. MYERS:  No.

25         THE COURT:  Thank you.  You can step down.

Trujillo - redirect - Warden                    349

1          (Witness steps down.)

2          THE COURT:  Is the Government calling any further

3    witnesses?

4          MR. WEINTRAUB:  No, Your Honor.

5          THE COURT:  Mr. Myers, are you?

6          MR. MYERS:  Yes.

7          THE COURT:  All right.  Just one witness?

8          MR. MYERS:  Yes.

9          THE COURT:  Your client, I take it?

10          MR. MYERS:  Yes.

11          THE COURT:  All right.  We will be again at 2:15.

12          MR. MYERS:  That's fine.

13          THE COURT:  How long do you think your client will

14    be?

15          MR. MYERS:  I'm not even quite sure.  I really don't

16    -- I'm guessing I can get through it in an hour or so, hour

17    and a half.

18          THE COURT:  We need to conclude by 5 o'clock, just

19    to let you know.  Why don't we start at 10 after 2:00.

20          (Lunch recess.)

21

22

23

24

25

Proceedings                                            350

1              (In open court.)

2              MR. MYERS:  Judge, I actually have an application.

3              THE COURT:  Yes.

4              MR. MYERS:  Mr. Cortes is asking for more time to

5      prepare.  I know you gave the prosecutor a directive to bring

6      witnesses here based on their -- you look puzzled.

7              THE COURT:  No.

8              MR. MYERS:  Based on their representations in their

9      brief, you said if the witnesses were involved in their brief,

10     bring those, have available for the hearing.  So I did not

11     really -- I wasn't informed by my client he wanted to testify

12     until yesterday.  Of course you can appreciate, to a certain

13     extent, that he hears what the witnesses are saying over two

14     days, and there's X number of exhibits, and he wants to refute

15     those.  So last night I told him that this is the twenty-third

16     hour.  It is a little late for that.  We don't have exhibits

17     of our own, et cetera, et cetera.

18              I understand that, you know, you might have even

19     heard enough in this case to make a determination.  However he

20     feels as though he is not prepared to go up there.  It would

21     be probably less than a day of testimony if you were to give

22     us a week to come back here.

23              THE COURT:  No, we have to continue this and we have

24     to complete it this afternoon.  I'm sorry.  I don't have --

25     five o'clock is a hard stop and we need to -- I'm perfectly

Proceedings                                        351

1  willing to hear obviously what the defendant has to say and

2  obviously it is his right to testify at this proceeding.  It

3  is also his right not to testify at this proceeding.

4          It is his -- any time we are talking about

5  testimony, of course it's the defendant's decision to make

6  personally, which I'm sure you have explained to him, Mr.

7  Myers.

8          You know, your lawyer can give you advice about

9  whether you should testify in a proceeding like this, but it

10 is your decision to make personally.

11         Do you understand that?

12         THE DEFENDANT:  Yes, Your Honor.

13         THE COURT:  Let's proceed.

14         MR. MYERS:  Okay.

15         THE COURT:  Do you want to swear the witness in?

16         THE COURTROOM DEPUTY:  Yes, Judge.

17         Raise your right hand, please.

18         Do you solemnly swear or affirm that the testimony

19 that you are about to give to the Court will be the truth, the

20 whole truth and nothing but the truth?

21         THE WITNESS:  I do.

22         (Witness sworn.)

23         THE COURT:  Will you please state and spell your

24 name for the record.

25         THE WITNESS:  Roberto, R-O-B-E-R-T-O.   Last name

Cortes - direct - Myers                    352

1    Cortes, C-O-R-T-E-S.

2              THE COURTROOM DEPUTY:  You may be seated.

3              THE WITNESS:  Okay.  Thank you.

4              MR. MYERS:  Judge, before we begin, before I start

5    questioning, I put the Government on notice that they we would

6    be referring to the same exhibits that I submitted in my brief

7    1 through 20.  Unfortunately, at 2:00 o'clock in the morning,

8    I don't have an extra copy for everybody, but it is on ECF.

9              THE COURT:  Does the Government have an extra copy?

10             MR. WEINTRAUB:  Yes, I just handed it.

11             THE COURT:  Thank you.

12             MR. MYERS:  Thank you.  I appreciate that.

13             Okay.  Is everybody ready?

14   **ROBERTO CORTES**,

15        called as a witness, having been first duly

16        sworn/affirmed, was examined and testified as follows:

17   DIRECT EXAMINATION

18   BY MR. MYERS:

19   Q    Mr. Cortes, just I try to pay attention overhear, put the

20   binders away.

21             How old are you?

22   A    I was born in 1966, so 57.

23   Q    Okay.  And what is your educational background?

24   A    College graduate and Drexel University, bachelor's in

25   finance and business.

Cortes - direct - Myers                                353

1  Q    Okay.  Do you have a graduate degree?

2  A    No.

3  Q    Okay.  I want to lead you back to -- tell me a little bit

4  about your work history, where did you starting working at?

5  A    I've been working mainly in the banking industry right

6  out from college.

7  Q    Okay.

8  A    Started all the way down from teller, credit analyst,

9  then I worked as a broker in the securities industry, became

10  principal of a broker-dealer in Miami, and then I moved over

11  to a boutique private equity firm that pretty much bought and

12  sold companies, private and then took them public.

13  Q    Okay.  Let's just --

14          THE COURT:  What was the name of that firm?

15          THE WITNESS:  Mentor Capital.

16          THE COURT:  Okay.

17  Q    So let's --

18  A    Sorry.  Just to finish it.  And then CBIC Oppenheimer as

19  a broker, and then I went in the real estate business in 1999.

20  Q    Okay.  Where do you live now?

21  A    Currently rent an apartment in Key Biscayne, Florida.

22  Q    Let's just move right up to the dates in question here.

23  How did Biscayne Capital come to be?

24  A    Yeah.  So I started the real estate business first in Key

25  Biscayne.  And in early 1999, as explained before by other

Cortes - direct - Myers                              354

1  people, bought tear-down homes, tear-down lots and then build

2  them out and sell them.

3  Q    Do your best -- I know it is distracting.  Try to get

4  your mouth a little bit closer to the microphone so everyone

5  can hear you a little clearly because you have a little bit of

6  an accent.

7  A    Okay.

8  Q    There you go.

9          So when did Biscayne come into be?

10         How did it come into be?

11         How did you set it up.

12  A    So, when we -- when Weisson and I got together and start

13  developing the real estate business in the early 2000s, I felt

14  that the market and real estate was getting tight.  This was

15  2001, September 11th, rates went down and real estate market

16  took off for a few years.  And then in 2006 and '7, I felt

17  that we needed to diversify, South Bay, let's say -- call it

18  to be more specific, South Bay Holdings, which was the company

19  owning the other subsidiaries, LLC companies that owned real

20  estate needed to diversify, and I went back, you know, to what

21  I knew had to do before, which was private banking.  It was

22  management.  So --

23  Q    Let me stop right there.

24         Give us a less-than-30-second explanation how South

25  Bay was set up in relation to Biscayne.

Cortes - direct - Myers                                355

1  A     South Bay Holdings, as I said, was a holding company in

2  Florida, and their balance sheet, we owned Florida LLC real

3  estate companies and it was the owner of Biscayne at that

4  time.  The first Biscayne was a holding company in Delaware,

5  which the idea of growing, from Delaware, as a holding company

6  subsidiaries in Latin America.  It was always the idea to grow

7  the Latin America business.

8  Q     Okay.  How does South Bay earn its money?

9  A     At that time by buying and selling properties in real

10  estate in Key Biscayne.

11  Q     Okay.  Did they own deal with anything else besides

12  properties?

13  A     The shares of Biscayne Capital holdings at that time.

14  Q     So they own the shares?

15  A     Correct.

16  Q     What is the principle behind South Bay owning the shares

17  of Key Biscayne?  What is the economic principle there that

18  you are driving at?

19  A     Right.  So the idea of South Bay owning the Biscayne

20  Capital Holding shares was to obviously as being the

21  shareholder of Biscayne to grow the Biscayne business and make

22  it a valuable company.  From my expertise in the past, the

23  idea was to create this value, create this company, make it

24  grow in assets under management, and down the road sell the

25  company at a profit.

1    Q    Okay.  And who would get the profit from that when you

2    sold something as large as Biscayne?  How would that be

3    divvied up?

4    A    Well, the way -- when it was set up, Biscayne and the way

5    that I envisioned was to create -- basically two types of

6    shares, the A shares were the voting shares owned by South Bay

7    that owned 70 percent of the company, but I envisioned the way

8    to grow Biscayne was to bring advisors and assets under

9    management by providing them to be, let's say, a quasi partner

10   through a stock option plan.

11          So an advisor that may have worked at Merrill Lynch

12   was an employee, if he would come to work at Biscayne,

13   eventually, three, four, five years down the road, let's say

14   from 2010 to 2016, he would be part of the exit strategy of

15   selling the company.

16   Q    Okay.  Just getting through this rapidly, would that be

17   like an incentive program, that if the broker had B shares in

18   the company and the company sold, there is an incentive for

19   him to continually have a connection to Biscayne?

20   A    Yes, it's correct.  Because pretty much the sale of a

21   company like Biscayne is pretty much based on the revenues and

22   the assets under management.

23   Q    Okay.  And when you say the revenues, how would Biscayne

24   make revenues?

25          In less than a minute, explain that simply.

1  A     Just like any other broker-dealer, the Biscayne opened

2  bank securities accounts, the advisors of clients' securities

3  accounts and all the fees generated by those securities

4  accounts would be -- the rights would be of Biscayne.

5  Q     Okay.  So when the brokers themselves are selling product

6  and making certain commission, the owners, for lack of a

7  better term, of Biscayne would take part of those commissions?

8  A     Correct.  Pretty much the way that the broker-dealer

9  securities worked at that time was, you know, the advisor

10 would bring a book of business.  The book of business would be

11 placed at different banks and all the commissions that would

12 come from those clients will be pretty much split 50 percent

13 for the advisor and 50 percent for Biscayne and its

14 operations.

15 Q     Okay.  Explain Sentinel.  We have spoken about Sentinel

16 Investment Fund.  What is that?

17 A     Yes.  So, in 2005, I spoke with my brother, Juan Carlos,

18 at that time and Ernesto Weisson to institutionalize a little

19 bit more how to raise capital to grow the South Bay Holding

20 business.  And the idea was to create a fund, which we did,

21 that this fund sold participations to investors.

22        And it was always intended from the beginning that

23 at that time obviously South Bay owned majority of real estate

24 to go into real estate and had, to an extent, South Bay

25 Holdings will receive the funding leeway to invest in other

1  projects.

2         MR. MYERS:  Okay.  I'm going to put up on the screen

3  now what we will refer to as Defense Roman numeral I, which is

4  in the defense Fatico brief.

5  Q    Are you familiar with that Sentinel Investment Fund SPC?

6  A    Yes.

7  Q    What is that document?  Without going into the 30 pages,

8  what is the document basically extended?

9         What does it portray?  What does it try to convey?

10 A    Once we create a vehicle, investment vehicle that is

11 going to receive funds from investors, you have to -- the best

12 way to prepare something is called a disclosure document.

13 Everything is in writing where you put in writing exactly all

14 the rules that -- that are played in this investment.  So it

15 was very clear from day one this fund and something was

16 directly informed to the lawyers that prepared these documents

17 that there were lack of liquidity, all of the investors had

18 potentially risk of loss.  So to an extent this was almost

19 like a hedge fund where at the end of the day the fund would

20 invest as a loan to Florida -- Florida LLC, and the Florida

21 LLC would invest into real estate and other potential

22 businesses.

23 Q    Okay.  What was your understanding in this industry that

24 when somebody invested in this Sentinel Investment Fund, what

25 were -- what did you attempt to convey to the clients when

1  they invested in such a fund?

2  A    Well, I really didn't speak directly with clients.  So

3  the people that would sell the products, the advisors, would

4  understand by reading of the documents what the documents

5  said.

6            Just to step back.  I just want to add something

7  that I did not add before with regard to Sentinel, was that

8  the economic value of Sentinel for South Bay was that it was

9  very expensive for South Bay to raise money from private

10 lenders.  We were paying 12, 13, 15 percent rate sometimes and

11 this fund was at 6, 7, 8 percent.  So it was an economic

12 difference in interest expense.

13 Q    Okay.  And just give the Court a brief summary of the

14 secondary trading of notes.

15 A    Yeah.  So this is something that it's -- I believe at

16 this time crucial for the understanding of how the business

17 worked at Biscayne and the proprietary notes, which are to an

18 extent and the cash flows are misunderstood.

19           I agree that it may be an unorthodox way that the

20 proprietaries were created.  These are SPVs, Cayman SPVs,

21 which are the investors into South Bay, and the investors

22 invested securities into these SPVs.

23 Q    Special purpose vehicles?

24 A    Special purpose vehicles.

25           Sp part of the -- I would say the appealing part to

1    make it a marketable product was that the advisors, when they

2    spoke with their clients, although these have maturity of

3    three, four, five years, it was explained that in certain

4    circumstances they could be created as secondary market.

5           Biscayne in Uruguay, which -- just to back up a

6    little bit, Biscayne Holdings had their -- their first company

7    was in Uruguay.  The Biscayne Capital S.A. where they got a

8    license for a broker-dealer license.  And this happened right

9    in the middle of the prime -- subprime crisis.  And the reason

10   that Uruguay was the best place was because all of these

11   advisers were having a big book of clients but they didn't

12   have the banks there to give them the service.

13          Merrill Lynch was going under, a division of Bank of

14   America.  Lehman Brothers went bankrupt.  All of these

15   American banks and Swiss bank were big in -- all of these

16   American banks, they have large operations in South America,

17   in Uruguay, particularly.  And because of the crisis, they

18   needed to retreat to their own headquarters and they had to

19   close offices.

20          So it was a great opportunity for Biscayne to have

21   well-educated advisors, English-speaking advisors, and they

22   had a big book of business, trusted by their clients, but they

23   didn't have a place to go, so they came to Biscayne.

24          So Biscayne not only have these advisors and all of

25   these clientele with different banks and securities, it made

1  all the sense -- like all these other banks here in New York,

2  you have your own trading desk, meaning when an advisor tells

3  a client -- a client tells an advisor, for example, I need to

4  sell one of the Brazilian bonds, I want to liquidate a

5  Brazilian bond, instead of going to the market to sell it, the

6  objective of the trader is to maintain a market within the

7  company.  And if he cannot get a bid, it goes out to the

8  market.

9          So a lot of times, a lot of trades that were done,

10  the purchases in the cash flows that is spoken here were

11  repurchases, not necessarily new investors.  Sometimes an

12  investor wanted to sell -- they had bought 300,000 of GMS and

13  he wants to get out after earning three years of interest and

14  another investor wanted to increase the position of GMS.  So

15  you would see sometimes that an advisor would call and say one

16  of my clients wants to sell 300,000 of GMS, and that's why

17  sometimes we see in the cash flows pay 300,000 to XYZ client

18  advisor.

19          So the secondary trading in the cash flow is not

20  particularly depicted as new money.

21          I don't know if I made myself clear or it's

22  confusing.

23  Q    Okay.  Let's just back up for a second.

24          When you say new money, was it your understanding

25  somebody who is investing in, say, Sentinel, what was your

Cortes - direct - Myers                           362

1   understanding how you could use their money?

2   A    So Sentinel, as an investor would invest in Sentinel and

3   Sentinel would lend that money to South Bay and South Bay

4   would generate a promissory note to Sentinel.

5        So in the books of South Bay, you have a liability,

6   promissory note to South Bay, and at that moment cash on South

7   Bay, asset.

8        And then South Bay objective was to manage the real

9   estate business, which it got -- I'm not going to say

10  different during the subprime crisis, although they were very

11  valuable assets they were harder to sell, but at the same

12  time, in 2008, 2009, it was when the Biscayne Capital

13  Holdings, because of what I just explained, that it was a

14  perfect time to come in, was starting to thrive.  Therefore,

15  the balance sheet or the asset of South Bay was growing even

16  though the real estate was hurting.

17  Q    So how far -- if you have assets on one side, for

18  example, 30 different properties sitting in Cinnamon Cay and

19  you have some liabilities and you're trying to balance that

20  out, how far can you extend yourself in the liability side

21  until you encounter problems?

22  A    Well, you cannot go beyond the value of the assets.

23  Q    Okay.  And during the subprime crisis, when you saw an

24  opportunity, did you have -- how many assets did you have on

25  the books at that time roughly?

1   A    When exactly?  Around when?

2   Q    During the subprime crisis you were just mentioning.

3   A    So in 2008 and 2009, I would have to -- I would guess,

4   what 30, 40 million.  I don't know.  I'm just guessing.

5   Q    Is that in Proprietary Products?

6   A    The assets are the real estate.

7        The Proprietaries would be the liability side.

8   Q    Okay.  So explain that for a second.  If you have certain

9   assets being what?

10  A    So the assets would be the properties in Key Biscayne.

11  Q    Okay.

12  A    The properties in Ocean Reef Club.

13  Q    Okay.

14  A    The shares of Biscayne.  Pretty much that was the key

15  assets.

16       And in the liabilities you have the Sentinel

17  Investment Fund notes and perhaps -- I don't recall exactly

18  what time the receive SPVs started to be a liability or, let's

19  say, a lender to South Bay.

20  Q    Okay.  There's somewhat of an ambiguous concept of shares

21  in Biscayne.  How would somebody know that that's valuable and

22  why would they invest in that?  And how does that weigh into

23  your thinking in raising that point?

24  A    From my education in private equity, a company that may

25  have no revenues, just let's go to an extreme, that has

Cortes - direct - Myers                           364

1    probably intellectual property or is building a big factory to
2    sells cars, for example, not necessarily in sales, may have a
3    large amount of debt.  That doesn't mean that the assets are
4    worthless.  So I would call this the same situation that
5    happened in South Bay, the South Bay balance sheet.  Biscayne
6    Capital Holding shares was growing in value constantly since
7    2009 through 2016 at a 20 percent increase every year.  And
8    these are audited financials.  When it reached its maximum
9    peak was 1.6 billion under management and revenues a little
10   bit over $20 million per year.
11   Q    Okay.  I'm going to get away from these esoteric
12   concepts, but just one more.
13        Let's just say you want to start a car company and
14   it's called Matthew's Car Company, my first name, and somebody
15   gives you $100 million to start the company.  You haven't
16   produced one car yet.  And is the principle that somebody may
17   give you $100 million and say I want the interest on the $100
18   million over the next five years?
19   A    I don't --
20   Q    Is the principle that they were to buy, say, promissory
21   notes or they were to buy stock?  What are they purchasing?
22        If I give you $100 million towards Matthew's Car
23   Company, what are they purchasing?
24   A    What would they purchase with that money, the company,
25   you mean?

Cortes - direct - Myers                    365

1    Q    Yes.

2    A    Ideally factories and start getting -- hire the right

3    people, the marketing people, the --

4    Q    And on the balance sheet, what does it look like?

5    A    It's a cost.  Like the cost of all the property, all of

6    the assets that you are buying at a cost basis pretty much.

7    Q    Okay.  So when you are trying to raise money for a

8    company and you're taking in these notes, the notes mature at

9    certain dates; correct?

10   A    Correct.

11   Q    And what happens when the notes expire?  Is there a

12   principle by which you can have a secondary offering to cover

13   the first set of notes that are expiring?

14   A    Correct.  I mean, my understanding and what I have seen,

15   that common practice in the business world, as long as you

16   have an asset that it's existing, it's growing, it's looking

17   healthy, the market itself would let you know if there is --

18   you can refinance the whole note.  As a matter of fact, that

19   happens every day.

20   Q    Okay.

21   A    A lot --

22   Q    Here's the million-dollar question.  Let me ask you, when

23   you are going through that process of raising money, notes are

24   expiring, you owe old money, but you have another round of

25   financing, when you are doing that, how do you evaluate your

1    assets if you are, say, Biscayne?

2           There are 100 people who are owed money.  You have

3    100 more people coming in as new investors.  How do you

4    evaluate whether or no you should take in the new money to pay

5    off old money?

6    A    Well, we had multiple times audited financials of South

7    Bay Holdings, and also we perform a business valuation of

8    Biscayne Capital at certain time.  So we were trying to, in a

9    realistic manner, show that we have valuable assets that would

10   be -- would be -- I would say the right word -- that would

11   provide an ability to raise new money and pay the old money,

12   like the refinancing of a note or a refinancing of a bank or a

13   new issue to pay the old issue.

14          Plus, normally, you ask a little bit more, because

15   you're not only taking all investors, but you ask for more

16   working capital as long as the company continues to grow.

17   Q    Okay.  So at some point was a business valuation done for

18   Biscayne Group?

19   A    Yes.

20   Q    Okay.  I want to show you what I have marked as Roman

21   numeral VI, which is in the first Fatico brief by the defense,

22   business valuation report, Biscayne Group Holdings LLC.

23          Do you recognize that document?

24   A    Yes.

25   Q    I just want to turn to page 12 of that document.

1              Do you recognize that asset page?

2    A    Yes.

3    Q    These figures here, in December of 2011, what is that?

4    A    That's 2 million in assets.

5    Q    Okay.  In 2011, what are the liabilities?

6    A    Biscayne had no liabilities.

7    Q    Okay.  Why not?

8    A    Because South Bay Holdings was a shareholder of Biscayne.

9    So on Biscayne balance sheet, you have contribution of the

10   major the shareholder, which is South Bay Holdings, into

11   Biscayne.

12   Q    Okay.

13   A    What I -- what is important on the broker-dealer to

14   understand is that you have the balance sheet of the

15   broker-dealer and the clients' accounts' money outside the

16   balance sheet.

17              So, in 2011 -- in 2009, '10 and '11, I would guess

18   there were 700 million of assets under management.  In 2010,

19   probably a little over a billion.  And in 2011, a billion or

20   two.

21              So the assets under management are not on the books

22   of Biscayne.  Those are the clients' money but Biscayne had

23   contracts and agreements with banks and advisors that all

24   those fees would flow into Biscayne, therefore, making

25   Biscayne very valuable because it becomes a perpetuity income

Cortes - direct - Myers                    368

1   of cash flow, pretty much.

2   Q     Okay.  Let me put up page 16.

3         You say the dollar growth.  These are projected

4   stream in dollars.  And let's just move all the way up to

5   2016.  It was projected to make how much?

6   A     These earnings, yeah.

7   Q     Okay.  Do you recall the assets under management when the

8   company started?  The first couple years, what were the assets

9   under management?

10  A     We started from zero.

11  Q     Okay.

12  A     20, 30 million, and we grew incredibly over the next six

13  years.

14  Q     When you say incredibly, how much?

15  A     From zero to 1.6 billion.

16        THE COURT:  When you say company, are you referring

17  to Biscayne Capital?

18        THE WITNESS:  Yes, Your Honor.  Biscayne Capital.

19  I'm talking about in particular with assets of clients under

20  management.

21  Q     Okay.  When you have that kind of assets under management

22  as a company, you're still taking -- one of the owners of

23  Biscayne, you're still taking from the advisors' fees,

24  correct?

25        The advisors keep making commissions on all these

1  trades and collecting clients.  They send the money to banks.

2  And at the banks, you or somebody -- your CFO of your company

3  would have a list of those banks; correct?

4  A    Correct.

5  Q    Who was that person?

6  A    Our CFO was Arlene Vargas, was an ex-PWC auditor.

7  Q    Okay.  And the way you're actually be paid, you, Weisson,

8  anybody associated with your company, they get paid out of a

9  portion of the fees being generated by the brokers?

10 A    Correct.  In other words, like any company, Biscayne had

11 bank accounts.  And since we have bank relationships, because

12 we have so much clients' money into those bank accounts, some

13 of the banks offer for Biscayne to have the bank accounts

14 there.

15        So a normal situation would be -- because the

16 largest part of the business was in Switzerland.  60 percent

17 of the assets was in Swiss Banks, 40 in U.S.  So, USB, for

18 example, would be holding 140 million dollars' worth of

19 Biscayne clients.  And every quarter they would deposit

20 management fees there, in the millions of dollars of

21 management fees, and the CFO would collect from all the bank

22 accounts of Biscayne into a major account.  It would pay

23 salaries, office, growth, et cetera, et cetera, et cetera.

24        During the growth process, as we were having to

25 acquire, let's say, to use the right word, new book of

Cortes - direct - Myers                    370

1   business, South Bay was injecting equity into Biscayne.  South

2   Bay invested I believe almost $30 million of equity into

3   Biscayne Capital.  And Biscayne Capital turned this $30

4   million into valuation in an estimate over $80 to $100

5   million.

6   Q    Okay.  Let's move ahead to how did Madison come into

7   existence.

8   A    Okay.  So, Madison, so the way that the Proprietary

9   Products, meaning the Cayman SPVs that were created, so they

10  issue securities to the clients, to a portion of the clients.

11  The part that may be a little convoluted, like, for example,

12  Biscayne -- let's say one client has an advisor managing that

13  client and the client has a million-dollar account at UBS, the

14  advisor would buy Proctor & Gamble, whatever, 80 percent, but

15  he could also talk to the advisor and sell 100,000 of GMS, of

16  one of the Proprietary Products.

17          So, as a matter of fact, $1.6 billion under

18  management and under my last recollection was about 200

19  million in Proprietary Products, which equate to about 10, 12

20  percent of the total portfolio, which was the expected

21  allocation.

22          So that -- so what happened was the SPVs, there are

23  individual entities that receive money from these banks when

24  the client bought the security, the cash was sent to the SPV.

25  The SPV received money for the sale of the security, turn

1   around and invested that money into South Bay.

2          For that operation, you need bank -- a banking

3   service.  And for a few years we were working, being a Cayman

4   company with a Cayman bank, DMS in Cayman.

5          After a few years Cayman -- I'm sorry, DMS decided

6   move away from that business and look for -- they said look,

7   we're not going to do any more constitutional, we want more

8   private.  That's when Fernando Haberer came in and say I have

9   a solution for you, I created this company Madison, and I'm

10  going to resolve a lot of the issues of securities coming and

11  selling in the portfolios and the money that we need in South

12  Bay to continue to grow Biscayne.  I didn't see anything wrong

13  with it.  It was something that I found at that time actually

14  a very valuable and requested need.

15         So I didn't think more of it.  As a matter of fact,

16  I saw an e-mail before that in 2014 or something like that, he

17  send a message, an e-mail saying hey, good news, Deutsche Bank

18  is going to provide services.  I said great, make sure it's in

19  writing.

20         And to me, Madison was Fernando and Gustavo Trujillo

21  providing a service to the SPVs at that time.

22  Q    Okay.  I just want to show you -- I will mark it as Roman

23  numeral II, monthly financial results of Biscayne Capital,

24  which you were speaking about, dated July 31, 2016.

25         And what is the -- what does that mean, P&L

Cortes - direct - Myers                          372

1   comparative year-to-date?

2   A    Okay.  So it showed through July 2015 compared to July

3   2016 how the revenues were 11.5 and 10.6.  The clearing costs,

4   then the net fees and commissions, and how much was paid the

5   advisors.

6   Q    What is this figure here, assets under management?

7   A    The assets under management at that time, 1.5 and 1.4,

8   the next year, a reduction of 100,000.

9   Q    Okay.  Let's move up to the SEC investigation.  When did

10  that investigation start of your company?

11  A    Okay.  So when we were starting Biscayne Capital in 2006,

12  actually, in Ecuador, we also wanted to have a registered

13  investment advisor in Miami, which I believe it was open in

14  2008.

15         In 2012, we saw that the registered investment

16  advisory in Miami was really not a good asset, it was not a

17  good business.  As a matter of fact, like I just explained,

18  Biscayne Capital Uruguay in 2009 was the place to be, was

19  where all of these advisors needed to go.

20         So in 2012, the SEC came for a routine -- what you

21  call?  Not investigation.

22  Q    Audit?

23  A    -- routine audit.  Even though we showed them that we had

24  already placed a letter to close the IRA in Miami.  They came

25  anyways.  They stayed there for three months.  They looked at

1   everything, you know, stayed at the office.  And two years

2   later, in 2014, we received a formal audit of investigation in

3   2014, the SEC.

4           For one year, we were scrutinized, every document,

5   audit, very thorough of the SEC.  And I had a three-day

6   testimony in Washington, D.C. at the SEC.  At the end, in

7   2015, if I recall, August, the lawyer that was representing us

8   at that time told us that the SEC called, that they want a

9   settlement without admitting any wrongdoing or admitting --

10  denying or admitting any wrongdoing.  And he suggested

11  strongly that we taking the -- what he called a parking

12  ticket, was 50,000 each, because at the end of the day, with

13  the SEC after investigating for over a year and a half every

14  single item, they didn't find any mat -- any improper use of

15  the money.

16          What they found was that, according to their

17  standards, there should have been better disclosure.

18  Q    And just explain that.  What did you take that to mean,

19  better disclosure of what?

20  A    The main thing was the conflict of interest.  They did

21  not feel comfortable, even though the prospectuses, there was

22  a section in 2012 that said that there were potential conflict

23  of interest of the money used, of the proceeds from all these

24  note holders, and that part of that money could have been used

25  for Biscayne Capital, for example, they had the same ownership

Cortes - direct - Myers                              374

1   as the South Bay receiving the investment.

2   Q    There was a potential conflict between South Bay and

3   Biscayne?

4   A    Right.  So the disclosure memorandum said potential

5   conflict of interest with related entities.

6   Q    Okay.

7   A    And what the SEC wanted was to describe the names.  So in

8   2013 --

9   Q    Okay.  I got it.  We got it.  Let me just cut you off.

10  I'm sorry.

11         Let's move ahead to what the determination was

12  against you personally.  What did they say about Roberto

13  Cortes?

14  A    Okay.  So there was a $50,000 penalty and I could not

15  reapply for three years to the securities industry, but I was

16  already -- I didn't have any license --

17  Q    Okay.

18  A    -- any security license.

19  Q    Is that basically a reference to you can't be a broker?

20  A    Correct.

21  Q    Were you ever a broker in your life?

22  A    I was in 1988 in Oppenheimer.

23  Q    Was your role at Biscayne to be a broker?

24  A    No.

25  Q    Okay.  Mr. Trujillo was asked several questions about why

Cortes - direct - Myers                                        375

1   then Biscayne moved offshore.  Can you address that?

2   A    Yeah.  There's a lot of hearsay and assumption

3   assumptions and speculations.  It is okay to say I think this,

4   I think that, but incorrect.

5        The move from the Proprietary Products outside --

6   because at that time, in 2012, when the SEC investigation

7   came, it was being managed, let's say, in Miami.  But from a

8   risk management standpoint it made absolutely no sense to have

9   the SPVs, and Cayman SPVs being managed in Miami.  So we

10  wanted to move it from a jurisdictional standpoint outside.

11  Q    How would that help?

12  A    I'm sorry?

13  Q    From a jurisdictional standpoint, who cares whether you

14  had it in Miami or in Uruguay.  What's the difference?  Why

15  would it help?

16  A    Why would it help?

17       Maybe because, from a banking standpoint, it would

18  be easier for Swiss banks, for example, to open bank accounts

19  for these non-U.S. entities.

20       Let's not forget that in the 2012, '13, and 14,

21  there was all these -- it's called -- it's not Fatico.  There

22  was this agreement between the Governments with tax issues in

23  the U.S. and Switzerland.  So there was all this disclosure, a

24  lot of entities, the non-U.S. entities outside of the U.S.

25  Q    What was the effect of the SEC's determination on your

Cortes - direct - Myers                          376

1  business?

2  A    So in 2015, we agreed to settle with the SEC.  However, I

3  was directly involved in negotiating the language of the

4  order.  It took almost eight months to negotiate with the SEC

5  how would the order read.  So we already knew that the order

6  was going to come.  And, unfortunately, even though the lawyer

7  fought about this, they wanted to name personally us, meaning

8  Ernesto Weisson, Juan Carlos Cortes, and myself.  So this was

9  one of the main decisions why the trust was set up to protect

10 the asset, which I can later talk about the trust when asked.

11 Q    Okay.  So it dovetails into that.

12       So a trust was set up for what purpose?

13 A    The reason that a trust was set up, as you know, the

14 trust doesn't have really an ownership.  It's a company at the

15 end of the day that has an agreement where the -- where it has

16 beneficiaries and not owners.  So if we put ourselves in time,

17 in 2015, Biscayne was generating to us a substantial amount of

18 money.  It was a business with over 100 employees, offices in

19 different places, compliant departments, a real business, and

20 working really very independent from the management in Miami.

21       So what we decided is that because the association

22 of Cortes, Weisson, and Cortes' brother to all of the

23 structure of Biscayne and the SEC release was going to be

24 very, very damaging for Biscayne business, so what we decide

25 is to set up a trust with the intent that the company continue

Cortes - direct - Myers                377

1   its operation, continue its value of growth, and the

2   beneficiaries of all these companies -- of this company were

3   the noteholders.  That was the way that it was set up.

4   Q    All right.  When you say the company, your talking about

5   Biscayne, right?

6   A    Biscayne, and also it became the beneficiary of the

7   investors of all the real statement.  In other words, the

8   entire assets of South Bay were deeded or settled into the

9   trust.

10  Q    Okay.  And what was Madison's role or how were they

11  affected by a trust?

12  A    Well, they had to -- being a service provider of the

13  notes, okay, which also the notes that all these companies,

14  the note companies were put into another trust.  There were

15  two trusts:  The South Bay trust and the Vanguard trust.  So

16  all these SPVs, now they were no longer controlled by us.

17  They were controlled by the trustees.  The trustee controlled

18  both of trusts.

19           So Madison, as an advisor or service provider, let's

20  say, of these companies, needed to, in reality, hand over all

21  these bank accounts to the trust directors.

22  Q    Okay.  And how did that affect the business of Biscayne

23  when that started happening?

24  A    Well, I think what you're asking is that once the SEC

25  came, the SEC order came in 2016, it really started to affect

Cortes - direct - Myers                    378

1    dramatically the -- Biscayne, because the order came and a

2    couple of advisors got uncomfortable.  But most importantly,

3    that the hardest part of everything was that Biscayne without

4    banking clearing services was -- it's impossible to work

5    pretty much, almost impossible to work.

6    Q    So I'm going to stop you.

7    A    Yeah.

8    Q    No banking clearing services, or they started to dwindle.

9    Just explain to the Court in less than a minute how that

10   process, the clearing services, without them, how does that

11   affect your business?

12   A    Tremendously, because that's where the client have their

13   accounts.  In other words, we had a big relationship with,

14   let's say, Bank of New York right here, Pershing.  So Pershing

15   had an agreement with Biscayne where all of the clients that

16   we bring to Pershing will have a set of account numbers, all

17   of the trades and transactions will go to us.  So an advisor

18   in Buenos Aires, let's say, will go to a client and say you

19   will open an account in the Bank of New York, you can go and

20   see everything there, but it's through Biscayne.  I'm your

21   advisor.  So the business model of Biscayne had to work with

22   all these backbone service, backbone providers.  Pershing main

23   business is provide clearing services for broker-dealers all

24   over the world in reality.

25                THE COURT:  The banks are like a back office?

1           THE WITNESS:  Right.

2    Q    So when these clearing services start to flee, not be

3    associated with you, what was financial effect?  What happens

4    at your company mechanically when they start to say I'm

5    Pershing, I'm not working anymore?  What happens?

6    A    Devastating.

7    Q    That's a nice word, but what financially starts to

8    happen?

9    A    Yeah.  What happens is, you know, some of the advisors

10   leave to other firms or other platforms try to move out of

11   Biscayne pretty much.

12   Q    Okay.  And how about financially?  Financially, not what

13   the people need to do, but what happens financially to your --

14   A    Well, revenues starting to go down pretty much, no

15   growth.

16   Q    Where was the revenue coming from before and how does it

17   go down?

18   A    Well, revenues were coming before from all these clients

19   paid to Biscayne.  So if these clients are moved to another

20   bank, they go to another source, to another company that own

21   this -- these accounts.

22   Q    And all these fees you're talking about and all the money

23   Biscayne can make off of the broker fees and grab a certain

24   percentages of your fees, did that decrease?

25   A    Yes.

1  Q    Okay.  And then what happens to your company after they

2  decrease?

3         Let's say $10 million start to flow out the wrong

4  way and the clients take the money with their different

5  brokers who don't want to be associated with you, what

6  financially occurs?

7  A    The business deteriorates, the value of the assets

8  decrease.

9  Q    Okay.  Is that the only thing that Biscayne share A

10 decreases in value or other things start to happen?

11 A    I'm not following the question.

12 Q    Okay.

13 A    I'm sorry.

14 Q    The money aspect of what is decreasing is just the value

15 of Biscayne only?

16 A    Less cash flow, less money coming in, less fees coming

17 in.

18 Q    Okay.  And did that happen in 2016 and '17?

19 A    It started at the end of 2016 through the end of 2017,

20 yes.

21 Q    Did that create a crisis in your company basically?

22 A    Yes.

23 Q    What kind of crisis?

24         Explain what the crisis was to the judge.

25 A    Several crisises in reality started to occur, number one,

Cortes - direct - Myers                       381

1    in my opinion -- I want to back up a little bit.

2           In 2016, okay, December of 2016 is when I became --

3    I was 50 years old, okay.  So I go to Ecuador into 2016 to

4    celebrate with my family.

5           THE COURT:  To do what?

6           THE WITNESS:  To celebrate my 50-year-old birthday.

7    You'll see how this is relevant, Your Honor.  Sorry to diverge

8    a little bit.

9    A    So we were having -- Mr. Weisson was invited to

10   everything, end of 2016.  By then, I had already made

11   announcements in Uruguay that I was no longer the CEO, because

12   let's recall that in the timeline -- and sometimes it is

13   confusing -- at the early 2016, the trust was already in

14   place.  The SEC order came in May 2016.  At the end of 2016,

15   I'm announcing, via conference call, and also on my last trip

16   to Uruguay in Argentina, I announce that I'm stepping down and

17   I'm no longer involved with Biscayne.

18          Then in 2016 I go through an unfortunate situation

19   that I have no idea what happened.  I almost got caught by the

20   Ecuadorian Government.  This is December 25th.  And I hear

21   news that they're trying to raid Weisson and this and that.

22          I go to the airport to come to Miami.  I'm a U.S.

23   citizen.  And they didn't let me go.  So I had to pretty much

24   flee and escape Ecuador through Colombia, while I was -- I had

25   to escape from my own people that were trying to get me out.

1          Why I'm telling you all this is because that's when

2   now that I have had a chance to read all of this 3500

3   material, it is -- I'm absolutely amazed how much activities

4   happened in 2016 behind my back with all this bribery, with

5   all this Government officials, where Weisson and Trujillo and

6   Haberer were working money laundering and I'm sitting duck,

7   not understanding what is going on.

8          When I had to flee, I'm like looking at the ceiling.

9   I don't know what is going on.  Thank God I was able to go

10  back to Miami.

11         So 2017 comes along, and by that time, Madison,

12  Trujillo, Weisson, and Haberer took things into their own

13  hands and pretty much were acting in complete control of all

14  of the SPVs and Biscayne.

15         Where I stayed in the U.S., I didn't go out of the

16  U.S. at all.  I was pretty scared to fly.  I didn't go to

17  Argentina.  I didn't go to Uruguay.

18         Like Weisson was flying six times a year and meeting

19  with them over there.  I had nothing to do with them.  So --

20  so, what happened was I was working at that time with the

21  trustees of the trust on the real estate side trying to be of

22  use because we had these agreements where -- for I believe a

23  year and a half after trust was made -- a year and a half to

24  18 months -- I'm sorry -- 18 months, we were helping a

25  transition.

Cortes - direct - Myers                        383

1          So I have plenty of exhibits and evidence that I

2     cannot share while I'm actively working with the trust

3     directors and following trust orders.

4          Yes, I was active, but at the same time I understand

5     that change of command that all the documents needed to be

6     signed by the trust directors.

7     Q    Okay.  Let me stop you there.

8          When you say you were working with the trust, it

9     follows that Madison was in existence at this time, correct?

10    A    In essence, Madison was going completely against the

11    trust by managing recklessly all of the SPVs and also

12    presenting a plan to buy Biscayne from the trust.

13

14          (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

1   (Continuing)

2   BY MR. MYERS:

3   Q     Okay.

4         And how do you know that?  How did you know that

5   they had a plan to actually buy out Biscayne and take the

6   assets?

7   A     Right.

8         So, Dario Epstein is one of Fernando Haberer's, I

9   don't know if they are still friends, but good friend at the

10  time.  Dario Epstein get involved as a consultant for Biscayne

11  in 2015, I think, before, when I was in charge, he was an

12  outside consultant and became a very good friend of Weisson

13  and Haberer in Argentina.

14        So, what Haberer suggested with Dario Epstein was

15  that they were going to take over Biscayne.  And I was no

16  longer involved, I already had pretty much said to all that I

17  was no longer involved -- I'm sorry.

18        I -- was no longer involved and Dario Epstein and

19  Haberer were, in fact, in control of Biscayne operations and

20  all of the SPVs operations.

21        THE COURT:  I am sorry, who was in charge of all of

22  Biscayne?

23        THE WITNESS:  Madison and Dario Epstein with

24  Fernando Haberer and Trujillo.

25        THE COURT:  And when was this?

1            THE WITNESS:  This is 2017.  The beginning.

2            THE COURT:  What time, all of 2017?

3            THE WITNESS:  Well, it started.  Because 2016 is

4    when the SEC ordered accounts out.  The end of 2016 is when I

5    go out and proclaim to everybody that I'm no longer there.

6            I have this incident in December of 2016 and by

7    then, 2017, is when Dario Epstein, together with Fernando

8    Haberer is starting to say what -- we're in control.  As a

9    matter of fact, we're going to grow this business and we're

10   going to -- we're going to make an offer to buy Biscayne out

11   of the trust.  So they run the company on their own.

12   Q    Did they approach you to participate in that?

13   A    No.

14   Q    Okay.

15           And there's been a lot of discussion the last

16   several days about communication that you had with some of

17   these other partners who are running Madison.

18           Did you at any time like, purposely cut off all kind

19   of communication with them or were you communicating in these

20   chats and emails?

21   A    Yes.  I mean, for me, was very difficult to completely

22   cut off.  I mean, the way that I'm looking now in -- from a

23   reflection standpoint, you know, you have to have to an extent

24   a little foot in the door or your enemies closer.  I was very,

25   very concerned of what's going to happen in the future.  This

1   is 2017.  I was very concerned what's going to happen in the

2   future if this is all being managed in a rogue way.

3           So, to an extent, I want to be in contact with them,

4   but at the same time, there is a lot of things happening.

5   These -- this timeline, you look at one timeline, it is

6   dynamic.  There are other things happening simultaneously with

7   that.

8   Q    Okay.

9           When you say dynamic --

10  A    Independently meaning.

11  Q    Are you referring to the trust has its own interest

12  that's against basically Madison?

13  A    Correct.

14  Q    Okay.

15  A    I have very -- various communications with the trust

16  where I send an email saying you need to have this questions

17  with Ernesto Weisson.  You have to get involved, et cetera,

18  et cetera.

19  Q    Okay.

20          Did you -- did you ever sit down with Weisson and

21  talk to people running the trust?

22  A    No.

23  Q    Okay.

24  A    Well, at that time --

25  Q    Do you know if Weisson, Trujillo or Haberer, did they

1   ever sit down with the trust?  The people running the trust,

2   the trustor?  Trustee?

3   A    Okay.

4        So, I mean the thing is that, you know, we been --

5   we been listening to all these test -- witnesses and

6   everything, but there is something that is very, very clear.

7   Q    Okay.

8        Just answer the question first before you get to

9   that?

10       Do you know what those three fellows sat down with

11  the trust to try to reconcile things?

12  A    No.

13  Q    And make sure the assets are protected?

14  A    No.

15  Q    Did you?

16  A    Yes.

17  Q    Why?

18  A    Because I had an agreement.  I mean, first of all, was

19  for the best interest of the creditors and the note holders

20  that working with the trustee in the trust -- the directors,

21  the assets are protected.  So we had to follow the -- what we

22  had signed.

23       We had signed an agreement where the South Bay and

24  the SPVs were settled into the trust and need to be managed by

25  the trustee and directors.  Yeah, we can help, but they are

1   the ultimate ones making all the decisions.

2           I was a cooperator with the trust.  Weisson and

3   Haberer and Trujillo were not -- not -- not -- not interested

4   in talking to them.

5   Q    Okay.

6           And they were not interested in talking to them

7   because they, in fact, wanted to purchase Biscayne, right?

8   A    Two things.  One, because they wanted to purchase

9   Biscayne; and second, because by losing control of the SPVs,

10  they would lose control of the money, which they needed to

11  have control of all the cash flows.

12  Q    Okay.

13          And when you say the SPVs?

14  A    Special purpose --

15  Q    Hang on.  Just wait until the question ends.

16          The cash flows, the SPVs, are you talking about

17  that's independently within Madison or they could actually get

18  access to Biscayne and take cash and assets out of there

19  somehow?

20  A    No.  Remember the proprietary products are the ones

21  that -- that issue securities that were sold to investors and

22  the proprietary products are the ones who have the cash.

23  The -- the -- the investors in Biscayne are purchasers of

24  these proprietary products.  So, it was all a loop.

25          Weisson needed to be close to the investment

1  advisors so he can continue to promote his projects.  So, he

2  would tell the advisors, sell more of the -- of the product

3  because I -- I need money.  I don't know if he told them for

4  Villa Hermosa or not.  But the money would go to the SPVs,

5  controlled by Madison, and Madison was controlling all the

6  cash and all the movements.

7  Q    Okay.

8         And I think I'm driving at how did that happen?

9  They controlled that, but isn't Madison completely separate

10 from Biscayne?  Or how did that mechanically go about?  How

11 did they go about raiding, for lack of a better term?

12 A    Right.

13        Because the way that this happened is -- and I think

14 Deutsche Bank, that's why they're in trouble -- is when

15 Madison opened the, let's say, the master account and then you

16 open that Deutsche Bank, and it opened subaccounts for each of

17 the special purpose vehicles, what Deutsche Bank should have

18 done, or they may have faked the signatures, I don't know, is

19 to say give me that documentation of every Cayman SPV so I see

20 who is the signature, who is the authorized signature on every

21 single company.

22        Instead, Madison opened all these subaccounts and

23 they control everything, all the wire transfer.

24 Q    When you say -- I think it's very important when, you say

25 they opened a subaccount, basically you have Biscayne, they

1   have an account.  Now Madison, once that account somehow

2   through Deutsche Bank or whatever bank, how do they go about

3   opening some subaccount?  How would you go about that?

4   A    Well, I'm not -- I'm not a 100 percent -- I don't -- this

5   is what they told me how to do it.  But what happens is, from

6   a general knowledge of banking, in -- when you open a master

7   account, and Deutsche Bank provided, let's call it subsidiary

8   accounts under -- under a master account.  So let's say

9   Madison is 1001, and this is 1001-1, 1001-2, et cetera.

10  Q    All right.

11       So are you, in essence, to use a very colloquial

12  term, are you trying to trick the bank basically into

13  thinking, well, I will just go open a subaccount?  It's

14  basically the same account that Biscayne has?

15  A    Technically, if the bank is doing their compliance and

16  they're not being duped or faked, they need to receive the

17  legal documentation of every single subaccount and understand

18  these are segregated and separate accounts.

19  Q    All right.

20       Did you have anything to do with opening up all

21  these subaccounts which move money over to Madison?

22  A    Absolutely not.  Zero.

23  Q    All right.

24       Let's move on to Michael Pearson, who is he?

25  A    So, in 2017, I'm in contact with -- with this group, the

1    trustees and also with the Madison group.

2    Q    And I let me just stop you right there.

3    A    Yes.

4    Q    Who is Michael Pearson?

5    A    Michael Pearson is a individual from, I think it's

6    English that lived in Cayman, and he has a company that

7    specializes in liquidate -- liquidation and distressed

8    situations.

9    Q    All right.

10            Who approached him?

11   A    So the way that that happened --

12   Q    Okay.

13            Who approached him?  What person approached him?

14   A    I did.

15   Q    That's the answer.

16            When did you do that?

17   A    I did that at the end of 2017.

18   Q    Why did you do that?

19   A    The reason I did that is after speaking with the

20   directors of the trust, Herman Houston and Bass Horston, I

21   told them that the situation was getting out of control.

22   Q    Okay.

23            What situation?

24   A    The SPVs and Biscayne not being purchased, all the

25   promises from Dario Epstein.  I felt the assets were being

1  depleted.

2  Q    Okay.

3        And how did you find that out?

4  A    How do I find that out?

5        Because...  how do I find that out?  That's a good

6  question.  I don't know.

7        I mean, I just heard -- I was hearing from Weisson

8  or from Haberer that advisors are leaving.  I just saw a very

9  erratic conduct going on.  I was not like -- like I, like I

10 repeated many times, even though there is comings in and out

11 in the Flux where I'm involved, I'm not daily involved as I

12 was in 2015 or '16 in control.

13 Q    So when you say you're not daily involved, did you look

14 at cash flow spreadsheets with Mr. Trujillo?

15 A    From my recollection 2016, yes.  And 2017, I would say --

16 and I been talking to you about this -- I don't recall looking

17 at a lot -- maybe I have seen like two or three times, but

18 there was -- I see so many millions of dollars moving there,

19 that I don't recall seeing that much money moving.

20 Q    All right.

21       Were you in communication about the money moving,

22 though?  Did you confront Mr. Trujillo saying, hey, you can't

23 move money?  You can't cover up some of this debt.

24       Did you have conversations with him about that?

25 A    Yes.

1  Q     Okay.

2           Did you realize that was wrong how they were

3  covering up some of the holes?

4  A    At that time, I started to feel very uncomfortable seeing

5  that the assets were being depleted and they were continue to

6  raise money.  And, you know, I felt that Madison was growing

7  and I don't know what kind of business they were doing.

8  What -- it kind of start -- one of the things that concern me

9  was that Madison was borrowing -- using the SPVs to fund other

10 businesses outside the trust.

11          That's when I approach the trust and I said -- the

12 trustee, and I said we need to stop this.  We need to find

13 someone that needs Herman Houston, who referred Michael

14 Pearson to me and I -- I was the one who approach and flew to

15 Cayman and met in person Michael Pearson.

16 Q    All right.

17          And how did you find out the money was being used

18 outside the SPVs?

19 A    Now I'm saying, now I found out through Villa Hermosa

20 looking at 60 million going there, millions and millions of

21 dollars, all of these money laundering, bribery business in

22 Ecuador and Government.

23 Q    And so those topics that you just rattled off there, when

24 did you find those out?

25 A    Now.

1   Q     When you looked at this case?

2   A     Yes.

3   Q     When you looked through the material?

4   A     Yes.

5   Q     Did Trujillo or Weisson, did they ever tell you about

6   Villa Hermosa --

7   A     No.

8   Q     -- dealing with Ecuadorian Government officials?

9   A     No.

10  Q     Did they ever approach you about buying some Government

11  bonds from Ecuadorian Government officials?

12  A     No.

13  Q     Okay.

14        Let's move ahead to Ferran.

15  A     I wanted to see if I can add something regarding Raymond

16  James and Crèdit Andorrà regarding Biscayne Capital.

17  Q     Okay.

18        Describe what happened there.

19  A     So this is 2014 and '15.  To prove that there is -- there

20  were actions where there was no foreseeability that the

21  business going down, to me, my understanding and perhaps the

22  other ones don't understand this, meaning Trujillo and

23  Weisson, we sign an agreement with Raymond James in Uruguay

24  that Raymond James had, at that time, certain compliance

25  issues with the SEC in the United States, and they wanted to

1    get rid of the branch in Uruguay.

2            Now, the branch in Uruguay was about $1.5 billion.

3    We did the due diligence.  We interview every single advisor.

4    We had signed agreement was every single advisor.  We were

5    about to buy Raymond James in Uruguay, technically doubling

6    the size of Biscayne from 1.5 billion to 3 billion.  And from

7    20 million in revenue to 40 million.

8    Q    So let me just stop you there.

9    A    Yes.

10   Q    So you're going to basically buy their whole book?

11   A    Business.  And employees, too.

12   Q    And employees, you buy -- it's like buying up a hundred

13   brokers or something like that, right?

14   A    Well, there were like 30.

15   Q    30, okay.

16           And you don't have to pay 1.5 billion more dollars

17   for that, right?

18   A    No, the contract the agreement, the purchase agreement

19   was 9 million.

20   Q    Okay.

21           And what year was this?

22   A    I believe '14, '15.

23   Q    Okay.

24           So, in 2015 and 2014, you felt the company was

25   liquid enough to go out and make a $9 million purchase of

1   Raymond James?

2   A    Absolutely.  That -- that company, if purchased, would

3   generate immediately $20 million in revenue a year.  It would

4   have been a great purchase.

5   Q    Okay.

6        And how would that purchase -- how did that tie in

7   with Madison?  Is Madison in on that deal with Trujillo and

8   Weisson?

9   A    Well, Madison was, you know, was doing their own thing at

10  that time.

11  Q    So were they interested in joining you to get that book?

12  A    Yeah, but they're -- I was in control at that time.  I

13  was a CEO.  They were just a service provider.  They were not

14  in control.

15  Q    Okay.

16  A    And then the other thing is that I don't recall it was

17  before or after.  We received an offer from a bank in Spain

18  that wanted to buy Biscayne for $20 million for a portion of

19  the company.  And then what is called an earnout, as the

20  company was growing in assets, it would be paying more as a

21  company grows; up to $70 million of the sale.

22       Funny enough, it was Dario Epstein in that time who

23  told me don't sell to the Spaniards.  You are -- you are

24  giving the money -- the company away.  And then, later on, he

25  was the one, when things were going wrong, let's say in 2017,

1   who try to put an offer and buy Biscayne from the trust.

2          Sorry that I wanted to make clarification of those

3   instances which I think prove value in the future and also had

4   real purchase of the company.

5   Q    Okay.

6          And when did Epstein try to buy the Biscayne from

7   the trust?

8   A    In 2017.

9          There is a -- I couldn't find --

10  Q    Okay.  Okay.

11         Let's talk about Ferran.  Okay?

12  A    Okay.

13  Q    Ferran was a broker, right?

14  A    Ferran was a -- an owner of a company in Spain.  Their

15  own small broker-dealer in Biscayne -- in Spain.

16  Q    Okay.

17         And which property was he interested in?

18  A    Prop -- oh, talking about Ocean Reef property.  The

19  investments in Ocean Reef properties.

20  Q    Yes.

21         Ocean Reef has how many homes in it?

22  A    So Ocean Reef was purchased by South Bay in 2006 and

23  2007, and there were 29 lots purchased for -- in Ocean Reef

24  Club in Key Largo.

25         So Ferran, at that time, in 2015 or '16, I believe,

1    '15, I discuss with him to develop a project together of seven

2    homes in Ocean Reef Club.

3    Q    And was Mr. Weisson with you when these negotiations went

4    on?

5    A    Yes.

6    Q    Carry on, go ahead.

7    A    So, the -- the -- the agreement, or the business proposal

8    was, you'd buy seven or these joint venture, let's call it

9    that way, was seven properties at a value of 775,000 each

10   property, which is about 5.4 million total, plus each -- in

11   Ocean Reef, each home is a private club, have membership

12   attached to it.  It's called an equity membership.  But at

13   that time the equity membership was $200,000 each, so that's

14   another 1.4 million.

15          So, as explained before, before the trust and after

16   the trust, South Bay owned that LLC's owning these properties

17   in Ocean Reef Club, so the idea was that once Ferran invested

18   the entirety of the lots, plus a membership, the -- the lots

19   would be deeded to or free and clear, let's call in this joint

20   venture, and then he would needed to fund another, I would

21   say, $10 million for the construction of the properties.

22   Q    All right.

23          And the -- I believe it was Mr. Weisson --

24   Mr. Weisson was speaking about he needed -- he wanted his own

25   vehicle.

1              Explain that.

2    A    Ferran.

3    Q    Ferran wanted his own vehicle?

4    A    Yeah.  Ferran said, yeah, I like the idea, you know, not

5    only he was interested in Ocean Reef.  He wanted a -- Biscayne

6    to merge with them or buy -- or Biscayne buy Ferran business

7    as from advisory standpoint.  Had nothing to do with the real

8    estate.

9              He said, okay, yeah, I'm interested, but, you know,

10   since I'm going to put my clients into this new project, I

11   like to have my own vehicle.  My own investment vehicle,

12   tailored for me.

13   Q    What was it called?

14   A    Well, the way that the --

15   Q    What was it called?

16   A    There were two, that's what I'm going to say.  IACAP 62

17   series and Select investment -- Select something PLC.

18   Q    Okay.  Okay.

19              And why would somebody need their own vehicle?

20   A    Him being a banker, maybe he wanted to be on a

21   separate -- separate investment vehicle.  With a seven

22   properties to get --

23   Q    Do you recall how much the seven lots he put toward that?

24   A    The seven lots' value 5.4 million was agreed.

25   Q    Okay.

Cortes Ripalda - direct - Myers                    400

1          And the 35.4 for seven lots, plus some club

2   memberships, would that come to about 6 or $7 million?

3   A    6.8, yeah.

4   Q    Okay.

5          Now, how would he obtain a hundred percent interest

6   in those properties?  What would he have to do?

7   A    He would have to pay a hundred percent of the amount that

8   was agreed upon.  Like, if you buy any property for any

9   apartment, any home, you not going to come and pay a partial

10  amount and expect to be mortgage released, free and clear

11  delivered to you.

12  Q    Okay.

13         So did he meet his obligations?

14  A    No.

15  Q    All right.

16         MR. MYERS:  Let me just show you what I've marked as

17  Roman numeral three.

18         (Exhibit published.)

19  Q    You see at the top, Ferran Mirapeix?

20  A    Yes.

21  Q    And he writes in Spanish, which is translated:  We have

22  not been capable to make the expected investments.

23         What does that mean?

24  A    That they were supposed to meet an amount of money to

25  invest at a minimum, the lots and the memberships, and he said

1    later I will have to look internally why we have failed.

2    Q    Okay.

3         And what occurred after that?  When they failed to

4    meet their obligations completely?

5         He did give you -- sorry.  Let me just backtrack.

6         He did give you like, close to $5 million toward the

7    6.8, correct?

8    A    My recollection of the information that I have was 2.895.

9    Now in this hearing, I heard that it's more.

10        So, I don't have documentation at all regarding that

11   extra money.  I have documentation of him emailing the

12   administrator of the Select saying I have invested 2,000,895

13   into Select.

14   Q    Okay.

15        But whether it was 2.8 or whether it was 5, it had

16   to be 6.8 to meet his obligations, right?

17   A    Yeah.

18   Q    When you were -- you walked around with Ferran and looked

19   at the properties, right?

20   A    Yes.

21   Q    Was Weisson there?

22   A    Yes.

23   Q    Did you ever tell Ferran that the -- none of the

24   properties have mortgages on them?

25   A    Never.  Of course he knew there were mortgages.

1   Q    Okay.

2        And why do you say that?

3   A    Because normally you have a lot -- you have -- you know,

4   on a street, you have seven properties, it's the most common

5   is that those properties were brought through a bank or with a

6   bank.  Not all paid in cash.

7   Q    Okay.

8        So somebody would have to -- what were the

9   individual lots worth?

10  A    I would say like a million dollars.

11  Q    All right.

12  A    775 between 600 and a million, that's what we end up at

13  775.

14  Q    Okay.

15       And so if you're walking down the street, somebody,

16  a builder or a bank, would have to come up with $7 million

17  cash in order for none of those properties to have a mortgage

18  on them, right?

19  A    Correct.

20  Q    Okay.

21       Is it common for an investor to purchase a property

22  that already has a mortgage on it?

23  A    I don't understand the question.

24  Q    Well, you have investors coming to get property, like

25  Ferran.

1          Is it a common practice in dealing with real estate

2    and Cinnamon Bay -- Cinnamon Cay, that the properties already

3    have mortgages on them, or does that scare people away from

4    purchasing them?

5    A    No.  I mean, you go to buy a house, the seller has a

6    mortgage, you get a new mortgage, you pay him off.

7    Q    Okay.

8          That's what I'm driving at now.

9    A    Right.

10   Q    So when Ferran gave you the money of whether it was

11   5 million or 2.9, and failed to meet his obligations, what

12   happens then?

13   A    In -- at the end of day, he end up being an unsecured

14   creditor of the assets because he -- he -- he pretty much

15   defaulted on the obligation, on the joint venture agreement.

16   Q    Okay.

17         And when you default, what happens?  Do you just

18   give him back his money or what happens mechanically?

19   A    Well, he became an unsecured creditor of the assets.

20   Q    Okay.

21         And he -- you still have his $5 million or 2.9;

22   right?

23   A    Yeah.

24   Q    Okay.

25         Did you ever have any discussion with Ferran that

1   his money -- just the seed money to purchase the properties,

2   was going to 100 percent be used to simply purchase the

3   property?

4   A    The money that he was put -- if he would put a hundred

5   percent of the money?

6   Q    Yes.

7   A    Yes.

8   Q    And if he failed, where was the money at that point?

9        Where was his money invested in Select?  Where was

10  it?  Where did it go?

11  A    It went to South Bay because South Bay is the owner of

12  Ocean Reef Group LLC, which is the owner of -- the --

13  Q    What did South Bay do with it?

14  A    At that time, I have no idea.  They could have paid on

15  other investors or for working capital.  It's --

16  Q    Okay.

17  A    -- it's the same when you sell a property.

18       Let's say you have a property of a million dollars

19  and $200,000 mortgage.  Somebody comes and say, I want to buy

20  your property.  There's no agreement that the first 500,000

21  partially is -- normally doesn't happen like that -- but

22  somebody comes and give you $500,000, and you are the seller,

23  you as the seller of the property, the $500,000, you have

24  discretion to do whatever you want.  That's your money.

25  Q    Okay.

1        So, are you conveying that if I go to a bank and I
2   want to buy a million dollar house, but I give the bank
3   $200,000, they don't have to hold the money, the exact dollars
4   that I have given them, waiting for me to pay off the last
5   800?  They can do what they want with the $200,000 that I've
6   given them?
7   A    Well, but if you are the seller.  The bank is not the
8   seller.  I'm talking about the seller.
9   Q    Yes.  The seller, okay.
10  A    The seller -- the seller doesn't -- no, doesn't.
11  Q    Say that again.
12  A    No, I don't believe the seller has the obligation to hold
13  that money unless it is agreed upon.
14  Q    Okay.
15  A    So, for example, if it's agreed upon, I'm going to give
16  you $300,000, the monies not on escrow until I pay you the
17  difference, yes.
18        But this was an investment done by a sophisticated
19  investor that he had to -- he knew the reason South Bay, to
20  start with, was selling or entering this joint venture of
21  these seven properties, was because South Bay was interested
22  on selling this interest of the properties; not to have the
23  money sitting there.
24  Q    So the money did not go to a bank to hold.  It went to
25  South Bay to hold, correct?

1   A    Correct.

2   Q    And was your understanding that South Bay could use that

3   money be for administrative fees or anything they wanted to

4   until he met his obligation?

5   A    Yes.

6           THE COURT:  And so he understood that if he did not

7   make -- pay the full amount of the deal, that he was going to

8   loss $5.8 million?  That is what he understood?

9           THE WITNESS:  I don't -- I don't know what he

10  understood, but I think he or I --

11          THE COURT:  Somebody had to understand what was

12  going to happen with the downpayment if he could not make the

13  rest of it.

14          So the deal is for what, 6 million or 7 --

15          THE WITNESS:  7 million.

16          THE COURT:  -- 7 million.

17          So, he paid 75 percent of that, and he had to

18  understand -- according to you, he understood that the other

19  30 percent, or whatever, if he did not pay that, he lost all

20  of money.

21          THE WITNESS:  No, he didn't lose.  He became an

22  unsecured creditor of those assets.  He became a creditor.  He

23  has a claim of money against those assets.

24  Q    Okay.

25          And you say eventually that some of the properties

1  end up in foreclosure?

2  A    Yes.

3  Q    Would they also be creditors on that property?

4  A    The first mortgage is.

5  Q    Okay.

6         So there were multiple --

7         THE COURT:  Did he know -- there was another

8  mortgage on the property before he brought it.

9         THE WITNESS:  Yes.

10        THE COURT:  He knows that?  Did you all discuss

11 that?

12        THE WITNESS:  Yes.

13        THE COURT:  Oh, so you had a discussion with him

14 that there was a first mortgage on the property.

15        THE WITNESS:  Right.  Explaining that we needed the

16 money to pay off the mortgages.

17 Q    So when you say the money to pay off the mortgage, if he

18 paid off the mortgage that was outstanding, would he then

19 become a secured creditor because he paid that off?

20 A    Yes.

21 Q    So now he would be basically in possession of the

22 property.

23 A    Correct.

24 Q    Now, when he -- I think Weisson said something about he

25 wanted his money put into escrow.

1          When would his money be put into escrow?

2    A    According to the documents, the escrow money was after he

3    paid for the full amount of the assets.  The escrow money was

4    for construction and interest reserve.

5    Q    Okay.

6          So then the money would be put into escrow for

7    construction because why?  The builders need money to syphon

8    off to build the place?

9    A    Yeah, that's a surplus over the 775.  If we receive 775

10   for the lots, and he sends another, let's say million, that

11   money goes in escrow.  And the reason, particularly that

12   document was drafted that way, is because the 775 was only to

13   be provided in -- once received the money in full in exchange

14   for the full mortgage, let's say of Select, into that

15   property.

16         And the difference will go in escrow as an escrow

17   reserve, and the builder would request draws as the

18   construction moves along.

19   Q    Now, in 2018 was there a lawsuit concerning these

20   properties?

21   A    Yes.

22   Q    Okay.

23         Did Mr. Trujillo, who testified this morning, did he

24   join in that lawsuit?

25   A    Yes.

1  Q    And how did he join in that lawsuit?

2  A    So, Your Honor, so, the question about Ferran, as a

3  matter of fact, I met with Ferran in 2018 and I proposed to

4  him, say, look, you did not -- you were not able to pay for

5  the full amount of the lot.  I'll work with existing lender

6  and give you three lots for, I don't remember, three or four

7  lots, in exchange for the money that was given.

8         All this was discussed with the trustee explaining

9  that this unsecured investor, Select, Ferran was trying to

10  work something out with regards to the -- to the lots.

11         At the same time, Trujillo, Haberer and Weisson,

12  when they found out that one of the homes in Ocean Reef -- the

13  Ocean Reef was sold, by the trust -- not by me, by the

14  trust -- the seller was the trust and the trust needed that

15  money to pay down debt and receive income, so avoiding

16  foreclosure, because that money from the sale would have put

17  up to date all the other -- the mortgage lender at that

18  time -- they decided to block a second sale saying that they

19  owned these notes and mortgages on behalf of Select.

20         The crazy thing I would say here is that Trujillo

21  was appointed at that time through Amcorp as the director of

22  Select conflicting interest with Ferran.  So Select sue the

23  trust -- meaning Trujillo, Weisson and Haberer -- with the

24  same common lawyer, Andrew Levy in Miami, working together,

25  they sue Cinnamon Cay, public record in Dade County, Miami,

Cortes Ripalda - direct - Myers                    410

1    Dade County, for saying that they can no longer sell any of

2    the properties because Select had an interest in it.

3              So that's -- that's what happened.  And at the end,

4    what end that, this triggered the mortgage lender that has a

5    right with a mortgage in front of a judge in Dade County,

6    foreclose on the properties.

7    Q    Is that London Financial?

8    A    Yes.

9    Q    Okay.

10   A    To an extent, just to summarize --

11   Q    Rhetorical question, but you didn't join in Trujillo's

12   and Select's lawsuit, did you?

13   A    No, quite the opposite.

14   Q    Okay.

15             Did you go speak to the trust?

16   A    I was helpful and in cooperating, working with the

17   lawyers of the trust in this lawsuit.  Eduardo Rodriguez on

18   the other side.

19   Q    All right.

20             Let's move on to another topic, liquidity, okay?

21             THE WITNESS:  Can I take a bathroom break?

22             MR. MYERS:  I'm not in control here.

23             THE COURT:  Yes, but we will wait for you to get

24   back, okay.

25             MR. MYERS:  So run.

VB        OCR        CRR

1            THE WITNESS:  Okay.

2            MR. WEINTRAUB:  Can we also just as a matter now

3    address timing for cross, given the Court's hard stop?

4            It's 3:45.  The Government would request to at least

5    have 45 minutes for cross; 4:15.

6            THE COURT:  You can go ahead.  Go.

7            (Witness steps down/temporarily excused.)

8            THE COURT:  Yes, can you wrap it up by then,

9    Counsel?

10           MR. MYERS:  By when?

11           THE COURT:  4:15.

12           MR. MYERS:  I'll do my best.  Do my duty.

13           THE COURT:  Because as I said, 5:00 is the hard

14   stop.  We cannot go past 5:00.

15           (Pause in the proceedings.)

16           (Witness returns.)

17           THE COURT:  Okay.

18   DIRECT EXAMINATION (Continuing)

19   BY MR. MYERS:

20   Q    Okay.  So let's talk about liquidity.

21           What problems occurred around liquidity?  I think we

22   all know the money market idea.  So you don't have to go into

23   an explanation of what it is.

24           What problems occurred with liquidity?

25   A    Okay.  So I'd like to put in context.

1          Biscayne Capital clients had securities and cash in

2     their accounts and I saw there was, as it were growing, there

3     was always a large amount of cash in these accounts.  At one

4     point over $250 million that the banks were holding in cash

5     and the cash was producing interest for the banks and not for

6     Biscayne.

7          So in order for me to increase the profitability of

8     Biscayne, I came out with this idea of creating a money market

9     liquidity product, and I -- I don't recall how I discuss, I

10    were in contact with Commerz Bank, the German bank in London

11    and I told them, look, can you structure a product tailored

12    for Biscayne?  And they were very clear on their prospectus

13    and how they controlled the -- it's called investment

14    concentration risk and investment objectives.

15         So at that time, this is 2013, the trader -- Madison

16    was not involved, okay.  Trujillo was not involved in nothing

17    to do with these things.  It was Nicholas Barcia, the head

18    trader of Uruguay, the one in charge managing all the trading

19    for Biscayne.  I worked closely with him and I said, okay,

20    let's -- I want to really, really work hard on this product.

21    I want it to grow.  To me was $250 million were sitting there

22    not producing absolutely anything.

23         So I push hard in creating this product.  It was,

24    from the beginning, very clear to Nicholas Barcia that he

25    would invest 80 to 90 percent, with my direction and

1   recommendation, in liquid, high-grade products.  This was, to

2   me, very legitimate business, nothing wrong with it.

3             I don't know if I want to talk about that it was

4   shown that I --

5   Q    I'm just going to interrupt you and show you, I'm going

6   to call it Roman numeral V.

7             (Exhibit published.)

8             MR. MYERS:  This liquidity sheet, Commerz term

9   sheet.

10  Q    Is this an example of what you're talking about?

11            Let me move that, sorry.

12  A    Yes.

13  Q    Such as Caterpillar, GE.

14            So you take cash and invest it in those vehicles?

15  A    Yeah.  So the class so, is on the top means that's a term

16  30, 60, 90, 100, 720 days.

17  Q    Okay.

18            And instead of just sitting around in cash, you take

19  the 250 million and you put it in those vehicles?

20  A    Correct.

21  Q    And Commerz Bank, did they have certain rules about

22  investment?

23  A    Correct.

24  Q    What type of rules did they have?

25  A    I believe, if I recall, it's over 10, 11 years ago, they

1  would not allow more than 25 or 30 percent of the underlying

2  product to be on nonliquid products.  Such as the proprietary

3  products.

4  Q    Okay.

5        And you heard me ask Mr. Trujillo about his comment

6  that they moved this liquidity, their version of liquidity,

7  over to proprietary products.  And the whole thing was just

8  filled with proprietary products, not these investments you

9  just mentioned on that sheet.

10        Is that true?

11 A    Yes.

12 Q    Now, did they have -- did Haberer, did he have a

13 different idea about liquidity than you did?

14 A    So what happens is that when Nicholas Barcia and Biscayne

15 trading desk pretty much it was dismantled Uruguay and things

16 were moved to Bahamas and different places, Madison and

17 Trujillo went -- became, to an extent, managing the whole

18 company in their execution.

19        So Haberer said, hey, I have this good idea with

20 IACAP, I can create a new liquidity product.

21        I said okay, fine, you are in charge.  You know,

22 control, do -- I don't know what you're doing.

23        He said okay, I'm already --

24        Remember it's 2016, end of 2015, 2016, I'm dealing

25 with the SEC.  I'm trying to close a deal with Raymond James

Cortes Ripalda - direct - Myers                    415

1    and I'm like, okay, you want to handle that, go ahead.  You

2    know, because like at that time, I think, even though I push,

3    I think that that liquidity never went higher than 20, 25

4    million.  They didn't get to 100 million that I expected to be

5    significant income for Biscayne.

6    Q    All right.

7         Did you have any participation, managerial-wise or

8    discussions, about Haberer's idea about how to use the

9    liquidity?

10   A    No.

11   Q    How about with Trujillo?

12   A    No.

13   Q    Okay.

14        What is Galty?

15   A    Galty is a company owned by my brother-in-law, Juan

16   Carlos Calero.

17   Q    Okay.

18        And did he have your father-in-law's account?

19   A    No, he had his own account at Julius Baer.  He had his

20   own account at Julius Baer; Galty.

21   Q    Okay.

22        Was there an issue with that account?

23   A    Well, according to what has been presented, it's some

24   sort of misunderstanding.

25        Like I had two clients of the hundreds of clients

1  was my father-in-law and my brother-in-law.  The only two

2  clients.  Know them for 15 years.  And I told them, look, you

3  know, to me was perfectly fine to invest in the Commerz Bank

4  and, yeah, I saw the previous email that I told Trujillo the

5  sale is automatic.

6         To me, okay, a white lie, you know, to -- not a big

7  deal.  It's a liquidity product.  Remember that's all liquid

8  product.  And I spoke with Juan Carlos and there is emails.

9  They were explicitly explaining what it was.  And as a matter

10 of fact, the concern, okay, in detail, was that the

11 Julius Baer account, because was the first one, the first

12 thing it was sold, it was put on the section of alternative

13 investments.

14        As you know, the -- the -- these bank statements,

15 the security statements, they change cash, they put bond, they

16 put stocks, and they put also at the bottom, alternative

17 investments, like some mutual fund.

18        So this Commerz liquidity was earmarked incorrectly

19 by Julius Baer as an alternative investment.  And I explained

20 to Juan Carlos, that it's not that case, that it's actually a

21 money market product.  So information was sent to Julius Baer,

22 they correct it, the labeling.  And from then on, the Commerz

23 Bank liquidity note appear on the cash or cash equivalent

24 section of the securities statement.  He was fine with it.  He

25 had no problem.

1              Later -- later on was sold and there was no issue at

2     all with Galty and the Commerz liquidity note.

3     Q    Okay.

4              Let's move on to another topic.

5              San Andres, who is that?

6     A    Hector San Andres is a gentleman from Guayaquil, Ecuador,

7     who I met, I met him in the year, I would say 2000.

8     Q    Okay.

9              And at some point, did he invest in Madison?

10    A    No.  Hector San Andres, this I believe was maybe year

11    2014, 2015.  I receive a call from him and he is telling me,

12    Roberto, I have a great business for you regarding some

13    Ecuadorian Government bonds.  To me, that was like, a red

14    flag.  Immediately.

15    Q    Why?  Why was that a red flag?

16    A    Because normally, unfortunately, things related to

17    Government in Ecuador, it's always has a tale of bribery,

18    corruption.  Something always goes wrong.

19    Q    Okay.

20             Did you convey to anybody that you didn't want to

21    invest in Government Ecuadorian --

22    A    Absolutely.

23    Q    Who did you convey to?

24    A    I convey to --

25             MR. MYERS:  Judge?  She wants to show you something.

1           (Pause in the proceedings.)

2           THE COURT:  Go ahead.

3  Q    So -- so you were saying you had no interest in investing

4  in Ecuadorian Government bonds?

5  A    No, not investing, no intention to be -- to provide any

6  services or association with Government, with anything related

7  to Ecuadorian Government.

8  Q    Okay.

9  A    So I said --

10  Q    San Andres?

11  A    My brother, I think you asked who knew before the

12  introduction.

13           I told Juan Carlos Cortes, my half-brother, I said

14  look, we don't want to have nothing to do with this Government

15  situation, Ecuadorian thing.  You call Hector San Andres, and

16  if you want, refer that business to Fernando Haberer.  If he

17  wants to work with him or do anything with him, that's his

18  prerogative.  I don't want to have to do anything with that

19  situation.  Keep me out of that.

20  Q    Okay.

21           Did you then start to deal with anybody -- Weisson,

22  Trujillo, Haberer -- concerning Andres?

23  A    No.  What happened was --

24  Q    That's fine.  Let's just move on.

25           Eventually, that turned out to be dirty money, you

1  found out, right?

2  A    What I learned -- what happened was, I believe Haberer

3  told me one day, he said, the bonds that were in San Andres, I

4  used them.  Like that, you know, like he just throws like

5  nothing happened.

6  Q    Okay.

7         And how much -- how much money was that?

8  A    I think at the time was 2, $3 million.

9  Q    Okay.

10 A    And I'm like, what?

11        THE COURT:  This happened in 2014 and 2015 that you

12 were advised of this advice, this --

13        THE WITNESS:  No, I believe this happened in 2016,

14 '17.  After.

15        THE COURT:  No, that when this deal was brought to

16 you, I thought you said it was 2014 or 2015.

17        THE WITNESS:  I don't exactly recall, the time

18 exact.  I could look.

19        THE COURT:  All right.

20        So but in any event, you referred this deal to

21 Haberer.

22        THE WITNESS:  Haberer.

23        THE COURT:  Did he have of a business separate from

24 yours?

25        THE WITNESS:  Madison.

1           THE COURT:  He worked the company you were in charge

2   of, though, right?

3           THE WITNESS:  I was not in charge of Madison.  He

4   started Madison as --

5           THE COURT:  Oh, this is -- you referred this deal to

6   Madison.

7           THE WITNESS:  Yes.

8           THE COURT:  Okay.

9           THE WITNESS:  Well, referred to Juan Carlos, who

10  referred to Madison, to be more precise.

11          I said to Juan Carlos, my brother, talk to Haberer

12  to see if he's interested in that business.  Him and Trujillo.

13  Not me.

14  Q    How did you eventually learn of some of the criminality

15  that was going on as part of this Ecuadorian bribery scheme?

16  How did you learn that?

17  A    Well, like I said, one day, I don't recall when, Fernando

18  Haberer, in a casual conversation told me, oh, I used that

19  money for, I sold those bonds and the bonds aren't there

20  anymore.  We used that money.

21          And then, later on, he said, I need you to help out,

22  help out and be in the calls, help out and try to calm him

23  down.

24  Q    Okay.

25          And how long -- you had known San Andres for how

1  long?

2  A    Since 2000.

3  Q    And you had a good relationship with him?

4  A    I would say yes.

5  Q    Did you call him up and try to calm him down, that --

6  A    I was driving to the conference calls, pretty much.

7  Q    Okay.

8        And did you participate?

9  A    I listen to it and, unfortunately, I try to say calm

10 down, let's see something I'm sure Fernando, Gustavo will work

11 something out; relax.

12 Q    Okay.

13       During this time period, did you stand to gain any

14 kind of financial gain from Madison?

15 A    No.

16 Q    Okay.

17       You eventually got pulled in to or you thought you

18 could be under certain investigation in Ecuador because of

19 this mess, right?

20 A    Well, like I said, in December 2016, I was happily in a

21 party and I received in my WhatsApp some pictures of some sort

22 of indictment or investigation, open investigation, and my

23 name came up together with Weisson.

24 Q    Is that why you asked for the $20,000 for a lawyer?

25 A    Yes.

1   Q     Okay.

2         And did you get that money?

3   A     I don't remember.  Probably.

4   Q     Okay.

5         Did you cooperate with Ecuadorian prosecutors?

6   A     Yeah.  Once I had -- when I hired this lawyer in Ecuador,

7   I was able to have a confidential meeting in Miami, because I

8   would not go to Ecuador anymore.

9         And they -- the secretary -- the *Secretaria General*,

10  the -- I would call it the state attorney from Ecuador, flew

11  to Miami, met with me and we were with a -- she brought like

12  ten people with her.  We had a meeting only myself, not even

13  Weisson was there, where I had an opportunity to clarify that

14  I had nothing to do what was going on with Weisson and his

15  businesses in Ecuador.

16  Q     Okay.

17        Let's move on to a different subject.

18        Do you recall Mr. Weisson, the first witness, do you

19  recall him testifying about this Villa Hermosa?

20  A     Yes.

21  Q     And that was a $16 million venture that you took out of

22  Madison?

23  A     Yes.

24  Q     Were you aware that you took out the 16 million?

25  A     No.

1  Q    All right.

2        When did you find out that $16 million was taken out

3  of Madison?

4  A    Reading the 3500 material.

5  Q    Okay.

6        Were you even aware when this was going on from

7  Trujillo or Weisson that they were funding this low-income

8  housing area using Madison's money?

9  A    No, not using Madison money.  They were using Biscayne

10 Capital clients.

11 Q    Yeah.

12 A    And then the SPVs, which were owned by the trust and were

13 diverting money to places that they should not have.

14 Q    Okay.

15       Through Madison, though, right?

16 A    Correct.

17 Q    Okay.

18 A    Which, just to add, it had not been explained, nor nobody

19 has been able to say how much money on that spreadsheet is

20 money that Madison used for other ventures.  I had no idea.

21 Nobody knows nobody has told me this.

22 Q    So when Trujillo was talking about cash flows, did he

23 ever say, wait, we have some investments, I'll call them, that

24 we're using the accounts to fund outside of Madison, like

25 personal ventures like Villa Hermosa?

1          Did they ever talk about those?

2  A    Well, Mr. Trujillo just testified that he created a

3  different spreadsheet to have as an investment such as

4  Madison, where I was not included.  And his words were because

5  I was no longer that involved.

6  Q    Okay.

7          So do you know how much money that amounted to?  Do

8  you have any way of figuring these outside projects that they

9  were using Madison's money for?

10  A    Impossible to know.  I have no idea.

11  Q    Okay.

12          Let's talk about self-clearing.

13          What is that?  Just give us a 30-second review of

14  what you understand self-clearing is.

15  A    Okay.

16          So, as -- as was explained before, Biscayne business

17  model was to work with banks, custodian banks, that would

18  provide a way to have clients' accounts being opened directly

19  and these banks, as Your Honor expressed, were like the

20  back-office.

21          So, another way to do this business is when you have

22  what is called an omnibus account, and you have the correct

23  software to divide up on your own other clients's assets via

24  securities and cash, and the software would divide up

25  individually this, let's say, subaccounts.  Call it that way.

1         So, that self-clearing, in particular, is when a

2    financial institution decides to manage, in an omnibus account

3    with a software, dividing up the cash and securities of other

4    clients, even though if you look at the bank account, it's one

5    big bank account.

6         With cash and securities you have $20,000 shares of

7    Apple, but then the software divide it into each share goes to

8    each client account.  And that generates bank statement, the

9    statement, the bank or security statements, I will call it.

10   Q    Okay.

11   A    Bank statements.

12   Q    Okay.

13        And so the term self-clearing, not just the Apple

14   and what you see in the spreadsheet.

15        What's the emphasis on the self?  How would you --

16   your company create self-clearing as opposed to using

17   something else?

18   A    The -- you -- that you clear for your own -- you have

19   your own omnibus account with the software that divides the

20   money of all the clients.  And also, that software not only

21   divides the money, you have to keep track of all the trades,

22   the buys and sells, and everything; everything else.

23   Q    Okay.

24        And were you aware that Trujillo and Weisson and

25   Haberer were doing this self-clearing?

1  A     The objective in, I think this 2015 or 2016, is that this

2  would be good because it's a way to diversify of depending so

3  much of custodian banks.

4            And then they took that the next step, they took it

5  on their own and they decided to -- to -- to start the

6  self-clearing program, I believe, with the Bahamas, Biscayne

7  Bahamas company.

8  Q     So did they discuss with you this self-clearing to get

9  away from the banks?  Did you have conversations about this?

10 A     By that time, when this happened, I believe this happened

11 in 2017, Haberer, Weisson, Trujillo and Epstein were already

12 working together.  And they were dividing things up so what

13 they wanted to do, my understanding, was they send a bunch of

14 clients from Raymond James from Ecuador, to Deutsche Bank

15 for -- on behalf of Biscayne Bahamas, and that's where all

16 that money was -- money and securities were in that bank,

17 Bahamas account, at Deutsche Bank.

18 Q     All right.

19            Did you have any conversations or communication

20 about how to operate the self-clearing?

21 A     No.  I -- as a matter of fact, I learned yesterday in the

22 testimony of Trujillo that there were about $5 million of

23 cash.

24            What I did know, Trujillo did explain to me one day

25 in Miami, he said to me:  This is a mess, all the securities

1    and all the cash were -- are there, but they're all mixed up.

2    We don't have a way to separate it.

3              Remember -- I was having this meeting isolated every

4    two, three months.  It's not like daily.  I never went to

5    Buenos Aires.  They come to Miami once every three months and

6    I have to meet with them at the end of day because they have

7    all these closed-door meetings with Haberer, Weisson and

8    Trujillo.  And I'm sitting, waiting around until at the end of

9    day, finally, they decided to have a meeting with me to give

10   me an update on how things going, and he tells me, this

11   happening.

12             And I said, wow.  That's a terrible mess.  And he

13   did say, and we use the cash for to buy liquidity.

14             And I said, that's a big problem.  I think you have

15   to put the things in order and submit to the clients the

16   account openings of every account and if -- and also explain

17   to them that they are in a product that is earning interest.

18             That was my -- my explanation to him of that

19   conversation.  I did not direct him to do anything.  They told

20   me what they did.

21             And yes, I knew.  Unfortunately, I knew, and

22   that's -- here is where I am.

23   Q    Okay.

24             Just one or two more issues.  The overdraft issue

25   that we keep speaking about.  You one time worked at a bank,

1    right?

2    A     Yes.

3    Q     You know what an overdraft is, right?

4    A     Yes.

5    Q     Okay.

6          Explain an overdraft situation, not just when a

7    person writes out a check for $100, but they only have 90 in

8    their account.

9          Explain to us in less than a minute the overdraft

10   principle when you're dealing with larger cash flows.

11   A    My understanding or my experience actually, was many

12   years ago, that banks, commercial banks, offer to business

13   account companies, companies that are not individuals, but

14   companies that operate, buy and sell, they're active, some

15   checks come in and they don't have the money, and they know

16   the money's coming later, they provide some overdraft.  They

17   pay, the bank pays on behalf of the client, the money needed.

18         And it's also a revenue source of income as well.

19   So Haberer explained to me that, hey, by the way, we

20   receive -- we have now some -- a line of credit from Deutsche

21   Bank.  We have from Madison that have all these accounts and

22   buys and sells these products, now we can -- we -- I -- I

23   obtained a line of credit from Deutsche Bank.

24         And I said congratulations.  I think it's great what

25   you did.  That's about it.  I didn't know that this was a --

1   an illegal operation in any way.

2   Q    Did you ever see any cash flow sheets?

3         Did you ever see any cash flow sheets from Madison?

4   A    From Madison?

5   Q    Yes.

6   A    I don't know exactly -- no, from Madison, no.  Particular

7   cash -- Madison cash flow sheets.  No.

8

9            (Continued on following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    MR. WEINTRAUB:  Can I display it for him on the

2 table?

3 (Continuing)

4 DIRECT EXAMINATION

5 BY MR. MYERS:

6 Q    Just taking a look at AQ, did you ever visit the offices

7 of Madison?

8 A    Maybe in 2014 or '15.

9 Q    Okay.  Just take a look at this.  They showed this as

10 Exhibit AQ earlier --

11 A    Yes.

12 Q    -- to Trujillo.

13 A    Yes.

14 Q    Tell her it's a Commerz money market, the same thing,

15 that it was something automatic for accounts having cash but

16 without generating anything, tell her it's something general

17 and automatic.  It's already been agreed with Julius.  It's

18 like a checking account that pays something.  Tell her it's

19 currently paying .25 percent per year.

20    What is going on in this e-mail?

21 A    I explained that I wanted to tell the assistant of my

22 brother-in-law would ask, just to tell him that the money --

23 the liquid money on the account was going to be invested in

24 this Commerzbank.

25    Like I explained before, it is like tell him just --

1   like to me, it's a white lie.  It's like come on, just tell

2   him that it's automatic because it's going into a money

3   market.

4   Q    Okay.  Why did you consider that to be not so

5   significant?

6           Why was that not significant to say something like

7   that?

8   A    Because I had a good relationship with my brother-in-law

9   and he trusted me.  Many of the investments were done there.

10  I directed him very much on everything to buy in that account.

11  He asked me -- I said look, I want to -- this was not the only

12  product.  I have offered him other products before.

13  Q    You had offered him --

14  A    Other products before, other --

15  Q    That he made money off of?

16  A    Yes, other investments.

17  Q    Dating back to when?

18  A    I don't know the dates.  This is 2013, I believe, yes,

19  December 2013, I mean.

20          MR. MYERS:  Nothing further, Judge.

21          THE COURT:  Thank you.

22  CROSS-EXAMINATION

23  BY MR. WARDEN:

24  Q    Mr. Cortes, is it fair to say that the primary purpose of

25  the various notes was to invest in real estate, the

Cortes - cross- Warden                              432

1   proprietary notes?

2   A    No.

3   Q    That was a purpose that was marketed to clients, was it

4   not?

5   A    Well, we are talking -- you should clarify a timeframe

6   because we are looking at 16 years.  So it may have changed at

7   the beginning, the first five years.  Then Biscayne, so.

8   Q    Okay.  Did Sentinel fund notes, those were to invest in

9   real estate?

10  A    Yes.

11  Q    Then the SG notes, real estate?

12  A    I would say.

13  Q    You would?

14  A    The -- the notes were, like I explained, were created to

15  invest through -- through a loan to South Bay Holdings, and

16  South Bay Holdings had real estate and the development of

17  Biscayne Capital.  In the timeline like we said, it started to

18  grow 2008, '9 and '10, and Biscayne became relevant at the

19  time.  So it was a combination of things.

20  Q    Well, let's look at a few of them.

21       I'm pulling up Exhibit P.  Do you see that?

22  A    Yes.

23  Q    SG Strategic Income Limited?

24  A    Yes.

25  Q    June 2011?

1  A     Yes.

2  Q     And as part of the investment objective, it says the

3  referenced entity primarily invest into mortgages,

4  mortgage-backed securities, land development of real estate,

5  and a wide variety of real estate related investments.

6  Without limiting the generality of the foregoing and

7  notwithstanding the aforesaid, from time to time the

8  management of the referenced entity may invest in other

9  investments consistent with the investment objective of the

10 referenced entity; is that right?

11 A     Yes.

12 Q     Does that allow you to take that money, invest it in SG

13 and use it to pay back other investors in other proprietary

14 notes?

15 A     Yes.

16 Q     It does?

17 A     Part of the SEC investigation, it was completely related,

18 the SEC order was related to lack of disclosures.  So I'm

19 looking at one page, this -- this -- this disclosure document

20 has 50 pages.  And we hired lawyers specifically to make sure

21 that all disclosures were in order to avoid the problem that

22 we had with the SEC.  It was about making sure all the risk

23 disclosures were there and opportunities to invest in other

24 companies such as Biscayne Capital Holdings.

25 Q     Pulling up Exhibit Q.  Do you see that?

Cortes - cross- Warden                                    434

1    A    Yes.

2    Q    And this is another SG issuing from June of 2013; is that

3    right?

4    A    Yes.

5    Q    2011 or 2013.  I can't tell.  '11.

6              And does it have similar language as the document we

7    just looked at?

8    A    Yeah, pretty much one master document was created by the

9    lawyers to make sure that all the disclosures and investment

10   objectives were met in the different SPVs.

11   Q    Isn't it true that this language does not tell an

12   investor that you would take their money and use it to pay off

13   other investors?  Yes or no, sir?

14   A    I cannot answer because I'm looking at one page of 78

15   pages.

16   Q    I'm asking you if this language under "investment

17   objectives" says that.

18   A    Okay, can you repeat the question, please.

19   Q    Isn't it true the language under "investment objective"

20   does not disclosure to investors that you would use their

21   money from their investment in SG to pay back other investors?

22   A    It doesn't say that.

23   Q    Pulling up Exhibit R.  This is for a different

24   proprietary note, preferred income collateralized interest

25   limited.

1          Do you see that?

2    A    Yes.

3    Q    Turning to page 10 of that exhibit, it says -- under

4    "investment objective," it says, "The issuer shall apply all

5    proceeds from the issuance of notes, less the sales charges to

6    investments, including, but not limited to, commodities fixed

7    income notes and equities."

8          Do you see that?

9    A    Yes.

10   Q    Isn't it true that that doesn't disclose to investors

11   that you are going to use their money to pay back other

12   investors?

13   A    To pay back other investors?

14   Q    It does not say that, does it?

15   A    No.

16   Q    Mr. Cortes, would you agree that --

17   A    Yeah.  Go ahead.

18   Q    -- by the time of your testimony to the SEC that South

19   Bay was not able to cover all of its debts?

20   A    What date?

21   Q    At the time of your testimony to the SEC.

22   A    Can you repeat the question, please?

23   Q    At the time of your testimony to the SEC, South Bay was

24   not able to cover all of its debts?

25   A    Even if it liquidates all of the assets, normally an

1  ongoing business would have to liquidate all its assets and

2  see if it has enough cash to pay all its debt.  The question

3  to me, what I recall from the SEC investigation is that the

4  balance sheet of South Bay Holdings at that time, it showed

5  positive equity, no negative achievement.

6          In other words, the assets were higher than the

7  liabilities.

8  Q    Okay.  Mr. Cortes, I'm going show you what I am marking

9  as Exhibit AAH.  Do you see this?

10 A    Yes.

11 Q    Is this the SEC cease and desist order involving Biscayne

12 Capital, Roberto Cortes, Ernesto Weisson, Juan Carlos Cortes,

13 and Frank Chatburn?

14         THE COURT:  What's the question?  We have to speed

15 this up a bit.

16         MR. WARDEN:  Fair enough.

17 Q    I'm turning to paragraph 2 of the SEC's order against

18 you, sir.  Do you see this?

19 A    Yes.

20 Q    It says that Biscayne Capital International failed to

21 disclose, among other things, the primary BCI principal's

22 beneficial ownership interest and role in the creation of the

23 Proprietary Products issuers.

24         Further, BCI failed to disclose additional material

25 information under the Advisors Act concerning South Bay's

Cortes - cross- Warden                               437

1  financial condition, including that both preceding and during

2  the relevant period, South Bay failed to generate enough

3  revenue or operating cash flow to meet maturing debt or to

4  sustain operations absent obtaining the additional financing

5  generated by the sale of Proprietary Products and was required

6  to renegotiate several past due financial obligations.

7          Did I read that correctly?

8  A    Yes.

9  Q    Paragraph 26 of the SEC's order:

10         As later reported in its audited financials

11 throughout the relevant South Bay failed to generate enough

12 revenue or operating cash flows to pay off maturing debt to

13 sustain its operations or fund its development plans without

14 obtaining additional financing."

15         Did I read that correctly?

16 A    Yes.

17         THE COURT:  I just have a question.

18         THE WITNESS:  Yes.

19         THE COURT:  You indicated that you have enough

20 assets to cover everything, but people don't usually sell

21 their assets.  That happens in a bankruptcy; correct?

22         THE WITNESS:  Right.

23         THE COURT:  And when you sold of the assets, that

24 wasn't enough to pay back everybody, correct?

25         People lost money, am I right?

Cortes - cross- Warden                     438

1          THE WITNESS:  During the SEC investigation or --

2          THE COURT:  No.  I'm talking about at the end of the

3   ball game, people lost a lot of money?

4          THE WITNESS:  Right.  What happens at the end of the

5   game, the problem is not the liability; the problem is that

6   all the assets were gone.  Biscayne Capital was raided and

7   taken away by Madison and all the real estate assets were

8   foreclosed.

9          So the problem happened at the end in 2018.  But in

10  2013, 2014, '15 and '16, although the cash flow generation can

11  be -- create a shortfall, if you have enough assets --

12         THE COURT:  So it's your position that there were no

13  longer assets because these people that were running Madison

14  dissipated the assets?  Is that what you're saying happened?

15         THE WITNESS:  I think that's what happened.

16         THE COURT:  And you didn't know anything about that

17  until it all crashed?

18         THE WITNESS:  It started to happen at the end of

19  2017 and I did know that things were starting to go wrong.

20  Q    And you saw -- you recall the e-mail we -- Mr. Trujillo

21  testified about yesterday?

22  A    I cannot see it on my screen.

23  Q    I am asking you.

24  A    Sorry.

25  Q    Do you recall an e-mail from February of 2014 in which

1   you were informed of the plan to move the business proprietary

2   notes into bank accounts held through Madison?

3   A    I don't recall that e-mail.  If you have, refresh,

4   please.

5           And, Your Honor, just to add, I'm sorry.  The

6   liquidator, to Michael Pearson, which is the federal

7   bankruptcy -- Florida federal bankruptcy liquidator appointed

8   in Miami, in his lawsuit --

9           THE COURT:  Are you -- are you asking a question?

10          MR. WARDEN:  I did not ask a question.

11          THE WITNESS:  I thought I was following up on your --

12          THE COURT:  No.  Just answer the question that the

13  Government is asking now.

14          THE WITNESS:  I apologize, Your Honor.

15  Q    Mr. Cortes, do you see this e-mail in which Mr. Haberer

16  first reports back that Madison Asset is going to have

17  accounts opened with sub-accounts for each issuing entity?

18  A    Yes.

19  Q    And you were informed of this?

20  A    Yeah, I addressed this at the beginning of this this

21  morning.

22  Q    And you said it was a good idea and to confirm it in

23  writing with Deutsche Bank?

24  A    It's correct, because we needed --

25  Q    I asked you a yes-or-no question, sir.

1   A     Yes.

2   Q     Isn't it true as early as 2013 you had difficulty

3   covering maturities?

4   A     Yes.

5   Q     Okay.

6             I'm showing you what's marked as Exhibit AZ.  Do you

7   see this e-mail on April 5, 2013 from Frank Chatburn?

8   A     Yes.

9   Q     And do you see that he writes:  Roberto, I need the

10  maturities listed below to be covered as soon as possible,

11  please?

12  A     Yes.

13  Q     He further writes:  I just put in a subscription for 150k

14  at GMS.

15            So is that a different purchase of proprietary notes

16  from a different client?

17  A     Yes.

18  Q     "And 216k from Denfield just came in, where 21,600 are

19  going to be left invested."

20            Now, Denfield you know is Romero Luque?

21  A     Correct.  At that time I understood who he was.

22  Q     And this is his bribery money used to pay Petroecuador

23  officials bribes that's coming in right here to Sentinel

24  investment fund?

25  A     That's right.  That's why I told him to close the account

1    immediately when I understood from Juan Carlos Cortes -- I

2    didn't know about Denfield, since you're asking.  What I knew

3    was that Chatburn requested to move this back-to-backs to

4    three other people and immediately in my office, in front of

5    Weisson and Juan Carlos and Chatburn, I instructed them that I

6    did not want to have anything do with Ecuadorian politics and

7    close those accounts.

8    Q    Mr. Cortes, I am going to ask you going forward if you

9    could listen to my questions and if it calls for a yes-or-no

10   question, please limit it to that.

11        Your counsel will have an opportunity to follow up

12   with you after.

13   A    Sorry.  Okay.

14   Q    And you say here:  Summary 216,000 came in, plus 150,000

15   that will settle next week, adding up to 366,000.  The

16   maturities are 313,000.  So it is correct we approved the

17   payment detailed below.

18        So you have here connected, correct, Mr. Chatburn

19   bringing in new money, you've connected that to paying off his

20   maturities of old money; is that correct?

21   A    Yeah.

22   Q    And then he clarifies, actually, the incoming amounts

23   that you were calculating there are not correct, or are

24   correct, but we can only count on you 171,600 because the 2016

25   transaction is a B to B.

Cortes - cross- Warden                                    442

1              Now, that's this B to B loan?

2    A    Right.

3    Q    So Mr. Luque's money came in and most of it wasn't really

4    an investment into Proprietary note; is that right?

5    A    I don't understand the question.

6    Q    You gave his money, almost 80 percent of it right back

7    out to him; right?

8    A    This is 2013.  I don't recall 11 years ago transaction.

9    Q    Well, I'm just reading here.  He was going to put in

10   216,000 but only -- only keep $21,000 in?

11   A    Like a back-to-back you mean, yes.

12   Q    Yes.

13   A    That's what it says.

14   Q    Because you were going to let that money come in and be

15   paid out?

16   A    This was the normal operation not only with him, some

17   investors wanted to put the money and get a back-to-back at

18   that time.  It was actually -- it's a good investment for the

19   group.

20            Sorry, you want me to answer or can I --

21   Q    That's fine.

22            It's a good investment because you get some of the

23   cash and they get to do things like to pay bribes and avoid

24   taxes?

25   A    No, no, I wasn't going to say that.

1          MR. MYERS:  Judge, I'm going to object to that.

2    That's a summation point.

3          THE COURT:  I will sustain the objection.

4    Q    At any rate, when Mr. Chatburn says, clarified the amount

5    of money that was actually coming in, you responded and say

6    well, then it's not correct.  You are asking me for 313k,

7    that's the maturities below; correct?

8    A    Yeah.

9    Q    And putting in 150k, plus 21k, so you're only putting in

10   171,000, so I'm 137 short.

11         Isn't it true that what you were doing is equating,

12   in order to pay maturities on your Proprietary notes, you're

13   equating -- requiring, in fact, Mr. Chatburn to bring in new

14   money?

15   A    This -- this -- the way that the business operated --

16   Q    Yes or no, sir?

17   A    But I don't understand the question.  It's a very long

18   question.

19         What is the question?

20   Q    In order to pay out the maturities that were identified

21   here of 313,000 --

22   A    Yeah.

23   Q    With me so far?

24   A    Yes.

25   Q    -- you required Mr. Chatburn to bring in new money of

Cortes - cross- Warden                              444

1   more than that?

2   A    Yes.

3   Q    From other clients?

4          THE COURT:  Is that correct?

5          THE WITNESS:  What he's saying, yes.

6   Q    Okay.  Looking now at Exhibit AA-B.

7

8          (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Continuing)

2    BY MR. WARDEN:

3    Q    Do you see this email from October 23, 2013, from Dennis

4    Curran to Frank Chatburn?

5    A    Yes.

6    Q    He writes:  Frank, Roberto confirmed to me that you were

7    possibly going to do the exchange for these last clients

8    attached.  Please confirm so I can place the order.

9         Do you see that?

10   A    Yeah.

11   Q    And at the top of this email here you respond, and this

12   is the subject line is:  SG ORC Exchange.

13        Do you see that?

14   A    Yeah.

15   Q    That's an exchange of the SG proprietary note for an ORC

16   proprietary note, correct?

17   A    It was, I believe, my recollection is a maturity that was

18   happening.

19   Q    Okay.

20        And you respond to Dennis Curran:  No, it is not an

21   exchange.  That will be paid.  What I was saying is that FCH

22   is placing other trades of other accounts to cover that

23   payment.

24        Do I read that correctly?

25   A    Yes.

1   Q    You testified that you told Mr. Ferran that there were

2   already mortgages on the properties as you were reviewing the

3   investment with him.

4   A    What I recall, I believe so.

5            MR. WARDEN:  Let's pull up Exhibit AC.

6            (Exhibit published.)

7   Q    Do you see the term sheet here?

8   A    Yes.

9   Q    And the term sheet says:  Through the structure,

10  investors will be secured by the following guarantees:  First

11  mortgages on the houses, clubs, memberships, club memberships

12  and project reserves in escrow.

13  A    Through this structure investors will be secured by the

14  following guarantees, yes.

15  Q    And those guarantees was a first mortgage.

16  A    Through the structure, yes.

17  Q    Okay.

18           But there was -- as you're testifying that you had

19  already told Mr. Ferran that that wasn't true.

20  A    I didn't say that.  If you have a mortgage, somebody

21  comes and buys your mortgage, you give him a first mortgage.

22  You have to pay it first.

23  Q    Does this say that you're going to use it to pay somebody

24  else's mortgage?  It does not, does it?

25  A    I don't understand the question.

1          MR. MYERS:  Judge, that's misleading.  It says:

2     Through the structure.

3          THE WITNESS:  It's clear.

4     Q    You didn't tell Ferran, did you, that his money was going

5     to buy -- pay off the other mortgages in this document, did

6     you?

7     A    Can you repeat the question?

8     Q    This document didn't tell Mr. Ferran that his money would

9     go to pay off other first mortgages that existed.

10    A    No, it stays that it -- through the structure he will get

11    a first mortgage.  And it says:  Total note amount

12    16.5 million right below it.

13    Q    And did -- did the money that Mr. Ferran did bring in,

14    was that used to purchase to pay off the first mortgages?

15    A    No.

16    Q    It was not?

17    A    No.

18    Q    So --

19         MR. WARDEN:  I'll withdraw that.

20         THE COURT:  What was this money used for?

21         THE WITNESS:  I don't -- I mean, the -- more than

22    likely, South Bay.

23         THE COURT:  More than likely.

24         Do you know what the money invested in this

25    property that -- he did not end up with a property.

1          THE WITNESS:  Right.

2          THE COURT:  So what happened?  Do you know what

3    happened to the money that he gave you in connection with

4    purchasing the property?

5          THE WITNESS:  It went to the owner of -- of the

6    property, Ocean -- more than likely Ocean Reef Group, I would

7    say.  And he would maybe have paid other obligations or the

8    other debt.

9          THE COURT:  You do not have any idea personally?

10         THE WITNESS:  I'm sorry?

11         THE COURT:  You do not personally have any idea what

12   happened?

13         THE WITNESS:  No, with exact, not at this time.

14   Q    Mr. Cortes, I'm pulling up Exhibit I-1, the cash flow

15   spreadsheet.

16         (Exhibit published.)

17   Q    I'm looking at row 28, columns AK and AL where Ferran

18   confirmed.

19         Do you see that?

20   A    Who prepares this?

21   Q    Do you see that, sir?

22   A    Yes.

23   Q    And that's approximately 4.9 million from Ferran?

24   A    Yes.

25   Q    And do you see that that money is going out to SP2,

Cortes Ripalda - cross - Warden                    449

1   SBH 20, SBH 2018, GMS 2, GMS 3, Viki?

2   A    Yeah.

3            (Pause in the proceedings.)

4   Q    Okay.

5            You testified regarding the client Westwood that

6   Ferran Haberer asked you to help?

7            Help deal with the client?

8   A    Yes.

9   Q    And to help calm him down?

10  A    Yes, sir.

11  Q    And you did that.

12  A    I don't know, I think so, I tried.

13  Q    You tried.

14  A    Yes.

15  Q    You didn't go to him and say we don't have your money?

16  A    No.

17  Q    You didn't tell him the truth?

18  A    No.

19  Q    You testified regarding self-clearing, that in 2016, you

20  knew that self-clearing money had been moved to liquidity; is

21  that true?

22  A    Trujillo informed me that, yes.

23  Q    And in 2016 -- and we looked at an email yesterday.

24           Do you recall seeing that email from 2016 from Pablo

25  Perrotta disclosing that as well?

1    A    I don't remember.  If you can show it, thank you.

2    Q    But Trujillo told you anyways?

3    A    Trujillo told me that -- that something they had moved,

4    what I just explained before, that he had moved the assets

5    from Raymond James to the omnibus at Deutsche Bank and that

6    they were working on organizing the product and that they had

7    bought the liquidity with the cash of the clients, that

8    liquidity product.  Yes, I had that casual conversation at

9    7:00 p.m. in Miami.

10   Q    And you didn't go tell the clients that it happened, had

11   it?

12   A    I couldn't -- I didn't know any clients.

13   Q    You didn't go tell your financial advisors, did you?

14   A    I don't recall.  I didn't talk to the financial advisors

15   at that time.  I was all disconnected.  This was 2017.

16   Q    And you had already lied to clients about liquidity note,

17   hadn't you?

18   A    Excuse me?

19   Q    You had already lied to clients about the liquidity note,

20   hadn't you?

21        MR. MYERS:  I'm going to object this is totally

22   argumentative.  I don't know what conversation he's talking,

23   which client?

24        THE COURT:  I will allow him to answer.

25        MR. MYERS:  Which client?

Cortes Ripalda - cross - Warden                451

1   Q    Mr. Cortes, you testified on direct from your counsel

2   that you told a white lie to your brother-in-law.

3           Is that true?

4   A    I told him -- I told -- I didn't say that.  I lied to him

5   at all.

6   Q    You called it a white lie, sir; isn't that right?

7   A    I didn't lie to him.  I told Trujillo, if he ask, to tell

8   him that the company can be -- the asset -- the product could

9   roll over into cash.  But it's important that the underlying

10  assets were highly liquid.  Commerz Bank.

11  Q    So your testimony is that you didn't the lie to your

12  brother-in-law.  You told Trujillo to lie to your

13  brother-in-law for you, didn't you?  Yes or no?

14  A    Okay, yes.

15          MR. WARDEN:  Just one moment, Your Honor.

16          THE WITNESS:  Can I go ask my attorney?  Or not?

17          THE COURT:  No.

18          THE WITNESS:  Okay.

19          (Pause in the proceedings.)

20  Q    Now, Exhibit H-1, the Flux chat that we looked at, the RC

21  on that is you, correct?

22  A    Yes, sir.

23  Q    And you were talking to Mr. Trujillo and Mr. Weisson and

24  Mr. Haberer, all throughout 2016 and '17; is that true?

25  A    If there were texts there, yes.

1   Q    Okay.

2         Now, you testified that in -- in preparing for this,

3   you read the Government interviews and statements of Mr.

4   Trujillo; is that correct?

5   A    The 3500 material?

6   Q    Yes.

7   A    Yes.

8   Q    And you saw in that that he admitted to participating in

9   a Ponzi scheme, yes?

10  A    I don't recall exactly he read this, but maybe.

11  Q    He admitted to his crimes, yes?

12  A    Yes.

13  Q    And he implicated Mr. Weisson and said Mr. Weisson

14  conspired with him?

15  A    I don't -- I don't remember reading that, but I don't

16  know.  I don't remember if exactly says that.  I mean, I see a

17  lot of activity between both of them, yes.

18  Q    Mr. Trujillo admitted to conspiring with Mr. Weisson; is

19  that fair summary?

20  A    Yeah.

21  Q    Mr. Trujillo admitted to conspiring with Mr. Haberer.

22  Fair?

23  A    Yes.

24  Q    Okay.

25        And Mr. Trujillo admitted to conspiring with you.

Cortes Ripalda - cross - Warden                    453

1          Now, is your testimony here that he's telling the

2    truth that he conspired with Mr. Weisson?

3    A    This was a loss amount.  We're talking about loss amount.

4    Q    Okay.

5          So you acknowledge that you conspired with Mr.

6    Trujillo.

7    A    In -- you have to explain a particular transaction.  Not

8    overall, no.

9    Q    Do you recall pleading guilty here?

10   A    Excuse me?

11   Q    Do you recall pleading guilty in this courtroom?

12   A    I pleaded guilty, yes.

13   Q    And do you recall what you told the Judge under oath?

14   A    Yes.

15              MR. MYERS:  Judge, is this relevant?

16              THE COURT:  Pardon me?

17              MR. MYERS:  Is this relevant to a Fatico hearing?

18              THE COURT:  I think so.

19   Q    And you recall testifying or saying under oath that:

20   Between 2013 and 2018, that you, along with others in the

21   indictment, agreed to devise a scheme to defraud investors by

22   falsely representing, by way of e-mails and other electronic

23   means, to investors of Biscayne Capital that their investments

24   were to be used to purchase proprietary products.  More

25   specifically, fund real estate investments when, in fact,

Proceedings                                                    454

1   their investment monies were used in an illegal fashion to

2   cover the debts owed to other investors within

3   Biscayne Capital.

4           Correct?

5   A    Yes.  I -- I did say that.

6   Q    And that you knew that:  What we did was not legal.

7   A    Yes.

8   Q    Correct?

9   A    Yes, I -- that's -- you are reading the allocution,

10  correct.

11          MR. WARDEN:  Nothing further, Your Honor.

12          THE COURT:  Do you have anything further?

13          MR. MYERS:  No, Judge.

14          THE COURT:  All right.

15          You can step down.

16          THE WITNESS:  Thank you.

17          (Witness excused.)

18          THE COURT:  All right.

19          How is it the parties wish to proceed?  I cannot - I

20  do not have time for argument on this at the present time.

21          Does the Government want to put anything in writing?

22          Do you want to put something in writing --

23          MR. MYERS:  No, Judge, I say that after reading my

24  128-page brief, and another 60-page brief, and two days of

25  hearing, I think you have a good picture about what happened

Proceedings                                                455

1   here, unless the Prosecutor is going to draft a hundred-page

2   brief I have to respond to it, which I don't think they will.

3   I think I can rely on the record.

4            MR. WEINTRAUB:  The Government would also rely on

5   the record.

6            THE COURT:  So nobody wants to share with the Court

7   their view of the testimony I have been listening to for the

8   last two days?

9            MR. MYERS:  Well --

10           THE COURT:  I mean, that would be kind of

11  interesting to hear your perspective on that, but.

12           MR. MYERS:  I would have to take a look at the

13  transcript and go over two days of testimony, which I don't

14  want to do in 11 minutes.

15           THE COURT:  All right.

16           Well, if you want to argue this orally, I can put

17  this down for a date for you to do that, if that is how you

18  want to proceed.

19           Tiffany, we cannot do it next week.

20           THE COURTROOM DEPUTY:  The soonest we can do it is

21  December 2nd.

22           THE COURT:  What time?

23           MR. MYERS:  Is December 4th available?

24           THE COURTROOM DEPUTY:  No.

25           MR. MYERS:  Great.

Proceedings                                      456

1          THE COURTROOM DEPUTY:  The 3rd?

2          MR. MYERS:  The 3rd is better.

3          MR. WEINTRAUB:  I absolutely cannot do the 3rd,

4    unfortunately.

5          THE COURT:  You cannot do the 3rd?

6          MR. WEINTRAUB:  No, I can't.

7          THE COURT:  What is the problem with the 2nd?

8          MR. MYERS:  The 2nd I have to go to Delaware, which

9    I just canceled a proffer with seven --

10         THE COURT:  I know I have something.

11         THE COURTROOM DEPUTY:  The 4th we have the bench

12   trial that will go into next week.  And then we have the

13   hearing, the two-day hearing following.

14         So the next date would be the 13th of December.

15         THE COURT:  All right.

16         The 13th of December.

17         Does that work for you, Mr. Myers?

18         MR. MYERS:  Yes.

19         THE COURTROOM DEPUTY:  It would have to be at

20   12:00 o'clock.

21         MR. MYERS:  Just praying that I don't start a trial,

22   but likely to just plead guilty so I don't want to hold

23   anybody up anymore.

24         THE COURT:  And Mr. Cortes wants to persist in his

25   plea of guilty, correct?

Proceedings                                    457

1          MR. MYERS:  Yes.

2          MR. WARDEN:  Your Honor, I really apologize for

3     this.  I have a sentencing in Boston on the 13th.

4          THE COURT:  Where?

5          MR. WARDEN:  A sentencing in Boston, in District

6     Court in Boston.

7          THE COURT:  In Boston?

8          MR. WARDEN:  Yes, sorry.  I'm in Washington, D.C.

9     based, sorry.

10          THE COURT:  All right.

11          THE COURTROOM DEPUTY:  How about December 10th?

12          THE COURT:  It could take longer to set a date for

13     hearing than it did for the testimony.

14          MR. MYERS:  Boy, we're all getting sour right now,

15     aren't we?  After two days of this.

16          Okay.  So I'm going to go for the 10th, just to roll

17     with it, but I'm ordered to a Federal trial, but I know the

18     defendant is a little off his rocker, and I think that we can

19     resolve it somehow, since I'm not putting his name on the

20     record, let's try for December 10th, if we go in the

21     afternoon.

22          I'll notify the Court immediately if that trial goes

23     ahead.

24          THE COURT:  All right.

25          Do we have the afternoon?

Proceedings                                           458

1          THE COURTROOM DEPUTY:  Yes, 2:00 o'clock.

2          THE COURT:  Okay.

3          MR. WEINTRAUB:  The Government does not need more

4    than 15, 20, minutes, 10 minutes to make its summation;

5    doesn't have a lot to say in regard to fulsome testimony.

6          THE COURT:  Okay.

7          Well, I would like to do it sooner, but I guess we

8    cannot get anybody to sit any sooner.

9          MR. MYERS:  Can my client be on Zoom?

10         THE COURT:  No.  He needs to be here.  This is an

11   important matter.  I do not think he ought to be on Zoom.

12         MR. MYERS:  He can hear everything I'm saying on

13   Zoom.  I'm only going to sum up for ten minutes.

14         Okay.  He'll come.

15         THE COURT:  Okay.

16

17         (Matter concluded.)

18

19                         ooo0ooo

20

21

22

23

24

25

VB         OCR         CRR

459

1                                I N D E X

2

3    **WITNESS**                                              **PAGE**

4    **GUSTAVO TRUJILLO**

5         CROSS-EXAMINATION BY MR. MYERS                 259

6         REDIRECT EXAMINATION BY MR. WARDEN             321

7    **ROBERTO CORTES**

8         DIRECT EXAMINATION BY MR. MYERS                352

9         CROSS-EXAMINATION BY MR. WARDEN                431

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25